

ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

SEP 23 2003

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| Arrival Star, Inc., )<br><br>     *Plaintiff*, )<br><br>vs. )<br><br>Delta Air Lines, Inc., Sabre, Inc. )<br>Travelocity.com, L.P., City of Atlanta, )<br>Worldspan, L.P., Flytecomm )<br>Corporation, Centerpost Corporation )<br>Continental Airlines, Inc., Japan Air )<br>Lines Company, Ltd., American )<br>Airlines, Inc., Roadway Express, Inc. )<br>Electronics for Imaging, Inc., American )<br>Express Company, SITA Information )<br>Networking Computing USA, Inc., )<br><br>     *Defendants*. ) | Case No.: 1:02-CV-2543-JOF |

## PLAINTIFF'S BRIEF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT (MOTION #1) THAT CLAIMS 1 & 27 OF THE '936 PATENT ARE INVALID

The pending summary judgment motions fail to advise the Court that as hard as patents are to obtain, they are even harder to invalidate. Congress and the Federal Circuit have seen to that. A significant weakness of the instant motions' argument to invalidate claims 1 and 27 of the patent-in-suit is the utter failure to advise the Court that it is a defendant's burden to show ***clear and convincing evidence*** that a patent

179

claim is anticipated by the prior art. When it comes to assessing the novelty of a patent, showing prior art that appears reasonably close at first blush is not enough. Here, there is no clear and convincing evidence of patent invalidity by anticipation.

The testimony of the principals of RLM Software, Ms. Flynn and Mr. Steinberg, must be carefully scrutinized in light of the documentary evidence. The principals are obviously acting out of self-interest because an RLM customer – Sabre - stands accused of infringing the patent. Pl. Facts, ¶ 50. Sabre has demanded indemnification from RLM. Id., ¶ 51. To attempt to get close to the thrust of claims 1 and 27, the RLM principals now describe Flightview (pre-1997) as a system with a home computer that permitted a user to request information about a flight, which caused a message that included a geographic map to be generated, based on the travel data retrieved, and then sent by the home computer to the user communication device at a remote location.

The documents regarding Flightview paint a different picture of how Flightview worked pre-1997 by showing that (1) the map in Flightview was a "background map" selected by the user in advance of requesting flight information; (2) the background map did not change based on a request for flight information, or data retrieved in response to that request; (3) the message about a flight, when requested, was sent in a purely textual "datablock" format, not as a message that included a geographic map. The message was displayed on top of the pre-existing "background map."

2

The map that RLM's documents concede was merely a "background map" in Flightview (pre-1997) is *front and center* in claims 1 and 27 of the patent-in-suit.   For this reason, the instant motions to invalidate claims 1 and 27 should be denied because a trier of fact could reasonably find (and probably will find) that claims 1 and 27 are fundamentally different than Flightview as it existed pre-1997.

## STATEMENT OF FACTS

**Date of Invention**.  Mr. Jones, the named inventor of the '936 patent, conceived of the invention of claims 1 and 27 of U.S. Patent No. 6,278,936 (the "936 patent") no later than the first quarter of 1994.  Pl. Facts, ¶ 3.  From that point in time until March 7, 1997 (when the provisional patent application was filed), he was actively working on creating and testing the invention.   *Id.*   Mr. Jones then filed provisional patent application no. 60/039,925 on March 7, 1997, which detailed the subject matter of claims 1 and 27.  Pl. Facts, ¶ 1.

Claims 1 and 27 have numerous claim limitations.  Claim 1 is a system claim, and reads as follows (note the letters are added for convenience of reference):

1.   A system for monitoring travel of vehicles relative to particular location, comprising:

(A)  a storage mechanism configured to store **travel data transmitted from a communications device associated with a vehicle being monitored by said system**, said vehicle located at a first remote location;

(B) a data manager configured to receive a request from a user and to **retrieve travel data associated with said vehicle from said storage mechanism in response to said request;**

(C) **a first communications device configured to transmit a message to a second communications device located at a second remote location, said message based on said travel data retrieved** by said data manager and indicative of a proximity of said vehicle from a particular location; and

(D) **a mapping system configured to receive said travel data retrieved by said data manager and to generate mapping data based on said travel data retrieved by said data manager, said mapping data defining a geographical map,** said geographical map indicating said proximity of said one vehicle from said particular location, **wherein said mapping data is included in said message.** (emphasis added).

Claim 27 is a method claim that reads as follows (again, the letters are

added for reference):

27. A method for monitoring travel of vehicles and for reporting a status of vehicles relative to particular locations, comprising the steps of:

(A) **receiving travel data transmitted from vehicle at a first remote location;**

(B) storing said travel data;

(C) **receiving a request from a user located at a second remote location;**

(D) **retrieving travel data associated with said vehicle in response to said request;**

(E) **forming a message corresponding with said travel data retrieved** in said retrieving step and indicating, via said message, a proximity of said vehicle from a particular location;

(F) **transmitting said message to a communications device** associated with said user;

(G) **generating mapping data based on said travel data retrieved in said retrieving step, said mapping data defining a geographical map** that indicates said proximity of said one vehicle from said particular location; and

(H) **including said mapping data in said message**. (emphasis added).

As shown herein, the Flightview system as it existed prior to 1997 lacked at least

one essential limitation of both of these claims.

**Early Demonstrations Lacked Monitoring of Flights**. FAA Aircraft Situation

Display for Industry (ASDI) flight data did not become available to RLM Software to

use before August 1994. Pl. Facts, ¶ 4. From 1990 through 1994, all demonstrations of

Flightview®, RLM admits that it used "canned" data, which was data that one RLM

principal testify was "made up" in order to simulate what an aircraft situation display

would look like. Pl. Facts, ¶ 5. Thus, from 1990-1994, there was no "travel data

transmitted from a communications device associated with a vehicle being monitored

by said system" per claim 1(A). Likewise, from 1990-1994, before FAA data was

released to RLM, there was no actual "receiving travel data transmitted from vehicle at

a first remote location" per claim 27(A).[1]

The early demonstrations of Flightview also did not consist of two communication devices at first and second remote locations and a home computer retrieving and passing messages between them. Instead, all the software was hosted by the same computer that was used as the demonstration display unit at one location only: the place of the demonstration. Pl. Facts, ¶ 6. Accordingly, the 1990-1994 demonstrations lacked "a *first* communications device configured to transmit a message to a *second* communications device located at a *second remote location*" per claim 1(C). For the same reason, the demonstrations likewise never performed the step of "receiving a request from a user located at *a second remote location*" per claim 27(C).

**The 1993 RAA Presentation of Flightview**. On April 26, 1993, Jim Steinberg spoke for 30-45 minutes (including time allotted for audience questions) at the RAA Spring meeting Pl. Facts, ¶ 8, and that he showed approximately twenty slides describing certain aspects of Flightview, as well as color slides of the screens a user would see when using Flightview to track a flight, to the attendees of the meeting, consisting of about twenty airline executives. The presentation did *not* consist of a

---

[1]   In this regard, the diagram at page 10 of the Declaration of Lorraine Flynn is misleading. The diagram shows ASDI data coming from an airplane's transponder. As shown herein, *bona fide* FAA ASDI data originating from such a transponder did not become available to RLM until sometime in 1994.

description of each and every claim limitation of claims 1 and 27 of the '936 patent. *Id.*

The description of the mapping provided at the 1993 presentation and embodied in the slides is contrary to the contents of claims 1 and 27 because the user in Flightview (as explained during the conference and as exemplified by the color slides) would establish the background map on the screen *before* the request for information on a particular flight would be sent. Pl. Facts, ¶¶ 9, 14. Once the system received a request to provide information on a particular flight, the information was sent as a text message in "datablock" form, where it was displayed as text on whatever the last map was that the user had selected for background. Pl. Facts, ¶¶ 9, 14.

As described at the 1993 RAA meeting, the selection of a background map was independent of the flight status information on a particular aircraft Pl. Facts, ¶ 10, so there was no generation of "mapping data *based on said travel data retrieved* by said data manager" (per claim 1(D)), and no "generating mapping data *based on said travel data retrieved* in said retrieving step" (claim 27(G)). Pl. Facts, ¶ 10.

Moreover, at the 1993 RAA meeting, Mr. Steinberg provided no details of hardware or software configuration, or system design, during his presentation, so there would have been no discussion of a first and second communication devices, and no discussion as to software configuration. Pl. Facts, ¶ 13. Technical details of the

system's operations were protected from disclosure by Mr. Steinberg in his presentation. Pl. Facts, ¶ 13.

### Flightview (With Attendant Background Maps) Was Not Operational Until 1995.

Flightview was not operational until *November 1994*. Pl. Facts, ¶ 15. Plus, the November 1994 system (licensed to Boston Coach) did not use any display of maps whatsoever. Pl. Facts, ¶ 15. At no time prior to 1995 (the BWI system) was there any public display of Flightview that permitted users to make requests for flight status. Pl. Facts, ¶ 16. In fact, the 1995 Flightview Maintenance Guide, states that "Flightview is a *new* software product . . . ." Pl. Facts, ¶ 16 (emphasis added).

### Flightview Installed at BWI (1995).

Regarding the 1995 BWI system, the user of Flightview at the BWI airport could see flight "datablock" information overlaid onto a pre-existing background map that is selected by the user independently of the request for flight information. Pl. Facts, ¶ 17. The BWI documentation describes the data to be displayed textually in response to a user inquiry as "the plane's flight number, type of plan, its destination or place of departure, how far away it is from its destination, etc." Pl. Facts, ¶ 17. There is no mention of a geographic map being displayed in response to a user inquiry about the status of a flight, per claim 1(D) and 27(G). *Id.* In fact, the sequence of the storyboards makes it clear that the background map is set *before* the

8

user even requests information on a flight. *Id.* Thus, there was no generation of "mapping data *based on said travel data retrieved by said data manager*" (per claim 1(D)), and no "generating mapping data *based on said travel data retrieved in said retrieving step*" (claim 27(G)).

The 1995 Flightview Maintenance Guide corroborates that no mapping data was transmitted to a user based on travel data retrieved as a result of a request for flight information. As with the BWI documents, the description of data transmitted by Flightview in this contemporaneous document fails to make any mention of the transmission of any data "defining a geographic map" as part of the message sent to the requesting party, as per claim 1(D) and claim 27(G) and (H). Pl. Facts, ¶ 19.

**Flightview Proposal to American West (1995).** The RLM proposal to America West dated 1995 was a proposal for essentially the same system that Mr. Steinberg described in 1993. Pl. Facts, ¶ 20. As such, it did not include a system comprising a storage mechanism, a data manager, communications devices, a mapping system, where all components are configured to work in the manner set forth in claims 1 or 27 of the '936 patent. Pl. Facts, ¶ 20, 22.

Specifically, the functionality of Flightview described at page 6 of Exhibit 14 to the Flynn Deposition contains only the following capabilities relating to maps and mapping

data: "configuration files for tailoring display *at startup*" and "user tailorable display of *background* maps." Pl. Facts, ¶ 23 (emphasis added). Separately, the functionality of Flightview regarding the retrieval and display of flight information is only described as follows: "advanced flight filtering and highlighting capabilities" (referring to searching for a flight), "*datablock* display of complete flight information," and "*textual* display of flight information." *Id.* As shown herein, unlike claim 1(D) and claim 27(G) and (H), in Flightview pre-1997, there was no map delivered based on a user's request for specific flight status information delivered as part of the message,. Pl. Facts, ¶ 24.[2]

The *April 24, 1996* Software License and Maintenance Agreement executed by RLM Software and America West (the "American West License") suggests that America West was not actually using Flightview as of March 7, 1996, the critical date in this case. Pl. Facts, ¶ 26. Not surprisingly, Mr. Steinberg, a principal of RLM since 1989, could not recount a single instance when RLM permitted testing of its data feed without a license agreement already in place. Pl. Facts, ¶ 26.

---

[2]   In addition, the proposal provides so little guidance in terms of hardware and software configuration that no one of ordinary skill in the art reading the proposal to America West would understand the proposal to teach all elements of claims 1 and/or 27 of the '936 patent or enable the creation of a system that would infirnge those claims as written. Pl. Facts, ¶ 25.

In any event, the only mention of mapping or display of mapping data within the America West License consists of the inadequate disclosure of the display of "background maps" found on page 14. Pl. Facts, ¶ 27. The description of the Flightview software states that the display of background maps is user-configurable (rather than determined based on specific travel data retrieved in response to a user request, per claim 1(D) and claim 27(G)). *Id*. There is no mention of a map or mapping data that is determined by anything other than the user's selection of the on-screen background map from the "Main menu" dialogue box. *Id*.

**The RLM Software - US West Experiment (April 1996 – December 1996).** On March 5, 1996, a non-binding memorandum of understanding ("MOU") was entered into between RLM and US West Interactive Services ("US West"). Pl. Facts, ¶ 28. The MOU described the fact that the parties were undertaking "current discussions." Pl. Facts, ¶ 29, with a view towards collaborating for the development of new technology ("Developer's proposed Interactive FlyNow Web Site"), and included conducting (1) a *technical trial* of the RLM Flightview data feed ("Phase One") for use in connection with TheTrip.com web site from April 30, 1996 until June 30, 1996 [3]; and (2) a subsequent marketing ("Phase Two") trial to determine the commercial appeal

---

[3] The Phase One technical trial dates were late re-scheduled to begin June 3, 1996 and end September 30, 1996. Pl. Facts, ¶ 31.

of the web site once deployed.[4] Pl. Facts, ¶ 29.

As of March 5, 1996, RLM's understanding of the Phase One trial was that referred to the fact that "[RLM] would work with [US West] to *develop* a system that . . . would use Flightview information on their website." Pl. Facts, ¶ 30. RLM believed as of March 5, 1996 that it would provide its formatted data to US West, and that US West was going to work on the user interfaces of its web site that would permit the Flightview product to work over the Internet. Pl. Facts, ¶ 30. Mr. Steinberg of RLM testified that at least some of the technical trial work between RLM and US West involved testing a data feed from RLM into US West 's system. Pl. Facts, ¶ 38.

Before and during the technical trials of the newly developed technology, RLM and US West agreed to protect each other's confidential information in connection with the collaboration to develop the technology used on the Trip.com web site, including the existence of the MOU itself. Pl. Facts, ¶ 34. This was because "we were discussing the flight tracking -- discussing providing the flight tracking system on [US West's] website." Pl. Facts, ¶ 34.

Sometime in 1996 *after* the March 5, 1996 dated MOU, the parties beta tested

---

[4]    RLM's understanding of the purpose of the Phase Two trial was to "allow [US West] to put that on the Internet. . . .  To allow the ability to receive realtime flight information off of their website." Pl. Facts, ¶ 32.

the technology jointly developed by RLM and US West.   [Flynn Dep., pp. 77-79]

"Beta testing is when you allow a group of people to test your system [so] that it's ready

to go live." Pl. Facts, ¶ 35. The technology jointly developed by RLM and US West

was not deployed in a live operating environment any earlier than September or

October of 1996. Pl. Facts, ¶ 36.[5]

## ARGUMENT

### A.     The Summary Judgment Standard Is Higher For Patent Invalidity.

Summary judgment is appropriate only when there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986);

*Seal-Flex, Inc. v. Athletic Track & Court Constr.,* 98 F.3d 1318, 1321 (Fed. Cir. 1996).

At the outset, the "party moving for summary judgment bears the burden of identifying

the evidence that demonstrates the absence of a disputed material issue of fact and

establishes that the moving party is entitled to judgment as a matter of law." *Seal- Flex,*

98 F.3d at 1321 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)).  If the

moving party meets this burden, the opposing party, to avoid summary judgment, "must

---

[5]   In December 1996, US West was still providing user requirements to RLM for
software development. Pl. Facts, ¶ 37.

respond with sufficient evidence to show that there is a material factual dispute and that, on the non- movant's evidence, the movant is not entitled to judgment as a matter of law." *Id.* In reviewing the non-movant's case, the court must "view[ ] the evidence and draw[ ] factual inferences favorable to the party opposing the motion." *Id.* (citing *Celotex,* 477 U.S. at 323).

Where, as here, the party moving for summary judgment is challenging the validity of a patent, it must present evidence sufficient to overcome the presumption of patent validity. *See* 35 U.S.C. § 282. To be sufficient, such evidence must be "clear and convincing." *E.g., Mas-Hamilton Group v. LaGard, Inc.,* 156 F.3d 1206, 1216 (Fed. Cir. 1998). If the moving party makes such a showing, the opposing party has the burden of coming forward with sufficient rebuttal evidence to raise a genuine issue of material fact, but "the presumption of validity remains intact and the ultimate burden of proving invalidity remains with the challenger throughout the litigation." *Mas-Hamilton,* 156 F.3d at 1216.

The upshot of the Defendants' motion is that the Defendants are merely "practicing the prior art," asserting that technology which "infringes if later anticipates if earlier." Aside from being untrue in this case, such a position ignores the allocation of burdens to the defendant in a patent case. "[A]ccused infringers are not free to flout the requirement of proving invalidity by clear and convincing evidence by asserting a

14

'practicing prior art' defense to literal infringement under the less stringent preponderance of the evidence standard." *Tate Access Floors, Inc. v. Interface Architectural,* 279 F.3d 1357, 1367 (Fed. Cir. 2002). The differing burdens of proof required to show infringement and validity are indeed important, and should be considered. *See id.* at 1366 ("the differing burdens of proof for infringement and validity are indeed important"); *National Presto Indus., Inc. v. West Bend Co.,* 76 F.3d 1185, 1189 (Fed.Cir.1996) ("In deciding a motion for summary judgment of invalidity the burden of proof must be considered.")

Thus, the only issue before the Court on the instant motion is whether the Defendants have shown that there is no genuine issue of material fact and that clear and convincing evidence shows claims 1 and 27 are invalid pursuant to 35 U.S.C. § 102(a) and/or 102(b).[6] As shown herein, disputed issues of fact preclude summary judgment, and the evidence is far less than convincing, on the subject of anticipation.

## B.   The Facts Refute a Showing of Anticipation of Claims 1 and 27.

---

[6] Separately, Arrival Star shows that the operation of Flightview as it exists on the Sabre and American Express web sites (where, among other things, there are no background maps, and where map-messages are formed and delivered in response to user requests) does not bear substantial similarity to pre-1997 Flightview (where, among other things, fixed background maps were used that were independent of textual messages delivered to user in "datablock" format). However, the only issue presently before the Court on this motion is whether or not pre-1997 Flightview anticipated claims 1 and 27.

"To be anticipating, a prior art reference must disclose 'each and every limitation of the claimed invention[,] ... must be enabling[,] and [must] describe ... [the] claimed invention sufficiently to have placed it in possession of a person of ordinary skill in the field of the invention.' " *Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1346 (Fed. Cir. 2000) (quoting *In re Paulsen*, 30 F.3d 1475, 1478-79 (Fed. Cir. 1994)).

A claim is anticipated, and thus invalid, if each and every limitation is found either expressly or inherently in a single prior art reference. *See Celeritas Technologies, Ltd. v. Rockwell International Corp.*, 150 F.3d 1354, 1361 (Fed. Cir. 1998), *cert. denied*, 525 U.S. 1106 (1999); *Structural Rubber Prods. Co. v. Park Rubber Co.*, 749 F.2d 707, 715 (Fed. Cir. 1984). "To establish inherency," the Federal Circuit has stated, "the extrinsic evidence 'must make clear that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill.'" *In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999) (internal citation omitted); *see also Continental Can Co. U.S.A., Inc. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991). Such inherency may not be established by " 'probabilities or possibilities.' " *Continental Can*, 948 F.2d at 1269 (quoting *In re Oelrich*, 666 F.2d 578, 581 (C.C.P.A.1981)). If all of the elements of the claims at issue are described in a single prior art reference, they must also be arranged as in the

patented device in order for the prior art reference to anticipate the claims. *C.R. Bard, Inc. v. M3 Systems, Inc.,* 157 F.3d 1340, 1349 (Fed. Cir. 1998).

### 1.   Section 102(a)

As is the case with anticipation under any of the provisions of Section 102, invalidity based on anticipation under 102(a) requires that *all* of the limitations of the claims be found within a *single* prior art reference. *Carella v. Starlight Archery & Pro Line Co.,* 804 F.2d 135, 138 (Fed. Cir. 1986).

Section 102(a) requires that all the limitations of the claims be set forth in prior art dated before the inventor's own date of invention. To wit:

> Any suggestion that a document is prior art because it appears before the *filing date of a patent* ignores the requirements of section 102(a). *Section 102(a) explicitly refers to invention dates, not filing dates.* Thus, under section 102(a), a document is prior art only when published before the invention date. For the Cook catalog to constitute prior art, therefore, it must have been published before Dr. Mahurkar's invention date.

*Mahurkar v. C.R. Bard, Inc.,* 79 F.3d 1572, 1576 (Fed. Cir. 1996).   The date of invention is the date of conception, not the date of reduction to practice. *Pfaff v. Wells Electronics, Inc.,* 525 U.S. 55, 60 (1998) ("The primary meaning of the word 'invention' in the Patent Act unquestionably refers to the inventor's conception rather than to a physical embodiment of that idea."); *Id.* at 66 ("petitioner's argument ... does not persuade us that it is necessary to engraft a reduction to practice element into the meaning of the term 'invention' as used in § 102(b)"); *Burroughs Wellcome Co. v. Barr*

17

*Laboratories, Inc.,* 40 F.3d 1223, 1227-28 (Fed. Cir. 1994) ("Conception is the touchstone of inventorship, the completion of the mental part of invention.").

In this case, Mr. Jones invented the subject matter of claims 1 and 27 no later than the first quarter of 1994. Pl. Facts, ¶ 3. Thus, unless the invention described in those claims is clearly and convincingly described in a single prior art reference dated prior to the first quarter of 1994, there is no anticipation under 102(a) as a matter of law.

Here, Flightview as described by the Defendants was described by RLM as a "new" system in 1995. Pl. Facts, ¶ 16. The deployment of the system in 1995 at BWI was the first time Flightview was known to or used by the public. *Id.*[7] This was well after the date of invention applicable to claims 1 and 27.

RLM principals discuss the following pre-1994 events and documents: (a) the 1990 ATCA convention demonstration ("demo"); (b) the 1990 high-level Flightview product marketing brochures; (c) the registration of the Flightview® trademark in 1990; and (d) Mr. Steinberg's 1993 presentation to the Regional Airlines Association regarding Flightview. Each point is addressed in turn.

From 1990-1994, *when FAA data was inaccessible to RLM*, there was no "receiving travel data transmitted from vehicle at a first remote location" per claim

---

[7]   The first time Flightview was operational use by a customer was in November of 1994, after the date of Mr. Jones invention. Pl. Facts, ¶ 15. However, this usage was by Boston Coach, and there is no dispute that RLM provided no mapping (or other display) functionality associated with this usage. Pl. Facts, ¶ 15.

27(A). Pl. Facts, ¶ 5. Moreover, because all the software was hosted by the same computer that was also used as the demonstration display unit at the demo location, the 1990-1994 demonstrations lacked "a *first* communications device configured to transmit a message to a *second* communications device located at a *second remote location*" per claim 1(C), and also failed to perform the step of "receiving a request from a user located at *a second remote location*" per claim 27(C). Pl. Facts, ¶ 6.

Regarding the *high-level* marketing brochures dated 1990, there is no "one-to-one correspondence between the features of the Flightview® system" as described in the 1990 Flightview brochures allegedly handed out at the 1990 ATCA convention, and the elements of claims 1 or 27. Pl. Facts, ¶ 7. Moreover, no one of ordinary skill in the art reading the brochure in question would understand it to teach a system or method that has a one-to-one correlation to the claim elements of claim 1 or claim 27 of the '936 patent. Pl. Facts, ¶ 7. *See Helifix v. Blok-Lok*, 208 F.3d 1339, 1348 (Fed. Cir. 2000) (rejecting anticipation argument where the asserted prior art reference did not permit someone skilled in the art to possess the claimed invention without an undue amount of experimentation). Thus, Ms. Flynn of RLM is forced to prepare a claim comparison chart of only the most superficial nature in order to claim a one-to-one relationship between the claims at issue and the product brochures.

In addition, it is irrelevant that the date of first use of the Flightview® *trademark*

is 1990 under Section 102 anticipation analysis. *See Preemption Devices v. Minnesota Mining and Mfg. Co.,* 732 F.2d 903, 906 (Fed. Cir. 1984) ("We find *particularly unconvincing* [appellant's] argument based on the declaration filed in connection with the application to register the trademark OPTICOM, stating the dates of first use and first use in commerce. Those statements were not made with respect to the use of the invention but the use of the mark.") (emphasis added).

Regarding the 1993 RAA presentation, Mr. Steinberg was careful not to give away technical details of RLM's plans for Flightview, including hardware and software design information. Pl. Facts, ¶ 13. Thus, his presentation was simply not detailed enough to teach all the elements of claim 1 or claim 27. Pl. Facts, ¶¶ 8 and 14. In fact, the description of the mapping provided at the 1993 presentation and embodied in the slides is contrary to the elements of claims 1 and 27 because the user in Flightview (as explained during the conference and as exemplified by the color slides) would establish the *background* map on the screen *before* the request for information on a particular flight would be sent. Pl. Facts, ¶ 9. Once the system received a request to provide information on a particular flight, the information was sent in a textual "datablock" form, where it was displayed on whatever the last map was that the user had selected. Pl. Facts, ¶ 9. This approach differs from that of claim 1(D) and claim 27(G) and (H).

In sum, there is no single prior art reference prior to the date of invention that contains all elements of claim 1 or claim 27. Above all else, the map that is called for as part of the message in claims 1 and 27 is merely "background" and is not a part of the message in pre-1997 Flightview. For this reason alone, granting summary judgment on anticipation prior to the date of invention would constitute reversible error. *See Continental Can*, 948 F.2d at 1267-1269 (reversing summary judgment under Section 102(a) and remanding for trial on disputed factual issue).

2. **Section 102(b)**

Invalidation of a patent may occur under Section 102(b) if it is established, by clear and convincing evidence, that a "public use" of the prior art at issue occurred (or that the prior art technology was "on sale") *more than a year before the application for the challenged patent was filed. See Tone Bros., Inc. v. Sysco Corp.*, 28 F.3d 1192, 1197 n. 4 (Fed. Cir. 1994); *Articulate Sys., Inc. v. Apple Computer*, 53 F.Supp.2d 62, 75 (D. Mass. 1999). The "critical date" referenced in Section 102(b), unlike that used in Section 102(a), is one year prior to the filing of the patent application in question. Because the Defendants concede that the priority application date of the '936 date is at least as early as March 7, 1997 (Flynn Dec., p.30), the "critical date" for purposes of 102(b) analysis is no later than March 7, 1996.

21

As with Section 102(a), prior art under Section 102(b) must include every element of the claims in suit and then some. "A determination that an invention was on sale within the meaning of section 102(b) requires that 'the claimed invention asserted to be on sale was operable, the complete invention claimed was embodied in or obvious in view of the device offered for sale, and the sale or offer was primarily for profit rather than for experimental purposes.'" *Micro Chem., Inc. v. Great Plains Chem. Co.,* 103 F.3d 1538, 1544 (Fed. Cir. 1997) (citing *KeyStone Retaining Wall Sys., Inc. v. Westrock,, Inc.,* 997 F.2d 1444, 1451 (Fed. Cir. 1993).

Summary judgment is particularly inappropriate when questions of experimentation arise. For instance, in emphasizing the multi-factor approach required to assess whether use is really *public* within the meaning of 102(b) (and not "experimental"), *Articulate Systems, Inc. v. Apple Computer, Inc.,* 53 F.Supp.2d 62, 75-77 (D. Mass. 1999), *denied* summary judgment to a defendant on public use grounds (§ 102(b)) even though (1) four demos of prototype software occurred before the critical date, and (2) the prototype software admittedly practiced the independent claim of the patent. In this case, there is no such admission.

Here, RLM Software principals point to the following as evidence of a sale or public use of the subject matter of claims 1 and 27 prior to the March 7, 1996 critical date: (a) the 1990 ATCA convention demonstration (addressed above); (b) the 1995

installation of Flightview at BWI Airport; (c) the 1995 Flightview proposal to America West; and (d) the March 5, 1996 Memorandum of Understanding ("MOU") between RLM and US West to commemorate confidential discussions about jointly creating a new flight status information service. As shown herein, none of this evidence overcomes the high bar of anticipation.

The 1995 installation of Flightview at BWI and the America West Proposal are not public uses or offers for sale of *the invention of claims 1 and 27*. The mapping in the BWI system and outlined in the American West Proposal consisted of the user-configurable *background* map selected before any flight status request is made by the user, not of maps selected and displayed as messages based on the retrieval of flight status information. Pl. Facts, ¶¶ 17-27. Moreover, as shown above, the messages regarding flight status were purely textual "datablock" messages about flight information, which did not contain a geographic map. Consequently, the elements of claim 1(D) and claim 27(G) and (H) are missing from the BWI installation of Flightview and from the America West Proposal.[8]

The March 5, 1996 MOU between RLM and US West is a prelude to a later agreement to run experimental testing trials of new technology to be jointly developed

---

[8]   In any event, it does not appear that there was an operational Flightview system at America West  until after April of 1996 (after the critical date) because the Flightview software license agreement with America West was not entered into until April 24, 1996.

by the parties. Pl. Facts, ¶ 29.[9]   The testing did not occur until after March 7, 1996, the

critical date under 102(b). Pl. Facts, ¶ 30-32, 35-38.[10]   The parties entered into

confidentiality agreements that were in effect before and during the testing period. Pl.

Facts, ¶ 34.[11]   The testing was going to use the RLM Flightview data feed, but the user

interface was being developed by US West. Pl. Facts, ¶ 30.   There was no actual

deployment of the jointly-developed technology any earlier than September of 1996.

Pl. Facts, ¶ 36.   In any event, the experimental testing and deployment occurred *after*

the March 7, 1996 critical date. Pl. Facts, ¶ 30-38.   On these facts, the MOU dated

---

[9]   The Defendants have not argued, much less shown, that the non-binding MOU, signed two days before the critical date, made the technology that was being developed "on sale" within the meaning of 102(b). *See Envirotech Corp. v. Westech Eng'g Inc.*, 904 F.2d 1571, 1574, 1575 (Fed. Cir. 1990) (party asserting the bar "must prove by clear and convincing evidence ... that there was a definite sale or offer to sell more than one year before the application for the subject patent").

[10]   Such testing is indicative of *experimental* rather than public use under 102(b):

> An inventor's need to test the invention, to ascertain whether the work is complete or further changes should be made, and to show that the invention will work for its intended purpose.   Such testing and development may encompass or even require disclosure to the public, without barring the inventor's access to the patent system.

*Allied Colloids, Inc. v. American Cyanamid Co.*, 64 F.3d 1570, 1576 (Fed Cir. 1995)

[11]   *Articulate Systems, Inc. v. Apple Computer, Inc.*, 53 F.Supp.2d 62, 75-77 (D. Mass. 1999) described the multi-factor, fact-intensive analysis required to determine experimental versus public use under 102(b), but emphasized that "Although none of the foregoing circumstances is dispositive, relinquishment of control by the patentee and the *presence or absence of a secrecy agreement* appear to carry the most weight." (emphasis added).

March 5, 1996, two days before the critical date, merely previews the subsequent *experimentation* about a system the details of which are so utterly lacking that no one knows whether it departed form the use of foreground "datablock" messages and independent "background maps," or if so, when. There is nothing even close to a public use or offer for sale within the meaning of 102(b). Moreover, had use or an offer for sale occurred prior to March 7, 1996, it would not constitute a bar under 102(b) because the factors show the purpose of any use contemplated was experimental.

## CONCLUSION

In the '936 patent, the message to the user includes mapping data defining a geographic map, and the mapping data is based on the travel data retrieved. Conversely, pre-1997 Flightview used textual, datablock messages containing flight status information and displayed separately preset "background maps," set in advance by the user. In this Flightview system, the flight data retrieved in response to a user command did not influence the nature of the predefined background map. Thus, a reasonable trier of fact would find that claims 1 and 27 of the '936 patent represent an about face from the prior art. For this reason, the motion should be denied.

This _23_ day of September, 2003.

Respectfully submitted,

Steven G. Hill
Georgia Bar No. 354658
Peter F. Schoenthaler
Georgia Bar No. 629789
Eric G. Maurer
Georgia Bar No. 478199

HILL, KERTSCHER & PIXLEY,
LLP
3350 Riverwood Parkway
Suite 800
Atlanta, Georgia 30339
Telephone: (770) 953-0995
Attorneys for Plaintiff ArrivalStar, Inc.

Of Counsel:

Mark E. Ferguson
Kaspar J. Stoffelmayr

BARTLIT BECK HERMAN PALENCHAR
& SCOTT
54 West Hubbard St., Suite 300
Chicago, IL 60610

## TYPE AND FORMAT REQUIREMENTS

Pursuant to LR 7.1D, counsel by signature above certifies that this memorandum has been prepared in Times New Roman 14 point type font, as authorized in LR 5.1B.

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a true and correct copy of the foregoing **Plaintiff's Brief in Opposition to Summary Judgment Motion #1 (Validity of '936 Patent)** upon the following defendants by facsimile and by depositing said copy in the U.S. mail, postage prepaid, and addressed as follows:

Frank G. Smith, III
Patrick J. Flinn
J. Patrick Elsevier
ALSTON & BIRD LLP
One Atlantic Center
1201 W. Peachtree Street
Atlanta, Georgia 30309-3424

**Attorneys for Defendants Sabre, Inc., Travelocity.com, L.P., and American Express Co.**

Douglas D. Salyers
Kenneth R. Ozment
TROUTMAN SANDERS LLP
600 Peachtree Street, NE
Suite 5200
Atlanta, Georgia 30308-2216

Of Counsel:

Antony J. McShane
NEAL, GERBERT & EISENBERG
Two North La Salle Street, Suite 2200

Chicago, Illinois  60602-3801

**Counsel for Defendant Centerpost Corporation**

Samuel J. Najim
Nagendra Setty
David S. Kerven, Ph.D.
JONES, DAY, REAVIS & POGUE
3500 Sun Trust Plaza
303 Peachtree Street, N.E.
Atlanta, GA  30308-3242

Of Counsel:

Steven E. Sigalow
JONES, DAY, REAVIS & POGUE
NorthPoint, 901 Lakeside Avenue
Cleveland, Ohio  44114-1190

**Counsel for Defendants SITA Information Networking Computing USA, Inc., Roadway Express, Inc. and City of Atlanta**

Leslie B. Zacks
Jerry B. Blackstock
Joel K. Gerber
HUNTON & WILLIAMS
Bank of America Plaza
Suite 4100
600 Peachtree Street, NE
Atlanta, GA  30308-2216

Of Counsel:

Russell B. Hill

HOWREY SIMON ARNOLD & WHITE, LLP
2020 Main Street
Suite 1000
Irvine, California 92614

**Counsel for Defendant Electronics for Imaging, Inc.**

James L. Ewing, IV
Vaibhav P. Kadaba
KILPATRICK STOCKON, LLP
Suite 2800
1100 Peachtree Street
Atlanta, Georgia 30309-4530

**Attorneys for Defendants Delta Air Lines, Inc., Continental Air Lines,**

**Inc., American Airlines, Inc., Japan Air Lines Company, Ltd.**

John C. Herman
DUANE MORRIS LLP
1180 W. Peachtree Street
Suite 700
Atlanta, Georgia 30309-3448

Of Counsel:

Thomas B. Luebbering
Scott R. Brown
HOVEY WILLIAMS, P.C.
2405 Grand Boulevard, Suite 400
Kansas City, Missouri 64108-2519

**Counsel for Defendant Worldspan, L.P.**

Deborah A. Heineman

SMITH, GAMBRELL & RUSSELL LLP
Suite 3100, Promenade II
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309-3592

Of Counsel:

Michael Sobel
SQUIRE, SANDERS & DEMPSEY L.L.P.
600 Hansen Way
Palo Alto, CA 94304-1043

**Counsel for Defendant FlyteComm, Corp.**


This 23 day of September, 2003.

_____
Attorney for Plaintiff

ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

SEP 2 3 2003

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

Arrival Star, Inc., )
)
    *Plaintiff,* )
)
)
vs. )   Case No.: 1:02-CV-2543-JOF
)
Delta Air Lines, Inc., Sabre, Inc. )
Travelocity.com, L.P., City of Atlanta, )
Worldspan, L.P., Flytecomm )
Corporation, Centerpost Corporation )
Continental Airlines, Inc., Japan Air )
Lines Company, Ltd., American )
Airlines, Inc., Roadway Express, Inc. )
Electronics for Imaging, Inc., American )
Express Company, SITA Information )
Networking Computing USA, Inc., )
)
    *Defendants.* )
)

## PLAINTIFF'S RESPONSES TO LOCAL RULE 56.1B
## STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT (MOTION #1)
## THAT CLAIMS 1 & 27 OF THE '936 PATENT ARE
## INVALID AND STATEMENT OF ADDITIONAL
## FACTS RAISING GENUINE ISSUES OF MATERIAL FACT

Plaintiff Arrival Star, Inc. hereby responds to the LR 56.1B Statement of

Undisputed Facts filed by Sabre, Inc. in support of its Motion for Summary

Judgment (Motion #1) that Claims 1 & 27 of the '936 Patent are Invalid and Its

179

Statement of Additional Facts Raising Genuine Issues of Material Fact for Trial.

<u>Objections</u>

Plaintiff objects that numerous alleged "facts" are not really facts at all, but statements about the interpretation, scope and language of the '936 patent. As the Court is aware, and as is briefed by the parties in considerable detail, claim construction is a matter for the Court.[1]

<u>List of Facts That Raise Genuinely Disputed Issues for Jury Trial (L.R. 56.1B)</u>

Plaintiff submits the following facts show genuinely disputed matters forestalling summary judgment on any of movants' asserted grounds. These facts are relied upon in disputing factual assertions of Sabre, and are referred to herein as "Plaintiff Fact #__" with the fact number describing the numbered factual paragraph in question.

<u>Plaintiff Fact #</u>:

1.   For purposes of this motion only, Arrival Star accepts the defendants'

---

[1]   Plaintiff also notes that in some cases it has admitted matters because they are either immaterial, irrelevant or because it was more convenient than disputing the matter on summary judgment. This is owing to the large number of allegedly undisputed facts set forth by the Defendants. Thus, out of an abundance of caution, Plaintiff reserves the right to dispute any allegation that it has admitted out of convenience herein should the matter become material at the trial of this case, except with respect to any undisputed facts used as the basis for the Court's summary judgment ruling,

position that the priority date of claims 1 and 27 of the '936 patent is March 7, 1997, per the contents of provisional patent application no. 60/039,925. [Jones Dec.[2], par. 2, filed herewith as Plaintiff's Appendix, Exhibit A]

2.  Mr. Jones, and others of ordinary skill in the art, were aware of computer hardware and, from reading the '936 patent, would be aware how to program such hardware to perform the functions in the manner described by the claims of the '936 patent. [Jones Dec., par. 3]

3.  Mr. Jones, the named inventor of the '936 patent, conceived of the invention of claims 1 and 27 of the '936 patent no later than the first quarter of 1994. [Jones Dec., par. 4; Stubbins Dec., par. 3-4] From that point in time until March 7, 1997 (when the provisional patent application was filed), he was actively working on creating and testing the invention. [Jones Dec., par. 4; Stubbins Dec., par. 2]

4.  It was not until sometime August 1994 or later in 1994 that FAA flight data even became available to RLM Software. [Flynn Dep., pp. 25-29, 34]

---

[2]  All references to "Jones Dec." are to the Declaration of Martin Kelly Jones, and *not* to the Second Declaration of Martin Kelly Jones (Infringement of Claim 37).

5.   From 1990 through 1994, in any demonstrations of Flightview®, RLM had to use "canned" data, which was data that it "made up" in order to simulate what an aircraft situation display would look like. [Steinberg Dep., pp. 18-19; Flynn Dep., pp. 20-21, 25-29, 141-142]

6.   The early demonstrations of Flightview did not consist of two communication devices at remote locations passing messages between each other.   Instead, the software was hosted by the same computer that was used as the demonstration unit. [Flynn Dep., pp. 20-21]

7.   There is no "one-to-one correspondence between the features of the Flightview® system" as described in the 1990 Flightview brochure allegedly handed out at the 1990 ATCA convention, and the elements of claims 1 or 27. [Jones Dec., par. 9, Ex. A; Hicks Dec., par. 11]  No one of ordinary skill in the art reading the brochure in question would understand it to teach a system or method that has a one-to-one correlation to the claim elements of claims 1 or 27 of the '936 patent.  [Hicks Dec., par. 11]

8.   On April 26, 1993, Jim Steinberg spoke for 30-45 minutes (including time allotted for audience questions) at the RAA Spring meeting [Steinberg Dep., p. 24, 28], and that he showed about twenty slides describing the

4

benefit and certain aspects of the operation of the Flightview system, as well as color slides of the screens a user would see when using the system to track a flight, to the attendees of the meeting, consisting of about twenty airline executives. The presentation did not consist of a description of each and every claim limitation of claims 1 and 27 of the '936 patent. [Steinberg Dep., pp. 34-93; Jones Dec., par 5-7.]

9.  The description of the mapping provided at the 1993 presentation and embodied in the slides is contrary to the contents of claims 1 and 27 because the user in Flightview (as explained during the conference and as exemplified by the color slides) would establish the background map on the screen before the request for information on a particular flight would be sent. [Steinberg Dep., pp. 80-84, 89-90, 92-94, 100-103] Once the system received a request to provide information on a particular flight, the information was sent in "datablock" form, where it was displayed on whatever the last map was that the user had selected. [Steinberg Dep., pp. 89-90, 92-93]

10. As described at the 1993 RAA meeting, the selection of a background map was independent of the flight status information on a particular aircraft [Steinberg Dep. Pp. 89-90, 92-93, 100-103], so there was no generation of "mapping data based

on said travel data retrieved by said data manager" (claim 1), and no "generating

mapping data based on said travel data retrieved in said retrieving step."

[Steinberg Dep., pp. 89-90, 92-93, 100-103; Hicks Dec., par. 10]

11. Mr.Steinberg testified that Flightview would display flight data "on a map," not as

a map. [Steinberg Dep., pp. 65, 72, 75-76, 89-93, 100-103]

12. The software command to draw a map resided on the computer being used by the

airline dispatcher and was not a command sent from RLM's computers in

Massachusetts. [Steinberg Dep., pp. 84-85[3]; Steinberg Dep., Ex. 7 (pp. 3-4)

("bwi1 runs the Flightview touch screen programs")] Separately,

communications with RLM from the local computer running Flightview consisted

of accepting the data feed from RLM and translating the data feed from a

telephone signal to a computer devised signal (similar to the function of a

modem). [Steinberg Dep., Ex. 7 (pp.3-4)]

13. At the 1993 RAA meeting, Mr. Steinberg provided no details of hardware or

software configuration, or system design, during his presentation, so there would

---

[3]   Mr. Steinberg, who has worked on Flightview since 1989 and is intimately
familiar with its operation, returned to his deposition after the lunch break and did
an about face from his earlier testimony, stating incredibly that the system worked
in exactly the opposite manner as he previously testified.

have been no discussion of a first and second communication devices, and no discussion as to software configuration. [Steinberg Dep., pp. 32-33] Technical details of the system's operations were protected from disclosure by Mr. Steinberg in his presentation. [Id.]

14. At the 1993 RAA meeting, Mr. Steinberg showed representative screens illustrating how Flightview works. [Steinberg. Dep., Ex. 3] The screens show an initial, "Main Menu" that permits a user to select a "Background Map." [Id.] Specific airline data is shown as being textual data presented in a text-block format. [Id.] However, neither the slides nor the screen he showed would have enabled one of ordinary skill in the art to practice claims 1 or 27 of the '936 patent. [Jones Dec., par. 7; Hicks Dec., par. 10]

15. The Flightview system was not operational for customer use in any form until November 1994. [Flynn Dep., pp. 31-32 and Ex. 14 (p.2 and 12)] The November 1994 system (licensed to Boston Coach) did not use any display of maps whatsoever. [Steinberg Dep., p. 96, 118; Flynn Dep., p.45]

16. At no time prior to 1995 was there any public display of Flightview that

had user interactivity as part of the display.  [Steinberg Dep., Ex. 6, p.3][4]

In fact, the 1995 dated Flightview Maintenance Guide, Exhibit 7 to the

Steinberg Deposition, states on page 1 that "Flightview is a new software

product . . . ."  [Steinberg Dep., Ex. 7]

17.   The user of the Flightview system at the BWI airport exhibit could see flight

"datablock" information overlaid onto a pre-existing background map that is

selected by the user independently of the request for flight information. [Steinberg

Dep., pp. 100-103, 108-110 and Ex. 5 (p.GS 500-18); Hicks Dec., par. 10]  The

BWI documentation lists the data to be displayed in response to a user inquiry as

"the plane's flight number, type of plan, its destination or place of departure, how

far away it is from its destination, etc." [Steinberg Dep., Ex. 4, p. 4c]  There is no

mention of a map being displayed in response to a user inquiry about the status of

a flight. [Id.; Hicks Dec., par. 10]  In fact, the sequence of the storyboards in Ex. 5

to the Steinberg Deposition makes it clear that the background map is set before

---

[4]   Ms. Flynn testified that in 1995, she edited the February 1995 press release that
is Exhibit 6 to her deposition in order to ensure that it *accurately communicated
information about Flightview.*  [Flynn Dep., p. 39]  She made three edits to the
press release.  [Id. at 40]  Despite the fact that she edited the sentence *immediately
preceding* the sentence describing the anticipated use of Flightview at BWI airport
as "the *first time* this type of information will be on public display in an interactive
format," (emphasis added) she did not edit this sentence of the press release.  A
jury could therefore infer that at the time, she believed the statement in the press
release was accurate and did not need to be edited.

the user requests information on a flight.  [Steinberg Dep., Ex. 5 (pp. GS 500-13 through GS 500-18); Hicks Dec., par. 10]

18.  The following accurately describes how Flightview functioned *circa* 1995: "After touching one of the small airplane icons, all arriving and departing aircraft revert to being dots.  A flight information block called a datablock now appears near the selected flight.  The Header shows the Airline name and flight number of the selected flight.

The datablock gives the visitor the following specific information [in text form]:

- Airline and flight number

- Altitude and aircraft type

- Number of minutes to landing and the number of passengers

- Departing airport and arriving airport[.]"

[Steinberg Dep., Ex. 5 (p. GS 500-18); Ex. 20 (p. 12 (RLM 00076)].  Flightview as it functioned at BWI airport is substantially similar to Flightview as it functioned from 1989 through 1997.  [Steinberg Dep., pp.95-96, and 109-110]

19.  Exhibit 7 to the Steinberg Deposition, a 1995 Flightview Maintenance Guide,

further illustrates that no mapping information was transmitted to a user as a result of a request for flight information. The manual states "By simply touching the screen on your Flightview touch screen interface you are able ... to select any flight that is aloft and see detailed flight information such as flight number, departure and destination airports, altitude, cruising speed, and estimated time of arrival." [Steinberg Dep., Ex. 7 (pp. 1-2); Hicks Dec., par. 10]

20. The RLM proposal to America West dated 1995 was a proposal for essentially the same system that Mr. Steinberg described in 1993. [Steinberg Dep., p. 97] As such, it did not include a system comprising a storage mechanism, a data manager, communications devices, a mapping system, where all components are configured to work in the manner set forth in claims 1 or 27 of the '936 patent. [Steinberg Dep., pp. 96-98; Hicks Dec., par. 10; Jones Dec., Ex. A]

21. The American West proposal accurately characterizes the Flightview product that RLM offered to license to America West. [Flynn Dep., pp. 33 and Ex. 14 (pp. 4-7)]

22. The Product Description described at pp. 4-7 of Exhibit 14 to the Flynn Deposition (the America West proposal) does not teach certain limitations of claim 1 of the '936 patent. [Jones Dec., par. 9, Ex. A; Hicks Dec. ,par. 10]

23. Specifically, the functionality of Flightview described at page 6 of Exhibit 14 to the Flynn Deposition contains only the following capabilities relating to maps and mapping data: "configuration files for tailoring display at startup" and "user tailorable display of *background* maps." [Flynn Dep., Ex. 14; Jones Dec., par. 9, Ex. A]  Separately, the functionality of Flightview regarding the retrieval and display of flight information is only described as follows:  "advanced flight filtering and highlighting capabilities" (referring to searching for a flight), "*datablock* display of complete flight information," and "*textual* display of flight information." [Flynn Dep., Ex. 14; Jones Dec., par. 9, Ex. A; Hicks Dec., par. 10]

24. The description of Flightview functionality contained at page 6 of Flynn Deposition Exhibit 14 illustrates that certain elements of claims 1 and 27 of the '936 patent art missing.  For example, regarding claim 1 of the '936 patent, Exhibit 14 suggests that Flightview as it existed prior to 1997 lacked "a mapping system configured to receive said travel data retrieved by said data manager and to generate mapping data based on said travel data retrieved by said data manager, said mapping data defining a geographical map, said geographical map indicating said proximity of said one vehicle from said particular location, wherein said mapping data is included in said message." [Jones Dec., par. 10-11; Hicks Dec., par. 4-10]  Exhibit 14, page 6 also describes that the operation of Flightview

prior to 1997 did not perform the steps of "generating mapping data based on said travel data retrieved in said retrieving step, said mapping data defining a geographical map that indicates said proximity of said one vehicle from said particular location; and including said mapping data in said message." [Jones Dec., par. 10-13; Hicks Dec., par. 4-10]

25. No one of ordinary skill in the art reading the 1995 RLM proposal to America West would understand the proposal to teach all elements of claims 1 and/or 27 of the '936 patent. [Jones Dec., par. 10-13; Hicks Dec., par. 4-10]

26. Exhibit 15 to the Flynn Deposition is the April 24, 1996 Software License and Maintenance Agreement executed by RLM Software and America West (the "American West License"). [Flynn Dep., p.35 and Ex. 15] This suggests that America West was not actually using Flightview as of March 7, 1996. [Id.] Mr. Steinberg, a principal of RLM since 1989, could not recount a single instance when RLM permitted testing of its data feed without a license agreement already in place. [Steinberg Dep., p. 115-116]

27. The only mention of mapping or display of mapping data within the America West License consists of the display of background maps found

on page 14. [Flynn Dep., Ex. 15, p. 14] The description of the Flightview software states that the display of background maps is user-configurable. [Id.] There is no mention of a map or mapping data that is determined by anything other than the user's selection of the on-screen background map. [Id.]

28. On March 5, 1996, a non-binding memorandum of understanding ("MOU") was entered into between RLM and US West Interactive Services. [Flynn Dep., p. 50, Ex. 16]

29. The MOU described the fact that the parties were undertaking "current discussions" [Flynn Dep. Ex. 16 (p.1)] with a view towards collaborating for the development of new technology ("Developer's proposed Interactive FlyNow Web Site") to be deployed over the Internet, and included conducting (1) a technical ("Phase One") trial of the RLM Flightview data feed over the Internet for use in connection with TheTrip.com web site from April 30, 1996 until June 30, 1996 ; and (2) a subsequent marketing ("Phase Two") trial to determine the commercial appeal of the web site once deployed. [Flynn Dep., pp. 52-54 and Ex. 16 (p.1)]

30. As of March 5, 1996, RLM's understanding of the Phase One trial was that

referred to the fact that "[RLM] would work with [US West Interactive Services] to *develop* a system that they would use Flightview information on their website." [Flynn Dep., p. 54 (emphasis added). RLM believed as of March 5, 1996 that it would provide its formatted data to US West Interactive, and that US West Interactive was going to work on the user interfaces of its web site that would permit the Flightview product to work on the Internet. [Flynn Dep., pp. 54-55]

31.  The Phase One technical trial dates were late re-scheduled to begin June 3, 1996 and end September 30, 1996. [Flynn Dep., pp. 81-82]

32.  RLM's understanding of the purpose of the Phase Two trial was to "allow [US West Interactive Services] to put that on the Internet. . . . To allow the ability to receive realtime flight information off of their website." [Flynn Dep., p. 58]

33.  Exhibit A to the Trial Agreement contains an accurate description of the scope of work contemplated by RLM and US West Interactive Services as of June 12, 1996. [Flynn Dep., pp. 69-70]

34.  Among other things, RLM and US West Interactive Services agreed to protect each other's confidential information in connection with the collaboration to

14

develop the technology used on the Trip.com web site. [Flynn Dep., p. 67-68, 96-99 and Ex. 16 (p.2, par. 4)]   This was because "we were discussing the flight tracking -- discussing providing the flight tracking system on [US West Interactive Service's] website." [Flynn Dep., p. 68]

35.   Sometime in 1996 *after* the March 5, 1996 dated MOU, the parties beta tested the technology jointly developed by RLM and US West Interactive Services.  [Flynn Dep., pp. 77-79]   "Beta testing is when you allow a group of people to test your system [so] that it's ready to go live."  [Id. at 78]

36.   The technology jointly developed by RLM and US West Interactive Services was not deployed in a live operating environment any earlier than September or October of 1996. [Flynn Dep., p. 81-82]

37.   In December 1996, TheTrip.com was still providing user requirements to RLM for software development. [Flynn Dep., p. 99 and Ex. 19]

38.   RLM notes indicate that the RLM contribution to TheTrip.com was scheduled for "beta testing" in the second half of 1996. [Flynn Dep., pp.77-79]   Mr. Steinberg testified to the nature of at least some of the technical trial work between RLM and US West Interactive Services, which involved testing the data feed from RLM into the US West Interactive Services system.  [Steinberg Dep., pp. 113-

116]

39. The actual agreement regarding the technology partnership between the parties was not signed until late 1996 or early 1997. [Flynn Dep., pp.95-96]

40. Because the messages on flight status were sent by Flightview prior to March 7, 1996 in a *datablock* format, which did not include any mapping data, no mapping data was actually sent as part of the message to the user about a particular flight. [Jones Dec., par. 14, Hicks Dec., par. 10]

41. At no time prior to March 7, 1996 did Flightview comprise, in whole or in part, a "a mapping system configured to receive said travel data retrieved by said data manager and to generate mapping data based on said travel data retrieved by said data manager, said mapping data defining a geographical map, said geographical map indicating said proximity of said one vehicle from said particular location, wherein said mapping data is included in said message." [Steinberg Dep., pp. 133-136, 142-146, 148]

42. At no time prior to March 7, 1996 did the operation of Flightview perform the steps of "generating mapping data based on said travel data retrieved in said retrieving step, said mapping data defining a geographical map that indicates said proximity of said one vehicle from said particular location; and including said

mapping data in said message." [Steinberg Dep., pp. 133-136, 142-146, 148]

43.  The foregoing statements in paragraphs 40-42 are because the user in Flightview (as it existed prior to 1997) would establish the background map on the screen before the request for information on a particular flight would be sent.  Once the system received a request to provide information on a particular flight, the information was sent in "datablock" form, where it was displayed on whatever the last map was that the user had selected.  [Jones Dec., par. 14-15; Hicks Dec., par. 10]  Prior to 1997, the selection of a background map was independent of the flight status information on a particular aircraft [Steinberg Dep., pp. 133-136, 142-146, 148], so there was no generation of "mapping data based on said travel data retrieved by said data manager" (claim 1), and no "generating mapping data based on said travel data retrieved in said retrieving step."  [Id.]  Moreover, because the message was sent in a *datablock* format, which did not include any mapping data, no mapping data was actually sent as part of the message to the user about a particular flight.  [Jones Dec., par. 14-15; Hicks Dec., par. 10]

44.  FVTK Mapping as it existed prior to 1997 merely permitted the user to establish a background map, which would not change depending upon the flight status information, and which was selected prior to any request to

display information on a particular flight. [Steinberg Dep., pp. 133-136, 142-146, 148] The request for flight information then resulted in the transmission of a "datablock" consisting of non-mapping, textual data regarding a flight. [Jones Dec., par. 14-16; Hicks Dec., par. 10] The datablock would then be transposed on top of the user's previously-selected background map. [Jones Dec., par. 14-16; Hicks Dec., par. 10] The map would not change based upon the particular flight status information being reported. [Steinberg Dep., p.133-136, 142-146, 148]

45. Exhibit 20 to the Flynn Deposition is a 1997 User Manual for Flightview that describes the menus, commands and various screens of the Flightview software. [Flynn Dep., pp. 101-120 and Ex. 20] With only a handful of immaterial differences described at pp. 101-120 of the Flynn Deposition, the contents of the manual accurately describe the features, functions, commands, files, menus, screens and manner of operation of Flightview as it existed from 1989 through 1997. [Id.]

46. Exhibit 20 confirms that the mapping functionality in Flightview is limited to using the Flightview interface to "activate *background* display maps." [Ex. 20, p. 2 (RLM 66) (emphasis added); Jones Dec., par. 17-18]

Separately, the Exhibit 20 confirms that using the interface for Flightview, you are able to "tag particular flights with *data blocks* showing their aircraft type, origin, destination, speed, altitude and estimated time of arrival." [Id.]

47. A map of the United States is displayed by Flightview upon startup of Flightview. [Ex. 20, p. 3 (RLM 67)]

48. A detailed review of Exhibit 20, the Flightview User Guide dated 1997, reveals that Flightview as it existed in 1997 and all times before lacked "a mapping system configured to receive said travel data retrieved by said data manager and to generate mapping data based on said travel data retrieved by said data manager, said mapping data defining a geographical map, said geographical map indicating said proximity of said one vehicle from said particular location, wherein said mapping data is included in said message." [Jones Dec., par. 17-18]

49. A detailed review of Exhibit 20, the Flightview User Guide dated 1997, reveals that Flightview as it existed in 1997 and all times before did not perform the steps of "generating mapping data based on said travel data retrieved in said retrieving step, said mapping data defining a geographical map that indicates said proximity of said one vehicle from said particular location; and

including said mapping data in said message." [Jones Dec., par. 17-18]

50. RLM Software, whose principals Lorraine Flynn and James Steinberg have provided testimony in support of this summary judgment motion, is aware that its customer Sabre, Inc. is being sued for infringing the '936 patent through its use of "Flight Tracker," which makes use of RLM's Flightview technology. [Flynn Dep., pp.11-15]

51. Sabre has asserted a claim for defense and indemnification against RLM Software arising out of the allegations of Arrival Star against Sabre in this case. [Flynn Dep., pp. 21]

52. RLM Software has also been contacted by Arrival Star regarding its interest in licensing the '936 patent. [Flynn Dep., pp. 10-11]

53. RLM Software has at least 250 customers for its current Flightview product. [Flynn Dep., p. 146]

54. The diagram prepared by Lorraine Flynn on page 10 of her declaration filed in support of the motion for summary judgment on anticipation was prepared in connection with this litigation and only after she had reviewed the contents of the '936 patent. [Flynn Dep., pp. 130-131]

55. The only actual diagram RLM has for Flightview that was created prior to this lawsuit is Exhibit 9 to the Steinberg Deposition. [Flynn Dep., p.131-132; Jones Dec., par. 9] The only reference to any mapping capabilities in Exhibit 9 is to the "*Background* Maps Module." [Steinberg Dep., Ex. 9 (emphasis added)]   As noted, this actually supports the notion that the mapping capabilities of Flightview between 1989 and 1997 consisted exclusively in the provision of user-configurable background maps. [Jones Dec., par. 19]   Separately, a user request for flight information would result in a message in textual, datablock format would be overlaid on top of the pre-existing *background* map. [Id.]

Plaintiff furthermore responds[5] to each of Sabre's alleged statements of fact (each of which is referred to by its paragraph number in Sabre's listed statement of facts, and referred to as "Sabre Facts #__") as follows:

Section A – '936 Patent

1. Plaintiff admits the allegations of Sabre Fact # 1, with the qualification that

---

[5]   There are numerous places in the record where much of the evidence can be found in support of Allcare's facts and denials.  Allcare has thus endeavored to show the Court illustrative evidence, rather than to show the Court every piece of evidence that supports it case or refutes the allegedly undisputed facts of Defendants.

the patent application leading to the issuance of the '936 patent related back

to a provisional patent application filed on March 7, 1997. See Plaintiff Fact

# 1.

2. Plaintiff admits the allegations of Sabre Fact #2, with the qualification that

the construction of the patent claims-in-suit is purely a question of law for

the Court based upon the language used in the claims. In Sabre Fact #2,

Sabre opts not to quote the language of the claims, and Plaintiff denies that

the claims of the '936 patent are properly construed based upon the language

used in Sabre Fact #2.

3. Plaintiff admits in part and denies in part the allegations of Sabre Fact # 3.

While Plaintiff admits that there is a mapping system required by claim 1 of

the '936 patent, claim 1 of the '936 patent states that the system is "a

mapping system configured to receive said travel data retrieved by said data

manager and to generate mapping data based on said travel data retrieved by said

data manager, said mapping data defining a geographical map, said geographical

map indicating said proximity of said one vehicle from said particular location,

wherein said mapping data is included in said message." ['936 patent, Sabre Ex. A,

claim 1] Plaintiff further denies Sabre Fact #3 because claim 27 does not require a

mapping system. ['936 patent, Sabre Ex. A, claim 27]

4. Plaintiff admits that claim 1 of the '936 patent is set forth in Sabre Fact #4. Plaintiff admits that the '936 patent provisions referenced in Sabre Facts #2-3 describe in part a preferred embodiment of the invention of the '936 patent. However, the construction of individual claims of the '936 patent is a pure question of law for the Court. Thus, Plaintiff denies that claim 1 of the '936 patent is directed to "the basic vehicle monitoring system described above." Rather, claim 1 is directed to a system comprising the elements of the claim itself, and those elements alone.

5. Plaintiff admits that claim 27 of the '936 patent is set forth in Sabre Fact #5. Plaintiff admits that claim 27 of the '936 patent could be performed by the system of claim 1 of the '936 patent referenced in Sabre Facts #4. However, the construction of individual claims of the '936 patent is a pure question of law for the Court. Thus, Plaintiff denies that claim 27 of the '936 patent is directed to anything other than a method comprising the performance of the steps of the claim itself, and those steps alone.

6. Plaintiff admits Sabre Facts #6 and states further that the inventor, Mr. Jones, and others of ordinary skill in the art, were aware of computer

hardware and, from reading the '936 patent, would be aware how to program such hardware to perform the functions in the manner described by the claims of the '936 patent. [See Jones Dec., Pl. Ex. A, par. 3]

## B. RLM Pioneers the Commercial Flight Tracking System (1988-1990)

7. Plaintiff admits the allegations of Sabre Facts #7.

8. Plaintiff admits the allegations of Sabre Facts #8.

9. Plaintiff admits the allegations of Sabre Facts #8 in part, and denies them in part. Specifically, RLM software did not develop Flightview as it is used on the Sabre or American Express web sites in late 1989. RLM did not even begin doing technical trials of the use of an aircraft situation display for industry (ASDI) data feed for use over the Internet until months after March 5, 1996. [Plaintiff Fact #30-38]

## C. The Technology Behind the Flightview® System and Method

10. Plaintiff denies the allegations of Sabre Facts #10. From 1990 until 1994, RLM had no agreement to use real-time flight data for each commercial aircraft over North America, coming from transponders located on the aircraft. Rather, from 1990 through 1994, RLM had to used "canned" data,

which was data that it fabricated in order to simulate what an aircraft situation display would look like.  [Plaintiff Fact #5]  At no time prior to 1995 was there any public display of Flightview that had user interactivity as part of the display.  [Plaintiff Fact #16]  The early demonstrations of Flightview did not consist of two communication devices passing messages between each other. [Plaintiff Fact #6]  At no time prior to March 7, 1996 did Flightview comprise, in whole or in part, a "a mapping system configured to receive said travel data retrieved by said data manager and to generate mapping data based on said travel data retrieved by said data manager, said mapping data defining a geographical map, said geographical map indicating said proximity of said one vehicle from said particular location, wherein said mapping data is included in said message." [Plaintiff Fact #42; Hicks Dec., par. 10; Jones Dec., par. 14-16] At no time prior to March 7, 1996 did the operation of Flightview perform the steps of "generating mapping data based on said travel data retrieved in said retrieving step, said mapping data defining a geographical map that indicates said proximity of said one vehicle from said particular location; and including said mapping data in said message."  [Id.] The foregoing is because the user in Flightview (as it existed prior to 1997) would establish the background map on the screen before the request for information on a particular flight would be sent.  Once

the system received a request to provide information on a particular flight, the information was sent in "datablock" form, where it was displayed on whatever the last map was that the user had selected. [Id.] Prior to 1997, the selection of a background map was independent of the flight status information on a particular aircraft [Plaintiff Facts # 10, 17 and 42], so there was no generation of "mapping data based on said travel data retrieved by said data manager" (claim 1), and no "generating mapping data based on said travel data retrieved in said retrieving step." [Plaintiff Fact #43; Jones Dec., par. 14-16; Hicks Dec., par. 10] Moreover, because the message was sent in a *datablock* format, which did not include any mapping data, no mapping data was actually sent as part of the message to the user about a particular flight. [Id.]

11. Plaintiff denies the allegations of Sabre Facts #11. The flow diagram indicates a transponder and the use of live ASDI data which RLM did not even have access to until 1994. [Plaintiff Fact #5] Moreover, there was not a C1 and C2 communication device until any earlier than the 1995 BWI system. [Plaintiff Fact #6] The system was not operational for customer use in any form until November 1994. [Plaintiff Fact #15] The November 1994 system did not use any maps whatsoever. [Id.]

12. Plaintiff admits the allegations of Sabre Facts #12.

13. Plaintiff admits the allegations of Sabre Facts #13.

14. Plaintiff admits the allegations of Sabre Facts #14.

15. Plaintiff admits the allegations of Sabre Facts #15.

16. Plaintiff denies the allegations of Sabre Facts #16.  FVTK Mapping as it existed prior to 1997 merely permitted the user to establish a background map, which would not change depending upon the flight status information, and which was selected prior to any request to display information on a particular flight. [Plaintiff Fact #43-44; Jones Dec., par. 16; Hicks Dec., par. 10]  The request for flight information then resulted in the transmission of a "datablock" consisting of non-mapping, textual data regarding a flight. [Plaintiff Fact # 43]  The datablock would then be transposed on top of the user's previously-selected background map.  [Id.]  The map would not change based upon the particular flight status information being reported. [Id.]

17. Plaintiff denies the allegations of Sabre Facts #17.  FVTK Mapping as it existed prior to 1997 merely permitted the user to establish a background

map, which would not change depending upon the flight status information, and which was selected prior to any request to display information on a particular flight. [Plaintiff Fact #43-44; Jones Dec., par. 16; Hicks Dec., par. 10] The request for flight information then resulted in the transmission of a "datablock" consisting of non-mapping, textual data regarding a flight. [Plaintiff Fact # 43] The datablock would then be transposed on top of the user's previously-selected background map. [Id.] The map would not change based upon the particular flight status information being reported. [Id.]

18. Plaintiff denies the allegations of Sabre Facts #18. Flightview as it was sold prior to 1997, merely permitted the user to establish a background map, which did not change depending upon the flight status information, and which was selected prior to any request to display information on a particular flight. [Plaintiff Fact #43-44; Jones Dec., par. 16; Hicks Dec., par. 10] The request for flight information resulted in the transmission of a "datablock" consisting of non-mapping, textual data regarding a flight. [Id.] The datablock was transposed on top of the user's previously-selected background map. [Id.] The map did not change based upon the particular flight status information being reported. [Id.] By contrast, the user interface

for Flightview as it is used by Sabre and American Express currently does not have a function that permits the user to select a "background map." [Flynn Dec., par. 8 and Ex. 2]

19. Plaintiff admits the allegations of Sabre Facts #19. However, Plaintiff notes that none of the software source code has been produced for inspection, introduced in evidence or otherwise relied upon by Sabre or American Express in this case.

20. Plaintiff denies the allegations of Sabre Facts #20. At no time prior to March 7, 1996 did Flightview comprise, in whole or in part, a "a mapping system configured to receive said travel data retrieved by said data manager and to generate mapping data based on said travel data retrieved by said data manager, said mapping data defining a geographical map, said geographical map indicating said proximity of said one vehicle from said particular location, wherein said mapping data is included in said message." At no time prior to March 7, 1996 did the operation of Flightview perform the steps of "generating mapping data based on said travel data retrieved in said retrieving step, said mapping data defining a geographical map that indicates said proximity of said one vehicle from said particular location; and including said mapping data in said message." The

foregoing is because the user in Flightview (as it existed prior to 1997) would establish the background map on the screen before the request for information on a particular flight would be sent. Once the system received a request to provide information on a particular flight, the information was sent in "datablock" form, where it was displayed on whatever the last map was that the user had selected. [Plaintiff Fact # 40-43] Prior to 1997, the selection of a background map was independent of the flight status information on a particular aircraft [Id.], so there was no generation of "mapping data based on said travel data retrieved by said data manager" (claim 1), and no "generating mapping data based on said travel data retrieved in said retrieving step." [Id.] Moreover, because the message was sent in a *datablock* format, which did not include any mapping data, no mapping data was actually sent as part of the message to the user about a particular flight. [Id.]

## D. RLM Introduces Flightview® to the World, September 1990

21. Plaintiff admits in part and denies in part the allegations of Sabre Facts #21. Specifically, Plaintiff admits that RLM began marketing a system known as "FasTrack" in about 1989. However, RLM did not have an operational system to market at that time. [Plaintiff Fact # 5, 6, 15 and 16] RLM did not have a system that actually monitored aircraft until 1994. [Id.] Its first

operational system did not exist until November 1994. [Id.] RLM did not have a system on public display until 1995. [Id.]

22. Plaintiff admits in part and denies in part the allegations of Sabre Facts #22. RLM did not have an operational system to market as of September 1990. [Id.] RLM did not have a system that actually monitored aircraft until 1994. [Id.] Its first operational system did not exist until November 1994. [Id.] RLM did not have a system on public display until 1995. [Id.] Moreover, RLM did not have a messaging system set up to send from one communication device at a remote location a flight status message to a user communication device located at the demonstration facility. [Plaintiff Fact #6] Plaintiff admits that the simulated flight "datablock" would be "plotted on a map on the computer screen," as alleged, but notes that the background map functionality was predefined prior to the request for the datablock showing the textual information about flight status, and the datablock was overlaid or "plotted on" the pre-existing map. [Plaintiff Fact #17, 40-43 and 55]

23. Plaintiff admits the allegations of Sabre Facts #23.

24. Plaintiff admits in part and denies in part the allegations of Sabre Facts #24.

Plaintiff admits that the chart identified accurately quotes the claim elements of claims 1 and 27 of the 936 patent. Plaintiff further admits that the "Description in Flightview Brochure" accurately quotes from the brochure in question where there are quotes represented. However, Plaintiff denies there is any "one-to-one correspondence between the features of the Flightview® system" as described in the brochure and the elements of claims 1 or 27. [Plaintiff Fact #7; Jones Dec., Ex. A] No one of ordinary skill in the art reading the brochure in question would understand it to teach a system or method that has a one-to-one correlation to the claim elements of claims 1 or 27 of the '936 patent. [Id.; Hicks Dec., par. 11]

25. Plaintiff admits the allegations of Sabre Facts #25, but notes that this admission is to a set of allegations that are devoid of any detail as to what Flightview, as it was marketed or demonstrated prior to March 7, 1996, was comprised of.

## E. Flightview® at RAA Spring Meeting, April 1993

26. Plaintiff admits in part and denies in part the allegations of Sabre Facts #26. Specifically, Plaintiff admits that on April 26, 1993, Jim Steinberg spoke at the RAA Spring meeting, and that he showed about twenty slides describing

the benefit and certain aspects of the operation of the Flightview system, as well as color slides of the screens a user would see when using the system to track a flight, to the attendees of the meeting, consisting of about twenty airline executives.  Plaintiff denies the remaining allegations of Sabre Facts #26, insofar as the presentation did not consist of a description of each and every claim limitation of claims 1 and 27 of the '936 patent.  [Plaintiff Facts 8, 9, 10, 13, and 14]  To the contrary, for example, the description of the mapping provided at the 1993 presentation and embodied in the slides is contrary to the contents of claims 1 and 27.  The foregoing is because the user in Flightview (as explained during the conference and as exemplified by the color slides) would establish the background map on the screen <u>before</u> the request for information on a particular flight would be sent.  Once the system received a request to provide information on a particular flight, the information was sent in "datablock" form, where it was displayed on whatever the last map was that the user had selected.  [Plaintiff Fact # 9, 14]  The selection of a background map was independent of the flight status information on a particular aircraft [Plaintiff Fact # 10], so there was no generation of "mapping data <u>based on said travel data retrieved</u> by said data manager" (claim 1), and no "generating mapping data <u>based on said travel data retrieved</u> in said retrieving step."  [Plaintiff Fact #10]  Moreover, because

the message was sent in a *datablock* format, which did not include any mapping data, no mapping data was actually sent as part of the message to the user about a particular flight. [Plaintiff Fact # 9 and 14]   In addition, Mr. Steinberg provided no details of hardware or software configuration during his presentation, so there would have been no discussion of a first and second communication devices, and no discussion as to software configuration.   [Plaintiff Fact # 13]   Technical details of the system's operations were protected from disclosure by Mr. Steinberg in his presentation. [Id.]

F.   Flightview® Exhibit at BWI, 1994-1995

27. Plaintiff admits the allegations of Sabre Facts #27.

28. Plaintiff admits the allegations of Sabre Facts #28, noting that there are no allegations regarding what comprised the Flightview system that was (a) offered for sale; and (b) installed at BWI airport.

29. Plaintiff admits in part and denies in part the allegations of Sabre Facts #29.   The user of the Flightview system at the BWI airport exhibit can see flight "datablock" information overlaid onto a pre-existing background map that is selected by the user independently of the request for flight information. [Plaintiff Fact # 17]   Flightview would establish the background map on the screen before the request for

information on a particular flight would be sent. Once the system received a request to provide information on a particular flight, the information was sent in "datablock" form, where it was displayed on whatever the last map was that the user had selected. [Plaintiff Fact #17] Prior to 1997, the selection of a background map was independent of the flight status information on a particular aircraft [Id.], so there was no generation of "mapping data based on said travel data retrieved by said data manager" (claim 1), and no "generating mapping data based on said travel data retrieved in said retrieving step." [Plaintiff Fact #17, 40-43] Moreover, because the message was sent in a *datablock* format, which did not include any mapping data, no mapping data was actually sent as part of the message to the user about a particular flight. [Id.]

## G.   Other Sales of FLightview®, 1995-1996

30. Plaintiff admits the allegations of Sabre Facts #30 in part, but denies that the proposal included a system comprising a storage mechanism, a data manager, communications devices, a mapping system, where all components are configured to work in the manner set forth in claims 1 or 27 of the '936 patent. [Plaintiff Fact #25; Jones Dec., par. 9-13, Ex. A; Hicks Dec., par. 4-10]

31. Plaintiff denies the allegations of Sabre Facts #31 because the license agreement

documentation is the purchase of Flightview, and did not occur earlier. [Plaintiff Fact #26]

32. Plaintiff admits in part and denies in part the allegations of Sabre Facts #32. Plaintiff admits that on March 5, 1996, a non-binding memorandum of understanding ("MOU") was entered into between RLM and US West Interactive Services. The memorandum of understanding consisted in the fact that the parties were undertaking "negotiations" and "discussions" with a view towards collaborating for the development of new technology to be deployed over the Internet, and included conducting (1) a technical ("Phase One") trial of the RLM Flightview data feed over the Internet for use in connection with TheTrip.com web site from April 1, 1996 forward; and (2) a marketing ("Phase Two") trial to determine the commercial appeal of the web site once deployed. [Plaintiff Fact #29-30] By the time the parties entered into an actual Trial Agreement, dated June of 1996, the parties pushed back the dates of for these trials to later in 1996. [Plaintiff Fact #33] Among other things, the parties to the MOU and the Trial Agreement agreed to protect each other's confidential information in connection with these trials. [Plaintiff Fact #34] In addition, in December 1996, TheTrip.com was still providing user requirements to RLM for software development. [Plaintiff Fact #37] RLM notes indicate that the RLM contribution to TheTrip.com was

scheduled for "beta testing" in the second half of 1996. [Plaintiff Fact # 35-36, 38] The actual agreement regarding the technology partnership between the parties was not signed until late 1996 or early 1997. [Plaintiff Fact #39]

33. For purposes of this motion, Plaintiff admits that the date of priority for claims 1 and 27 of the '936 patent is March 7, 1997, and further admits the allegations of Sabre Facts #33.

<u>Type and Format Requirements</u>

Pursuant to LR 7.1D, the undersigned certifies that this document has been prepared in Times New Roman 14-point font, as authorized by LR 5.1B.

This 2 3 day of September, 2003.

Respectfully submitted,

Steven G. Hill
Georgia Bar No. 354658
Peter F. Schoenthaler
Georgia Bar No. 629789
Eric G. Maurer
Georgia Bar No. 478199

HILL, KERTSCHER & PIXLEY, LLP
3350 Riverwood Parkway

37

Suite 800
Atlanta, Georgia 30339
Telephone: (770) 953-0995

And

Mark E. Ferguson
Kaspar J. Stoffelmayr

BARTLIT BECK HERMAN PALENCHAR
& SCOTT
54 West Hubbard St., Suite 300
Chicago, IL 60610

Attorneys for Plaintiff ArrivalStar, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a true and correct copy of the foregoing **Plaintiff's Local Rule 56.1 Statement of Facts and Response to Defendants' Local Rule 56.1 Statement of Facts (Validity of '936 Patent)** upon the following defendants by facsimile and by depositing said copy in the U.S. mail, postage prepaid, and addressed as follows:

Frank G. Smith, III
Patrick J. Flinn
J. Patrick Elsevier
ALSTON & BIRD LLP
One Atlantic Center
1201 W. Peachtree Street
Atlanta, Georgia  30309-3424

**Attorneys for Defendants Sabre, Inc., Travelocity.com, L.P., and American Express Co.**

Douglas D. Salyers
Kenneth R. Ozment
TROUTMAN SANDERS LLP
600 Peachtree Street, NE
Suite 5200
Atlanta, Georgia  30308-2216

Of Counsel:

Antony J. McShane
NEAL, GERBERT & EISENBERG
Two North La Salle Street, Suite 2200
Chicago, Illinois  60602-3801

**Counsel for Defendant Centerpost Corporation**

Samuel J. Najim

Nagendra Setty
David S. Kerven, Ph.D.
JONES, DAY, REAVIS & POGUE
3500 Sun Trust Plaza
303 Peachtree Street, N.E.
Atlanta, GA  30308-3242

Of Counsel:

Steven E. Sigalow
JONES, DAY, REAVIS & POGUE
NorthPoint, 901 Lakeside Avenue
Cleveland, Ohio  44114-1190

**Counsel for Defendants SITA Information Networking Computing USA, Inc., Roadway Express, Inc. and City of Atlanta**

Leslie B. Zacks
Jerry B. Blackstock
Joel K. Gerber
HUNTON & WILLIAMS
Bank of America Plaza
Suite 4100
600 Peachtree Street, NE
Atlanta, GA  30308-2216

Of Counsel:

Russell B. Hill
HOWREY SIMON ARNOLD & WHITE, LLP
2020 Main Street
Suite 1000
Irvine, California  92614

**Counsel for Defendant Electronics for Imaging, Inc.**

James L. Ewing, IV
Vaibhav P. Kadaba
KILPATRICK STOCKON, LLP
Suite 2800
1100 Peachtree Street
Atlanta, Georgia 30309-4530

**Attorneys for Defendants Delta Air Lines, Inc., Continental Air Lines, Inc., American Airlines, Inc., Japan Air Lines Company, Ltd.**

John C. Herman
DUANE MORRIS LLP
1180 W. Peachtree Street
Suite 700
Atlanta, Georgia 30309-3448

Of Counsel:

Thomas B. Luebbering
Scott R. Brown
HOVEY WILLIAMS, P.C.
2405 Grand Boulevard, Suite 400
Kansas City, Missouri 64108-2519

**Counsel for Defendant Worldspan, L.P.**

Deborah A. Heineman
SMITH, GAMBRELL & RUSSELL LLP
Suite 3100, Promenade II
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309-3592

Of Counsel:

Michael Sobel
SQUIRE, SANDERS & DEMPSEY L.L.P.
600 Hansen Way

Palo Alto, CA  94304-1043

**Counsel for Defendant FlyteComm, Corp.**

This 23 day of September, 2003.

_____
Attorney for Plaintiff

ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C.

SEP 2 3 2003

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |  |
|---|---|---|
| ARRIVAL STAR, INC., a foreign corporation | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DELTA AIR LINES, INC., | ) | |
| a foreign corporation, | ) | |
| SABRE, INC., a foreign corporation, | ) | |
| TRAVELOCITY.COM, L.P., a foreign | ) | CIVIL ACTION FILE NO. |
| Limited partnership, CITY OF | ) | |
| ATLANTA, WORLDSPAN, L.P., | ) | 1:02-CV-2543-JOF |
| a foreign limited partnership, | ) | |
| FLYTECOMM, CORPORATION, | ) | |
| a foreign corporation, CENTERPOST | ) | |
| CORPORATION, a foreign corporation, | ) | |
| CONTINENTAL AIRLINES, INC., | ) | |
| a foreign corporation, JAPAN AIR | ) | |
| LINES COMPANY, LTD., a foreign | ) | |
| corporation, AMERICAN AIRLINES, | ) | |
| INC., a foreign corporation, | ) | |
| ROADWAY EXPRESS, INC., a | ) | |
| foreign corporation, | ) | |
| ELECTRONICS FOR IMAGING, INC., | ) | |
| a foreign corporation, AMERICAN | ) | |
| EXPRESS COMPANY, a foreign | ) | |
| corporation; and SITA INFORMATION | ) | |
| NETWORKING COMPUTING USA, | ) | |
| INC., a foreign corporation. | ) | |
| | ) | |
| Defendants. | ) | |



**PLAINTIFF'S APPENDIX OF EXHIBITS AND TESTIMONY OPPOSING
THE MOTIONS FOR SUMMARY JUDGMENT THAT CLAIMS 1 AND 27
OF THE '936 PATENT ARE INVALID**

Plaintiff Arrival Star, Inc. hereby files the following evidence of record in opposition to the motions for summary judgment that Claims 1 and 27 of the '936 patent are invalid under the theory that they are anticipated by the use of RLM's Flightview Flight-Tracking system:

1.    Deposition excerpts and exhibits from the Deposition of James Steinberg, taken August 28, 2003;

2.    Deposition excerpts and exhibits from the Deposition of Lorraine Flynn, taken August 29, 2003;

3.    Declaration of Martin Kelly Jones and exhibits;

4.    Declaration of David Hicks; and

5.    Declaration of Mark Stubbins.

This _23_ day of September, 2003.

                         Respectfully submitted,


                         _____
                         Steven G. Hill
                         Georgia Bar No. 354658
                         Peter F. Schoenthaler
                         Georgia Bar No. 629789
                         Eric G. Maurer
                         Georgia Bar No. 478199
                         Hill, Kertscher & Pixley, LLP

3350 Riverwood Parkway
Suite 800
Atlanta, Georgia 30339
(770) 953-0995

Attorneys for Plaintiff ArrivalStar, Inc.

## Certificate of Service

I hereby certify that I have this date served a true and correct copy of the foregoing **PLAINTIFF'S APPENDIX OF EXHIBITS AND TESTIMONY OPPOSING THE MOTIONS FOR SUMMARY JUDGMENT THAT CLAIMS 1 AND 27 OF THE '936 PATENT ARE INVALID** upon the following defendants by depositing said copy in the U.S. mail, postage prepaid, and addressed as follows:

Douglas D. Salyers
Kenneth R. Ozment
TROUTMAN SANDERS LLP
600 Peachtree Street, NE
Suite 5200
Atlanta, Georgia  30308-2216

OF COUNSEL:
Antony J. McShane
NEAL, GERBERT & EISENBERG
Two North La Salle Street, Suite 2200
Chicago, Illinois  60602-3801

**Counsel for Defendant Centerpost Corporation**

Samuel J. Najim
Julie A. Fleming
David S. Kerven, Ph.D., Esq.
JONES, DAY, REAVIS & POGUE
3500 Sun Trust Plaza
303 Peachtree Street, N.E.
Atlanta, GA  30308-3242

Of Counsel:
Steven E. Sigalow
JONES, DAY, REAVIS & POGUE
NorthPoint, 901 Lakeside Avenue
Cleveland, Ohio  44114-1190

**Counsel for Defendant Roadway Express, Inc. and City of Atlanta**

Leslie B. Zacks
Jerry B. Blackstock
Joel K. Gerber
Hunton & Williams
Bank of America Plaza
Suite 4100
600 Peachtree Street, NE
Atlanta, GA  30308-2216

OF COUSEL:

Russell B. Hill
Howrey Simon Arnold & White, LLP
2020 Main Street
Suite 1000
Irvine, California  92614

**Counsel for Defendant Electronics for Imaging, Inc.**

James L. Ewing, IV
Vaibhav P. Kadaba
Kilpatrick Stockon, LLP
Suite 2800
1100 Peachtree Street
Atlanta, Georgia  30309-4530

**Attorneys for Defendants Delta Air Lines, Inc., Continental Air Lines, Inc., American Airlines, Inc., Japan Air Lines Company, Ltd.**

Frank G. Smith, III
Patrick J. Flinn
J. Patrick Elsevier
Alston & Bird LLP
One Atlantic Center
1201 W. Peachtree Street
Atlanta, Georgia  30309-3424

**Attorneys for Defendants Sabre, Inc., Travelocity.Com, L.P., and American Express Co.**

Nagendra Setty
JONES, DAY, REAVIS & POGUE
3500 Sun Trust Plaza
303 Peachtree Street, N.E.
Atlanta, GA  30308-3242

**Counsel for Defendant SITA Information Networking Computing USA, Inc.**

John C. Herman
Duane Morris LLP
1180 W.  Peachtree Street
Suite 700
Atlanta, Georgia  30309-3448

Of Counsel:

Thomas B. Luebbering
Scott R. Brown
Hovey Williams, P.C.
2405 Grand Boulevard, Suite 400
Kansas City, Missouri  64108-2519

**Counsel for Defendant Worldspan, L.P.**

Deborah Heineman
Smith, Gambrell & Russell LLP
Suite 3100, Promenade II
1230 Peachtree Street, N.E.
Atlanta, Georgia  30309-3592

OF COUNSEL:

Michael Sobel
Squire, Sanders & Dempsey L.L.P.
600 Hansen Way
Palo Alto, CA 94304-1043

**Counsel for Defendant FlyteComm, Corp.**

This ⸰3 day of September, 2003.

Steven G. Hill

Attorney for Plaintiff



# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**

ORIGINAL

1

1        Volume 1, Pages 1 - 152

2             Index Page: 151

3        UNITED STATES DISTRICT COURT

4        NORTHERN DISTRICT OF GEORGIA

5             ATLANTA DIVISION

6        ---------------------------

7   ARRIVAL STAR, INC., a foreign

8   corporation,

9             Plaintiff

10  vs.                    Docket No. 1:02-CV-2543-JOF

11  DELTA AIR LINES, INC., a foreign

12  corporation, et al.,

13            Defendants

14        ---------------------------

15   VIDEOTAPED DEPOSITION OF JAMES DOUGLAS STEINBERG

16        Thursday, August 28, 2003, 9:36 a.m.

17            Bromberg & Sunstein

18            125 Summer Street

19            Boston, Massachusetts

20

21  ------- Reporter:  Janis T. Young, RDR, CRR -------

22        Farmer Arsenault Brock LLC

23        Boston, Massachusetts 02109

24        617.728.4404  Fax 617.728.4403

4

09:37:16  1   Steinberg.  And with me is John Stickevers, my

09:37:22  2   associate here at Bromberg & Sunstein.

09:37:37  3          JAMES DOUGLAS STEINBERG, Sworn

09:37:37  4          EXAMINATION

          5   BY MR. HILL:

09:37:37  6       Q.  Good morning, Mr. Steinberg.

09:37:37  7       A.  Good morning.

09:37:38  8       Q.  We met before we went on the record.  As

09:37:41  9   you know, my name is Steve Hill; I represent Arrival

09:37:44  10  Star.

09:37:44  11          Would you state your full name for the

09:37:46  12  record, please.

09:37:47  13      A.  Full name is James Douglas Steinberg.

09:37:50  14      Q.  And where do you reside?

09:37:53  15      A.  67 Pearl Street, Melrose, Massachusetts.

09:37:59  16      Q.  Zip?

09:37:59  17      A.  02176.

09:38:02  18      Q.  Have you been deposed before?

09:38:03  19      A.  Pardon me?

09:38:03  20      Q.  Have you been deposed before?

09:38:05  21      A.  No, I haven't.

09:38:06  22      Q.  I'm going to ask you a series of questions

09:38:08  23  today.  I'll try to ascertain what you may know

09:38:12  24  that's relevant to this particular lawsuit.  If at

FARMER ARSENAULT BROCK LLC

5

| | | |
|---|---|---|
| 9:38:15 | 1 | any point in time I ask you a question and you don't |
| 9:38:18 | 2 | understand the question, just ask me to rephrase it |
| 9:38:20 | 3 | or tell me you don't understand it, and I'll do my |
| 9:38:22 | 4 | best to ask it in a more intelligible way; okay? |
| 9:38:27 | 5 | A.   Okay. |
| 9:38:27 | 6 | Q.   You understand that the oath that you've |
| 9:38:29 | 7 | taken this morning is the same oath you'd take if |
| 9:38:31 | 8 | you were testifying live in this case in front of |
| 9:38:34 | 9 | the judge or jury, correct? |
| 9:38:36 | 10 | A.   Yes. |
| 9:38:36 | 11 | Q.   Is there any reason you can't provide your |
| 9:38:38 | 12 | best and truthful testimony today? |
| 9:38:40 | 13 | A.   No. |
| 9:38:40 | 14 | Q.   You're not under the influence of any |
| 9:38:44 | 15 | prescription drugs that have any impediment on your |
| 9:38:46 | 16 | memory or ability to recall things? |
| 9:38:48 | 17 | A.   No, I'm not. |
| 9:38:53 | 18 | Q.   What is your educational background, sir? |
| 9:38:55 | 19 | A.   I have a bachelor's degree in physics. |
| 9:38:58 | 20 | Q.   Where did you get that? |
| 9:39:00 | 21 | A.   At that time it was named, called Lowell |
| 9:39:06 | 22 | Technological Institute; it's now the University of |
| 9:39:09 | 23 | Mass. at Lowell. |
| 9:39:13 | 24 | Q.   Do you have any post -- |

FARMER ARSENAULT BROCK LLC

6

09:39:18  1       A.   No post degrees.

09:39:21  2       Q.   -- baccalaureate work?

09:39:23  3       A.   No.

09:39:23  4       Q.   No master's work?

09:39:25  5       A.   That's correct.

09:39:27  6       Q.   Other than the work that you've done with

09:39:33  7   RLM -- when did you join RLM Software?

09:39:36  8       A.   In 1989.

09:39:37  9       Q.   And prior to that you worked at the Volpe

09:39:40  10  Center; is that right?

09:39:41  11      A.   That's correct.

09:39:42  12      Q.   And how long were you working for the Volpe

09:39:44  13  Center?

09:39:45  14      A.   Twenty-two years.

09:39:48  15      Q.   What did you do before that?

09:39:50  16      A.   Well, I graduated in 1967, so that was my

09:39:56  17  first job.

09:39:56  18           Actually, let me rephrase that a little

09:40:00  19  bit.  The first two years it was a NASA center, and

09:40:05  20  then it transitioned to the Volpe Center, so...  In

09:40:08  21  1970 became the Volpe Center.

09:40:10  22      Q.   While at the Volpe Center, what kinds of

09:40:13  23  things did you work on?

09:40:14  24      A.   Primarily software development.  Most of my

FARMER ARSENAULT BROCK LLC

9:40:18  1  time there was with software development related to

9:40:22  2  FAA projects that the Volpe Center was charged in

9:40:25  3  assisting them.

9:40:31  4      Q.   Your responsibilities over your 22 years

9:40:33  5  were consistently in the field of software

9:40:34  6  development?

9:40:35  7      A.   Correct.

9:40:37  8      Q.   And you've been with RLM since 1989; is

9:40:42  9  that correct?

9:40:44  10      A.   Correct.

9:40:44  11      Q.   And during your tenure with RLM, have your

9:40:48  12  responsibilities also primarily been in the field of

9:40:50  13  software development?

9:40:51  14      A.   Well, software development and management.

9:40:55  15      Q.   Explain what you mean by management.

9:40:57  16      A.   Well, I'm one of the principals at the

9:41:03  17  company, so...  Management of the company --

9:41:07  18      Q.   Do you have an ownership interest in RLM

9:41:10  19  Software?

9:41:10  20      A.   Correct.

9:41:14  21      Q.   Are you a board member of RLM Software?

9:41:17  22      A.   I believe so.

9:41:19  23      Q.   Are you an officer?

9:41:21  24      A.   I think so, yes.

18

09:57:53  1      Q.   What kind of a testing environment were you

09:57:55  2  using?

09:57:58  3      A.   We were testing it with a set of canned

09:58:03  4  data that we generated for the flight information.

09:58:13  5      Q.   Where did that data come from?

09:58:16  6      A.   We generated the data.

09:58:20  7      Q.   When you say "we generated" it, can you

09:58:27  8  explain how --       .

09:58:28  9      A.   As I recall, we had a tool which would

09:58:31  10  create the messages that would be coming from the

09:58:35  11  FAA to support the system.

09:58:48  12      Q.   When you tested the system with the set of

09:58:52  13  canned data, "canned" to me means, connotes

09:58:57  14  something other than live actual data.  Am I right

09:59:01  15  about that?

09:59:03  16      A.   Canned in the sense it was not coming from

09:59:06  17  a live feed; correct.  But other than that, the

09:59:11  18  format, structure, was the same as what the data

09:59:14  19  feed would be.

09:59:16  20      Q.   Right.  So when you were testing with a set

09:59:19  21  of canned data, that was data that was not actually

09:59:25  22  coming from the FAA at that time?

09:59:28  23      A.   At that time, correct.

09:59:37  24      Q.   And the data itself was actually generated

19

1    by a tool that RLM developed?

2        A.   I believe so, yes.

3        Q.   Was it data regarding historical flights or

4    historical episodes?  Was it taken from actual

5    flights in the past, or was it just --

6        A.   I believe --

7            MR. BELT:  Let me just state an

8    objection.  There were at least four questions

9    there.

10       Q.   Well, answer the last one.  Was it based on

11   historical data?

12       A.   No.

13       Q.   Was it just made up?

14       A.   It was made up.

15       Q.   Any other aspects of the testing

16   environment that you can recall?

17       A.   Nothing specific.

18       Q.   What about deployment?  What kind of

19   deployment work were you doing during your first

20   seven to eight months with RLM?

21       A.   Again, in terms of getting the pieces

22   running in the computer system in a stable manner,

23   and running so that everything worked properly.

24       Q.   Do you recall any specific problems that

FARMER ARSENAULT BROCK LLC

20

01:11   1   you were confronting at that time?

01:15   2       A.   I don't recall.  I'm sure there was a

01:20   3   problem; I don't recall any specific show-stopper

01:24   4   kinds of things, no.

01:35   5       Q.   During your 36 or 37 years since you joined

01:47   6   the Volpe Center, and continuing through your tenure

01:51   7   with RLM, what kind of, how would you characterize

01:56   8   the innovations in the field of flight information

01:59   9   systems that you've witnessed?

02:06   10           MR. BELT:   Objection.

02:07   11      A.   Yes; I guess I need a little more

02:10   12  specifics.

02:10   13      Q.   Well, have there been major breakthroughs

02:14   14  during your time in this field, or would you

02:19   15  characterize the pace of innovation as slow and

02:23   16  steady?  I'm interested in your words rather than

02:25   17  putting words in your mouth, so I'm trying to ask it

02:28   18  as open-ended as I can.

02:30   19           MR. BELT:   Objection.

02:31   20      Q.   How would you characterize the pace of

02:34   21  innovation since you began your tenure with Volpe

02:37   22  Center?

02:45   23      A.   I guess I would say there's significantly

02:48   24  more data available, and significantly higher-

21

| | | |
|---|---|---|
| 10:02:54 | 1 | powered computers to process that data, are the |
| 10:02:59 | 2 | primary things that I see that have occurred. |
| 10:03:03 | 3 | Q.   Anything else, as you sit here right now, |
| 10:03:10 | 4 | that you think of as a meaningful development in the |
| 10:03:13 | 5 | innovation in the field of flight information |
| 10:03:15 | 6 | systems during your tenure with Volpe Center and |
| 10:03:20 | 7 | RLM? |
| 10:03:21 | 8 | A.   No.   I mean, I don't know what to respond |
| 10:03:24 | 9 | to that. |
| 10:03:39 | 10 | Q.   You mentioned earlier that you've done some |
| 10:03:44 | 11 | presentations and marketing work for RLM? |
| 10:03:50 | 12 | You need to say yes or no for the court |
| 10:03:52 | 13 | reporter. |
| 10:03:53 | 14 | A.   Yes. |
| 10:03:54 | 15 | Q.   Tell me about, when did you begin doing |
| 10:04:00 | 16 | marketing work and presentations for RLM? |
| 10:04:05 | 17 | A.   At the very onset. |
| 10:04:07 | 18 | Q.   1989? |
| 10:04:09 | 19 | A.   1989. |
| 10:04:14 | 20 | Q.   Let's concentrate for a moment just on the |
| 10:04:17 | 21 | presentations that you can recall giving.   In 1989, |
| 10:04:23 | 22 | do you recall making any presentations on behalf of |
| 10:04:26 | 23 | RLM? |
| 10:04:40 | 24 | A.   I don't recall. |

25

0:10:34
0:10:38
0:10:42
0:10:53
0:10:58
0:11:03
0:11:08
0:11:10
0:11:15
0:11:17
0:11:20
0:11:24
0:11:30
0:11:36
0:11:40
0:11:41
0:11:42
0:11:45
0:11:47
0:11:47
0:11:49
0:11:55
0:11:55
0:11:55

1    part of a group of presentations made under the

2    heading of advanced technology communications and

3    navigation systems update?

4        A.   I don't recall the specific heading.

5        Q.   Do you know a gentleman named Tim Kuescher

6    from Jetstream International?

7        A.   Not personally.

8        Q.   Have you ever met him before?

9        A.   I don't recall that I've met him.  I may

10   have.  I've met lots of people.

11       Q.   Do you recall whether he was also making a

12   presentation at the 1993 RAA meeting?

13       A.   I don't, no.

14       Q.   Do you know Jack Howell with the FAA?

15       A.   Jack Howell?

16       Q.   Yes.

17       A.   It does not ring a bell.

18       Q.   Do you know whether or not he was making a

19   presentation?

20       A.   I don't recall.

21       Q.   Do you know Doug Gibbs with BFG Flight

22   Systems?

23       A.   No.

24       Q.   Do you recall whether Mr. Gibbs was making

FARMER ARSENAULT BROCK LLC

26

10:11:58  1    a presentation on the same day you were?

10:12:01  2        A.   I don't recall.

10:12:03  3        Q.   Do you know Bob Dick with Mercury Airborne

10:12:09  4    Group?

10:12:09  5        A.   Not that I know.  Not that I recall.

10:12:12  6        Q.   You don't recall whether he was making a

10:12:14  7    presentation the same day you were at the RAA

10:12:16  8    meeting in 1993?

10:12:20  9        A.   I don't believe so.  I don't recall.

10:12:27  10       Q.   Do you know a gentleman named David

10:12:30  11   Bornemann from Bornemann Associates?

10:12:32  12       A.   I know David Bornemann, yes.

10:12:34  13       Q.   Do you recall whether he was at the RAA

10:12:36  14   meeting in 1993?

10:12:49  15       A.   Specifically, I can't picture seeing him,

10:12:50  16   no.

10:12:58  17       Q.   Did you attend any of the other

10:13:03  18   presentations that were made at the RAA meeting in

10:13:07  19   1993, or did you just come in, make your

10:13:09  20   presentation, and then leave?

10:13:11  21       A.   I believe it was, came in, made our

10:13:13  22   presentation, and left.

10:13:21  23       Q.   Do you have any documents at your office or

10:13:25  24   at home that would allow you to more precisely

27

1    estimate the length of time that your presentation

2    took in 1993?

3        A.   The only other documents I know of are the

4    presentation slides themselves.

5        Q.   Okay.  Would those help you in any way to

6    more accurately estimate the length of the

7    presentation?

8        A.   To some degree, yes.  I mean, to some

9    degree.  That's why I was posing my response of 45

10   minutes or so was the length of the presentation,

11   based on the number of pages of the presentation.

12       Q.   Okay.  Did you field any questions as a

13   part of the presentation?  Did you take any

14   questions from the audience?

15       A.   I'm sure there were.  I don't recall what

16   the specific questions were at this point.

17       Q.   I wouldn't expect you to.

18       A.   I mean, generally those are fairly two-way

19   presentations.

20       Q.   Do you recall whether during the

21   presentation questions were being asked while you

22   were making your presentation, or did you make your

23   slide show presentation and then open up the field

24   to questions from the audience?

28

A.   Specifically I don't recall, although generally when I make a presentation, I attempt to make it two-way from the very beginning.  I tell people to feel free to interrupt, feel free to ask questions.

Q.   So when you gave the estimate of a half an hour to 45 minutes, that would include any questions that were being asked as you were presenting?

A.   Again, ten years ago, that's the sense that I get that it was, yes.

Q.   You don't have any notes either that you prepared in advance of the presentation or that you brought back from the attendance at the presentation?

A.   Not that I know of.  Not that I know of, no.

MR. HILL:   Let's mark this as Exhibit 2.

(Marked, Exhibit 2, photocopies of slides, entitled Integrated Flight Information.)

Q.   Let me show you what the court reporter has just marked as Exhibit 2.  Are these the slides that you referred to in your earlier testimony about the 1993 presentation?

A.   These appear to be copies of the slides,

29

0:17:35  1   yes.

0:17:44  2        Q.   Do you recall attaching these slides to

0:17:46  3   your sworn declaration in this case?

0:17:50  4        A.   Yes.

0:17:55  5        Q.   And are these all the slides from the

0:17:56  6   presentation that you had in your possession,

0:17:59  7   custody or control at the time you signed your

0:18:00  8   declaration, or are there others?

0:18:02  9        A.   There are some screen shots that went with

0:18:05 10   this.

0:18:05 11        Q.   We'll get to the screen shots in just a

0:18:07 12   second.   I'm only focusing on the slides, the

0:18:11 13   textual slides.

0:18:14 14        A.   I'm sorry; ask the question again.

0:18:15 15        Q.   Are these the only textual slides that you

0:18:19 16   have in your possession from the 1993 presentation?

0:18:22 17        A.   Yes, as far as I know.

0:18:27 18        Q.   You didn't hold any slides back at the time

0:18:30 19   that you signed your declaration?

0:18:32 20        A.   No.

0:18:33 21        Q.   You gave everything over to the court --

0:18:37 22        A.   Correct.

0:18:38 23        Q.   -- for its review in this matter?

0:18:40 24        A.   Yes.

FARMER ARSENAULT BROCK LLC

32

| | | |
|---|---|---|
| 10:22:53 | 1 | Q.   What kinds of things was RLM doing up to |
| 10:23:01 | 2 | and including 1993 to try to protect its position as |
| 10:23:04 | 3 | a market leader? |
| 10:23:13 | 4 | A.   I guess I'm a little unclear what you mean |
| 10:23:16 | 5 | by protect. |
| 10:23:20 | 6 | Q.   Well, is there anything that RLM had |
| 10:23:26 | 7 | developed in the way of technical documentation or |
| 10:23:32 | 8 | source code or anything like that that it was |
| 10:23:36 | 9 | claiming trade secret or confidential business |
| 10:23:40 | 10 | information protection for? |
| 10:23:50 | 11 | A.   I don't recall -- I don't recall at that |
| 10:23:52 | 12 | point in time. |
| 10:23:54 | 13 | Q.   As you were preparing for your 1993 |
| 10:24:01 | 14 | presentation, were you at all concerned about how |
| 10:24:07 | 15 | much information about Flightview you put out to the |
| 10:24:11 | 16 | audience, recognizing that there could be some |
| 10:24:15 | 17 | technical people in the crowd? |
| 10:24:22 | 18 | A.   I would say yes. |
| 10:24:24 | 19 | Q.   Explain how that affected what the |
| 10:24:31 | 20 | composition of your presentation consisted of. |
| 10:24:36 | 21 | A.   We weren't presenting detailed design |
| 10:24:47 | 22 | specifications such as that.  It wasn't going to |
| 10:24:52 | 23 | that level of detail. |
| 10:24:53 | 24 | Q.   What about in your narrative presentation? |

1   Did you discuss any technical details or the

2   architecture, detailed design descriptions of

3   Flightview?

4           MR. BELT:   Objection.

5       A.   I probably could not recall specifically

6   the conversations.

7       Q.   So you have no recollection of discussing

8   the architecture of Flightview during the 1993

9   presentation?

10      A.   Not the detailed design.

11      Q.   When you say the detailed design, what do

12  you mean by that?

13      A.   To the level of all the programs that are

14  involved, all the routines in those programs, how

15  they communicate with each other, what language

16  they're coded in.

17      Q.   What about the hardware architecture and

18  configuration?  Do you have specific recollection of

19  describing the hardware configuration and

20  architecture at the 1993 presentation?

21      A.   Not specific recollection, no.

22      Q.   Do you think it's likely that you did

23  discuss that?

24          MR. BELT:   Objection.

34

| | | |
|---|---|---|
| 10:26:28 | 1 | A.   Again, I guess, I don't know. |
| 10:26:32 | 2 | Q.   You don't know? |
| 10:26:32 | 3 | A.   I mean, I don't recall. |
| 10:26:39 | 4 | Q.   What do you recall telling the people at |
| 10:26:42 | 5 | the 1993 presentation you made about the hardware |
| 10:26:47 | 6 | configuration for Flightview? |
| 10:26:55 | 7 | A.   I don't recall telling them anything. |
| 10:27:02 | 8 | Q.   Let's shift gears for a second and talk |
| 10:27:04 | 9 | about the software design and the flow of the |
| 10:27:10 | 10 | software.  What specifically do you recall telling |
| 10:27:16 | 11 | the audience about the design of the software? |
| 10:27:26 | 12 | A.   Well, the things that were told to the |
| 10:27:31 | 13 | audience were essentially what's in these overhead |
| 10:27:37 | 14 | projector sheets. |
| 10:27:38 | 15 | Q.   Okay.  Let's take a look at the slides, |
| 10:27:41 | 16 | then. |
| 10:27:41 | 17 | The first page of Exhibit 2 is a cover |
| 10:27:47 | 18 | slide entitled Integrated Flight Information, Jim |
| 10:27:53 | 19 | Steinberg, RLM Software, Boston, Mass.  What, if |
| 10:27:59 | 20 | anything, do you recall telling the audience while |
| 10:28:04 | 21 | this slide was on your overhead projector? |
| 10:28:09 | 22 | A.   I guess I don't recall the specific words. |
| 10:28:13 | 23 | I could tell you the intent of the slide. |
| 10:28:15 | 24 | Q.   Go ahead and tell me the intent of the |

35

10:28:17  1    slide, then.

10:28:19  2        A.   It was to present the capability of the

10:28:29  3    system that would integrate various types of flight

10:28:32  4    information.

10:28:37  5        Q.   I'm going to adjust my position just a

10:28:39  6    little bit to bring your head around so that the

10:28:41  7    court reporter can see you a little bit better so

10:28:43  8    she can get a good take down; okay?

10:28:45  9             MR. BELT:   Let me just take a peek in

10:28:48  10   the monitor here.   I just want to know if anything

10:28:51  11   is shifting here.

10:28:52  12            MR. HILL:   I certainly don't want

10:28:53  13   anything to be shifting on the monitor.

10:28:55  14            MR. BELT:   I'm just making sure the back

10:28:57  15   of your head is not there.

10:28:59  16            MR. HILL:   I agree.

10:29:14  17            Are we okay?

10:29:15  18            MR. BELT:   We're good to go.

10:29:23  19       Q.   Anything specifically you can recall

10:29:25  20   telling the audience about integrated flight

10:29:31  21   information while this slide was up for the audience

10:29:35  22   to look at?

10:29:39  23       A.   Nothing I can directly recall.   I would be

10:29:44  24   speculating as to what I would have said.

FARMER ARSENAULT BROCK LLC

36

10:29:46  1          Q.   I don't want you to speculate at all; I

10:29:50  2     just want the best of your recollection.

10:29:59  3                Take a look at the next slide.  This is

10:30:08  4     the slide marked Background, Flight Information and

10:30:13  5     Flightview.  What do you recall telling the audience

10:30:17  6     during your 1993 presentation while this slide was

10:30:21  7     up for them to look at?

10:30:31  8          A.   Again, it would be speculation.  I don't

10:30:35  9     recall specific words.

10:30:47  10         Q.   Do you recall, if not words, do you recall

10:30:49  11    substance of what you told the audience while this

10:30:56  12    slide was up during your presentation in 1993?

10:31:11  13               It's okay if you don't.

10:31:13  14         A.   Yes; right.

10:31:14  15         Q.   I'm not trying -- if you don't know, you

10:31:16  16    don't know.  If you don't recall, you don't recall.

10:31:18  17    That's fine.

10:31:20  18         A.   Again, knowing what the intent of the slide

10:31:23  19    is; but in terms of recalling specifically what was

10:31:25  20    said, no.

10:31:27  21         Q.   Okay.  We certainly don't want you to guess

10:31:31  22    or speculate today.

10:31:33  23               The next slide is entitled Company

10:31:37  24    Background, and there is a paragraph of text below

FARMER ARSENAULT BROCK LLC

37

| | | |
|---|---|---|
| 10:31:40 | 1 | that.  What do you recall about your approach with |
| 10:31:51 | 2 | this slide?  Did you simply read the paragraph to |
| 10:31:56 | 3 | the audience, or are there additional things that |
| 10:31:59 | 4 | you told the audience while this slide was |
| 10:32:02 | 5 | positioned for them to look at? |
| 10:32:07 | 6 | A.   This would have been a slide I probably |
| 10:32:09 | 7 | read pretty much verbatim and I moved on unless |
| 10:32:12 | 8 | somebody had a question. |
| 10:32:13 | 9 | Q.   Do you recall any questions? |
| 10:32:14 | 10 | A.   I don't recall if there were any. |
| 10:32:15 | 11 | Q.   Do you recall any other statements that you |
| 10:32:20 | 12 | made while this slide was up? |
| 10:32:22 | 13 | A.   No, I don't. |
| 10:32:26 | 14 | Q.   The next slide is entitled Company |
| 10:32:32 | 15 | Experience, and it has three paragraphs of text |
| 10:32:36 | 16 | below it.  And I'll ask you the same question:  When |
| 10:32:41 | 17 | this slide was positioned for the audience to see |
| 10:32:43 | 18 | during your 1993 presentation, do you recall reading |
| 10:32:50 | 19 | the text of these paragraphs to the audience, or was |
| 10:32:55 | 20 | there more to it than that? |
| 10:32:57 | 21 | A.   Again, this would be the kind of slide that |
| 10:33:00 | 22 | I would have purely read and moved on. |
| 10:33:04 | 23 | Q.   Other than reading the text of this |
| 10:33:06 | 24 | particular slide to the audience, is there anything |

38

| | | |
|---|---|---|
| 10:33:08 | 1 | else that you can recall telling the audience while |
| 10:33:11 | 2 | this slide was positioned? |
| 10:33:14 | 3 | A. Not that I can recall. |
| 10:33:21 | 4 | Q. The next slide says Jim Steinberg, and it |
| 10:33:26 | 5 | has three paragraphs of text below it. What did you |
| 10:33:32 | 6 | tell the audience at your 1993 presentation while |
| 10:33:36 | 7 | this slide was positioned for them to see? |
| 10:33:49 | 8 | A. Again, I don't have a recollection of the |
| 10:33:52 | 9 | specific words that I would have used. Again, this |
| 10:33:54 | 10 | would be the kind of slide that I would pretty much |
| 10:33:57 | 11 | just present as it is. |
| 10:34:05 | 12 | Q. Let's look at the next slide, entitled |
| 10:34:10 | 13 | Information Explosion, and it says, volume, |
| 10:34:14 | 14 | availability, integration and visualization. What |
| 10:34:18 | 15 | do you recall telling the audience in your 1993 |
| 10:34:22 | 16 | presentation while this Information Explosion slide |
| 10:34:26 | 17 | was up for the audience to see? |
| 10:34:37 | 18 | A. I guess the same, the same issue of these |
| 10:34:41 | 19 | are the kinds of things that we were going to cover |
| 10:34:43 | 20 | in the next set of slides, and that's it. |
| 10:34:49 | 21 | Q. Is it fair to characterize this as maybe an |
| 10:34:52 | 22 | introduction or an overview slide? |
| 10:34:54 | 23 | A. Yes. |
| 10:34:54 | 24 | Q. A preview for what's about to come? |

39

| | | |
|---|---|---|
| 10:34:56 | 1 | A.   Yes. |
| 10:34:56 | 2 | Q.   You probably didn't spend very much time on |
| 10:35:00 | 3 | this slide then, true, relative to some of the other |
| 10:35:03 | 4 | ones? |
| 10:35:03 | 5 | A.   I probably didn't.  I don't know for sure. |
| 10:35:05 | 6 | I mean -- |
| 10:35:06 | 7 | Q.   You can't recall? |
| 10:35:07 | 8 | A.   Right. |
| 10:35:15 | 9 | Q.   The next slide is entitled Available |
| 10:35:20 | 10 | Information, and there are eight different lines of |
| 10:35:30 | 11 | text below that.  What do you recall telling the |
| 10:35:32 | 12 | audience about the Available Information slide? |
| 10:35:51 | 13 | A.   Again, I don't recall the specific words, |
| 10:35:53 | 14 | but this is a slide that I would have started to |
| 10:35:56 | 15 | talk a little bit to the specific content of each of |
| 10:35:58 | 16 | these types of data. |
| 10:36:04 | 17 | Q.   Do you recall what you told the audience |
| 10:36:06 | 18 | about the FAA en route tracking data? |
| 10:36:13 | 19 | A.   Not specific words, no. |
| 10:36:17 | 20 | Q.   During your 1993 presentation, do you |
| 10:36:19 | 21 | recall telling the audience, or do you recall what |
| 10:36:25 | 22 | you told the audience about the aircraft reports |
| 10:36:31 | 23 | including ACARS, ADS and Pilot? |
| 10:36:35 | 24 | A.   Again, I don't recall the specific language |

40

| | | |
|---|---|---|
| 10:36:37 | 1 | that was used, other than an explanation of what |
| 10:36:40 | 2 | these terms were. |
| 10:36:42 | 3 | Q.   Well, let's talk about what these terms |
| 10:36:44 | 4 | are, then. |
| 10:36:45 | 5 | What do you think you told the -- what |
| 10:36:49 | 6 | do you recall telling the audience in your 1993 |
| 10:36:52 | 7 | presentation about what ASD is? |
| 10:36:58 | 8 | A.   That discussion would have been involving |
| 10:37:04 | 9 | that ASD is data that the FAA is collecting from the |
| 10:37:12 | 10 | radar posted at the host computers on the national |
| 10:37:16 | 11 | aerospace computer systems; that the data is |
| 10:37:18 | 12 | currently being funneled back into the Volpe Center, |
| 10:37:21 | 13 | where for the first time ever there was a national |
| 10:37:25 | 14 | picture of flight tracking information available. |
| 10:37:32 | 15 | Q.   And what do you recall telling the audience |
| 10:37:35 | 16 | in your 1993 presentation about ACARS, aircraft |
| 10:37:40 | 17 | reports? |
| 10:37:41 | 18 | A.   Specific words, I don't recall.  Again -- |
| 10:37:43 | 19 | Q.   Just the substance. |
| 10:37:47 | 20 | A.   The substance would be that this is an |
| 10:37:49 | 21 | additional source of flight tracking information |
| 10:37:52 | 22 | which many of the airlines have the aircraft |
| 10:37:55 | 23 | equipment with ACARS equipment, and that ADS and |
| 10:38:01 | 24 | pilot reporting positions are also available as |

41

| 10:38:03 | 1 | flight tracking information. |

10:38:03   1   flight tracking information.

10:38:07   2      Q.  Do you know as of the 1993 presentation

10:38:11   3   which of the major carriers had their airplanes

10:38:16   4   equipped with ACARS?

10:38:18   5              MR. BELT:  Objection.

10:38:21   6      A.  I don't know a detailed list.

10:38:24   7      Q.  Do you know any?

10:38:26   8      A.  American Airlines, as I recall, indicated

10:38:29   9   they used ACARS.

10:38:33   10      Q.  They indicated that to you?

10:38:38   11      A.  I don't know.

10:38:47   12      Q.  What did you tell the audience in your 1993

10:38:51   13   presentation about weather data?

10:39:00   14      A.  Again, the substance of there being weather

10:39:03   15   data available, graphic and textual, that would fit

10:39:07   16   into an integrated flight dispatch workstation

10:39:16   17   module.

10:39:16   18      Q.  What did you tell the audience in your 1993

10:39:21   19   presentation about schedule data in connection with

10:39:24   20   this slide?

10:39:24   21      A.  Probably not much more than what's on the

10:39:27   22   slide.

10:39:27   23      Q.  That it exists?

10:39:28   24      A.  That it exists, and they probably knew more

42

10:39:31  1    about it than I did.

10:39:32  2        Q.   That there are reservation systems out

10:39:37  3    there?

10:39:38  4        A.   Yes.

10:39:38  5        Q.   Do you know if you mentioned any specific

10:39:41  6    reservation systems?

10:39:43  7        A.   I don't recall if I had mentioned them by

10:39:46  8    name.

10:39:47  9        Q.   What do you recall telling the audience in

10:39:49  10   your 1993 presentation about crew data?

10:39:53  11       A.   Again, that it was essentially an airline

10:39:57  12   application that fit within the scope of integrating

10:40:03  13   into a Flightview workstation; and again, that's

10:40:09  14   information they knew more about than I did.

10:40:13  15       Q.   What do you recall telling the audience

10:40:15  16   during your 1993 presentation about air space

10:40:21  17   configuration?

10:40:24  18       A.   Again, the substance of that bullet would

10:40:27  19   have been talking about the availability of air

10:40:35  20   space configuration data, of jet route data, of nav

10:40:41  21   aids and fixes, and getting that information into a

10:40:45  22   flight dispatch system.

10:40:48  23       Q.   What do you recall telling the audience

10:40:54  24   during your 1993 presentation about corporate policy

FARMER ARSENAULT BROCK LLC

43

| | |
|---|---|
| 10:40:56 | 1 | in connection with this slide? |
| 10:40:58 | 2 | A.   Again, the substance of that was that there |
| 10:41:08 | 3 | were corporate policies that may be in place in |
| 10:41:09 | 4 | terms of how airlines operate their aircraft and how |
| 10:41:12 | 5 | much extra fuel they put on them, which would be the |
| 10:41:15 | 6 | kind of information that would be available through |
| 10:41:18 | 7 | such a system. |
| 10:41:20 | 8 | Q.   Take a look at the next slide.  The next |
| 10:41:27 | 9 | slide is entitled ASD Data, Flight Tracking |
| 10:41:34 | 10 | Information, and then it has some text below that. |
| 10:41:39 | 11 | What do you recall telling the audience |
| 10:41:42 | 12 | during your 1993 presentation about this slide? |
| 10:41:52 | 13 | A.   Again, I don't recall the specific words. |
| 10:41:57 | 14 | The substance would have been essentially what's |
| 10:41:59 | 15 | here, an explanation of what the data is, where it |
| 10:42:02 | 16 | comes from, why it's suddenly available. |
| 10:42:17 | 17 | Q.   Do you think the substance of what you said |
| 10:42:18 | 18 | regarding this slide is accurately captured in the |
| 10:42:21 | 19 | text on the slide, or are there other components |
| 10:42:25 | 20 | that you recall divulging to the audience while this |
| 10:42:30 | 21 | slide was up for view? |
| 10:42:34 | 22 | MR. BELT:  Objection. |
| 10:42:35 | 23 | A.   I don't recall if there were additional |
| 10:42:39 | 24 | items that I went over. |

44

10:42:44   1      Q.   Take a look at the next slide, ASD Data,

10:42:50   2   Potential Uses.  What do you recall telling the

10:43:06   3   audience during your 1993 presentation about this

10:43:06   4   slide?

10:43:23   5      A.   Again, substantively, a short description,

10:43:27   6   a short discussion of one of the items.

10:43:33   7      Q.   Okay.  Well, let's just go one by one

10:43:36   8   through the items and I'll ask you.  The "'Now view'

10:43:40   9   of National IFR Air Traffic," what do you recall

10:43:43   10  telling your audience during your 1993 presentation

10:43:48   11  about "now view" of national IFR air traffic?

10:43:52   12     A.   That would have been a discussion of

10:43:55   13  essentially the fact that this data was now all --

10:43:59   14  was currently available for the entire country, so

10:44:02   15  that a "now view" is the ability to put up a display

10:44:07   16  of where everybody is right now, every flight is

10:44:10   17  right now.

10:44:13   18     Q.   Next bullet point says, "Timely alert of

10:44:17   19  congested airports and routes."  What do you recall

10:44:19   20  telling the audience during your 1993 presentation

10:44:22   21  about timely alert of congested airports and routes?

10:44:26   22     A.   Again, the substance of that would have

10:44:28   23  been a discussion on visualizing the position of

10:44:36   24  aircraft relative to destination airports, relative

10:44:39  1    to the route structure, being able to see where

10:44:45  2    congestion was occurring and react to it.

10:44:48  3         Q.   Do you have a recollection of the words

10:44:49  4    that you used to convey that?

10:44:53  5         A.   Not specifically.

10:44:54  6         Q.   The next is "Monitor progress of feeder

10:45:00  7    flights." What do you recall telling the audience

10:45:03  8    during your 1993 presentation about monitoring

10:45:06  9    progress of feeder flights?

10:45:09  10        A.   Again, the substance of that would have

10:45:14  11   been visualizing or having a visualization of where

10:45:19  12   these feeder flights were, which were flights that

10:45:22  13   were feeding into hubs where another airline may be

10:45:26  14   taking off from; seeing where they were, seeing

10:45:30  15   whether they would be on time so that their

10:45:32  16   passengers would make it onto the departing

10:45:37  17   aircraft.

10:45:37  18        Q.   Next is "Track user selectable flights."

10:45:43  19   What do you recall telling the audience during your

10:45:45  20   1993 presentation about track user selectable

10:45:49  21   flights?

10:45:50  22        A.   Again, the substance of that would be

10:45:53  23   describing how the system would allow them to select

10:45:57  24   which flights they saw, based on various criteria

FARMER ARSENAULT BROCK LLC

46

10:46:01  1   of, show me all the American Airlines flights, show

10:46:08  2   me all the America West flights going into Houston;

10:46:12  3   a whole set of criteria that one could use to select

10:46:15  4   flights and track them.

10:46:17  5       Q.   Do you recall the words that you used to

10:46:18  6   communicate that to the audience?

10:46:21  7       A.   Not the specific sentences, no.

10:46:24  8       Q.   Do you recall any of them?

10:46:27  9       A.   Other than looking at this, and -- no.

10:46:35  10      Q.   Do you actually have a recollection of the

10:46:39  11  portion of the presentation where you discussed

10:46:42  12  track user selectable flights, or are you making

10:46:49  13  your best approximation based upon what's on the

10:46:52  14  slide here?

10:46:53  15          MR. BELT:   Objection.

10:46:55  16      Q.   Let me ask the question a different way.

10:46:58  17          Independent of what you see on the

10:46:59  18  slide, do you have an independent recollection of

10:47:03  19  what you said to the audience during your 1993

10:47:06  20  presentation?

10:47:15  21      A.   Specific words, no.  Yes, in the sense that

10:47:19  22  that's the reason that we made these presentations,

10:47:22  23  was to essentially talk about that item.  That was

10:47:25  24  one of the highlights of our system that we were

47

10:47:29  1    marketing.  But I don't remember specific sentences

10:47:35  2    that were...

10:47:39  3        Q.   Next says, graphic display of flight plans.

10:47:45  4    What do you recall telling the audience during your

10:47:48  5    1993 presentation about graphic display of flight

10:47:50  6    plans?

10:47:52  7        A.   Again, the substance of this bullet was to

10:47:59  8    explain to them that the system could display flight

10:48:04  9    plans on the display of the flights that they were

10:48:10  10   tracking.

10:48:18  11       Q.   Do you recall anything else about what

10:48:22  12   you -- well, let me ask it differently.  Do you

10:48:24  13   recall the specific words that were used during the

10:48:29  14   presentation to describe the graphic display of

10:48:32  15   flight plans?

10:48:33  16       A.   I guess I don't recall specific words;

10:48:39  17   correct.

10:48:41  18       Q.   What did you tell the audience during your

10:48:42  19   1993 presentation about visualizing the impact of

10:48:47  20   weather?

10:48:48  21       A.   Again, substantively, this bullet would be

10:48:53  22   where I would explain the display of weather

10:48:57  23   information, radar -- what they call radar, weather

10:49:02  24   radar information, showing how seeing that on the

48

10:49:06  1    screen with the flight positions, what operations

10:49:11  2    people visualize where the planes are and how the

10:49:13  3    weather is going to impact their operations.

10:49:19  4        Q.   What do you recall telling the audience

10:49:24  5    during your 1993 presentation about visualizing the

10:49:27  6    impact of the reroute alternatives?

10:49:32  7        A.   Again, substantively, this bullet would be

10:49:36  8    similar to the previous one in that the system would

10:49:39  9    allow them to display alternate routes and see how

10:49:47  10   those routes are impacted by weather graphically.

10:49:51  11       Q.   Anything else you can recall about that?

10:49:55  12       A.   Not specifics of sentences, no.

10:50:04  13       Q.   Then you have offline analysis with

10:50:11  14   schedules and route structure.  Tell me what you

10:50:14  15   recall about telling the audience during your 1993

10:50:23  16   presentation about offline analysis for schedules or

10:50:24  17   route structure.

10:50:26  18       A.   Again, substantively, this bullet was where

10:50:30  19   we would, or where I would discuss with them the

10:50:36  20   ability of the system to be used to analyze where

10:50:39  21   planes have been, to help them define their route

10:50:44  22   structures between city pairs, to help them change

10:50:48  23   schedules if necessary based on what they see

10:50:51  24   happening in the flight world in general.

10:50:53  1      Q.   What's the significance of the term "off

10:50:56  2   line" as it's used in this slide?

10:51:01  3      A.   Off line meaning using data that has been

10:51:04  4   saved on the system rather than in real time.

10:51:10  5      Q.   You're using historical data?

10:51:13  6      A.   For this analysis.

10:51:17  7      Q.   And what did you tell the audience during

10:51:19  8   your 1993 presentation about offline training and

10:51:24  9   archived data?

10:51:25  10     A.   Again, the substance of this bullet would

10:51:28  11  have been a discussion on the ability to use the

10:51:32  12  archived data in a replay mode for training flight

10:51:36  13  dispatchers, situations that actually occurred.

10:51:46  14     Q.   Next slide is entitled Information Use.

10:51:52  15  What do you recall telling the audience during your

10:51:55  16  1993 presentation while this Information Use slide

10:52:00  17  was up for their view?

10:52:02  18     A.   Again, the specifics, I don't recall.  The

10:52:05  19  substance would have been discussing each of the

10:52:11  20  bullets.

10:52:11  21     Q.   Go ahead and walk me through the bullets

10:52:14  22  and tell me what you recall discussing with the

10:52:16  23  audience.

10:52:19  24     A.   We would have discussed the use of this

50

10:52:24  1    data in long-range planning, similar to the previous

10:52:30  2    page where they talked about route structures,

10:52:34  3    talked about using the data, the historical data, to

10:52:39  4    perhaps better develop their schedules; using

10:52:43  5    historic data to better manage their resources based

10:52:51  6    on what they had seen happening in the past, where

10:52:56  7    they need key personnel, where they don't, that kind

10:52:58  8    of thing.  I suppose sort of the long-range planning

10:53:04  9    issue.

10:53:05  10            Then the operations planning, talking

10:53:13  11   about using the system, integrating the flight

10:53:15  12   planning systems, providing flight planning

10:53:18  13   information to display on the system, making use of

10:53:21  14   this system and integrating it with crew assignment

10:53:24  15   systems, knowing where the planes are, when the

10:53:26  16   crews would be arriving.

10:53:28  17            The same with aircraft.  They had

10:53:35  18   realtime tracking of flights, making situation

10:53:38  19   displays based on weather and congestion, and the

10:53:41  20   monitoring of situations for, in this case, one

10:53:44  21   example is directing feeder flights.

10:53:51  22   Q.    Do you recall anything else about the

10:53:54  23   substance of what you discussed with the audience

10:53:56  24   during your 1993 presentation while this Information

51

10:54:01  1  Use slide was up for display?

10:54:07  2      A.   No.

10:54:10  3      Q.   Do you recall any specific words, phrases,

10:54:14  4  or sentences that you used to convey the substance

10:54:18  5  that you've just testified about regarding this

10:54:21  6  Information Use slide?

10:54:22  7      A.   Not specific words or sentences.

10:54:31  8      Q.   The next slide is entitled Flightview.

10:54:39  9  What did you tell the audience during your 1993

10:54:45  10  presentation while the Flightview slide was up for

10:54:49  11  their view?

10:54:50  12          Let's call this Flightview Goal, since

10:54:53  13  the next word after Flightview is Goal, just so

10:54:57  14  we're all clear on the record what we're talking

10:55:00  15  about.

10:55:00  16          Let me ask my question again.  What do

10:55:02  17  you recall telling the audience during your 1993

10:55:06  18  presentation while the Flightview Goal slide was up

10:55:09  19  for the audience to see?

10:55:10  20      A.   Again, substantively, we would have been

10:55:26  21  discussing, or I would have been discussing the

10:55:29  22  Flightview system and the goal of using it to

10:55:34  23  effectively manage flight operations, focusing on

10:55:40  24  the five bullets.

52

10:55:42  1      Q.   Go ahead and walk through the bullets and

10:55:44  2   tell me what you recall telling the audience during

10:55:47  3   the 1993 presentation about each of the bullets on

10:55:50  4   the slide.

10:55:54  5      A.   I don't recall what I would have told them

10:55:56  6   about the first one at the moment.

10:56:01  7            On-time performance certainly is using

10:56:04  8   the system to monitor the flights, follow the

10:56:07  9   flights, and improve their on-time performance by

10:56:11  10  being able to react to situations quickly.

10:56:17  11           Customer service, in terms of being able

10:56:21  12  to tell customers, passengers, when flights are

10:56:25  13  going to be landing, when they're going to be

10:56:27  14  available to take off.

10:56:30  15           Competitiveness, I guess I don't recall

10:56:33  16  what specific items I would have brought up there,

10:56:38  17  other than if you improve on-time performance,

10:56:42  18  customer service, you're going to be more

10:56:44  19  competitive.

10:56:44  20           And again, the allocation of resources

10:56:48  21  is making use of the system to see where everything

10:56:51  22  is.

10:56:58  23     Q.   Anything else about the substance of the

10:57:01  24  Flightview Goal slide that you recall conveying to

53

| 10:57:03 | 1 | your audience during the 1993 presentation? |
| 10:57:06 | 2 | A.   Not that I can recall. |
| 10:57:08 | 3 | Q.   Do you recall any of the specific words, |
| 10:57:11 | 4 | phrases or sentences that you used during your |
| 10:57:14 | 5 | presentation in 1993 while the Flightview Goal slide |
| 10:57:17 | 6 | was up for the audience to view? |
| 10:57:21 | 7 | A.   Specifically, no. |
| 10:57:26 | 8 | Q.   The next slide we'll call the Flightview |
| 10:57:30 | 9 | Means slide, since "Means" is the next word after |
| 10:57:34 | 10 | "Flightview."  What do you recall telling the |
| 10:57:38 | 11 | audience during your 1993 presentation while the |
| 10:57:41 | 12 | Flightview Means slide was up for their view? |
| 10:58:02 | 13 | A.   Again, substantively,.we would have |
| 10:58:09 | 14 | discussed how Flightview would provide a fully |
| 10:58:12 | 15 | integrated flight operations system for the items |
| 10:58:15 | 16 | that are shown here. |
| 10:58:19 | 17 | Q.   Just walk me through each of the bullet |
| 10:58:22 | 18 | points and tell me as best you can recall what |
| 10:58:26 | 19 | specifically you told the audience during your 1993 |
| 10:58:30 | 20 | presentation about each. |
| 10:58:32 | 21 | A.   The first bullet is a "Single-user |
| 10:58:36 | 22 | interface," and would have discussed the ability of |
| 10:58:41 | 23 | the system to be the interface for the user while |
| 10:58:46 | 24 | requiring multiple computers for multiple tasks, and |

54

| | | |
|---|---|---|
| 10:58:49 | 1 | hosting several interfaces on this one system. |
| 10:58:55 | 2 |     Q.   When you answered that, you said, would |
| 10:58:58 | 3 | have discussed, rather than did discuss; and I'm |
| 10:59:04 | 4 | just wondering whether or not your response at this |
| 10:59:07 | 5 | point is based not on what you recall telling the |
| 10:59:10 | 6 | audience, but instead is based on what you think you |
| 10:59:13 | 7 | probably told the audience based on other |
| 10:59:15 | 8 | presentations you've done.  Am I right about that? |
| 10:59:24 | 9 |     A.   Yes, that's probably -- yes. |
| 10:59:27 | 10 |     Q.   Go on; continue.  Tell me what you can |
| 10:59:31 | 11 | recall about what you told the audience about each |
| 10:59:34 | 12 | of these items on the Flightview Means slide. |
| 10:59:38 | 13 |     A.   The second item is the "Integrated access |
| 10:59:42 | 14 | to required data," is again the issue of having a |
| 10:59:47 | 15 | single workstation, having a single system which has |
| 10:59:51 | 16 | integrated data from various airline systems |
| 10:59:53 | 17 | available to the dispatcher. |
| 10:59:58 | 18 |     Actual distribution of functions, I |
| 11:00:01 | 19 | don't recall what I would have said about that |
| 11:00:04 | 20 | specifically. |
| 11:00:08 | 21 |     Building block modular system is |
| 11:00:12 | 22 | stressing the ability of the system to be extended, |
| 11:00:19 | 23 | the module design, and that the system was built to |
| 11:00:22 | 24 | have other items, other data elements integrated |

55

11:00:25 1    into it, which is pretty much the next bullet, which

11:00:30 2    is enhanceable.

11:00:32 3         At this point, open system

11:00:38 4    implementation was referring to getting away from

11:00:42 5    using proprietary operating systems and languages to

11:00:47 6    host computer systems.

11:00:53 7         Q.   Okay.  Let's go to the next slide,

11:00:57 8    Flightview Benefits.

11:01:03 9         Oh; first of all, just to close, just to

11:01:06 10   finish off this Flightview Means slide, is there

11:01:13 11   anything else substantively that you can recall

11:01:16 12   telling the audience during your 1993 presentation

11:01:18 13   while the Flightview Means slide was up for their

11:01:21 14   view?

11:01:22 15        A.   Not specifically.

11:01:23 16        Q.   And do you recall any of the specific

11:01:27 17   words, phrases or sentences you used during your

11:01:29 18   1993 presentation while the Flightview Means slide

11:01:32 19   was up for their view?

11:01:45 20        A.   Not directly, not specifically.

11:01:47 21        Q.   All right.  Let's look at Flightview

11:01:50 22   Benefits.  What do you recall telling the audience

11:01:58 23   during your 1993 presentation while the audience was

11:02:02 24   viewing the Flightview Benefits slide??

56

| | | |
|---|---|---|
| 11:02:15 | 1 | A.   Again, substantively, we would have |
| 11:02:17 | 2 | discussed the benefits of the Flightview system |
| 11:02:19 | 3 | which are delineated in each of the bullets, or in |
| 11:02:27 | 4 | each of the lines. |
| 11:02:30 | 5 | Q.   As you sit here, do you have a recollection |
| 11:02:33 | 6 | of discussing any benefits to the use of the |
| 11:02:36 | 7 | Flightview system other than what's bulleted here on |
| 11:02:39 | 8 | the slide? |
| 11:02:50 | 9 | A.   I don't believe -- I don't recall that I |
| 11:02:54 | 10 | did; yes -- no. |
| 11:03:00 | 11 | Q.   Go ahead and walk through.  Do you have a |
| 11:03:05 | 12 | recollection of walking the audience through the |
| 11:03:07 | 13 | individual bulleted benefits that are shown on this |
| 11:03:10 | 14 | slide? |
| 11:03:22 | 15 | A.   Again, I believe I would have.  I don't |
| 11:03:25 | 16 | have a specific recollection of seeing myself doing |
| 11:03:28 | 17 | it. |
| 11:03:30 | 18 | Q.   You think you must have -- |
| 11:03:31 | 19 | A.   Yes. |
| 11:03:31 | 20 | Q.   -- because they're here on the slide? |
| 11:03:33 | 21 | A.   Yes. |
| 11:03:35 | 22 | Q.   Well, go ahead and tell me substantively |
| 11:03:41 | 23 | what you believe you told the 1993 audience about |
| 11:03:44 | 24 | these bulleted benefits. |

57

11:03:45  1        A.   Well, the presentation was to airlines

11:03:56  2   whose business essentially is to know where their

11:03:59  3   flights are.  The line "Accurate flight following" I

11:04:04  4   would have discussed, presented to them the ability

11:04:07  5   of this system to accurately show them where their

11:04:11  6   flights are, based on essentially realtime data.

11:04:16  7        We would have discussed, or again, I

11:04:18  8   would have discussed the benefits of visualizing the

11:04:22  9   impact of weather on what their flights were doing,

11:04:28  10  being able to identify areas of congestion based on

11:04:32  11  looking at the position of all the flights and

11:04:35  12  seeing where they were going, and being able to

11:04:41  13  monitor any flights that were feeding into their

11:04:44  14  system for whom they probably had passengers that

11:04:46  15  would be coming onto their planes.

11:04:50  16        Visualizing air space configuration,

11:04:53  17  seeing where the jet routes were, seeing what

11:04:56  18  alternatives there were for perhaps the jet routes

11:04:59  19  you were flying, if you wanted to change, which

11:05:02  20  leads into the next one, which is interactively plan

11:05:05  21  alternatives for rerouting.

11:05:10  22        Department-wide data sharing is having

11:05:13  23  the ability to have this data available to other

11:05:17  24  departments in the airline, have other airline

58

11:05:19   1   applications requesting this data and using the data

11:05:26   2   for replay and training.

11:05:41   3       Q.   Anything else substantively that you

11:05:43   4   believe you discussed with the audience during your

11:05:47   5   1993 presentation regarding the Flightview Benefits

11:05:53   6   slide?

11:05:55   7       A.   I don't recall that there was anything in

11:05:57   8   addition.

11:05:58   9       Q.   And do you recall any of the words, phrases

11:06:00   10  or sentences you specifically used during the 1993

11:06:06   11  presentation to describe the Flightview Benefits

11:06:09   12  slide?

11:06:12   13      A.   Not the specific sentences, no.

11:06:15   14      Q.   Let's take a look at the next slide.

11:06:19   15  Flightview Capabilities is what this slide is

11:06:29   16  entitled.  What do you recall telling the audience

11:06:31   17  about the Flightview capabilities while this slide

11:06:37   18  was up for the audience to view?

11:06:41   19      A.   Again, the substance of what I would have

11:06:42   20  discussed here was the capabilities of the

11:06:46   21  Flightview system that are listed here, and how they

11:06:51   22  apply to flight operations.

11:06:54   23      Q.   Walk me through what you would have

11:07:01   24  discussed with the audience during your 1993

59

| | |
|---|---|
| 11:07:04 | 1 |

presentation for each of these, as best you can

recall.

A.   In terms of discussing its capabilities, I

would have indicated that the Flightview system is

capable of doing flight tracking, gets realtime

flight information; discussed the ability to the

system to selectively track flights of the user's

interest.

I would have indicated that the system

had the capability for accessing weather information

and tracking weather information graphically as it

was available.

The system had the capability of also

providing a flight planning system or interfacing to

an airline flight planning system.

Similarly with data integration; the

system had the ability to provide the flight

tracking information back to the airline computers

on request, or integrate in additional airline

information into the Flightview system.

Monitoring; the system would have had

the capability of monitoring air space based on

certain conditions, certain number of aircraft

arriving at an airport in a certain time frame,

60

| | | |
|---|---|---|
| 11:08:35 | 1 | indicating congestion, monitoring flights |
| 11:08:41 | 2 | specifically, where they may be late for arrival, |
| 11:08:45 | 3 | and somehow or other alerting the user. |
| 11:08:51 | 4 | And the archive/replay, training of the |
| 11:08:54 | 5 | system had the capability of doing those with the |
| 11:08:57 | 6 | data it was receiving and the database that it was |
| 11:08:59 | 7 | maintaining of the data. |
| 11:09:00 | 8 | Q.   That's offline, though, right? |
| 11:09:03 | 9 | A.   That would be, right. |
| 11:09:04 | 10 | Q.   You believe you would have told the |
| 11:09:06 | 11 | audience that the replay and training was -- |
| 11:09:09 | 12 | A.   Would have indicated that it was making use |
| 11:09:13 | 13 | of archived data, yes. |
| 11:09:16 | 14 | Q.   And is that all that you can recall in |
| 11:09:18 | 15 | terms of the substance of what you believe you would |
| 11:09:23 | 16 | have disclosed to the audience during your 1993 |
| 11:09:26 | 17 | presentation about Flightview capabilities? |
| 11:09:29 | 18 | A.   Yes, it is. |
| 11:09:31 | 19 | Q.   Do you recall any of the specific words, |
| 11:09:34 | 20 | phrases or sentences that you believe you would have |
| 11:09:39 | 21 | used during your 1993 presentation? |
| 11:09:41 | 22 | A.   Specifically, no. |
| 11:09:46 | 23 | Q.   And as you were walking me through the |
| 11:09:52 | 24 | substance of the capabilities, I counted three times |

FARMER ARSENAULT BROCK LLC

61

11:09:55  1  that you used the phrase, again, "I would have said

11:10:01  2  this"; and am I correct in discerning that what your

11:10:06  3  testimony is about the substance of what you

11:10:09  4  communicated in 1993 is based really upon your

11:10:13  5  recollection of what you've generally done when

11:10:17  6  you've made presentations about Flightview and your

11:10:20  7  presumption that you would have followed your normal

11:10:23  8  course?

11:10:25  9      A.   Yes.

11:10:29  10     Q.   How many presentations have you made about

11:10:32  11  Flightview in the last ten years, ballpark?

11:10:42  12     A.   Formal presentations like this?  Four or

11:10:51  13  five.

11:10:55  14     Q.   What about demos, demonstrations or one-on-

11:11:03  15  one -- excuse me?

11:11:08  16     A.   In terms of conventions, conferences, where

11:11:11  17  we've demonstrated the system?  Is that the

11:11:13  18  question?

11:11:14  19     Q.   Sure; let's start there.

11:11:19  20     A.   Again, I guess we have probably on the

11:11:26  21  order of 25 or 30 various conferences or conventions

11:11:31  22  that we've shown the system over the last ten years.

11:11:36  23     Q.   In the last five years, how many

11:11:40  24  presentations, formal presentations, would you say

62

| | | |
|---|---|---|
| 11:11:42 | 1 | you've made? |
| 11:11:55 | 2 | A.   I don't believe I have made any formal |
| 11:11:58 | 3 | presentations in the last five years. |
| 11:12:00 | 4 | Q.   How many demonstrations at conventions? |
| 11:12:04 | 5 | A.   In the last five years? |
| 11:12:06 | 6 | Q.   Yes. |
| 11:12:12 | 7 | A.   Again, without having the list in front of |
| 11:12:16 | 8 | me, it's probably on the order of three for myself |
| 11:12:19 | 9 | in the last five years; three to four. |
| 11:12:22 | 10 | Q.   How many one-on-one demonstrations or |
| 11:12:28 | 11 | marketing presentations have you taken part in |
| 11:12:32 | 12 | regarding Flightview in the last five years? |
| 11:12:42 | 13 | A.   Myself, I believe it was probably the same |
| 11:12:46 | 14 | order of magnitude, five or six at these |
| 11:12:50 | 15 | conventions. |
| 11:12:51 | 16 | Well, you're asking how many -- right; |
| 11:12:56 | 17 | sorry. |
| 11:12:57 | 18 | Q.   No; go ahead.  Five or six? |
| 11:13:02 | 19 | A.   Can you ask the question, please? |
| 11:13:06 | 20 | Q.   Yes.  How many demonstrations or marketing |
| 11:13:12 | 21 | presentations have you made in the last five years |
| 11:13:18 | 22 | of the Flightview system? |
| 11:13:19 | 23 | A.   Five or six. |
| 11:13:21 | 24 | Q.   And during these marketing demonstrations |

63

11:13:23   1   and presentations, do you talk about the

11:13:31   2   capabilities of the Flightview system?

11:13:34   3       A.   Yes.

11:13:37   4       Q.   Let's look at the next slide, Flightview

11:13:44   5   Toolkit Modules, Advanced Flight Tracking.  Tell me

11:13:57   6   what you recall telling the audience during your

11:14:01   7   1993 presentation about the, or while the Flightview

11:14:08   8   Toolkit Modules, Advanced Flight Tracking slide was

11:14:13   9   up for their view.

11:14:17   10      A.   Again, the substance of this slide would

11:14:19   11   have been to have discussed the five main items that

11:14:24   12   are on the slide regarding the flight tracking

11:14:29   13   capabilities of Flightview.

11:14:31   14      Q.   Tell me what you recall specifically

11:14:34   15   telling the audience during your 1993 presentation

11:14:37   16   about the acquisition of ASD data.

11:14:44   17      A.   Again, the substance would have been a

11:14:48   18   discussion of retrieving, or having access to the

11:14:53   19   ASD data from the FAA, receiving that data from

11:15:02   20   them, dumping it into a database, making it

11:15:05   21   available for the Flightview system to display

11:15:08   22   flights in real time.

11:15:15   23      Q.   Tell me, do you recall any specific words,

11:15:18   24   phrases or sentences that you would have used while

64

| | | |
|---|---|---|
| 11:15:21 | 1 | discussing the acquisition of ASD data? |
| 11:15:26 | 2 | A.   I don't recall specifically.  It would be |
| 11:15:31 | 3 | an assumption. |
| 11:15:34 | 4 | Q.   What do you recall telling the audience |
| 11:15:41 | 5 | during your 1993 presentation about maintaining a |
| 11:15:44 | 6 | dynamic flight database? |
| 11:15:53 | 7 | A.   The substance of that discussion was the |
| 11:16:02 | 8 | integration of this data into the database, the |
| 11:16:05 | 9 | flight tracking data, that RLM Software has a |
| 11:16:11 | 10 | dynamic database at our facility where we include |
| 11:16:14 | 11 | all the flight data.  We use that data to build |
| 11:16:18 | 12 | flight tables that are made available to the |
| 11:16:23 | 13 | Flightview systems; basically, that's it. |
| 11:16:33 | 14 | Q.   So you believe you told the audience even |
| 11:16:37 | 15 | the future of having Flightview tables within the |
| 11:16:40 | 16 | database? |
| 11:16:41 | 17 | A.   I believe so, yes. |
| 11:16:45 | 18 | Q.   That was not something that RLM considered |
| 11:16:50 | 19 | to be confidential business information or trade |
| 11:16:52 | 20 | secret information at that time? |
| 11:16:55 | 21 | A.   Not the fact that there were tables, no. |
| 11:17:04 | 22 | Q.   Tell me what you recall telling the |
| 11:17:06 | 23 | audience during your 1993 presentation about |
| 11:17:09 | 24 | performing all ASD functions. |

65

11:17:13    1        A.    The substance of the discussion here would

11:17:18    2    have been that the majority of the audience was

11:17:23    3    familiar with the FAA's aircraft situation display

11:17:29    4    system, and we were indicating that we had the same

11:17:37    5    functions, that that system had the ability to

11:17:42    6    display in real time all the flights that are being

11:17:44    7    tracked by the FAA; the ability of the user, through

11:17:50    8    various filters, to highlight flights that are of

11:17:53    9    interest to them based on all kinds of criteria; and

11:17:56   10    the ability to display that information on maps

11:18:00   11    containing additional navigational air space

11:18:05   12    information.

11:18:09   13        Q.    Is there any other, anything else

11:18:14   14    substantively that you can recall discussing

11:18:16   15    associated with this bullet, entitled "Performs all

11:18:22   16    ASD functions"?

11:18:30   17        A.    Not that I can recall.

11:18:32   18        Q.    And do you recall any of the specific

11:18:35   19    words, phrases or sentences that you used during the

11:18:38   20    1993 presentation while you were discussing the

11:18:41   21    performance of all ASD functions in connection with

11:18:45   22    this slide?

11:18:48   23        A.    Not specific sentences, no.

11:18:53   24        Q.    The next bullet point is entitled

66

11:18:56  1    "User-customized command files."  What do you recall

11:19:01  2    telling the audience during your 1993 presentation

11:19:04  3    about user-customized command files?

11:19:08  4        A.   That the Flightview system supported the

11:19:11  5    ability for the user to create text files with

11:19:15  6    commands that would tailor how the system looked and

11:19:20  7    what data it would display.

11:19:27  8        Q.   Do you recall any of those specific --

11:19:29  9    first of all, do you recall anything else about the

11:19:31 10    substance of what you disclosed to the audience

11:19:33 11    during your 1993 presentation in connection with the

11:19:37 12    user-customized command files?

11:19:40 13        A.   Not specifically.

11:19:41 14        Q.   And do you recall any of the specific

11:19:45 15    words, phrases or sentences that you used during the

11:19:47 16    1993 presentation associated with the user-

11:19:52 17    customized command files discussion?

11:19:53 18        A.   No.

11:19:57 19        Q.   The next bullet is entitled "Required core

11:20:03 20    module of Flightview system."  What do you recall

11:20:05 21    telling the audience during your 1993 presentation

11:20:07 22    about the required core module of Flightview system?

11:20:12 23        A.   The substance of this bullet was to

11:20:16 24    indicate to the audience that the Flightview toolkit

67

11:20:18 1    was essentially the required module for them to be

11:20:23 2    able to do any flight tracking, get any flight data,

11:20:31 3    that other modules in the system were not required.

11:20:36 4        Q.   Other than that, is there any other

11:20:38 5    substance to the discussion of required core module

11:20:42 6    of Flightview system that you can recall?

11:20:46 7        A.   Not that I can recall, no.

11:20:48 8        Q.   And do you recall any of the specific

11:20:51 9    words, phrases or sentences that you used during the

11:20:53 10   discussion of the required core module of the

11:20:56 11   Flightview system?

11:20:57 12       A.   Not specific words or sentences.

11:20:59 13            MR. HILL:  We've been going for over an

11:21:01 14   hour.  Why don't we take a five-, ten-minute break;

11:21:05 15   let the witness and me catch our breaths.

11:21:12 16            THE VIDEOGRAPHER:  The time is 11:21.

11:21:14 17   This is the end of Cassette No. 1.  We're off the

11:21:18 18   record.

11:34:14 19            (Recess taken)

11:34:18 20            THE VIDEOGRAPHER:  The time is 11:34.

11:34:20 21   This is the beginning of Cassette No. 2 in the

11:34:23 22   deposition of James Steinberg.  We're on the record.

11:34:26 23       Q.   Mr. Steinberg, when we left off, we had

11:34:29 24   just made it to the page in Exhibit 2 entitled

68

| | | |
|---|---|---|
| 11:34:35 | 1 | Flightview Toolkit Modules, Weather; and I'd like |
| 11:34:41 | 2 | you to tell me what you recall telling the audience |
| 11:34:44 | 3 | during the 1993 presentation you gave about |
| 11:34:50 | 4 | Flightview toolkit modules, weather. |
| 11:34:53 | 5 | A.   The substance of that presentation would |
| 11:34:55 | 6 | have been a discussion of each of the line items on |
| 11:34:59 | 7 | this chart. |
| 11:35:05 | 8 | Q.   Can you just walk me step by step through |
| 11:35:08 | 9 | each of the line items and what you can recall |
| 11:35:10 | 10 | telling the audience about each? |
| 11:35:12 | 11 | A.   First line item, which processes National |
| 11:35:16 | 12 | Weather Service data and reports, would have been a |
| 11:35:20 | 13 | discussion on Flightview interfacing with Weather |
| 11:35:29 | 14 | Service information, embedding it in the database, |
| 11:35:33 | 15 | and making it available to the user through an |
| 11:35:37 | 16 | interface. |
| 11:35:37 | 17 | Maintain a user-accessible database of |
| 11:35:41 | 18 | weather data is a similar thing in terms of having |
| 11:35:44 | 19 | that data in a database, and keeping it for the user |
| 11:35:48 | 20 | to access. |
| 11:35:52 | 21 | Display requested weather reports is |
| 11:35:55 | 22 | allowing the user to indicate what weather reports |
| 11:35:58 | 23 | he would want and retrieve that information and then |
| 11:36:02 | 24 | display it. |

69

| 11:36:06 | 1 | Weather selectable by station, area or |
| 11:36:10 | 2 | weather conditions is the ability to get the weather |
| 11:36:15 | 3 | based on certain criteria:  again, the station, |
| 11:36:18 | 4 | generally the airport name or an area of the |
| 11:36:21 | 5 | country, or weather which satisfies certain |
| 11:36:30 | 6 | conditions. |
| 11:36:30 | 7 | Display of graphic weather information |
| 11:36:32 | 8 | is just that:  display of graphic weather products |
| 11:36:37 | 9 | that are available through the Weather Service and |
| 11:36:39 | 10 | other vendors. |
| 11:36:44 | 11 | Q.   Other than what you've just said, is there |
| 11:36:46 | 12 | anything else substantively you can recall |
| 11:36:48 | 13 | discussing with the audience during your 1993 |
| 11:36:51 | 14 | presentation about the Flightview toolkit modules, |
| 11:36:55 | 15 | weather? |
| 11:36:55 | 16 | A.   Not that I can recall. |
| 11:36:57 | 17 | Q.   Do you recall any specific words, phrases |
| 11:37:00 | 18 | or sentences that you used during your 1993 |
| 11:37:05 | 19 | presentation to present the Flightview toolkit |
| 11:37:08 | 20 | modules, weather? |
| 11:37:09 | 21 | A.   No, I don't. |
| 11:37:11 | 22 | Q.   The next slide is entitled Flightview |
| 11:37:14 | 23 | Modules, Flight Planning.  Tell me what you can |
| 11:37:18 | 24 | recall telling the audience during your 1993 |

70

11:37:21  1    presentation about Flightview modules for flight

11:37:24  2    planning.

11:37:26  3        A.   The substance of this presentation was to

11:37:30  4    let the audience know that Flightview had an

11:37:34  5    interface with, or could present an interface with

11:37:40  6    the commercial flight planning system of the

11:37:43  7    airline's choosing.

11:37:45  8             As part of that interface, the system

11:37:47  9    could print flight plans that would be made

11:37:49  10   available through the flight planning system, print

11:37:53  11   weather information associated with the airports

11:37:55  12   along those flight plans.  In addition, discussion

11:37:58  13   on the graphic display of those flight plans,

11:38:01  14   choosing the flights for which you want flight plans

11:38:07  15   displayed, and actually displaying that data.

11:38:14  16       Q.   And what?

11:38:15  17       A.   And actually displaying that data.

11:38:22  18       Q.   Anything else substantively you can recall

11:38:25  19   associated with the flight planning module that

11:38:27  20   you --

11:38:28  21       A.   No.

11:38:29  22       Q.   Sorry; I didn't mean to cut you off.

11:38:33  23            Any specific words, phrases or sentences

11:38:36  24   that you can recall using during the 1993

71

11:38:38   1   presentation wherein you discussed the flight

11:38:42   2   planning module?

11:38:46   3       A.   No, not that I can recall.

11:38:51   4       Q.   Next slide is entitled Flightview Modules,

11:38:56   5   External Interface Windows.  Tell me as best you can

11:39:02   6   recall what you discussed with the audience during

11:39:04   7   your 1993 presentation when you discussed the

11:39:07   8   external interface windows module?

11:39:13   9       A.   The substance of this presentation was a

11:39:16   10  discussion on the ability for Flightview to provide

11:39:21   11  what we call a communication window to external

11:39:26   12  systems, specifically those systems listed here.

11:39:35   13      Q.   Other than what you've just said, is there

11:39:38   14  anything else substantively that you recall

11:39:42   15  discussing while discussing the external interface

11:39:45   16  windows module during the 1993 presentation?

11:39:51   17      A.   Not that I recall.

11:39:51   18      Q.   And do you recall any specific words,

11:39:53   19  phrases or sentences that you used during the 1993

11:39:55   20  presentation when discussing the external interface

11:40:01   21  windows module?

11:40:08   22      A.   No, I don't.

11:40:22   23      Q.   Next page, next slide, is entitled

11:40:24   24  Flightview Modules, Data Exchange.  What do you

72

11:40:30  1    recall telling the audience during the 1993

11:40:32  2    presentation about the data exchange module?

11:40:38  3        A.   I discussed the three lines on this slide

11:40:43  4    relative to data exchange.

11:40:47  5        Q.   Other than the text that's shown on the

11:40:52  6    slide, do you recall telling the audience anything

11:40:56  7    else about the data exchange module?

11:41:11  8        A.   Don't recall the specifics; would have

11:41:14  9    elaborated on each of the items.

11:41:16  10       Q.   How did you elaborate on the first item?

11:41:20  11       A.   The first item is the ability of the

11:41:25  12   Flightview system to receive data from the airlines'

11:41:30  13   systems, which would have included data on ACARS,

11:41:34  14   data from their pilot reporting system; integrating

11:41:38  15   that into the Flightview database, and making that

11:41:42  16   data available for selection by the user and display

11:41:46  17   on the Flightview map.

11:41:50  18       Q.   Did you say, display on the Flightview map?

11:41:54  19       A.   Correct.

11:41:54  20       Q.   I'm sorry; I'm just making sure I can hear

11:41:57  21   you correctly.

11:41:58  22       A.   The second bullet was a discussion on the

11:42:01  23   ability for Flightview to transmit the flight data

11:42:07  24   from our system to an airline computer based on

73

11:42:09  1    requests from that airline computer for specific

11:42:14  2    information.

11:42:15  3            And the third line is essentially the

11:42:17  4    discussion of the airline application being able to

11:42:20  5    request that specific flight data.

11:42:26  6    Q.   And other than what you've just said, is

11:42:28  7    there anything else substantively that you can

11:42:31  8    recall discussing during the 1993 presentation

11:42:33  9    regarding the data exchange module of Flightview?

11:42:36  10   A.   Not that I can recall.

11:42:37  11   Q.   And do you recall any of the specific

11:42:39  12   words, phrases or sentences that you used when

11:42:41  13   discussing the data exchange module of Flightview

11:42:46  14   during that presentation?

11:42:47  15   A.   Not specifically.

11:42:49  16   Q.   The next slide is entitled Flightview

11:42:52  17   Modules, Alert Monitor.  What do you recall telling

11:42:58  18   the audience during your 1993 presentation about the

11:43:00  19   alert monitor module of Flightview?

11:43:10  20   A.   Substantively a discussion of a description

11:43:13  21   of each one of these items on this page.

11:43:20  22   Q.   Go ahead and walk me through what

11:43:24  23   substantively you recall telling the audience during

11:43:27  24   your 1993 presentation about each of these bullet

74

| | | |
|---|---|---|
| 11:43:29 | 1 | points. |
| 11:43:30 | 2 | A.    That the Flightview system had a module |
| 11:43:33 | 3 | which was called the alert monitor.   The alert |
| 11:43:38 | 4 | monitor would monitor flights and weather |
| 11:43:42 | 5 | information, the position of flights, the position |
| 11:43:44 | 6 | of weather information, the type of weather |
| 11:43:48 | 7 | information at certain locations. |
| 11:43:50 | 8 | Second item is that that module would |
| 11:43:53 | 9 | look at that information and determine if there were |
| 11:43:58 | 10 | some reason to alert the dispatcher as to an |
| 11:44:05 | 11 | airplane going into a bad weather condition. |
| 11:44:07 | 12 | And the third one is the ability for |
| 11:44:10 | 13 | Flightview to display those alert conditions on the |
| 11:44:14 | 14 | workstation to the dispatcher. |
| 11:44:18 | 15 | Q.    And other than what you've just said, is |
| 11:44:21 | 16 | there anything else substantively you can recall |
| 11:44:25 | 17 | discussing with the audience during your 1993 |
| 11:44:27 | 18 | presentation about the alert monitor module slide? |
| 11:44:37 | 19 | A.    No, there isn't. |
| 11:44:41 | 20 | Q.    And do you recall any of the specific |
| 11:44:43 | 21 | words, phrases or sentences you used when discussing |
| 11:44:46 | 22 | the alert monitor module of Flightview during this |
| 11:44:50 | 23 | presentation? |
| 11:44:50 | 24 | A.    No, I don't. |

75

11:44:59  1      Q.    The next slide is entitled Flightview

11:45:01  2   Module, Archive Replay.  What do you recall telling

11:45:06  3   the audience during your 1993 presentation about the

11:45:09  4   archive replay module of Flightview?

11:45:13  5      A.    The substance of this slide was the ability

11:45:21  6   of the Flightview system to provide for the online

11:45:28  7   storage of flight tracking information and an

11:45:31  8   ability for that information to be retrieved by

11:45:35  9   airline applications.

11:45:39  10             Second item is the ability of the system

11:45:41  11  to take that stored data and retrieve it and replay

11:45:46  12  it in a Flightview display on a Flightview map for a

11:45:52  13  dispatcher.

11:45:52  14             And the third one was a discussion of

11:45:56  15  how you make use of offline archive data and

11:46:05  16  training scenarios and replay mode to train

11:46:10  17  dispatchers.

11:46:14  18     Q.    Other than what you just said, is there

11:46:16  19  anything else about the substance of your

11:46:18  20  discussions during your 1993 presentation of the

11:46:20  21  archive replay module that you can recall?

11:46:25  22     A.    No, there isn't.

11:46:27  23     Q.    And do you recall any of the specific

11:46:29  24  words, phrases or sentences that you used when

76

11:46:31   1   discussing the archive replay module during your

11:46:35   2   1993 presentation?

11:46:35   3        A.   No, I don't.

11:46:38   4        Q.   There was one thing; one of these was a

11:46:42   5   little bit confusing to me as I was listening to

11:46:44   6   you, and maybe you can help clarify for me.  The

11:46:46   7   bullet point marked "Replay of critical data for

11:46:51   8   review," is that an online function of the archive

11:46:56   9   replay module?

11:46:59   10       A.   The replay module could work off of the

11:47:04   11  online system for the last hour's worth of data.

11:47:08   12       Q.   But when you're engaged in retrieving data

11:47:12   13  for replay, you're actually using recent historical

11:47:16   14  flight data; is that right?

11:47:17   15       A.   That's correct.

11:47:22   16       Q.   And you said that that data will be shown

11:47:24   17  on the Flightview map?

11:47:25   18       A.   Correct.

11:47:48   19       Q.   The slides that I've just shown you in

11:47:51   20  Exhibit 2, how were they provided to the audience?

11:47:56   21  Were they projected on a slide show projector?  Were

11:48:01   22  they given to the audience members in hard copy?

11:48:04   23       A.   They were projected on a projector.  I

11:48:17   24  can't say for certain if we had hard-copy handouts

77

| | | |
|---|---|---|
| 11:48:24 | 1 | for them. |
| 11:48:24 | 2 | Q. You don't recall whether you had them? |
| 11:48:26 | 3 | A. Right. |
| 11:48:35 | 4 | Q. We're going to get to the screen shots in |
| 11:48:38 | 5 | just a second as part of the '93 presentation; but |
| 11:48:45 | 6 | how were the screen shots? Were they done on an |
| 11:48:52 | 7 | overhead projector as well? |
| 11:48:53 | 8 | A. Yes. |
| 11:48:53 | 9 | Q. Same answer regarding -- you don't recall |
| 11:48:57 | 10 | whether or not hard copies of the screen shots were |
| 11:49:00 | 11 | given out to the audience members? |
| 11:49:02 | 12 | A. I don't recall. I'm pretty sure they were |
| 11:49:03 | 13 | not, since we probably would not have spent the |
| 11:49:06 | 14 | money. But specifically, I don't recall. |
| 11:49:10 | 15 | Q. You don't recall one way or the other. |
| 11:49:15 | 16 | And is it fair to say that the |
| 11:49:19 | 17 | presentation you gave in 1993 consisted of you |
| 11:49:24 | 18 | talking about things that were on the overhead, or |
| 11:49:28 | 19 | were there times when there was nothing on the |
| 11:49:30 | 20 | overhead and you were just talking to the audience? |
| 11:49:40 | 21 | A. Again, without having a detailed recall of |
| 11:49:43 | 22 | exactly everything that happened, there was probably |
| 11:49:46 | 23 | something always on the overhead. |
| 11:49:50 | 24 | Q. Is there anything other than the contents |

78

| | | |
|---|---|---|
| 11:49:55 | 1 | of the slides that we've just gone through and the |
| 11:50:02 | 2 | screen shots that we're about to go to, is there |
| 11:50:05 | 3 | anything else that you have a recollection of |
| 11:50:07 | 4 | discussing with the audience during your 1993 |
| 11:50:10 | 5 | presentation? |
| 11:50:15 | 6 | A.   Not a specific recollection, no. |
| 11:50:18 | 7 | Q.   What if I said a general recollection? |
| 11:50:22 | 8 | MR. BELT:  Objection. |
| 11:50:23 | 9 | Q.   Do you have a general recollection of |
| 11:50:25 | 10 | discussing anything with the audience during your |
| 11:50:28 | 11 | 1993 presentation that wasn't a part of the slide |
| 11:50:33 | 12 | presentation that we've just gone through or the |
| 11:50:35 | 13 | Flightview screen shots that we're about to look at? |
| 11:50:37 | 14 | A.   No, no. |
| 11:51:08 | 15 | MR. HILL:  Can you mark this as Exhibit |
| 11:51:09 | 16 | 3, please? |
| 11:51:13 | 17 | (Marked, Exhibit 3, photocopies of |
| 11:51:18 | 18 | screen shots.) |
| 11:51:33 | 19 | Q.   The court reporter is handing you what I've |
| 11:51:35 | 20 | marked as Exhibit 3, and would you just identify |
| 11:51:38 | 21 | what Exhibit 3 is for the record, please? |
| 11:51:41 | 22 | A.   Exhibit 3 are screen shots provided at the |
| 11:51:50 | 23 | RAA conference presentation. |
| 11:51:54 | 24 | Q.   How were these screen shots obtained? |

79

| | | |
|---|---|---|
| 11:52:03 | 1 | A.   I believe we had a photographer take a |
| 11:52:09 | 2 | picture of the computer that had each one of these |
| 11:52:12 | 3 | displays on it, and then get them put onto |
| 11:52:17 | 4 | transparencies.  I don't recall exactly how that |
| 11:52:19 | 5 | took place. |
| 11:52:25 | 6 | Q.   What influenced the choice of screens to |
| 11:52:28 | 7 | take pictures of? |
| 11:52:52 | 8 | A.   The screen shots were shown to display the |
| 11:52:57 | 9 | functions and the features of the Flightview system |
| 11:53:00 | 10 | that would be appropriate to an airline dispatch. |
| 11:53:09 | 11 | Q.   Is it fair to say that you were trying to |
| 11:53:18 | 12 | show the, illustrate the features of Flightview that |
| 11:53:20 | 13 | you thought would be most appealing to the persons |
| 11:53:23 | 14 | in attendance at the '93 presentation? |
| 11:53:44 | 15 | A.   I believe that they were taken for not just |
| 11:53:46 | 16 | the '93 presentation, but to be appealing to that |
| 11:53:51 | 17 | audience in general, flight dispatcher audience. |
| 11:53:59 | 18 | Q.   Look at the first page of the exhibit.  I |
| 11:54:09 | 19 | have a couple of questions.  It looks like you have, |
| 11:54:12 | 20 | in the left-hand corner, you have a box that's |
| 11:54:15 | 21 | entitled Main Menu, and there's a box that's checked |
| 11:54:20 | 22 | that looks like it says Background, but it's |
| 11:54:23 | 23 | partially obscured.  Do you see where I am? |
| 11:54:29 | 24 | A.   Yes. |

80

| | | |
|---|---|---|
| 11:54:29 | 1 | Q.   Do you know what that text is that's |
| 11:54:31 | 2 | checked that looks like it begins with Background? |
| 11:54:40 | 3 | A.   It does say Background. |
| 11:54:42 | 4 | Q.   Does it say anything else? |
| 11:54:53 | 5 | A.   I don't believe so.  I don't know for sure |
| 11:54:57 | 6 | if there was. |
| 11:55:03 | 7 | Q.   Look at the -- |
| 11:55:04 | 8 | A.   Right. |
| 11:55:05 | 9 | Q.   Did you find the one? |
| 11:55:07 | 10 | A.   Yes. |
| 11:55:07 | 11 | Q.   The one that's, the screen that's got 19:44 |
| 11:55:14 | 12 | in the top right-hand corner? |
| 11:55:15 | 13 | A.   Yes. |
| 11:55:15 | 14 | Q.   And it says Background Maps there? |
| 11:55:18 | 15 | A.   Correct. |
| 11:55:18 | 16 | Q.   Does that help refresh your recollection as |
| 11:55:20 | 17 | to what the box says, or what the item is that we're |
| 11:55:24 | 18 | looking at on the first page? |
| 11:55:26 | 19 | A.   Yes. |
| 11:55:26 | 20 | MR. BELT:  Objection. |
| 11:55:35 | 21 | Q.   Do you believe, as you're looking at the |
| 11:55:39 | 22 | first page of Exhibit 3, that the checked item on |
| 11:55:45 | 23 | the main menu box says Background Maps? |
| 11:55:51 | 24 | A.   Yes. |

81

11:55:51  1        Q.   Is that based on your experience in working

11:55:54  2    with the Flightview system during the 1993 time

11:55:56  3    frame?

11:55:57  4        A.   Correct.

11:56:00  5        Q.   What is the effect of checking the box

11:56:04  6    marked Background Maps?

11:56:25  7        A.   I believe that the effect of that is to

11:56:29  8    bring up the next little box on top of that called,

11:56:32  9    entitled Background.

11:56:42  10       Q.   And are these the options for background

11:56:47  11   maps that Flightview had at the time that these

11:56:50  12   pictures were taken?

11:56:57  13       A.   Those are the options that we were

11:56:59  14   presenting the user, yes.

11:57:01  15       Q.   Were there other options that weren't being

11:57:04  16   presented?

11:57:04  17       A.   No.

11:57:09  18       Q.   The first background option is latitude-

11:57:16  19   longitude grid?

11:57:18  20       A.   Correct.

11:57:19  21       Q.   What is that?  Is that background shown on

11:57:23  22   any of these other screens?

11:57:33  23       A.   Yes, it is.  Yes.

11:57:45  24       Q.   Which?

82

11:57:46  1          That's the world view.

11:57:48  2      A.   It's shown in the world view.

11:57:50  3      Q.   Hold on just a second; let's make sure we

11:57:53  4  get that properly identified.  That's the screen

11:57:55  5  that has 14:54 in the top corner, top right-hand

11:58:02  6  corner?

11:58:03  7      A.   Correct.

11:58:03  8          MR. BELT:  I'm going to just note that I

11:58:05  9  think there are a couple of screen shots that say

11:58:10  10  14:54.  Perhaps there's a different way to identify

11:58:13  11  them.

11:58:13  12          MR. HILL:  Ah; good idea.

11:58:14  13      Q.   You are correct.  It says 14:54 in the top

11:58:20  14  right-hand corner and shows a map of the world on

11:58:23  15  it, right?  I think that's the only one that has a

11:58:29  16  map of the world.

11:58:31  17          MR. BELT:  Was that a question to the

11:58:33  18  witness to verify?

11:58:39  19          MR. HILL:  Well, I mean --

11:58:41  20          MR. BELT:  Just so the record is clear.

11:58:43  21      Q.   Do you agree with me that that's a map of

11:58:45  22  the world, the slide that we're looking at right

11:58:47  23  now?

11:58:47  24      A.   Yes.

FARMER ARSENAULT BROCK LLC

83

11:58:47  1      Q.   And that's what matches up to latitude-

11:58:51  2   longitude grid?

11:58:51  3      A.   Yes.

11:59:07  4      Q.   If you're the user, say you're a dispatcher

11:59:11  5   with a regional airline and you licensed Flightview

11:59:19  6   in the mid-1990s time frame, and you checked the box

11:59:23  7   for latitude-longitude grid, is this map of the

11:59:30  8   world going to be sent from the RLM computers in

11:59:36  9   Massachusetts to the end user's computer?

11:59:49  10     A.   No.

11:59:50  11     Q.   No?

11:59:50  12     A.   No.

11:59:51  13     Q.   Why is that?  Why wouldn't you do it that

11:59:59  14   way at that point in time?

12:00:02  15     A.   It gets drawn at the user's computer.

12:00:08  16     Q.   There's software to draw it on the user's

12:00:13  17   computer?

12:00:13  18     A.   Yes.

12:00:19  19     Q.   So you weren't actually sending graphic

12:00:23  20   image files over modem lines in the 1993 to 1995

12:00:30  21   time frame, were you?

12:00:31  22          MR. BELT:  Objection.

12:00:39  23     A.   No.

12:00:49  24     Q.   What if I selected the geographic

84

| | | |
|---|---|---|
| 12:00:52 | 1 | boundaries option for the background map?  What do I |
| 12:00:57 | 2 | get in that case? |
| 12:01:07 | 3 | A.   You get what people called "the map." |
| 12:01:10 | 4 | Q.   You get the map? |
| 12:01:11 | 5 | A.   The boundaries of countries, states in the |
| 12:01:17 | 6 | United States. |
| 12:01:18 | 7 | Q.   This slide? |
| 12:01:20 | 8 | MR. BELT:  Objection. |
| 12:01:24 | 9 | MR. HILL:  Well, I'm just trying to |
| 12:01:25 | 10 | match up to what he's looking at. |
| 12:01:28 | 11 | Q.   Can you identify the slide that you're |
| 12:01:30 | 12 | looking at? |
| 12:01:30 | 13 | A.   The slide I'm looking at has got a time |
| 12:01:34 | 14 | stamp of 14:54 in the upper right-hand corner, and |
| 12:01:38 | 15 | shows a map encompassing the United States. |
| 12:02:00 | 16 | Q.   And so if you select geographic boundaries, |
| 12:02:04 | 17 | the software will draw the map on the user computer? |
| 12:02:22 | 18 | It will draw the map of the United States? |
| 12:02:29 | 19 | A.   It will put a map on the display. |
| 12:02:32 | 20 | Q.   How does it do that?  Or how did it do |
| 12:02:37 | 21 | that? |
| 12:02:41 | 22 | A.   It did that by generating the necessary |
| 12:02:47 | 23 | commands to draw the lines on the display, |
| 12:02:52 | 24 | transmitting those commands to actual display, to |

12:02:57   1   display them.

12:02:58   2        Q.   Were those commands coming from RLM's

12:03:02   3   computers in Massachusetts?

12:03:05   4             MR. BELT:   Objection.

12:03:13   5        A.   No, they're not.

12:03:15   6        Q.   Where are those commands -- where are the

12:03:20   7   computers that those commands are coming from?

12:03:29   8        A.   The computers are at the airline dispatch

12:03:38   9   departments.

12:03:47   10        Q.   The next background option is Airports.   If

12:04:00   11   you click that, or if you check the option for

12:04:03   12   airports, what do you get for your background?

12:04:07   13        A.   If you check that, I believe another

12:04:11   14   dialogue box was placed up similar to what you see

12:04:16   15   on this slide.

12:04:17   16        Q.   And what would that dialogue box contain?

12:04:20   17        A.   A request to enter the airport names to be

12:04:25   18   displayed.

12:04:25   19        Q.   Once you select the particular airport name

12:04:30   20   to be displayed, what happens next?   I'm sorry; what

12:04:36   21   would happen next?

12:04:39   22        A.   The system would issue the appropriate

12:04:42   23   commands; retrieve the airport data location, name,

12:04:47   24   and issue the appropriate commands to draw that

86

12:04:52   1    airport and send those to the display.

12:05:03   2        Q.   And would those commands be coming from

12:05:07   3    software at the user site?

12:05:11   4        A.   They would be coming from the airline

12:05:14   5    dispatch workstations.

12:05:22   6        Q.   And then the Runways box is checked on the

12:05:26   7    first page of Exhibit 3, and you get another

12:05:37   8    dialogue box, it looks like, asking you to put in

12:05:41   9    the airport name; is that correct?

12:05:42   10       A.   Yes.

12:05:43   11       Q.   And once you put in the airport name, what

12:05:47   12   happens next?

12:05:49   13       A.   The system retrieves the runway

12:05:55   14   information, generates the necessary commands to

12:06:00   15   draw the runway structures and sends those to the

12:06:04   16   user's display.

12:06:06   17       Q.   Do you see any runways being displayed on

12:06:12   18   the monitor screen that's captured in the first page

12:06:17   19   of Exhibit 3?

12:06:20   20       A.   Yes.

12:06:21   21       Q.   Are those the marks, the lines surrounding

12:06:27   22   DCA?

12:06:28   23       A.   Yes.

12:06:31   24       Q.   So then does this screen represent the --

87

| | | |
|---|---|---|
| 12:06:42 | 1 | at least in terms of the runway lines around the |
| 12:06:48 | 2 | DCA, is that what gets drawn after you execute the |
| 12:06:53 | 3 | DCA function in the Runways dialogue box? |
| 12:07:05 | 4 | A.   Correct. |
| 12:07:05 | 5 | Q.   Before you execute the DCA function in the |
| 12:07:15 | 6 | Runways dialogue box, what would the background |
| 12:07:18 | 7 | screen look like? |
| 12:07:29 | 8 | A.   Well, it could look like a lot of things, |
| 12:07:33 | 9 | depending on what commands were issued before. |
| 12:07:35 | 10 | Q.   What would the default screen look like in |
| 12:07:42 | 11 | the Flightview system?  And if you're just pulling |
| 12:07:45 | 12 | it up and the first thing you did was call up the |
| 12:07:48 | 13 | dialogue box for the main menu to set your |
| 12:07:52 | 14 | background map, what's the screen going to look like |
| 12:07:55 | 15 | behind the Main Menu dialogue box? |
| 12:07:58 | 16 | MR. BELT:   Objection. |
| 12:08:11 | 17 | A.   I guess I'm still a little unclear as to |
| 12:08:18 | 18 | what stage we're at in looking at the system. |
| 12:08:18 | 19 | Q.   Well, what module do you have to be in to |
| 12:08:20 | 20 | get the Main Menu dialogue box to begin with? |
| 12:08:26 | 21 | A.   You need to be displaying Flightview. |
| 12:08:27 | 22 | Q.   You need to be displaying Flightview.  Is |
| 12:08:30 | 23 | there a default opening screen in Flightview? |
| 12:08:42 | 24 | A.   Yes. |

88

| | | |
|---|---|---|
| 12:08:42 | 1 | Q.   And what does that screen look like? |
| 12:08:44 | 2 | A.   It's a map showing the geographic |
| 12:08:49 | 3 | boundaries of the United States, Canada, Mexico, the |
| 12:08:54 | 4 | states themselves, and I believe the default |
| 12:09:01 | 5 | includes the position of each of the aircraft that's |
| 12:09:03 | 6 | in the air, shown as a dot. |
| 12:09:35 | 7 | Q.   Can I get you to turn to the fifth page in |
| 12:09:53 | 8 | Exhibit 3, which is time-stamped 19:44 in the top |
| 12:09:58 | 9 | right-hand corner.  This page is illustrating the |
| 12:10:23 | 10 | flight planning function of Flightview, correct? |
| 12:10:25 | 11 | A.   Correct. |
| 12:10:28 | 12 | Q.   So where is the aircraft?  Is there an |
| 12:10:47 | 13 | aircraft shown on this particular screen? |
| 12:10:51 | 14 | A.   No, there's not. |
| 12:10:52 | 15 | Q.   Why is that? |
| 12:11:01 | 16 | A.   Could I look at yours?  This is... |
| 12:11:04 | 17 | (The witness was shown a document.) |
| 12:11:09 | 18 | A.   Oh; it's in the same condition. |
| 12:11:12 | 19 | This illustrates the dialogue box that |
| 12:11:16 | 20 | gets brought up to the user on his request to access |
| 12:11:19 | 21 | the flight planning system. |
| 12:11:25 | 22 | Q.   Okay.  Is this advance flight planning? |
| 12:11:32 | 23 | MR. BELT:  Objection. |
| 12:11:38 | 24 | Q.   Is this flight planning before a flight has |

FARMER ARSENAULT BROCK LLC

89

12:11:40  1   taken off and is en route?

12:11:42  2       A.   Oh; yes.

12:11:43  3       Q.   That's what accounts for the fact that

12:11:46  4   there's no airplane shown on the screen, right?

12:12:04  5            (Pause)

12:12:04  6       A.   I'm sorry?

12:12:04  7       Q.   Is that right, that that's what accounts

12:12:06  8   for the fact that there's no airplane on the screen?

12:12:09  9       A.   Right; yes.

12:12:28  10      Q.   Okay.  Turn to the page that's time-stamped

12:12:35  11  20:37 on the top right-hand corner.  It looks like

12:12:41  12  this; yes.

12:12:43  13           If I want to use the flight -- if this

12:12:49  14  is the screen that I'm looking at in Flightview, and

12:12:52  15  I want to use the flight tracking function to get

12:13:01  16  information about this flight that's over -- let's

12:13:10  17  pick this flight over, right on the Colorado-Wyoming

12:13:15  18  border, UAL Flight 934.  Do you see that flight?

12:13:18  19      A.   Mm-hmm.

12:13:20  20      Q.   Let's say I want to track that flight and

12:13:25  21  get specific status information about that flight.

12:13:29  22  What am I going to do from this screen?

12:13:34  23      A.   From this screen, if you click, I believe,

12:13:40  24  the right mouse key, it brings up the menu that you

FARMER ARSENAULT BROCK LLC

90

12:13:44  1    see, or the bottom menu that you see on that first

12:13:47  2    page.

12:13:47  3        Q.   Right.

12:13:48  4        A.   And on that, there's a box that you can

12:13:53  5    click which is filter --

12:13:57  6        Q.   Filter aircraft?

12:13:59  7        A.   -- aircraft.  And that would bring up

12:14:01  8    another box where you enter the criteria of the

12:14:04  9    aircraft you want to filter.  One of the things that

12:14:07  10   you can fill in there is the aircraft ID for a

12:14:10  11   specific flight.  In addition, you can tell it what

12:14:18  12   color you want that flight to be, for instance.

12:14:22  13       Q.   And let's say I did that for UAL 934, and

12:14:29  14   no other flights.  What am I going to see after

12:14:41  15   that?

12:14:41  16       A.   What you'll see is you'll see an airplane

12:14:44  17   and a data block similar to those shown on the first

12:14:49  18   slide.

12:15:01  19       Q.   Okay.  Will I still see it on the map of

12:15:13  20   North America?  Or will I still see it --

12:15:16  21       A.   Yes.

12:15:16  22       Q.   -- on this map that we're looking at, the

12:15:20  23   time-stamped Page 20:37?

12:15:25  24       A.   Yes.

12:15:25  1      Q.   So in a manner of speaking what really

12:15:29  2   happens is that function erases or causes these

12:15:33  3   other flights that are all on this to disappear

12:15:35  4   except for 934; is that right?

12:15:39  5      A.   No, that's not right.

12:15:42  6      Q.   Tell me what's happening, then, to

12:15:44  7   accomplish that.

12:15:45  8           MR. BELT:  Objection.

12:15:50  9      Q.   Tell me what's happening so that after I

12:15:53  10  complete the dialogue box for filtering aircraft to

12:15:56  11  UAL 934, I'm seeing this map of the United States

12:16:00  12  again with only Flight UAL 934 being depicted.

12:16:04  13     A.   The request to find that particular flight

12:16:07  14  is sent to the software, the Flightview toolkit

12:16:12  15  software, which then looks for the database for that

12:16:14  16  flight and gets the information on it, and generates

12:16:20  17  the commands to draw that flight on the map, and

12:16:25  18  sends those commands to the display.

12:16:32  19     Q.   How does, at what point in time during that

12:16:44  20  process, starting with the execution of the filter

12:16:47  21  to UAL 934, at what point during the process do

12:16:53  22  these other flights that are being depicted on the

12:16:56  23  page that we're looking at, at what point in time

12:17:03  24  are they removed from the screen?

92

| | | |
|---|---|---|
| 12:17:05 | 1 | MR. BELT: Objection. |
| 12:17:08 | 2 | A.   Removed from the screen? |
| 12:17:09 | 3 | Q.   Well, maybe I'm just not following this |
| 12:17:14 | 4 | very well. |
| 12:17:15 | 5 | Once I execute the filter to UAL 934, |
| 12:17:21 | 6 | UAL 934 gets drawn on this background map that we |
| 12:17:25 | 7 | have on this particular page, right? |
| 12:17:26 | 8 | A.   Correct. |
| 12:17:28 | 9 | Q.   Do the other flights get redrawn as well? |
| 12:17:31 | 10 | A.   Correct. |
| 12:17:34 | 11 | Q.   So the fact that I filtered UAL 934 would |
| 12:17:40 | 12 | not change what I'm seeing on the time-stamped Page |
| 12:17:43 | 13 | 20:37? |
| 12:17:45 | 14 | MR. BELT:  Objection. |
| 12:17:45 | 15 | Q.   Is that correct? |
| 12:17:49 | 16 | A.   It would change what you're seeing by |
| 12:17:52 | 17 | adding UAL 934 and its information. |
| 12:17:56 | 18 | Q.   What other information on UAL 934 would get |
| 12:18:00 | 19 | added on top of this? |
| 12:18:01 | 20 | A.   The information that is shown in the data |
| 12:18:05 | 21 | block on the first slide. |
| 12:18:07 | 22 | Q.   So it would say UAL 934, and then it would |
| 12:18:11 | 23 | give the other textual information that is below |
| 12:18:15 | 24 | that? |

93

| | | |
|---|---|---|
| 12:18:15 | 1 | A.   Correct. |
| 12:18:15 | 2 | Q.   Those three lines of additional text?  I |
| 12:18:21 | 3 | guess the first -- well, the first line, it looks |
| 12:18:24 | 4 | like, is already on the screen, SLC ORD, which, is |
| 12:18:31 | 5 | that Salt Lake City to O'Hare? |
| 12:18:33 | 6 | A.   Correct. |
| 12:18:34 | 7 | Q.   So that's already on the screen.  So |
| 12:18:37 | 8 | really, I'd get the next two lines of text below |
| 12:18:39 | 9 | that, correct? |
| 12:18:42 | 10 | A.   Correct. |
| 12:18:43 | 11 | Q.   So that would be, what is the first line of |
| 12:18:45 | 12 | text that would be added, as represented on the |
| 12:18:51 | 13 | first page of Exhibit 3? |
| 12:18:53 | 14 | A.   It represents the speed and the altitude. |
| 12:18:56 | 15 | Q.   So speed and altitude would be added, and |
| 12:18:59 | 16 | what's the last line represent? |
| 12:19:02 | 17 | A.   The aircraft type and the miles to |
| 12:19:10 | 18 | destination. |
| 12:19:10 | 19 | Q.   Miles to destination? |
| 12:19:13 | 20 | A.   I'm sorry; minutes to destination. |
| 12:19:15 | 21 | Q.   Minutes to destination. |
| 12:19:17 | 22 | MR. HILL:  Excuse me one second; I need |
| 12:19:18 | 23 | to go off the record. |
| 12:19:20 | 24 | THE VIDEOGRAPHER:  The time is 12:19. |

FARMER ARSENAULT BROCK LLC

94

| | | |
|---|---|---|
| 12:19:21 | 1 | We're off the record. |
| 13:10:34 | 2 | (Luncheon recess taken) |
| 13:20:08 | 3 | THE VIDEOGRAPHER:  The time is 1:20. |
| 13:20:12 | 4 | We're back on the record. |
| 13:20:15 | 5 | Q.  We're back on the record after a lunch |
| 13:20:18 | 6 | break. |
| 13:20:19 | 7 | Mr. Steinberg, I want to ask you a |
| 13:20:25 | 8 | couple of questions about the evolution of the |
| 13:20:33 | 9 | Flightview software.  Obviously, we're looking at, |
| 13:20:37 | 10 | we have been looking at Plaintiff's Exhibit 3, which |
| 13:20:40 | 11 | is the screen shots circa 1993. |
| 13:20:47 | 12 | How do those screen shots differ from |
| 13:20:53 | 13 | screen shots for comparable functionality at, say, |
| 13:20:57 | 14 | the ATCA 1990 demonstration of the Flightview? |
| 13:21:01 | 15 | MR. BELT:  Objection. |
| 13:21:06 | 16 | A.  I believe these were, was the same system |
| 13:21:13 | 17 | shown at the ATCA conference; the screen shots would |
| 13:21:18 | 18 | have been similar. |
| 13:21:18 | 19 | Q.  So you believe the screen shots in |
| 13:21:21 | 20 | Plaintiff's Exhibit 3 are comparable to what someone |
| 13:21:24 | 21 | who attended the ATCA 1990 demonstration would have |
| 13:21:28 | 22 | seen in the way of screen shots? |
| 13:21:29 | 23 | A.  Yes. |
| 13:21:34 | 24 | Q.  Are there any major changes in |

95

13:21:37 1    functionality that occurred in the architecture or

13:21:43 2    design of Flightview between the ATCA demonstration

13:21:47 3    in 1990 and the presentation that you made in 1993?

13:21:53 4        A.   No; it was essentially the same, same

13:21:56 5    system.

13:22:00 6        Q.   Explain to me how the system that you

13:22:04 7    presented on in 1993 and showed these screen shots

13:22:13 8    for, how does that system compare to the system that

13:22:17 9    RLM implemented at BWI in 1995?

13:22:23 10       A.   It's, again, essentially the same system.

13:22:30 11   The system at BWI, the only change between the

13:22:34 12   systems is the programming language, but it's the

13:22:38 13   same design, same architecture, same functionality.

13:22:42 14   This system was done, I believe, in a Pascal system,

13:22:45 15   and the one at BWI was done in C.

13:22:50 16       Q.   The system at BWI, as I read the

13:22:54 17   documentation, seemed to be a touch-screen

13:23:02 18   interface.  Is that right?

13:23:03 19       A.   That is correct.

13:23:04 20       Q.   So that would be a difference --

13:23:05 21       A.   Correct.

13:23:06 22       Q.   -- between the two.  But that's just a

13:23:08 23   difference in terms of the input device, right, or

13:23:11 24   the input means?

96

13:23:12  1          MR. BELT:  Objection.

13:23:18  2      A.  It's a different input device, yes.

13:23:21  3      Q.  Just so the record's clear, as opposed to a

13:23:25  4  touch screen, with BWI, how had the inputs

13:23:30  5  historically been entered in Flightview?

13:23:36  6      A.  Selections off of these dialogue boxes

13:23:38  7  using a mouse and a keyboard.

13:23:44  8      Q.  The Flightview has as one of its customers

13:23:53  9  Boston Coach, I believe?

13:23:55  10     A.  Correct.

13:23:56  11     Q.  And it offered -- did it license Boston

13:24:01  12  Coach with Flightview?

13:24:05  13         Did it license Flightview with Boston

13:24:07  14  Coach?  I'm sorry.

13:24:09  15     A.  Boston Coach has a license with us, yes.

13:24:12  16     Q.  Is it for Flightview?

13:24:13  17     A.  It is not for the display system.

13:24:17  18     Q.  Is it text only?

13:24:18  19     A.  It's data only.

13:24:19  20     Q.  Data only?  Is that always how it's been

13:24:25  21  with Boston Coach?

13:24:27  22     A.  Correct.

13:24:31  23     Q.  And then there was a proposal that RLM

13:24:38  24  Software made to America West Airlines in 1995.  Do

97

| 13:24:42 | 1 | you recall that? |
| 13:24:44 | 2 | A.   I won't swear to the exact dates; but yes, |
| 13:24:46 | 3 | I know that we made a proposal to America West |
| 13:24:49 | 4 | Airlines about that time frame. |
| 13:24:50 | 5 | Q.   Was the RLM's Flightview system that was |
| 13:24:54 | 6 | proposed to America West in 1995 essentially the |
| 13:24:59 | 7 | same system that you presented at the 1993 |
| 13:25:03 | 8 | presentation? |
| 13:25:04 | 9 | A.   Essentially the same, correct. |
| 13:25:08 | 10 | Q.   What are the changes that you can recall |
| 13:25:11 | 11 | occurring in Flightview between the time of your |
| 13:25:14 | 12 | 1993 presentation and the time of the late 1995 |
| 13:25:18 | 13 | proposal to America West? |
| 13:25:20 | 14 | MR. BELT:   Objection. |
| 13:25:23 | 15 | A.   The America West system is a C and Windows- |
| 13:25:31 | 16 | based system.  The previous system was C and |
| 13:25:42 | 17 | X Windows, UNIX.  Other than that, the functions and |
| 13:25:45 | 18 | features, et cetera, are the same. |
| 13:25:48 | 19 | Q.   So you changed the coding language? |
| 13:25:51 | 20 | A.   Changed the language and the operating |
| 13:25:52 | 21 | system. |
| 13:25:54 | 22 | Q.   The hardware configuration didn't change; |
| 13:26:01 | 23 | is that right? |
| 13:26:05 | 24 | A.   Yes, the hardware configuration, in terms |

FARMER ARSENAULT BROCK LLC

98

13:26:08　1　of specific computers are PCs at America West,

13:26:14　2　versus a UNIX computer for the ATCA conference.

13:26:24　3　　　　　Was that what you were referencing?

13:26:26　4　　　Q.　Yes, among other things.　I'm really

13:26:30　5　focused right now on the changes that occurred

13:26:32　6　between the time of your 1993 presentation and 1995,

13:26:38　7　when the America West proposal was made.

13:26:40　8　　　　　So with that having been established,

13:26:42　9　let me ask the question again, give you an

13:26:47　10　opportunity.　What, if any, changes were made in

13:26:51　11　hardware configuration between the time of your 1993

13:26:55　12　presentation and the time of the 1995 America West

13:26:59　13　Airlines proposal?

13:27:04　14　　　A.　The America West system was a PC-based

13:27:09　15　computer system.　The previous system was a

13:27:15　16　UNIX-based.

13:27:21　17　　　Q.　Moving away from hardware configuration and

13:27:23　18　now focusing on the flow or the design of the

13:27:27　19　software, did the design of the software, at a

13:27:35　20　flow-chart level, change between the time of your

13:27:38　21　1993 presentation and the time of the 1995 proposal

13:27:41　22　to America West?

13:27:45　23　　　A.　No; same design.

13:27:56　24　　　　　MR. HILL:　Let me ask the court reporter

FARMER ARSENAULT BROCK LLC

113

| | | |
|---|---|---|
| 13:58:55 | 1 | Interactive Services, Inc.?  Were you involved in |
| 13:58:57 | 2 | any marketing to U.S. West? |
| 13:59:00 | 3 | A.   I was not involved in that to any extent at |
| 13:59:06 | 4 | all. |
| 13:59:06 | 5 | Q.   Who was leading the marketing effort to |
| 13:59:09 | 6 | U.S. West Interactive Services? |
| 13:59:12 | 7 | A.   Mary Flynn was primarily involved in that. |
| 13:59:16 | 8 | Q.   Is Mary Flynn an owner of RLM? |
| 13:59:21 | 9 | A.   Yes. |
| 13:59:22 | 10 | Q.   And what is her position with RLM? |
| 13:59:25 | 11 | A.   She's vice-president. |
| 13:59:44 | 12 | Q.   Did you participate in any testing or -- |
| 13:59:49 | 13 | well, let's just say, did you participate in any |
| 13:59:51 | 14 | testing of any software that was being provided by |
| 13:59:56 | 15 | RLM to U.S. West Interactive Services? |
| 14:00:06 | 16 | A.   Yes. |
| 14:00:08 | 17 | Q.   When was that? |
| 14:00:17 | 18 | A.   The specific time, specific year, I don't |
| 14:00:21 | 19 | recall.  Mid-'90s; '95, '6 period. |
| 14:00:34 | 20 | Q.   What were you testing? |
| 14:00:38 | 21 | A.   Testing a data feed to their system, to |
| 14:00:42 | 22 | them. |
| 14:00:42 | 23 | Q.   And what do you recall about the tests that |
| 14:00:49 | 24 | you participated in? |

114

14:01:00   1        A.   Specific details, I don't recall, other

14:01:10   2   than the testing would have entailed transmitting

14:01:14   3   data to an FTP server at their site, working with

14:01:19   4   engineers at their end to ensure that they got the

14:01:23   5   file.  I don't recall the specific issues that came

14:01:27   6   up at that point.

14:01:30   7        Q.   Other than the testing that you've just

14:01:31   8   described, do you recall any other work being

14:01:34   9   performed by you in connection with providing

14:01:38  10   software or data to U.S. West Interactive Services?

14:01:49  11        A.   Consultation with their engineers, and

14:01:53  12   understanding what the data is.  I believe we

14:02:02  13   provided them with data files for conversion from

14:02:06  14   three-letter input names to full textual names,

14:02:10  15   airline codes.

14:02:16  16        Q.   Is there anything else you can think of

14:02:18  17   that you did in connection with providing software

14:02:26  18   or data to U.S. West?

14:02:30  19        A.   Not that I recall at this moment.

14:02:35  20        Q.   Including the testing and the other work

14:02:39  21   that you just described in your previous answers, do

14:02:48  22   you know whether or not there was a contract in

14:02:52  23   place between RLM and U.S. West Services at the time

14:02:56  24   you were performing that work?

115

| | | |
|---|---|---|
| 14:03:10 | 1 | A.   I do not know the time frame of the |
| 14:03:12 | 2 | contract versus the testing of the data feed. |
| 14:03:16 | 3 | Q.   So you can't say one way or the other -- |
| 14:03:19 | 4 | A.   Correct. |
| 14:03:19 | 5 | Q.   -- as to whether it was before or after? |
| 14:03:21 | 6 | A.   Correct. |
| 14:03:22 | 7 | Q.   What about a memorandum of understanding? |
| 14:03:24 | 8 | What if I asked you the same questions about with |
| 14:03:27 | 9 | respect to a memorandum of understanding? |
| 14:03:28 | 10 | A.   I don't have the date on that, either. |
| 14:03:32 | 11 | Q.   So you wouldn't know whether it was before |
| 14:03:34 | 12 | or after a memorandum of understanding? |
| 14:03:44 | 13 | A.   Correct. |
| 14:03:47 | 14 | Q.   Was it a regular practice of RLM Software |
| 14:03:52 | 15 | to participate in testing data feeds with third |
| 14:03:58 | 16 | parties with whom it did not have a memorandum of |
| 14:04:01 | 17 | understanding or contract in place? |
| 14:04:04 | 18 | MR. BELT:  Objection. |
| 14:04:35 | 19 | A.   I can't tell you with a hard yes or no that |
| 14:04:38 | 20 | it was a regular policy of the company of doing |
| 14:04:45 | 21 | that. |
| 14:04:46 | 22 | Q.   Can you think of another episode prior to |
| 14:04:53 | 23 | the time that you did the work that you did with |
| 14:04:57 | 24 | U.S. West Interactive Services where you had |

116

14:04:58  1   participated in providing data feeds or doing other

14:05:03  2   kinds of testing with third parties, and there was

14:05:07  3   no contract or memorandum of understanding?

14:05:19  4       A.   Specifically, I couldn't provide that

14:05:23  5   information.

14:05:23  6       Q.   You could not provide it?

14:05:24  7       A.   Right.

14:05:57  8            MR. HILL:  Why don't we take a ten-

14:06:01  9   minute break.  I'm going to go through my notes and

14:06:05  10  flip through these documents and see if I have any

14:06:07  11  more questions for the witness.

14:06:09  12           THE VIDEOGRAPHER:  The time is 2:06.

14:06:11  13  We're off the record.

14:34:39  14           (Recess taken)

14:34:39  15           THE VIDEOGRAPHER:  The time is 2:34.

14:34:41  16  We're back on the record.

14:34:50  17           MR. HILL:  I've handed the court

14:34:51  18  reporter what we'll mark as Exhibit 7.

14:34:54  19           (Marked, Exhibit 7, Flightview

14:34:56  20  Maintenance Guide.)

14:35:22  21      Q.   Do you recognize Exhibit 7?

14:35:24  22      A.   Yes, I do.

14:35:25  23      Q.   What is it?

14:35:26  24      A.   It's the maintenance guide for the system

14:38:12  1    Q.   You've used the term "data feed" today.

14:38:19  2    A.   Yes.

14:38:22  3    Q.   Tell me what the data feed is defined as

14:38:25  4    when you use that term.

14:38:29  5    A.   Data feed is a transmission of data to

14:38:33  6    customers like Boston Coach, who are just receiving

14:38:36  7    the data from us and are not using the Flightview

14:38:41  8    mapping system.

14:38:44  9    Q.   And compare that -- how does that

14:38:49  10   definition of data feed compare to the term "data

14:38:52  11   block" that we looked at earlier?

14:38:54  12   A.   There's no relation.

14:38:55  13   Q.   No relation?

14:38:56  14   A.   Correct.

14:38:58  15   Q.   So in No. 3, on the page marked 356, where

14:39:07  16   it says, "Flight table data fields," under that, it

14:39:11  17   says, "For all flights in the limited ASD data feed,

14:39:17  18   the following information will be provided."

14:39:19  19        In that context, what is "data feed"

14:39:24  20   referring to?

14:39:24  21   A.   The limited ASD data feed?

14:39:28  22   Q.   Yes.

14:39:29  23   A.   That's the data feed that our line receives

14:39:32  24   from the FAA.

133

15:13:03  1    and an FVT Version 2?

15:13:06  2         A.   Yes.

15:13:07  3         Q.   What's the difference between FVT -- oh;

15:13:11  4    and going on to the next page, it looks like there's

15:13:13  5    a Version 3 as well.

15:13:15  6         A.   Specifically, I don't know what the

15:13:18  7    differences between those three versions, without

15:13:22  8    going back and looking at the code.

15:13:27  9         Q.   So I'm a user of the Flightview system in

15:13:29  10   1993.  I get a main menu screen on my map of North

15:13:36  11   America.  I call up the main menu dialogue box.  I

15:13:40  12   check background map, and the map I want to see is a

15:13:47  13   map of the United States.  I'm seeing all aircraft

15:13:52  14   on top of the -- overlaid on the map of the United

15:13:57  15   States, all commercial aircraft in the United

15:13:59  16   States.  I highlight one aircraft for more

15:14:06  17   information, and is there any set of circumstances

15:14:11  18   when I execute to filter out so I can just focus on

15:14:15  19   one aircraft; is there any circumstance where, when

15:14:19  20   that data is -- when that data block is displayed on

15:14:24  21   the screen, the Flightview toolkit would draw a

15:14:28  22   different map, a map of something other than the

15:14:32  23   United States map that I was looking at at the time

15:14:34  24   that I executed the command?

134

15:14:37  1      A.   I guess I'm a little -- I'm sorry, a little

15:14:47  2   confused by exactly what your question is.

15:14:49  3      Q.   I want to know whether or not, if the last

15:14:54  4   map I saw, the map that I picked to see, was a map

15:15:00  5   of the United States, and I filter a flight on my

15:15:04  6   map of the United States, are there any

15:15:06  7   circumstances where the Flightview toolkit would

15:15:10  8   redraw a different map than the map of the United

15:15:15  9   States, part and parcel of showing the data block

15:15:17 10   with the additional information on that aircraft?

15:15:22 11      A.   Not under those circumstances.  If you just

15:15:24 12   highlighted one flight, the FVTK would get the

15:15:28 13   information for that flight, would get the

15:15:30 14   information for the boundaries contained on the map

15:15:33 15   that were specified by the latest coordinates, and

15:15:38 16   reissue the commands to draw that map.

15:15:40 17      Q.   And in that instance, those coordinates and

15:15:44 18   everything would be a direct function of what my

15:15:52 19   background map choice was initially, correct?

15:16:03 20      A.   I guess -- I don't know what you mean by

15:16:07 21   your choice initially.

15:16:08 22      Q.   The box, the map that I originally chose as

15:16:14 23   a part the background map function on the main menu

15:16:18 24   screen.

135

15:16:18  1      A.   The map that you most recently chose?

15:16:20  2      Q.   Yes, the map that I most recently chose.

15:16:25  3      A.   The Flightview toolkit would redraw the map

15:16:29  4  from the database based on the settings that showed

15:16:34  5  a map at that latitude and longitude at that scale.

15:16:37  6      Q.   How would it know to draw that map of the

15:16:42  7  United States again?

15:16:48  8      A.   It contains state information on what size

15:16:55  9  map, what the center point was of the most current

15:17:01  10  version, most current map that you're looking at.

15:17:05  11      Q.   The most recent map that I selected?

15:17:07  12      A.   Right.

15:17:10  13      Q.   So because that was the last map that I was

15:17:13  14  looking at before it went to redraw, it would redraw

15:17:19  15  it again --

15:17:23  16      A.   It would get the data for that map --

15:17:24  17           MR. BELT:   Objection.

15:17:25  18      A.   -- and regenerate the commands to draw that

15:17:28  19  map, yes.

15:17:31  20      Q.   Now, you said in that circumstance that's

15:17:37  21  how it would operate.   Are there other circumstances

15:17:38  22  that you're contemplating where it would operate

15:17:40  23  differently?

15:17:41  24      A.   I said that only in the sense that you

15:17:46   1    didn't issue additional commands in between the

15:17:49   2    change of scale of the map or zoom to a different

15:17:52   3    airport or anything like that.

15:17:53   4         Q.   Those would be separate commands that --

15:17:56   5         A.   They would be separate commands, yes.

15:18:06   6         Q.   Other than the FVTK files that we were

15:18:13   7    looking at on Pages 6 and 7 of Exhibit 3, and the

15:18:17   8    earlier files that you specifically mentioned, are

15:18:19   9    there any other files that address this redrawing

15:18:24   10   process?

15:18:24   11        A.   Yes.  Page 4.

15:18:34   12        Q.   Okay.

15:18:36   13        A.   Ten lines down or so, there's a file,

15:18:39   14   rlm.flightview/inc/FVTK.h, which is part of the

15:18:50   15   source code for the Flightview toolkit module.

15:18:55   16        Q.   What does that particular file do?

15:18:57   17        A.   It's a programming language include file.

15:19:16   18        Q.   Any others?

15:19:49   19        A.   Yes.  The files on the first page, at the

15:19:58   20   end of the page, rlm.flightview/dat, there are data

15:20:14   21   files there that define the latitudes and longitudes

15:20:17   22   of airports, the latitudes and longitudes of airway

15:20:23   23   structures, latitude -- on the next page, latitudes

15:20:27   24   and longitudes, names of the various navigational

141

| 15:29:38 | 1 | A. Right; I would need a clarification on |
| 15:29:43 | 2 | exactly what you're asking. |
| 15:29:46 | 3 | Q. Well, the actual lines that you see on the |
| 15:29:49 | 4 | map on the screen, where did those lines come from? |
| 15:29:55 | 5 | Which of the source code files did those lines |
| 15:29:57 | 6 | emanate from? |
| 15:30:03 | 7 | A. The latitude/longitude information in those |
| 15:30:06 | 8 | lines is in these files that we referenced |
| 15:30:09 | 9 | previously here. The Flightview toolkit uses that |
| 15:30:14 | 10 | information and performs transformations based on |
| 15:30:18 | 11 | current scaling and screen size to generate the |
| 15:30:22 | 12 | commands to put the lines on the display, issue the |
| 15:30:30 | 13 | commands, transmit them to the display. |
| 15:30:31 | 14 | Q. Is that really -- I mean, is that |
| 15:30:35 | 15 | essentially a drawing program? |
| 15:30:37 | 16 | A. Is what a drawing program? |
| 15:30:39 | 17 | Q. Is it an automatic drawing program? I |
| 15:30:42 | 18 | mean, the software is programmed to literally draw a |
| 15:30:45 | 19 | map on the screen based upon latitude/longitude |
| 15:30:55 | 20 | coordinates that are in a database? |
| 15:30:56 | 21 | A. No. It's the Flightview software which is |
| 15:30:59 | 22 | doing that drawing, issuing the commands. |
| 15:31:02 | 23 | Q. Oh, I understand it's Flightview; but I'm |
| 15:31:04 | 24 | saying, is it a drawing routine within Flightview? |

142

| | | |
|---|---|---|
| 15:31:07 | 1 | A.   Is there a separate -- there is a separate |
| 15:31:13 | 2 | set of software commands that draw the world map, |
| 15:31:17 | 3 | yes. |
| 15:31:19 | 4 | Q.   And the world map -- |
| 15:31:21 | 5 | A.   Versus drawing an airport name. |
| 15:31:56 | 6 | Q.   I understand that in connection with |
| 15:31:57 | 7 | drawing the map on the screen, there are commands. |
| 15:32:00 | 8 | In addition to the commands, are there bits of data |
| 15:32:10 | 9 | that are necessary, a necessary component of drawing |
| 15:32:14 | 10 | the map on the screen? |
| 15:32:19 | 11 | A.   I guess the answer is yes.  There's got to |
| 15:32:26 | 12 | be data.  I mean... |
| 15:32:27 | 13 | Q.   What's the data that is necessary in |
| 15:32:34 | 14 | conjunction with the commands in order to generate a |
| 15:32:39 | 15 | map on the screen? |
| 15:32:41 | 16 | A.   The transformed values of the latitudes and |
| 15:32:49 | 17 | longitudes from latitude and longitude to display |
| 15:32:52 | 18 | coordinates. |
| 15:32:55 | 19 | Q.   Anything else? |
| 15:32:57 | 20 | A.   Specification of the color.  That's |
| 15:33:02 | 21 | probably it. |
| 15:33:08 | 22 | Q.   Can you think of anything else as you sit |
| 15:33:10 | 23 | here? |
| 15:33:16 | 24 | A.   I think that's it. |

FARMER ARSENAULT BROCK LLC

143

15:33:22    1       Q.   So the latitude, longitude, the color.  And
15:33:48    2   in the hypothetical that I posited earlier, where we
15:33:53    3   were talking about my map of the United States, my
15:33:57    4   filtering on an aircraft and a redrawing of the map
15:34:00    5   of the United States, the latitude, longitude and
15:34:06    6   color is based upon what the last screen I was
15:34:12    7   looking at had as its latitude, longitude and color;
15:34:18    8   correct?
15:34:19    9       A.   Well, the latitude and longitude is based
15:34:21   10   on the data that is read out of the data file
15:34:25   11   defining the line that's going to be drawn as part
15:34:27   12   of the map.
15:34:28   13           And the color is based on the current
15:34:32   14   setting of the color that the user wants the world
15:34:35   15   to be drawn in.
15:34:36   16       Q.   And the data file where the latitude and
15:34:44   17   longitude and color are drawn from, how does that
15:34:53   18   data file know what the latitude, longitude and
15:34:58   19   color settings for redrawing the map are?
15:35:02   20       A.   That data file doesn't know color.  The
15:35:05   21   data file contains the latitude and longitude of the
15:35:11   22   endpoints of all the lines that, if you looked at
15:35:16   23   them, would look like a map of the world.
15:35:21   24       Q.   Right.  And so how does it know, how does

144

15:35:27  1    Flightview know what the right latitude and

15:35:34  2    longitude data is to redraw the map of the United

15:35:41  3    States, in my hypothetical?

15:35:45  4         A.   The module, the Flightview toolkit, again

15:35:50  5    is saving -- or maintains state information as to

15:35:53  6    what the current latitude and longitude of the

15:35:59  7    center point is, what the width of the map is in

15:36:04  8    nautical miles that the user has requested; uses

15:36:09  9    that information to do the transformations.

15:36:11  10        Q.   And that user request that you just

15:36:15  11   referenced in my hypothetical is the original

15:36:21  12   selection of the background map, correct?

15:36:22  13             MR. BELT:  Objection.

15:36:27  14        Q.   I mean, if I have a map of the United

15:36:29  15   States that I've requested to see and then I filter

15:36:32  16   on an aircraft, and then it redraws the map of the

15:36:37  17   United States, and I haven't done anything else, am

15:36:43  18   I correct that the latitude -- that the way that

15:36:46  19   Flightview knows the latitude and longitude lines to

15:36:50  20   draw on the redrawn map is based upon what map I was

15:36:57  21   previously looking at before I made the request to

15:37:01  22   see flight status or filter on one particular

15:37:05  23   aircraft?

15:37:05  24             MR. BELT:  Objection.

145

15:37:11    1        A.   I believe the answer to that question is

15:37:15    2    yes, but you may have lost me a little bit in --

15:37:18    3        Q.   Well, let's break it down.

15:37:19    4             You know -- I mean, I get the sense you

15:37:23    5    know what I'm driving at.  Maybe it would just be

15:37:26    6    easier for me to ask you:  In my hypothetical, where

15:37:30    7    I have selected my background map, the United

15:37:32    8    States; I have asked, or executed a command to

15:37:37    9    filter on a particular aircraft; there is obviously

15:37:41   10    a latitude and a longitude; there obviously were

15:37:46   11    latitude and longitude lines drawn on my background

15:37:48   12    map.

15:37:49   13             And what I'd like you to explain to me

15:37:53   14    is how the software knows, how the Flightview

15:37:58   15    toolkit knows what latitude and longitude data to

15:38:04   16    draw from as it goes to redraw that map.

15:38:13   17        A.   As it goes to redraw that map, it will read

15:38:16   18    the data for -- out of these files for the entire

15:38:21   19    world.  The data is saved in these files in a way

15:38:24   20    that allows it to throw away chunks that don't fit

15:38:28   21    within the rectangular window that defines what the

15:38:33   22    user is looking at, had been looking at.

15:38:35   23        Q.   Had been looking at?  Meaning before the

15:38:43   24    filtering command was executed, right?

146

| | | |
|---|---|---|
| 15:38:45 | 1 | A.   Correct. |
| 15:38:48 | 2 | MR. HILL:  I don't have anything |
| 15:38:50 | 3 | further -- |
| 15:38:50 | 4 | A.   I guess -- okay. |
| 15:38:52 | 5 | Q.   Wait a second.  You know, if you want to |
| 15:38:54 | 6 | make -- |
| 15:38:55 | 7 | A.   No; that's okay. |
| 15:38:56 | 8 | Q.   I don't want to cut you off. |
| 15:39:02 | 9 | A.   Never say more than you have to. |
| 15:39:05 | 10 | MR. HILL:  Okay.  I don't have any other |
| 15:39:07 | 11 | questions. |
| 15:39:09 | 12 | MR. BELT:  I want to ask a question. |
| 15:39:11 | 13 | EXAMINATION |
| | 14 | BY MR. BELT: |
| 15:39:12 | 15 | Q.   When the Flightview toolkit generates a map |
| 15:39:15 | 16 | for display to the user, is there any connection |
| 15:39:17 | 17 | between that map and the flight data, the flight |
| 15:39:23 | 18 | data coming in from the ASD feed into RLM's system? |
| 15:39:42 | 19 | A.   I believe -- the answer is yes. |
| 15:39:45 | 20 | MR. BELT:  I have nothing else. |
| 15:39:48 | 21 | EXAMINATION |
| | 22 | BY MR. HILL: |
| 15:39:49 | 23 | Q.   Well, go ahead and explain your answer. |
| 15:39:51 | 24 | A.   That the Flightview toolkit is looking at |

FARMER ARSENAULT BROCK LLC

147

15:39:52  1    the data defining the map and the data defining the

15:39:57  2    flight positions, and issuing commands to draw those

15:40:03  3    two things on the map.

15:40:06  4         Q.   Those two things --

15:40:08  5              MR. BELT:  Wait a minute.  I just want

15:40:09  6    to put on the record, I don't have anything else.

15:40:11  7              Are you going to re-examine?

15:40:13  8              MR. HILL:  Yes.

          9              MR. BELT:  Okay.

15:40:14  10        Q.   Those two things in your last answer being

15:40:17  11   the redrawing of the map and the redrawing of the

15:40:20  12   aircraft?

15:40:22  13        A.   Correct.

15:40:24  14        Q.   So the connection is that the Flightview

15:40:27  15   toolkit has to look at the mapping data to draw the

15:40:31  16   map, and it has to look at the positional data from

15:40:36  17   the data feed to know where to draw the airplane on

15:40:41  18   the map?

15:40:47  19        A.   The Flightview toolkit needs to read the

15:40:50  20   mapping data, the latitude and longitude of the map;

15:40:54  21   needs to retrieve the flight information for the

15:40:58  22   flight of interest to get the latitude and longitude

15:41:00  23   of where that flight is.

15:41:02  24        Q.   So that it knows where to put the dot on

148

15:41:04  1   the screen to represent that aircraft, correct?

15:41:06  2       A.   So that it can issue the appropriate

15:41:09  3   commands to draw the airplane in the right position.

15:41:11  4       Q.   Right.  Can you think of a circumstance in

15:41:39  5   my hypothetical where I have a map of the United

15:41:43  6   States, and I execute a command to filter on a

15:41:46  7   particular aircraft that's on my display; and

15:41:52  8   because of the position of the aircraft, the

15:41:56  9   Flightview toolkit draws a different map than the

15:41:58  10  map of the United States?

15:42:03  11           MR. BELT:  Objection.

15:42:08  12      A.   Could I ask you to go over that again?

15:42:11  13      Q.   Sure.  You have a map of the United States

15:42:16  14  that has been selected as the background map.  You

15:42:20  15  want to filter on that UAL Flight 934 that we have

15:42:25  16  been looking at.  I execute a command to filter to

15:42:30  17  UAL 934.

15:42:32  18           Is there a circumstance that you're

15:42:33  19  aware of in Flightview where the Flightview toolkit

15:42:37  20  would draw a map other than the map of the United

15:42:42  21  States that I had been looking at because of the

15:42:48  22  position of UAL Flight 934?

15:43:04  23      A.   I don't believe so.

15:43:06  24           MR. HILL:  I don't have any other



# EXHIBIT / ATTACHMENT

## EX. 3

**(To be scanned in place of tab)**

DEPOSITION
EXHIBIT

3

STEINBERG 8-23-03

☑ Background
☐ Find Hi
☐ Filter      ☐ Lat. Long. Grid
☐ Identifi    ☐ Geographic Boundaries
☐ Weather     ☐ Airports
☐ Utiliti     ☑ Runways
☐ Flight      ☐ Airways
☐ Zoom        ☐ Range Rings
☐ QUIT        ☐ Air Traffic Co
              ☐ Navigation Aid
              ☐ Special Use Ai
              ☐ Radio Ranges

CANCEL

CANCEL







# EXHIBIT / ATTACHMENT

## EX. 4

**(To be scanned in place of tab)**

Baltimore/Washington
International Airport
Terminal
Concourse Loop

DEPOSITION
EXHIBIT
4
STEINBERG 8-23-03

December 1993
Cambridge Systematics

**BWI Observation Lounge**
**Exhibit Worksheet**
12/1/93

| **1** | **Introduction to Commercial Aircraft** | |
|---|---|---|
| | 1 | Commercial Jet Diagram | Cut-away view |

| **2** | **Weather** | |
|---|---|---|
| | 2 | Why Airports Close, or Why Planes Can't Land or Take Off | Fog, Wind, and Ice |
| | 2 b.1 | Current Weather Across the Country | Did you pack correctly for your trip? |
| | 2 b.2 | Current Weather Across the Country | The Weather Channel |

| **3** | **Flying** | |
|---|---|---|
| | 3 a.1 | Flight Simulator | Runway Approach and Landing at BWI |
| | 3 a.2 | Flight Simulator | Runway Approach and Landing at another US Airport |
| | 3 b.1 | Flying Yesterday | Tri-motor Ford/Early Cockpit |
| | 3 b.2 | Flying Yesterday | Early movies of flight |
| | 3 b.3 | Flying Yesterday | Movies of the 20s and 30s |
| | 3 b.4 | Flying Yesterday | DC-3 |
| | 3 b.5 | Flying Yesterday | Movies of the 40s and 50s |
| | 3 c.1 | Flying Today | 747 Cockpit |
| | 3 c.2 | Flying Today | Movie clips of the 60s through 90s — Theme #1 |
| | 3 c.3 | Flying Today | Movie clips of the 60s through 90s — Theme #2 |

| **4** | **Airways** | |
|---|---|---|
| | (4 a) | Your Trip | Victor Airways |
| | 4 b.1 | The Local Airways | Model |
| | 4 b.2 | The Local Airways | Video Loop |
| | 4 b.3 | The Local Airways | Interpretive Graphics |
| | (4 c) | Air Traffic Management System | Real-time traffic: What's happening right now? |

| **5** | **On the Ground Activities** | |
|---|---|---|
| | 5 a | "Pit Stop" | Ground Crew Identifications |
| | 5 b | Aircraft at BWI | Identification Guide |
| | 5 c | Airlines at BWI | Identification Guide |
| | 5 d | Control Tower | Select an Audio channel |

| **6** | **Aircraft Artifacts** | |
|---|---|---|
| | 6 a | Interpretive Graphics | Artifact IDs |
| | 6 b.1 | Cockpit | Artifact |
| | 6 b.2 | Cockpit | Mural |
| | 6 c.1 | Fuselage | Artifact |
| | 6 c.2 | Fuselage | "How Does Your Bag Travel" |
| | 6 d | Vertical Stabilizer | Artifact |
| | 6 e | Wing | Artifact |
| | 6 f | Engine | Artifact |
| | 6 g | Landing Gear | Artifact |

| **7** | **Seated Viewing Area** | |
|---|---|---|
| | 7 a | Control Tower | Ground Control |

| **8** | **Lounge Area** | |
|---|---|---|
| | 8 a | Table Top Graphics | Aerial views |

**BWI Observation Lounge**
**Exhibit Worksheet**
12/1/93                                                                **1a**

---

| **Area** | **Introduction to Commercial Aircraft** |
| --- | --- |

---

**Exhibit**        **Commercial Jet Diagram**
                   Cut-away view



**Intent**         To illustrate a modern jet, including its structure as well as its interior and exterior features.

**Storyboard**     A commercial jet, such as a 747, will be illustrated in a detailed perspective cut-away view, so that visitors can see interior and exterior features simultaneously.

**Media**          Mural, enlarged from an illustration

**BWI Observation Lounge**
**Exhibit Worksheet**
12/1/93

**2 a**

---

| | |
|---|---|
| **Area** | **Weather** |

---

| | |
|---|---|
| **Exhibit** | **Why Airports Close, or Why Planes Can't Land or Take Off**<br>Fog, Wind, and Ice |



| | |
|---|---|
| **Intent** | To show how visibility, and wind velocity are taken into account during take offs and landings. |
| **Storyboard** | Live data stream will show current wind direction, wind speed, and visibility. The data will be interpreted on panels that describe visibility requirements for take offs and landings as well as how wind direction affects runway use. A familiar Baltimore landmark will be used to illustrate 1200 feet of visibility, and a diagram of BWI's runway layout will be augmented with lights that show the runway currently in use and the current wind direction. |
| **Media** | Live data stream with wind direction, wind speed, and visibility, displayed on a video monitor or with LEDs; back-lit graphics. |

BWI Observation Lounge
**Exhibit Worksheet**
12/1/93                                                                    **2b.1**

---

**Area**        **Weather**

---

**Exhibit**     **Current Weather Across the Country**
                Did you pack correctly for your trip?



**Intent**      To allow visitors to call up real time regional/local weather (radar or satellite)

**Storyboard**  1. Attract loop shows a montage of weather conditions, shot around Baltimore region, from rain to snow, to sunshine, to wind gusts. Visitor is asked touch the screen to get today's weather.
                2. Screen shows entire nation's weather map, starting with satellite imagery, then overlaid with fronts, lows and highs, and finally ending with temperature zones outlined.
                3. Visitor is told to find local weather, press on the region to which your're traveling.
                4. Visitors touches screen, and screen changes to a weather map of the region. Visitors are asked to touch a more refined map, until the final spot chosen is a particular city.
                5. Screen display confirms name of city with visitor. Asks if visitor is bringing an umbrella, a heavy coat, sunscreen, etc.
                5. Screen displays weather forecast for that city.
                6. Screen comments on items visitor is or isn't bringing (umbrella, etc), based on the weather forecast.

**Media**       Interactive computer; ie WSI service; two monitors, touchscreen

**BWI Observation Lounge**
**Exhibit Worksheet**
12/1/93

**2 b.2**

| | |
|---|---|
| **Area** | **Weather** |

| | |
|---|---|
| **Exhibit** | **Current Weather Across the Country**<br>The Weather Channel |



**Intent**       To provide live weather information, especially for people who do not want to interact with a computer

**Storyboard**  Monitor displays "The Weather Channel" all the time.

**Media**       TV monitor hooked up to cable TV.

**BWI Observation Lounge**
**Exhibit Worksheet**
12/1/93

**3 a.1**

---

| Area | **Flying** |
|------|------------|

---

| Exhibit | **Flight Simulator** |
|---------|----------------------|
| | Runway Approach and Landing at BWI |



**Intent**       To allow visitors to "land" a plane at BWI.

**Storyboard**   1. The attract loop on the simulator shows a computer graphic representation of the view from a cockpit, circling around the airport, with identifiable landmarks seen on the screen. Visitor is invited to start the program by moving the joystick or yoke.
2. Visitors will be given the option to choose one of three levels of difficulty at each simulator.
3. If the easiest level, called "student pilot," is chosen, visitors will be guided as they try to land the plane, by keeping the plane on the appropriate angle of approach for the runway. They will see only one instrument and the "view from the cockpit."
4. If the second level of difficulty is chosen, "recreational pilot," visitors will also try to keep the plane lined up with the runway as they also keep the plane on the angle of approach. They will see two controls and the view from the cockpit.
5. The highest level of difficulty, "air transport pilot," would be much more difficult, and visitors would have to utilize many methods of controlling the aircraft.
6. A visitor could play all three levels in succession.

**Media**        Computer with harddrive, color monitors, possibly a laser disk player, and audio speakers The two simulator programs are identical in all ways except the graphic representations of the views out the cockpits--3a.1 shows BWI views and 3a.2 shows another airport.

BWI Observation Lounge
Exhibit Worksheet
12/1/93

**3 a.2**

---

| Area | **Flying** |
|---|---|

---

| Exhibit | **Flight Simulator** |
|---|---|

Runway Approach and Landing at another US Airport



| Intent | To allow visitors to "land" a plane at another US airport. |
|---|---|

| Storyboard | 1. The attract loop on the simulator shows a computer graphic representation of the view from a cockpit, circling around the airport, with identifiable landmarks seen on the screen. Visitor is invited to start the program by moving the joystick or yoke. |
|---|---|

2. Visitors will be given the option to choose one of three levels of difficulty at each simulator.

3. If the easiest level, called "student pilot," is chosen, visitors will be guided as they try to land the plane, by keeping the plane on the appropriate angle of approach for the runway. They will see only one instrument and the "view from the cockpit."

4. If the second level of difficulty is chosen, "recreational pilot," visitors will also try to keep the plane lined up with the runway as they also keep the plane on the angle of approach. They will see two controls and the view from the cockpit.

5. The highest level of difficulty, "air transport pilot," would be much more difficult, and visitors would have to utilize many methods of controlling the aircraft.

6. A visitor could play all three levels in succession.

| Media | Computer with harddrive, color monitors, possibly a laser disk player, and audio speakers The two simulator programs are identical in all ways except the graphic representations of the views out the cockpits--3a.1 shows BWI views and 3a.2 shows another airport. |
|---|---|

**BWI Observation Lounge**
**Exhibit Worksheet**
12/1/93

**3b.1**

---

**Area**        **Flying**

---

**Exhibit**     **Flying Yesterday**
                Tri-motor Ford/Early Cockpit



**Intent**      To provide visitors with the look and feel of an early cockpit, probably a Tri-Motor Ford.

**Storyboard**  Visitors can look at an image of an early cockpit, probably a Tri-Motor Ford. It is
                accompanied by a real yoke that visitors can touch. Interpretive panels include early views of
                BWI, describe the features of the Tri-Motor Ford, and tell visitors that they can see another
                example at the Smithsonian Institute in Washington.

**Media**       Still photo or back-lit transparency of a Tri-motor Ford cockpit, with real yoke (installed so
                that it cannot be moved) extending from photo.

**BWI Observation Lounge**
**Exhibit Worksheet**
12/1/93

**3b.2**

---

| **Area** | **Flying** |
|---|---|

---

**Exhibit**     **Flying Yesterday**
Early movies of flight



**Intent**     To show early attempts at flight, through short clips of documentary film footage.

**Storyboard**  1. Attract loop on small monitor screen alternates between four to six still images from film clips that the visitor may wish to see. Screen indicates that visitors should push a nearby button to see the film clip of their choice.
2. Visitor pushes a nearby button to see clip, which lasts 45 to 90 seconds.
3. After a button is pushed, its corresponding clip cannot be interrupted by another button that is pushed.

**Media**      Small video monitor screen, laserdisk player, push buttons

**BWI Observation Lounge**
**Exhibit Worksheet**
12/1/93

**3b.3**

| Area | **Flying** |
|---|---|

| **Exhibit** | **Flying Yesterday** |
|---|---|
| | Movies of the 20s and 30s |



| **Intent** | To accompany the early cockpit, a second video monitor will show clips from Hollywood films of the 20s and 30s, to give a lighthearted look at airplanes of the time. |
|---|---|

| **Storyboard** | 1. Attract loop on small monitor screen alternates between four to six still images from film clips that the visitor may wish to see. Screen indicates that visitors should push a nearby button to see the film clip of their choice. |
|---|---|
| | 2. Visitor pushes a nearby button to see clip, which lasts 45 to 90 seconds. |
| | 3. After a button is pushed, its corresponding clip cannot be interrupted by another button that is pushed. |

| **Media** | Small video monitor screen, laserdisk player, push buttons |
|---|---|

**BWI Observation Lounge**
**Exhibit Worksheet**
12/1/93

**3b.4**

---

**Area**        **Flying**

---

**Exhibit**      **Flying Yesterday**
                 DC-3



**Intent**       To provide visitors with the look and feel of a DC-3 cockpit.

**Storyboard**   Visitors can look at an image of a DC-3 cockpit, accompanied by a real yoke that they can
                 touch. Interpretive panels include views of BWI and describe the DC-3's features.

**Media**        Still photo or back-lit transparency of a DC-3 cockpit, with real yoke (installed so that it
                 cannot be moved) extending from photo.

**BWI Observation Lounge**
**Exhibit Worksheet**
12/1/93

**3b.5**

---

| | |
|---|---|
| **Area** | **Flying** |

---

**Exhibit**     **Flying Yesterday**
Movies of the 40s and 50s



**Intent**        To accompany the DC-3, clips from movies made in the 1940s and 1950s will be shown

**Storyboard**  1. Attract loop on small monitor screen alternates between four to six still images from film clips that the visitor may wish to see. Screen indicates that visitors should push a nearby button to see the film clip of their choice.
2. Visitor pushes a nearby button to see clip, which lasts 45 to 90 seconds.
3. After a button is pushed, its corresponding clip cannot be interrupted by another button that is pushed.

**Media**        Small video monitor screen, laserdisk player, push buttons

**BWI Observation Lounge**
**Exhibit Worksheet**
12/1/93

**3c.1**

| Area | **Flying** |

| Exhibit | **Flying Today** |
| | 747 Cockpit |



**Intent**   To provide visitors with the look and feel of a 747 cockpit..

**Storyboard**   Visitors can look at an image of a 747 cockpit, accompanied by a real yoke that visitors can touch. Interpretive panels include more recent views of BWI, describe the 747's features, and possibly describe future types of instrumentation.

**Media**   Still photo or back-lit transparency of a 747 cockpit, with real yoke (installed so that it cannot be moved) extending from photo.

**BWI Observation Lounge**
**Exhibit Worksheet**
12/1/93

**3c.2**

---

| Area | **Flying** |
|---|---|

---

**Exhibit**     **Flying Today**
Movie clips of the 60s through 90s — Theme #1



**Intent**     To show additional Hollywood clips from films that relate to airports or planes.

**Storyboard**     1. Attract loop on small monitor screen alternates between four to six still images from film clips that the visitor may wish to see. Screen indicates that visitors should push a nearby button to see the film clip of their choice.
2. Visitor pushes a nearby button to see clip, which lasts 45 to 90 seconds.
3. After a button is pushed, its corresponding clip cannot be interrupted by another button that is pushed.

**Media**     Small video monitor screen, laserdisk player, push buttons

**BWI Observation Lounge**
**Exhibit Worksheet**
12/1/93

**3c.3**

---

| **Area** | **Flying** |
| --- | --- |

---

**Exhibit**  **Flying Today**
Movie clips of the 60s through 90s — Theme #2



**Intent**       To show additional Hollywood clips from films that relate to aiports or planes.

**Storyboard**  1. Attract loop on small monitor screen alternates between four to six still images from film clips that the visitor may wish to see. Screen indicates that visitors should push a nearby button to see the film clip of their choice.
2. Visitor pushes a nearby button to see clip, which lasts 45 to 90 seconds.
3. After a button is pushed, its corresponding clip cannot be interrupted by another button that is pushed.

**Media**       Small video monitor screen, laserdisk player, push buttons

**BWI Observation Lounge**
**Exhibit Worksheet**
12/1/93                                                               **4 a**

---

| Area | **Airways** |
|---|---|

---

| **Exhibit** | **Your Trip**<br>Victor Airways |
|---|---|



| **Intent** | To show that airlines use "highways" (victor airways) in the sky to travel from point to point. Visitors can see the victor airways for their trip from BWI and they can choose to see the victors for six specific trips from BWI. The six pre-programmed trips will also display what one would see out of the window (ie major landmarks). Visitors have the option to purchase a copy of the preprogrammed trip. |
|---|---|
| **Storyboard** | 1. Attract loop shows alternating victor airways out of BWI to other US cities. Stationary graphic next to lower screen invites visitors to "Touch this screen to start."<br>2. After visitor touches screen, he or she is asked to touch the region that he or she is flying to. Then the map will zoom in on that region and ask the visitor to choose a particular city.<br>3. Map will then show the typical victor airways that the person's plane will take, highlighting cities and geographical landmarks along the way.<br>4. A menu screen then will then appear, and visitor will be asked to choose one of six US cities to see its victor airways. Choices may include: Seattle, Los Angeles, Miami, Boston, Houston, and Minneapolis.<br>5. After visitor chooses a city, screen changes to US map and victor airways are drawn in a slow sequence. The airways are enhanced with aerial and land-based photos of landmarks typically passed after approximately each 30 minutes of flying time.<br>6. Visitors have the option of purchasing a copy of one of the six pre-programmed flights, complete with victor airways, flying times, and landmarks along the way. |
| **Media** | Two monitors showing the same information at all times. Smaller monitor is equipped with a touchscreen. Need to check if all data can be stored on a hard drive, otherwise, laser disk will also be needed for the photo images. |

**BWI Observation Lounge**
**Exhibit Worksheet**
12/1/93

**4b.1**

| | |
|---|---|
| **Area** | **Airways** |

| | |
|---|---|
| **Exhibit** | **The Local Airways** |
| | Model |



**Intent**  Show the various configurations of controlled airspace and how airplanes actually stay on designated "highways" and routes in the sky in the Baltimore/Washington area. The depiction of "air-space" would show that what we commonly perceive as "empty" space is actually "filled" with all of the victor airways, holding patterns, instrumental landing systems, and various control zones.

**Storyboard**  Model may be accompanied by special lighting effects: edge-lit glass, fiber-optics, etc.

**Media**  Map and 3-D model of Baltimore/Washington area class 'B' airspace with an acrylic model of the "upside-down wedding cake", ILS's for DCA & BWI, airways, intersections and holding patterns, etc.

BWI Observation Lounge
Exhibit Worksheet
12/1/93

**4b.2**

---

**Area**       **Airways**

---

**Exhibit**    **The Local Airways**
               Video Loop



**Intent**     Show the various configurations of controlled airspace and how airplanes actually stay on
               designated "highways" and routes in the sky in the Baltimore/Washington area.

**Storyboard** 1. One monitor is placed along the perimeter of the airways model, near BWI airport on the
               model map, as part of the base of the model.
               2. Visitors can push a button or touch the screen to see video footage, either speeded-up
               or with cuts between views, that shows Washington/Baltimore area from an airplane that is
               on a holding pattern, waiting to land at BWI.
               3. The video will contrast the landmarks that the passenger sees out the window with the
               defined airspace that is figuratively occupying the sky in the same view.
               4. Computer graphics will be incorporated onto filmed footage. The footage may switch
               between, "what you see" and "what the pilot is thinking." For example, while a passenger
               may look down at the White House, a pilot imagines the no-fly zone that extends upwards
               from that building. A narrator's voice on the video will interpret what's being seen.
               5. The computer graphics in the video will correspond with the colored sections of the
               model.
               6. Video ends with a successful landing at BWI.

**Media**      One monitor connected to a laserdisk player; push-to-start button or touchscreen; speaker

**BWI Observation Lounge**
**Exhibit Worksheet**
12/1/93

**4b.3**

---

| **Area** | **Airways** |

---

**Exhibit**     **The Local Airways**
Interpretive Graphics



**Intent**     Show the various configurations of controlled airspace and how airplanes actually stay on designated "highways" and routes in the sky in the Baltimore/Washington area.

**Storyboard**     Graphics will "pull apart" the model elements and explain their significance.

**Media**     Front or back-lit panels with line drawings, text, and photos. Possible design elements that slide over each other, to "peel" away the elements of the model

BWI Observation Lounge
Exhibit Worksheet
12/1/93

**4c**

---

**Area**        **Airways**

---

**Exhibit**     **Air Traffic Management System**
Real-time traffic: What's happening right now?



**Intent**      To show the actual planes incoming and outgoing from BWI and their relationship with all the planes in the air over the US.

**Storyboard**  1. Attract screen is the live image of the US with dots signifying aircraft in the sky at any particular time. Screen includes a statement that gives the actual number of planes in the air at any moment. Static graphics near the small screen invite visitors to "Touch this screen to see current BWI air traffic."
2. After visitor touches the screen, some of the dots on the US map change to small silhouettes of planes, color-coded to signify incoming and outgoing BWI aircraft;
4. With "BWI planes" on map, visitors are then invited to zoom into the BWI region to touch one of the planes to get more specific flight information. If a visitor touches a plane, the monitor will display important information, including the plane's flight number, type of plane, its destination or place of departure; how far away it is from its destination, etc.
5. Nearby graphics will provide a key to the displayed data.

**Media**       A small monitor below a large, 4-by-6-foot rear projection, hooked up to live satellite or phonewire communications. Touchscreen on lower/smaller monitor, speaker.

**BWI Observation Lounge**
**Exhibit Worksheet**
12/1/93                                                                    **5 a**

---

| **Area** | **On the Ground Activities** |
|---|---|

---

**Exhibit**     **"Pit Stop"**
Ground Crew Identifications



| **Intent** | Show how all of the ground crew interact to "turn-around" a flight once it reaches the gate, (ie: refueling, auxiliary power, baggage conveyer and tug, aircraft push-back tug, de-icing, food service), demonstrate line crew hand signals for turn, stop, etc. |
|---|---|
| **Storyboard** | 1. A graphic image of a jet surrounded by its typical "pit stop" vehicles will be displayed, with the vehicles identified, just by name (refueling truck, auxilliary power generator, etc.) 2. Visitors can touch the image of a vehicle, and an audio track will describe the vehicle's function, possibly in a choice of languages, perhaps English or Spanish. |
| **Media** | Touch-sensitive image connected to programmed CD player, speaker |

**BWI Observation Lounge**
**Exhibit Worksheet**
12/1/93                                                                 **5b**

---

**Area**        **On the Ground Activities**

**Exhibit**     **Aircraft at BWI**
                Identification Guide



SILLOGRAPHS

**Intent**      To identify the aircraft that are seen from the exhibit viewing window.

**Storyboard**  Silhouettes or perspective drawings that identify the aircrafts that fly in and out of BWI, by
                style or model (DC-9, 727, 747, etc.), along with a few facts for each plane.

**Media**       Front-illuminated graphics: silkscreen, or vinyl, or cut-out acrylic

**BWI Observation Lounge**
**Exhibit Worksheet**
12/1/93

**5c**

---

| **Area** | **On the Ground Activities** |
|---|---|

| **Exhibit** | **Airlines at BWI** |
| | Identification Guide |



| **Intent** | To identify the airlines that utilize BWI, by seeing their logos |
|---|---|
| **Storyboard** | Panel with airline logos, either shown on an aircraft's vertical stabilizer or alone as a graphic. |
| **Media** | Front-illuminated graphics: silkscreen, or vinyl, or cut-out acrylic |

**BWI Observation Lounge**
**Exhibit Worksheet**
12/1/93

**5 d**

---

**Area**      **On the Ground Activities**

---

**Exhibit**   **Control Tower**
              Select an Audio channel

```
JEPPESEN                    JAN 10-92   11-1

  ATIS  115.1 127.8

  BALTIMORE Approach (R)  119.7

  BALTIMORE Tower  119.4

  Ground  121.9
```

**Intent**      To allow visitors to hear conversations between pilots and various controllers, and to
                illustrate that there are different levels of control.

**Storyboard**  At the exhibit window where planes are identified, visitors will also be able to hear various
                controllers on live audio hook-up.
                1. Graphics will briefly explain the hierarchy of air management, from gate control, to ground
                control, to the control tower to TRACON.
                2. Visitors can push one of four buttons to hear live conversations from these different
                channels.
                3. Audio will play on one channel until another button is chosen.
                4. After two minutes of no sound, the receiver will scan to the next active channel.

**Media**       Radio receiver with push buttons and default scanner mode, speakers throughout window
                identification area

**BWI Observation Lounge**
**Exhibit Worksheet**
12/1/93                                                                          **6a**

---

| **Area** | **Aircraft Artifacts** |
| --- | --- |

---

**Exhibit**       **Interpretive Graphics**
                  Artifact IDs



**Intent**        To identify the types of aircraft that the displayed artifacts represent.

**Storyboard**    A simple graphic panel will feature silhouettes of the aircraft (DC-9, 737, 707, etc.) that the
                  displayed parts were taken from. Each part (cockpit, fuselage, wing, etc.) will be highlighted
                  in a different color on its corresponding image.

**Media**         Front or back-lit graphic panel.

**BWI Observation Lounge**
**Exhibit Worksheet**
12/1/93

**6b.1**

---

**Area**      **Aircraft Artifacts**

---

**Exhibit**      **Cockpit**
· · Artifact



**Intent**      To show a close up view of the major parts of modern jet liners

**Storyboard**  A real cockpit taken from a 737 or a DC-9 will be installed at the top of the entry stairs to the
Observation Lounge. Visitors can sit in the two seats.

**Media**      Actual cockpit; no moving parts

**BWI Observation Lounge**
**Exhibit Worksheet**
12/1/93

**6b.2**

| Area | **Aircraft Artifacts** |
|---|---|

**Exhibit**    **Cockpit**
Mural



**Intent**    To present an appropriate view for visitors when they look out the cockpit windows.

**Storyboard**    When visitors look out of the windows of the cockpit, they will be looking at a panoramic view taken from a low flying plane over Maryland--either over the countryside or the Chesapeake Bay.

**Media**    Large photographic or scan-a-mural

**BWI Observation Lounge**
**Exhibit Worksheet**
12/1/93

**6c.1**

---

**Area**      **Aircraft Artifacts**

---

**Exhibit**      **Fuselage**
Artifact



**Intent**      To show a close up view of the major parts of modern jet liners

**Storyboard**   Visitors will get a close-up look at a section of a jet's fuselage, showing the passenger section up high and the baggage compartment below.

**Media**      Cross-section from an actual fuselage from a 737 or DC-9, with some of its skin removed.

**BWI Observation Lounge**
**Exhibit Worksheet**
12/1/93

**6c.2**

---

**Area**      **Aircraft Artifacts**

---

**Exhibit**    **Fuselage**
              "How Does Your Bag Travel"



**Intent**     To show how a typical luggage bag is transported, from the time it is handed to the baggage clerk until the passenger picks it up on the baggage carousel at the end of the trip.

**Storyboard**  1. The screen of a small TV is installed into a piece of luggage in the lower section of the fuselage. The screen will be black, like the piece of luggage.
2. When a motion or infrared detector senses the presence of a visitor, a short (90 second) video will start, showing, from a "bag's eye view," how a bag is transported.
3. At the end of the loop, the screen will return to black, with a 15 second delay before playing again.

**Media**      Small monitor, piece of luggage, videodisk player, small speaker (perhaps also in the luggage bag).

**BWI Observation Lounge**
**Exhibit Worksheet**
12/1/93

**6 d**

---

**Area**      **Aircraft Artifacts**

---

**Exhibit**   **Vertical Stabilizer**
              · · Artifact



**Intent**       To show a close up view of the major parts of modern jet liners

**Storyboard**   Visitors can walk around and touch a real vertical stabilizer removed from the tail section of a
                 jet.

**Media**        A vertical stabilizer, probably from a 737 or a Grumman Gulfstream

**BWI Observation Lounge**
**Exhibit Worksheet**
12/1/93

**6e**

---

**Area**      **Aircraft Artifacts**

---

**Exhibit**   **Wing**
              Artifact



**Intent**       To show a close up view of the major parts of modern jet liners

**Storyboard**   Visitors can walk under a wing of an aircraft.

**Media**        A wing from a 737 or a DC-9 with some of its skin removed will be suspended in the space.

**BWI Observation Lounge**
**Exhibit Worksheet**
12/1/93                                                                   **6f**

---

**Area**        **Aircraft Artifacts**

---

**Exhibit**     **Engine**
                Artifact



**Intent**      To show a close up view of the major parts of modern jet liners

**Storyboard**  Visitors can inspect the first-stage turbine fan and nacell of a DC-10 engine. Plexiglass will
                protect visitors' fingers from the jet's fins.

**Media**       First-stage turbine fan from a DC-10 engine.

**BWI Observation Lounge**
**Exhibit Worksheet**
12/1/93                                                                        **6 g**

| **Area** | **Aircraft Artifacts** |
|---|---|

**Exhibit**      **Landing Gear**
                 Artifact



**Intent**       To show a close up view of the major parts of modern jet liners

**Storyboard**   Visitors can walk arnd and touch a landing gear.

**Media**        Landing gear, possibly from a 707, will be installed in the space.

BWI Observation Lounge
**Exhibit Worksheet**
12/1/93

**7 a**

---

**Area**       **Seated Viewing Area**

**Exhibit**    **Control Tower**
               Ground Control

> ## JEPPESEN                    · JAN 10·92  (11-1)
>
> ATIS  115.1  127.8
>
> BALTIMORE Approach (R)  119.7
>
> BALTIMORE Tower  119.4
>
> Ground  121.9

**Intent**      To allow visitors to hear live conversations between pilots and ground controllers, while
                they are sitting in the large viewing window area.

**Storyboard**  Speakers throughout this seating area will be linked to the channel that pilots and ground
                controllers utilize. The speakers will be heard at all times.

**Media**       Radio receiver, speakers

**BWI Observation Lounge**
**Exhibit Worksheet**
12/1/93

**8 a**

---

| **Area** | **Lounge Area** |
|---|---|

| **Exhibit** | **Table Top Graphics** |
|---|---|
| | Aerial views |



| **Intent** | To show Washington's and Maryland's natural beauty as well as some of the state's airports in aerial views. |
|---|---|
| **Storyboard** | The top of each table in the bar area will feature a laminated photo of an aerial view of Maryland or the Washington, DC, area. Examples might include views of the Chesapeake Bay, Anapolis, the Eastern Shore, as well as views of BWI, College Park, and Martin State airports. |
| **Media** | Photo murals covered with plastic laminate or plexiglas. |



# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**

**Story Board - ASD Interactive**                          **BWI Observation Lounge**

| 1 |
|:-:|
| 2 |
| 3 |
| 4 |

<u>Organization of the touch screen</u>

The touch screen is organized into four areas:

The <u>Header</u> (1) is always active and contains three pieces of information:
- the current time and date
- the number of commercial aircraft currently in the air
- a description of the geographical area that is active in the Traffic Display Area and/or a description of a place or aricraft selected by the visitor

The <u>Traffic Display Area</u> (2) shows the configuration of air traffic as specified by the visitor.

The <u>Selection Button Area</u> (3) gives the visitor choices on how to display information in the Traffic Display Area.

The <u>Prompt Bar</u> (4) helps the visitor to navigate through the program by offering choices and giving descriptions of the buttons.

DEPOSITION
EXHIBIT
5
STEINBERG 8-28-03

Contract Number:  MAA-CO-94-005
Contract Title:  Terminal Observation Lounge  Exhibit

Schedules
Storyboards
GS.500-12

Story Board - ASD Interactive                    BWI Observation Lounge



Attract Loop

If the interactive is not used for a period of 30 seconds or more it will automatically begin the
following attract loop sequence:

1   show US map with all planes shown as dots
2   zoom into a randomly chosen state area and randomly select an airport
3   show arriving or departing flights and randomly select one aircraft
4   display data block and flight path for that flight
5   zoom out to the US map and after several seconds revert to screen #1
6   repeat sequence

No buttons are active

Visitors are prompted to touch screen to begin.

Contract Number:  MAA-CO-94-005                    Schedules
Contract Title:  Terminal Observation Lounge Exhibit    Storyboards
                                                   GS.500-13

Story Board - ASD Interactive                    BWI Observation Lounge



## US Map View

The Traffic Display Area shows a US map with aircraft represented as dots. The visitor is offered the option to zoom into any of the 50 state areas or to use the pop-up Key Pad to enter a specific flight number. The Key Pad button is active from this point on.

The following buttons are overlay options and can be toggled on and off. They are always active from this point on:

- Radar Precipitation
- Restricted Zones
- Jet Airways
- Low Altitude Airways
- State Borders

Any and all of these buttons can be on at any time. All buttons become highlighted if pressed.

Note: If BWI has flights to/from Alaska and Hawaii we probably need to show them graphically, if not then I suggest we not show them.

Story Board - ASD Interactive                    BWI Observation Lounge



Touch an airport for arriving and departing flights

Local/state level

After the visitor touches a state area, that area appears in the Traffic Display Area. All aircraft are represented as dots. The following information is shown at the state level:

- State abbreviations
- Airport names and locations

Small portions of adjacent states are shown at this level and if pressed will allow the visitor to zoom to that state.

In the Header area, the geographical description has changed to reflect the state area shown in the Traffic Display Area

The US Map button is now active and allows the visitor to zoom back to the national level.

The visitor is now offered the option of selecting a specific airport for further flight information.

Story Board - ASD Interactive                          BWI Observation Lounge



Choose arriving and/or departing flights by touching buttons

Airport Selection

When the visitor has chosen an airport, the airport name becomes highlighted to tell the visitor it has been selected. The Header also reflects the selected airport.

The Arriving and Departing flight buttons are now active. One or both of the buttons can be selected.

All aircraft are still represented as dots

TOGGLE AP ?

Story Board - ASD Interactive                    BWI Observation Lounge



Flight Overview

After selecting both arriving and departing flights, the selected aircraft change from dots to small airplane icons. Arriving flights are one color and departing flights are another.. The header shows which flights have been selected.

If the density of aircraft around the BWI area is such that the visitor cannot distinguish one plane from another, the visitor can get a much better view around the airport by pressing the Zoom to Airport button.

The visitor is now prompted to select a specific aircraft flight.

Story Board - ASD Interactive                    BWI Observation Lounge



Press the Flight Path button to see the airways this flight is using

Flight Information

After touching one of the small airplane icons, all arriving and departing aircraft revert to being dots. A flight information block called a data block now appears near the selected flight. The Header shows the Airline name and flight number of the selected flight

The data block gives the visitor the following specific information

- Airline and flight number
- Altitude and aircraft type
- Number of minutes to landing and the number of passengers
- Departing airport and arriving airport

The Flight Path button also becomes active and the visitor is prompted to press it.

Story Board - ASD Interactive                    BWI Observation Lounge



## Flight Path

After pressing the Flight Path button the airways depicted by the selected flight are traced for the visitor in the Traffic Display Area. If more ...

Story Board - ASD Interactive                    BWI Observation Lounge



## Flight Path

After pressing the US Map button, the Traffic Control Area zooms out to the national level to show the visitor the complete flight path of the selected aircraft.

The only other active button is the Quit button which, if pressed, allows the visitor to revert to the previous state or image.

At this point, the visitor has been given a thorough tour of the systems' capabilities and may proceed to choose another aircraft. If the visitor walks away in 60 seconds the system will begin the attract loop as described earlier.



# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**

| To  Jim Steinberg | From  Tony Stark |
|---|---|
| Cc  RL MSoftware | Co. |
| Dept. | Phone #  410-859-7710 |
| Fax #  617-787-2510 | Fax # |

## NEW OBSERVATION AREA NEARING COMP

The excitement is building!  The construction of BWI's new
observation lounge is in its final phase.  In late February, the
wing of a Boeing 737, brightly painted in Maryland colors, was
lifted into place.  The wing, and other aircraft parts, will all
be part of the lounge, located between Piers B and C.  This new
area will provide airport patrons with an excellent view of
activities on the airfield, due to the dramatic curved three-
story window jutting out some 13 feet over the airfield.  But
watching airplanes won't be the only source of entertainment.

Directly opposite the sky window is an equally impressive
10-feet-tall, 88-feet-long serpentine-shaped wall of interactive
exhibits.  These provide information on anything and everything
there is to know about airplanes, Maryland's aviation history and
flying in general.  This larger-than-life exhibit wall greets
visitors as they ascend the stairs or exit the elevator into the
second level of the new lounge.  The exhibits are a combination
of drawings, actual photographs and touch screens describing the
aviation industry.

The exhibit wall begins with a diagram of a commercial 747
jet.  The 13-foot wide cut-away gives Lounge visitors a bird's-
eye view of every part of the aircraft from its nose to the wing
and tail sections.

DEPOSITION
EXHIBIT
6
STEINBERG 8-28-03

History buffs will find the next sections of the wall very informative.  The Air Travel section begins with vintage footage of one of the earliest aircraft from the 1920's, the Tri-Motor Ford.  With the push of a button, visitors can also choose to see documentary footage of the DC-3.  Maryland's rich aviation history comes to life in this part of the exhibit.  Visitors will see photos of the Wright brothers in pilot training at College Park Airport, the China Clipper at the Martin Company and African-American general aviation pioneer John Greene. Highlights of the history of BWI are depicted from its beginnings:  the 1950 dedication ceremony of Friendship International Airport hosted by President Harry S Truman;  the landing of the first Boeing 707 seven years later; to BWI today. This section is completed by Flying Today, featuring a video clip of a Boeing 747 from the early 70's.

The next exhibit explains how weather affects flying.  The neatest thing about the weather exhibit is that by touching the exhibit screen, visitors can obtain the most current information on the weather at BWI and other major airports.  This is achieved through Accu-Weather, frequently used by news stations for weather forecasting.  Accu-Weather is a computerized weather information service which provides updates on current weather conditions including temperature, satellite images of cloud cover and weather forecasts for major U.S. cities and corresponding airports.  The Accu-Weather service is connected to a computer in the BWI exhibit by a fax modem.  Updated information is sent from

the State College, Pennsylvania company to the exhibit's computer continuously, providing visitors with the very latest weather information available.

The weather exhibit leads to what is sure to provide wannabe pilots with the thrill of a lifetime.  Visitors will step through the exhibit wall and into the cockpit of a commercial jet.  The mission: to land the aircraft safely at BWI.  Through computer simulation the pilot will see the approach to BWI as a licensed pilot does from the cockpit.  The tools visitors use for this aviation video game include a working yoke and the Primary Flight Display panel.  The pilot is surrounded by computer monitor windows to add to the realism of the exhibit.  Happy landing!

The next grouping of panels describes how air traffic control works.    The most exciting interactive exhibit here is an ~~the ASD or~~ aircraft situation display, ~~which~~ called FLIGHTVIEW. at first looks like a map of the United States covered with little dots.  Each dot represents an actual commercial aircraft flying over the nation. Using a keypad on the screen, visitors can type in the flight number.  The corresponding dot will light and information about the aircraft ··· the airline, flight number, departure and arrival points, and air time ··· will magically appear on the screen.  This exhibit is based on Federal Aviation Administration (FAA) technology ~~and graphics.~~  The exhibit is unique because it is the first time this type of information will be on public display in an interactive format.  The aircraft data is received

from ~~FAA offices~~ *RLM Software* in Boston via a dedicated data line to the
exhibit computer.  The information is updated every three to five
minutes.  A similar but more sophisticated system is currently
used by FAA air traffic controllers at BWI and around the world
in the management of air traffic.

The next exhibit represents the TCA or Terminal Control
Area.  This large free standing acrylic sculpture is a model of
the airspace surrounding BWI, as designated by the FAA.

But the lesson in aviation doesn't stop there.  Visitors
observing activity on the airfield will be able to identify
aircraft on the ramp and the pieces of equipment supporting the
plane.  Thanks to identification books strategically placed along
the perimeter of the window, visitors will be able to identify
the aircraft that fly into BWI.  They will also be able to name
the type of equipment servicing the aircraft by matching what
they see with the drawings in the book.  To really make visitors
feel they are a part of the experience and not just an observer,
audio of conversations between the pilot and the BWI Air Traffic
Control Tower will be broadcast through speakers in the sky
window area.  Visitors will also near broadcast transmissions of
Automated Terminal Information Service, or ATIS.  ATIS is routine
information on runways available and weather conditions that
pilots of private aircraft and corporate jets need on arrival and
departure at BWI.

FROM:OMNIFAX                    TO:16177872570                    FEB 23, 1995  1:23PM  #085  P.05

The design and gadgetry of the exhibit wall, including the aircraft parts also on display, has involved several different firms.  Many thanks to Greiner, Inc. of Timonium, the design architects; Cambridge Seven Associates of Massachusetts for exhibit design; The Alphin Company for refurbishing the aircraft parts; Hadley's Exhibits who fabricated the exhibits; and software developers, computer graphics experts and all others who helped make the Lounge an exciting place!

BWI's new Observation Lounge opens in April, so that you can see Maryland's blue skies through aviation's eyes!

P.S.  The new name will be unveiled at the opening ceremonies.

*FlightView*

Maintenance Guide

DEPOSITION
EXHIBIT
7
STEINBERG 8-28-03

RLM 00047

*FlightView Maintenance Guide*

*Copyright:* ©1995 RLM Software. All rights reserved.
RLM Software, 214 Lincoln Street, Suite 112
Boston, MA 02134-1346

*Trademark:* *FlightView* ® is a registered trademark of RLM Software.
The RLM Software logo is a trademark of RLM Software. Other brands or
products mentioned in this publication are the trademarks or registered
trademarks of their respective holders and should be treated as such.

*Copy and use restrictions:* *FlightView* is protected by the copyright laws
that pertain to computer software. It is illegal to make copies of the
*FlightView* software and data except for backups. It is illegal to give cop-
ies to another person, or to duplicate the *FlightView* software and data by
any other means, including electronic transmission. The *FlightView* soft-
ware contains trade secrets and in order to protect them you may not
decompile, reverse engineer, disassemble, or otherwise reduce the
*FlightView* software to human-perceivable form. You may not modify,
adapt, translate, rent, lease, loan, resell for profit, distribute, network or
create derivative works based upon the *FlightView* software or any part
thereof.


**R L M**
SOFTWARE

RLM 00048

# Table of Contents

Section I: Introduction ........................................................ 1

    Overview ...................................................................... 1

    *FlightView* - A General Description ............................. 1

Section II: System Components & Cabling ........................ 3

    *FlightView* Components. ........................................... 3

    *FlightView* Cabling .................................................. 5

Section III: Maintenance & Troubleshooting ..................... 7

    Hardware Maintenance ............................................... 7

    Touch Screen Cleaning and Maintenance ...................... 7

        Cleaning ............................................................. 7

        Maintenance ...................................................... 8

        Calibration ........................................................ 8

    Shutdown Procedure .................................................. 8

    Restart/Startup Procedure .......................................... 8

    Troubleshooting ....................................................... 9


**RLM**
SOFTWARE

RLM 00049

# Section I: Introduction

## Overview

This guide provides the procedures for maintaining the *FlightView* interactive display. *Section I - Introduction* - describes the *FlightView* touch screen system. *Section II - System Components and Cabling* - describes the components of *FlightView*, their functions and interrelationships, and their cabling requirements. *Section III - Maintenance and Troubleshooting* - describes how to maintain the hardware components, including the touch screen, how to shutdown and restart the system, and how to react to trouble situations.

## FlightView - A General Description

*FlightView* is a new software product that provides accurate, minute by minute flight information. Its interactive display with a touch screen interface allows you to track flight paths, aircraft positions, speeds, and estimated arrival times.

*FlightView* is made up of two main parts. First, a touch screen interface allows you to see and track all commercial flights over the United States. Second, a data feed provides the touch screen interface with the latest flight information.

*FlightView*, developed by RLM Software, uses a commercial version of the Federal Aviation Administration (FAA) air traffic data to generate a database of accurate, up to the minute flight information of all U.S. air traffic. The *FlightView* data feed consists of tables of specific flight information extracted from this database and transmitted over a high-speed telephone line to the *FlightView* interface at the customer site. The *FlightView* touch screen interface receives the information and displays the latest air traffic data as the user requests it.

By simply touching the screen on your *FlightView* touch screen interface you are able:



*FlightView Maintenance Guide*

❖  to view all air traffic and their locations as of a
   given moment over the continental United States,

❖  to zoom to any state to see air traffic within the
   state,

❖  to select a major airport in the United States to see
   all air traffic approaching and departing from that
   location, and

❖  to select any flight that is aloft and see detailed
   flight information such as flight number, depar-
   ture and destination airports, altitude, cruising
   speed, and estimated time of arrival.



In addition, you can toggle on or off various overlays to see air traffic
control sectors, jet routes (the airspace "highways"), and restricted
zones — areas where commercial flights are not allowed.



RLM 00051

*FlightView Maintenance Guide*

# Section II: System Components & Cabling

In order for *FlightView* to operate properly its equipment must be correctly configured. Below is a diagram followed by descriptions showing the various *FlightView* components. Also, a second diagram shows the cabling of these various components together with the cabling sequence.

## *FlightView* Components



*FlightView* includes four major components located in the steel rack plus two components located adjacent to the secured cabinet, all depicted in the above diagram:



RLM 00052

*FlightView Maintenance Guide*

❖ *bwi1*, an HP 425 computer with monitor and keyboard, is located on the top shelf of the rack. bwi1 runs the *FlightView* touch screen programs. Note the black "box" connected to the rear with three RS 232 ports. Via these ports it is cabled to the touch screen and to the MICOM described below.

❖ *bwi2*, also an HP 425 computer (no monitor), is the lower of the two computers in the rack. Its function is to manage the communications and the *FlightView* database. Note the black "box" connected to the rear with three sio ports. These connect to the MICOM unit (see below). Note also that it is connected by network cable to **bwi1**.

❖ *The MICOM Marathon 1K network feeder*, located on top of **bwi2**, is a communications controller unit and has six RS 232 ports located in the back. It is cabled to the Bat unit (port 1) (see below), to **bwi1** (ports 2 & 3), and to **bwi2** (ports 4, 5 and 6).

❖ *The Bat CSU/DSU*, located on top of the MICOM unit, accepts the data feed from RLM Software and translates it from a telephone signal to a computer devised signal, similar to the function of a modem. It is connected by a single cable to the MICOM unit.

❖ The *touch screen and the overhead projection screen* units are located adjacent in the wall panel and enable the user to issue commands to *FlightView* (using the touch screen) and to view results on the overhead projection screen. The touch screen is cabled to **bwi1** as described above, and to the overhead projection screen.

 **RLM**
SOFTWARE

RLM 00053

## *FlightView* Cabling

The *FlightView* cabling sequence is described below and shown on the diagram on the following page.

1) Touch screen cable connects from the touch screen to port 1 on **bwi1**.

2) Cable D connects from port 2 on **bwi1** to port 2 on MICOM.

3) Cable E connects from port 3 on **bwi1** to port 3 on MICOM.

4) Bat cable connects from Bat to port 1 on MICOM.

5) Cable A connects from port 1 on **bwi2** to port 4 on MICOM.

6) Cable B connects from port 2 on **bwi2** to port 5 on MICOM.

7) Cable C connects from port 3 on **bwi2** to port 6 on MICOM.

8) Network coaxial cable connects from LAN port on **bwi1** to LAN port on **bwi2**.


**RLM**
SOFTWARE

RLM 00054

# FlightView Cabling Configuration



RLM 00055

*FlightView Maintenance Guide*

# Section III: Maintenance & Troubleshooting

## Hardware Maintenance

When you purchase a *FlightView* system, you are leasing the *FlightView* software and buying the hardware described above. In other words, we own the software and you own the hardware. You will find that hardware requires minimum maintenance. Therefore, we do not recommend maintenance contracts beyond warranty periods for the various hardware components. Instead, plan to replace any hardware part on the occasion that it is needed. System hardware components carry the following warranties:

* The HP Computers    3 month warranty

* Communications
Hardware (MICOM)    1 year warranty

* Touch screen monitor
(Micro Touch)    3 year warranty

If you experience any problems with hardware, first call RLM Software for guidance.

## Touch Screen Cleaning and Maintenance

### Cleaning

The touch screen itself does not require much maintenance. Because it uses a capacitive sensing mechanism, it will operate even if it gets dirty or wet. However, we recommend that you periodically clean the glass touch screen surface with isopropyl alcohol, or a **non-ammonia** glass cleaner, applied with a damp cloth. Avoid using dry, gritty cloths or any cleaners other than glass cleaners. *Do not use any vinegar-based solutions.*



*Page 7*

RLM 00056

*FlightView Maintenance Guide*

## Maintenance

Should the touch monitor experience a functional problem during its operation, first call RLM Software to check software. If it is a hardware problem we will direct you to MicroTouch Technical Service at 508-659-9000.

## Calibration

Over time the touch screen sensor may "drift" and cause items to be selected off-center. If this happens, call RLM Software to re-calibrate the screen. Please note that small items such as flight dots or airplane icons are always hard to select due to many factors - angle of vision, size of finger pad, etc.. These small items do not signal a calibration problem.

## Shutdown Procedure

Simply turn off all components (bwi1, bwi2, MICOM, bat and touch screen).

## Restart/Startup Procedure

❖ Turn off all system components (bwi1, bwi2, MICOM, bat, touch screen)

❖ Turn on **bwi1** - top HP computer.

❖ Turn on **bwi2** - bottom HP computer.

❖ Turn on MICOM.

❖ Turn on Bat DSU/CSU.

❖ Turn on touch screen.

 **R L M**
SOFTWARE

RLM 00057

At this point the system should automatically restart and come back to normal working condition with 2000 to 3000 aircraft showing aloft after approximately fifteen (15) minutes.

## Troubleshooting

If any of the following conditions occur:

❖ *FlightView* is not displaying flights on the touch screen or overhead monitor, though a number of flights is indicated on the touch screen.

❖ Zero (0) commercial flights are indicated as being aloft.

❖ *FlightView* map is not displayed.

1) turn off all components (bwi1, bwi2, MICOM, Bat DSU/CSU, touch screen), 2) check cabling using the cabling diagram in Section II, and 3) follow restart procedure. If these or other problems persist, call RLM Software support line at 617-787-4200.



RLM 00058





# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**

Copyright 1990   RLM Software, Inc.   All Rights Reserved.



Aircraft Situation Display (ASD) Data

Weather Data (graphics and radar)

Aircraft Scheduling Data

Crew Scheduling Data

Airline Computer

Aircraft Maintenance Data

Airline Reservations Data

Crew Scheduling System

Airline Reservations System

Flight Planning System

Weather Data (text)

DEPOSITION EXHIBIT
STEINBERG 8-28-03

KEY

FlightView Modules

Data, Airline Computer & Systems



# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**

1            Volume 1, Pages 1 - 155

2                   Index Page:   153

3          UNITED STATES DISTRICT COURT

4          NORTHERN DISTRICT OF GEORGIA

5               ATLANTA DIVISION

6          - - - - - - - - - - - - - - - - - - - - - - - - - -

7     ARRIVAL STAR, INC., a foreign

8     corporation,

9                   Plaintiff

10    vs.                    Docket No. 1:02-CV-2543-JOF

11    DELTA AIR LINES, INC., a foreign

12    corporation, et al.,

13                   Defendants

14         - - - - - - - - - - - - - - - - - - - - - - - - - -

15        VIDEOTAPED DEPOSITION OF LORRAINE FLYNN

16        Friday, August 29, 2003, 9:33 a.m.

17               Bromberg & Sunstein

18                125 Summer Street

19             Boston, Massachusetts

20

21    - - - - - - - Reporter:  Janis T. Young, RDR, CRR - - - - - - -

22             Farmer Arsenault Brock LLC

23          Boston, Massachusetts 02109

24        617.728.4404   Fax 617.728.4403

law firm Bromberg & Sunstein for the Defendant

Sabre; also for the witness, Lorraine Flynn.  With

me today is my associate, John Stickevers.

We've also made this deposition

available to the other counsel in this case via a

conference call; and as of right now I don't think

we have anybody else on the line but we'll keep it

open in case anybody calls in to participate by

phone.

LORRAINE FLYNN, Sworn

EXAMINATION

BY MR. HILL:

Q.  Would you state your full name for the

record, please.

A.  Lorraine Flynn.

Q.  And where do you reside?

A.  In Newton, Massachusetts.

Q.  Can I get a street address and ZIP?

A.  22 Omar Terrace; the ZIP code is 02460.

Q.  And give me your educational background,

please.

A.  I have a degree in mathematics from the

University of Massachusetts.

Q.  Is that a bachelor's degree?

| | | |
|---|---|---|
| 9:36:15 | 1 | A. Yes. |
| 9:36:17 | 2 | Q. And do you have a master's or a Ph.D.? |
| 9:36:20 | 3 | A. No. |
| 9:36:22 | 4 | Q. What year did you graduate from U. Mass.? |
| 9:36:27 | 5 | A. Oh, I forget the exact year. I think it's |
| 9:36:32 | 6 | 1976. |
| 9:36:33 | 7 | Q. And did you work upon graduation? |
| 9:36:38 | 8 | A. Yes. |
| 9:36:38 | 9 | Q. What did you do? |
| 9:36:40 | 10 | A. I worked as a programmer, developer; yes, |
| 9:36:48 | 11 | computer programmer. |
| 9:36:50 | 12 | Q. And where did you do that work? |
| 9:36:52 | 13 | A. I did that at IOCS, Input/Output Computer |
| 9:36:56 | 14 | Services. |
| 9:36:57 | 15 | Q. From what year to what year? |
| 9:37:02 | 16 | A. From when I graduated from college until I |
| 9:37:05 | 17 | started the company, and I started the company in |
| 9:37:08 | 18 | '81; so I think I left either '80, early '80s, or |
| 9:37:13 | 19 | late '80s. |
| 9:37:15 | 20 | Q. When you say started the company, what |
| 9:37:18 | 21 | company are you referring to? |
| 9:37:19 | 22 | A. RLM Software. |
| 9:37:19 | 23 | Q. That was started in 1981? |
| 9:37:21 | 24 | A. It was incorporated in '81. There may have |

6

| | | |
|---|---|---|
| 9:37:26 | 1 | been work done on it earlier, like '80; but it was |
| 9:37:32 | 2 | officially, I think, incorporated in 1981. |
| 9:37:35 | 3 | Q.   From 1981 through the present date, have |
| 9:37:39 | 4 | you been employed by anyone other than RLM Software? |
| 9:37:44 | 5 | A.   No. |
| 9:37:45 | 6 | Q.   Tell me, between 1981 and 1989, what kinds |
| 9:37:52 | 7 | of things were you working on on behalf of RLM |
| 9:37:54 | 8 | Software? |
| 9:37:55 | 9 | A.   We did software development for other |
| 9:38:00 | 10 | companies. |
| 9:38:00 | 11 | Q.   Can you give me some examples? |
| 9:38:03 | 12 | A.   We did work for Wang Labs; we did |
| 9:38:09 | 13 | telecommunications software.  We did work for |
| 9:38:16 | 14 | Varian. |
| 9:38:16 | 15 | And what was the year?  I'm sorry. |
| 9:38:18 | 16 | Q.   1981 to 1989. |
| 9:38:20 | 17 | A.   '89.  Those are the two I remember. |
| 9:38:24 | 18 | Q.   And during this time frame, who else was |
| 9:38:27 | 19 | working on behalf of RLM Software? |
| 9:38:33 | 20 | A.   Through '89 -- |
| 9:38:35 | 21 | Q.   Right. |
| 9:38:37 | 22 | A.   -- from 1981?  We had Mary Flynn, Randy |
| 9:38:42 | 23 | Pollack.  I had another employee; I can't remember |
| 9:38:46 | 24 | her name now.  And Jim Steinberg. |

FARMER ARSENAULT BROCK LLC

7

9:38:51  1      Q.   And Ms. Flynn is your sister?

9:38:57  2      A.   Yes.

9:38:58  3      Q.   When did you begin working on the

9:39:01  4  development of what is now known as the Flightview

9:39:06  5  software?

9:39:07  6      A.   1988, around 1988.

9:39:11  7      Q.   Who were the people who participated in

9:39:13  8  working on the development of what is now known as

9:39:15  9  Flightview?

9:39:17  10     A.   Who participated in that?  In 1988, or any

9:39:25  11  time?

9:39:26  12     Q.   From 1988 until -- let's just narrow it for

9:39:29  13  now.  Let's just say from 1988 through 1990.

9:39:34  14     A.   Mary Flynn, myself and James Steinberg.

9:39:41  15     Q.   Is Mary Flynn still employed by RLM

9:39:45  16  Software?

9:39:45  17     A.   Yes.

9:39:45  18     Q.   What is her position?

9:39:47  19     A.   She's vice-president.

9:39:48  20     Q.   Does she have an ownership interest in RLM

9:39:51  21  Software?

9:39:52  22     A.   Yes.

9:39:54  23     Q.   You have an ownership interest in RLM

9:39:57  24  Software?

8

| Time | Line | |
|---|---|---|
| :39:57 | 1 | A.   Yes. |
| :40:07 | 2 | MR. BELT:  Excuse me, Steve. |
| :40:08 | 3 | Did somebody chime in on the conference |
| :40:11 | 4 | call?  I thought I had heard a beep. |
| :40:16 | 5 | MR. JAMISON:  Yes; this is Byron |
| :40:18 | 6 | Jamison, from Sabre.  I'm monitoring. |
| :40:20 | 7 | MR. BELT:  All right.  Did the reporter |
| :40:21 | 8 | get that? |
| | 9 | THE REPORTER:  Yes. |
| :40:22 | 10 | MR. BELT:  Thanks. |
| :40:25 | 11 | MR. JAMISON:  Yes.  Don't show me as |
| :40:28 | 12 | participating; just show me as an also present. |
| :40:33 | 13 | MR. HILL:  Would you mark this as the |
| :40:34 | 14 | next numbered exhibit? |
| :40:36 | 15 | (Marked, Exhibit 11, Virtually There |
| :40:46 | 16 | website page.) |
| :41:05 | 17 | Q.   The court reporter has handed you what's |
| :41:10 | 18 | marked as Exhibit 11.  Do you recognize Exhibit 11? |
| :41:15 | 19 | A.   Yes. |
| :41:17 | 20 | Q.   Would you state for the record what Exhibit |
| :41:20 | 21 | 11 is? |
| :41:30 | 22 | A.   It's a page on the Virtually There website. |
| :41:42 | 23 | Q.   What about the second page?  Do you |
| :41:50 | 24 | recognize the second page of Exhibit 11? |

FARMER ARSENAULT BROCK LLC

10

1    A.    The query is forwarded to Flightview, and

2    Flightview takes the request and retrieves the

3    appropriate information and forwards the information

4    to the user on the site.

5    Q.    And so just in terms of what's depicted on

6    Plaintiff's Exhibit 11, if the request is for

7    information regarding American Airlines Flight No.

8    18, the response from the RLM Flightview software

9    would be what is shown as Page 2 of Plaintiff's

10   Exhibit 11?

11   A.    Yes.

12   Q.    How was the map that is shown in the middle

13   of Page 2 of Plaintiff's Exhibit 11 generated by the

14   Flightview software?

15   A.    When the request is received, the data is

16   retrieved for that request and used to format the

17   map, showing the information on the map.

18   Q.    Is the map stored in a data file on an RLM

19   computer?

20   A.    No.

21   Q.    Is the map drawn by the Flightview

22   software?

23   A.    Yes.

24   Q.    Was RLM Software contacted by Arrival Star

1    regarding any of Arrival Star's patents?

2         A.    Yes.

3         Q.    Do you recall how that contact occurred?

4         A.    We received a letter.

5         Q.    Do you recall who the letter was from?

6         A.    I don't remember the name on it; I just

7    remember that it mentioned Arrival Star.

8         Q.    Do you recall what the substance of the

9    communication was?

10        A.    What I recall is it talked about that it

11   had patents, notification patents; and I think it

12   said something about that there may be patents that

13   we would be interested in using, and it might

14   have -- that's all I remember, really, right now.

15        Q.    Do you recall when that communication

16   occurred?

17        A.    No.    I mean, I would guess in the last

18   year.

19        Q.    Are you aware as you sit here that Arrival

20   Star has alleged infringement of the '936 patent by

21   Sabre's Virtually There website?

22        A.    Could you say that again?

23        Q.    Are you aware that Arrival Star has alleged

24   infringement of the '936 patent by the use of

12

47:34  1    Sabre's Virtually There website?

47:37  2        A.   Yes.

47:37  3        Q.   When did you become aware of that

47:40  4    allegation of infringement?

47:50  5        A.   I can't remember the exact date.

47:55  6        Q.   Was it within the last year?

47:58  7        A.   I would think so.  I think so.

48:02  8        Q.   Was it within the last month?

48:05  9        A.   No.

48:08  10       Q.   I'm going to try to give you some reference

48:11  11   points to use as dates.  You signed some

48:15  12   declarations --

48:16  13       A.   Yes.

48:16  14       Q.   -- under oath in this case?

48:17  15       A.   Right.  So it was before that.

48:19  16       Q.   It was before that?

48:20  17       A.   Right.

48:25  18       Q.   How do you recall learning of the

48:29  19   allegation of infringement of the '936 patent by

48:33  20   Sabre's Virtually There website?

48:40  21       A.   I received a letter from Sabre's attorney.

48:44  22       Q.   Do you recall who that was?

48:51  23       A.   I think it was Mr. Jamison, but I'm not

48:55  24   sure.

FARMER ARSENAULT BROCK LLC

13

48:55  1     Q.   At the time that you received that letter,

49:00  2  was Mr. Jamison an attorney on behalf of RLM

49:03  3  Software?

49:04  4     A.   No.

49:04  5     Q.   He wasn't under the employment of RLM

49:06  6  Software?

49:06  7     A.   No.

49:07  8     Q.   What did the letter say?

49:08  9          MR. BELT:   Objection.

49:15  10    A.   I don't remember the exact words.

49:21  11    Q.   Do you remember any substance of what the

49:23  12  letter said?

49:26  13    A.   I think it reported that it had received

49:29  14  notification from Arrival Star about its

49:36  15  notification and its -- I don't remember the exact

49:47  16  words; I know it was something about notification,

49:51  17  and probably about it, and...

49:59  18    Q.   Did it mention a lawsuit?

50:03  19          MR. BELT:   Objection.

50:03  20    A.   It mentioned -- I can't remember really

50:07  21  what it said, but it just said -- I know it said it

50:24  22  had received something from Arrival Star, and it had

50:28  23  to do with notification, its notification system;

50:31  24  and I don't know if it said flight tracking, but...

FARMER ARSENAULT BROCK LLC

14

Q.   Okay.   What did you do in response to the letter?

A.   Sent it to my lawyer.

Q.   Is that Mr. Belt?

A.   Yes.

Q.   I'm sorry; but the court reporter is taking down the transcript --

A.   Right; right.

Q.   -- so you need to answer the questions audibly.

A.   Yes.

Q.   Thank you.

MR. HILL:   Let's mark this as Exhibit 12.

(Marked, Exhibit 12, document entitled Flightview license agreement.)

Q.   The court reporter has marked Exhibit 12, and you have it in front of you.   Do you recognize Exhibit 12?

A.   Well, it looks like actually it's a couple of license agreements.

Q.   Either that or multiple copies of the same agreement.

Take a look at the Bates Page 2963 on

15

1   the exhibit, if you would.  It's about the fourth-

2   to-the-last page in the exhibit.

3       A.   There are a lot of pages here out of order,

4   actually.

5            Oh; okay.  Did you say 63?

6       Q.   Yes.

7       A.   Okay.

8       Q.   Is that your signature on Page 2963?

9       A.   Yes.

10      Q.   Do you recall signing the Flightview

11   license agreement with Sabre on or about August 30,

12   2000?

13      A.   Yes.

14      Q.   Can I see your exhibit for a moment?

15           Okay; it looks like what happened is

16   2953 through 2960 are duplicated, so it goes 2953 to

17   2960, and then it starts over again at 2953 and goes

18   all the way to 2966.

19           Take a look at that.  You commented that

20   there were pages out of order.  I want to know if,

21   other than what I've just said about the way the

22   pages work on the exhibit, there are any other pages

23   that you see that are out of order.

24      A.   It appears to be as you said.

21

1    Q.   Has Sabre asserted a claim for

2    indemnification or defense against RLM Software?

3              MR. BELT:   Objection.

4    A.   Yes.

5    Q.   When was that claim asserted?

6    A.   I don't remember the time; I don't remember

7    when.

8    Q.   More than a month ago?

9    A.   I can't remember when we got -- I think we

10   got a letter from them.  Actually, I shouldn't say

11   that; I'm guessing again.

12   Q.   I read your declaration, where you talked

13   about the ATCA conference demonstration in 1990.

14   There was some testimony about the hardware

15   configuration for the demonstration yesterday, but

16   I'll ask you as well.

17             Tell me, as best you can recall, how the

18   hardware was configured for the 1990 ATCA demo.

19   A.   We had a computer there on which we

20   demonstrated Flightview.

21   Q.   Was the software running, was the

22   Flightview software running on the computer that was

23   present at the conference?

24   A.   Yes.

1   1990 demonstration taken from aircraft movements on

2   a particular past date and time?

3      A.   It was based on data from -- it was based

4   on ASD data.

5      Q.   From what day or days?

6      A.   I don't know.

7      Q.   When do you recall the first time that RLM

8   was able to access live ASD information coming from

9   the FAA?

10      A.   1994.

11      Q.   What time in 1994?

12      A.   I don't remember.

13      Q.   Do you recall whether or not, at the time

14   in 1994 when RLM was able to access live FAA data

15   for the first time, whether or not there was an

16   agreement in place between the FAA and RLM Software?

17          MR. BELT:  Objection.

18      A.   Could you ask that question again?

19      Q.   At the time in 1994 that you testified RLM

20   was able to access live FAA ASD data, do you recall

21   whether or not there was an agreement in place

22   between RLM Software and the FAA?

23      A.   We didn't have an agreement with the FAA.

24      Q.   Was there an agreement in place between RLM

15:44   1   and any third party relating to the FAA's ASD data

15:53   2   feed?

15:53   3        A.   Yes.

15:54   4        Q.   And who was the agreement between?

15:57   5        A.   The Air Transport Association.

16:01   6        Q.   And RLM?

16:02   7        A.   Yes.

16:02   8        Q.   And was that agreement entered into in 1994

16:06   9   as well?

16:06   10       A.   Yes.

16:08   11       Q.   Do you recall when?

16:10   12       A.   No.

16:38   13            MR. HILL:   Let's mark this as the next

16:41   14   exhibit, please.

16:43   15            (Marked, Exhibit 13, agreement for the

16:48   16   release of limited aircraft situation display data.)

17:03   17       Q.   The court reporter has handed you what's

17:06   18   marked as Exhibit 13.   Do you recognize Exhibit 13?

17:14   19            MR. BELT:   Counsel, may I have a copy?

17:16   20            MR. HILL:   This is the only copy.   This

17:18   21   is a document you gave to me yesterday.   I don't

17:21   22   have a copy of it.   If you want to look at it...

17:25   23       A.   It looks like our agreement with ATA.

17:48   24       Q.   And what is it dated?

27

0:17:54   1        A.   It's signed by Jim Steinberg on February 7,
0:18:01   2   1994.
0:18:03   3        Q.   And when is it signed by the ATA?
0:18:08   4        A.   It's signed by the ATA on March 1, 1994.
0:18:21   5        Q.   Prior to -- well, how long after the
0:18:28   6   agreement was entered into between ATA and RLM
0:18:34   7   Software before RLM Software was actually receiving
0:18:37   8   live FAA data?
0:18:38   9             MR. BELT:   Objection.
0:19:13  10        A.   I don't recall.  We may have gotten it
0:19:36  11   before the agreement.
0:19:39  12        Q.   Why do you say that?
0:19:40  13        A.   We may have gotten it after.
0:19:43  14             Because sometimes agreements...
0:19:49  15        Q.   Do you see anything in the exhibit that
0:19:50  16   leads you to believe that the data was already being
0:19:55  17   made available to RLM?
0:20:40  18        A.   No, I don't.
0:20:42  19        Q.   So when you say it may, that the data may
0:20:48  20   have been available before the time of the agreement
0:20:50  21   that's shown on Exhibit 13, are you speculating, or
0:20:55  22   do you have a factual basis for making that
0:20:57  .23   statement?
0:21:34  24        A.   I don't know; I don't know.

FARMER ARSENAULT BROCK LLC

28

21:37  1    Q.   You don't know when the --

21:40  2    A.   I mean, I think, I was thinking maybe we

21:44  3  might have got it a month earlier, but we might not

21:47  4  have.

21:47  5    Q.   You just don't know?

21:48  6    A.   No.

21:49  7    Q.   Do you recall implementing Flightview or

22:02  8  some portion of the Flightview software for Boston

22:06  9  Coach?

22:08  10    A.   Yes.

22:09  11    Q.   And that was the first implementation of

22:16  12  Flightview to use live data coming from the FAA,

22:20  13  correct?

22:22  14    A.   I don't know what you mean by

22:25  15  implementation, first implementation.

22:27  16    Q.   First operational system in use by a

22:30  17  Flightview customer.

22:38  18    A.   Boston Coach was our first customer, I

22:41  19  think.

22:42  20    Q.   And was Boston Coach using a version of

22:48  21  Flightview that used live FAA data?

22:51  22    A.   Yes.

22:55  23    Q.   And do you recall how many, or how long RLM

23:05  24  Software had access to the live FAA data before it

29

1   began supplying it to Boston Coach?

2       A.   I would say a very short time, so --

3       Q.   Less than a month?

4       A.   I couldn't say that.  I don't know.

5       Q.   When you used the phrase "very short time,"

6   give me some idea of what you mean by that.

7       A.   Less than three months.

8       Q.   Same quarter?

9       A.   Right.

10          I think I have to take a break.

11          MR. BELT:  The witness would like a

12   break.

13          MR. HILL:  Sure.

14          THE VIDEOGRAPHER:  The time is 10:24.

15   We're off the record.

16          (Recess taken)

17          THE VIDEOGRAPHER:  The time is 10:33.

18   We're back on the record.

19          MR. HILL:  Would you mark that as the

20   next exhibit, please?

21          (Marked, Exhibit 14, RLM Software fax

22   cover sheet, Mary Flynn to Hollis, 12-8-95, with

23   attachments.)

24       Q.   The court reporter has handed you Exhibit

31

0:37:16  1       Q.   What is your normal process in the event

0:37:20  2    that you review a proposal and believe that changes

0:37:28  3    to the proposal are in order?

0:37:32  4       A.   We would discuss the changes, and if they

0:37:39  5    were agreed on, we would put them in.

0:37:41  6       Q.   Who is "we"?

0:37:44  7       A.   Mary, Jim and myself.  Mary Flynn, Jim

0:37:49  8    Steinberg and myself.

0:37:53  9       Q.   And if you see something in an RLM proposal

0:37:57  10   that is inaccurate, is it your normal or customary

0:38:07  11   practice to change it so that it will read

0:38:10  12   accurately?

0:38:12  13      A.   Yes.

0:38:12  14      Q.   Did you do that?  Did you review the

0:38:17  15   proposal for America West with a view towards making

0:38:20  16   sure that the contents of the proposal were

0:38:22  17   accurate?

0:38:22  18      A.   Yes.

0:38:23  19      Q.   And were you satisfied, prior to the

0:38:26  20   proposal going to America West, that its contents

0:38:28  21   were accurate?

0:38:41  22      A.   Yes.

0:38:42  23      Q.   Would you turn to Page 2 of the proposal,

0:38:44  24   which is the executive summary page?  Look at the

0:39:10 1  fourth paragraph down, the last sentence of the

0:39:15 2  paragraph, "RLM was the first non-airline company

0:39:18 3  that was approved to receive the ATA data, and our

0:39:22 4  system has been operational for our customers since

0:39:25 5  November 1994."

0:39:27 6         Is the November 1994 date a reference to

0:39:32 7  the operational system for Boston Coach?

0:40:05 8     A.   Yes.

0:40:06 9     Q.   Was the statement, or is the statement in

0:40:10 10  the last sentence in the fourth paragraph of this

0:40:12 11  page true and accurate?

0:40:15 12     A.   The last sentence of --

0:40:18 13     Q.   The sentence that I read to you, "RLM was

0:40:20 14  the first non-airline company," continuing to the

0:40:25 15  end of the fourth paragraph. Is that correct?

0:40:27 16     A.   Yes.

0:40:28 17     Q.   It's accurate information?

0:40:29 18     A.   Yes.

0:40:29 19     Q.   Thank you.

0:40:34 20         Would you review the pages of the

0:40:40 21  proposal starting with Page 4 and going through Page

0:40:50 22  8 of the proposal? And after you've read those

0:40:53 23  pages, let me know, and I'll have some questions for

0:40:56 24  you about those pages.

33

A.   To Page 8?

Q.   Yes.

A.   Okay.

Q.   You've reviewed Pages 4 through 8 of the
America West proposal?

A.   Yes.

Q.   Does the description of the Flightview
product that is included in these pages accurately
describe the Flightview product that RLM was
offering to America West at that time?

A.   Yes.

Q.   And tell me any differences that you're
aware of between the Flightview product as it's
described on Pages 4 through 8 of the proposal to
America West and the characteristics of the
Flightview product that was actually installed for
America West later.

A.   I can't think of any differences.

Q.   Take a look at Page 12 of the proposal,
please.  Do you see -- are you on Page 12?

A.   Yes.

Q.   Do you see the installation information
section and the listing for Boston Coach underneath
that?

FARMER ARSENAULT BROCK LLC

34

1       A.   Yes.

2       Q.   In the last sentence of that paragraph, it

3   says, "This system has been operational since

4   November 1994," correct?

5       A.   Yes.

6       Q.   And for the system to be operational, you

7   had to have the live FAA data, correct?

8       A.   Yes.

9       Q.   So recalling your earlier testimony about

10  receiving the live FAA in the same quarter as the

11  operational Boston Coach system, does that help

12  refresh your recollection that it was probably

13  sometime between August 1994 and November of 1994

14  that the live data feed became available to RLM?

15      A.   I still have the same answer.  I mean, I

16  would say yes.

17      Q.   More than likely?

18      A.   (Shook head.)

19      Q.   You need to say "yes" for the court

20  reporter.

21      A.   Yes.

22      Q.   Sorry.

23          MR. HILL:  Let's mark this the next

24  number, please.

35

:46:52
:46:59
:47:31
:47:33
:47:36
:48:11
:48:14
:48:25
:48:31
:48:39
:48:51
:49:06
:49:09
:49:15
:49:20
:49:24
:49:27
:49:33
:40
:44
:50
:59
:00
:05

1            (Marked, Exhibit 15, letter, Hubbell to

2    Mary Flynn, 4-24-96, with attachments.)

3        Q.   The court reporter has handed you Exhibit

4    15.  Would you please take a look at it and tell me

5    whether you recognize it or not.

6        A.   Yes.

7        Q.   State for the record what Exhibit 15 is.

8        A.   It's a signed copy of an agreement with

9    America West Airlines and RLM Software.

10       Q.   What's that contract dated?

11       A.   Actually, this copy says 1996.

12       Q.   Do you recall specifically when in 1996

13   this contract was executed?

14       A.   No; but the cover letter says April 24,

15   '96, we have signed both copies.

16       Q.   You believe it was signed on or about April

17   24, 1996, based upon that?

18       A.   Prior to April 24, 1996.

19       Q.   But you don't know exactly how far prior to

20   April 24, 1996, as you sit here?

21       A.   Well, I know it would probably be within a

22   month.

23       Q.   As of the March-April 1996 time frame, was

24   America West using Flightview?

FARMER ARSENAULT BROCK LLC

39

| Time | Line | |
|---|---|---|
| 10:55:57 | 1 | Q.   Do you know who Tony Stark is? |
| 10:56:01 | 2 | A.   I don't remember. |
| 10:56:06 | 3 | Q.   What was the purpose of making edits to |
| 10:56:11 | 4 | this press release, Exhibit 6? |
| 10:56:37 | 5 | A.   To make it reflect the use of our product, |
| 10:56:50 | 6 | Flightview. |
| 10:56:54 | 7 | Q.   Prior to making the edits, did you read the |
| 10:56:57 | 8 | press release all the way through? |
| 10:56:59 | 9 | A.   Yes. |
| 10:57:00 | 10 | Q.   And were you attempting to edit the press |
| 10:57:04 | 11 | release to ensure that its contents were accurate |
| 10:57:08 | 12 | insofar as they pertained to RLM Software or its |
| 10:57:12 | 13 | products? |
| 10:57:12 | 14 | MR. BELT:   Objection. |
| 10:57:18 | 15 | A.   I was editing it to make it more accurately |
| 10:57:27 | 16 | reflect our Flightview product. |
| 10:57:28 | 17 | Q.   So is it your testimony that the edits that |
| 10:57:37 | 18 | you made to Exhibit 6 were necessary so that the |
| 10:57:43 | 19 | description of Flightview would be accurate in the |
| 10:57:46 | 20 | press release? |
| 10:58:01 | 21 | A.   Yes. |
| 10:58:02 | 22 | MR. JAMISON:   Pardon the interruption; I |
| 10:58:04 | 23 | need to drop off to go to another meeting.  I'll be |
| 10:58:08 | 24 | back a little later. |

40

| | |
|---|---|
| 10:58:08 | 1 |
| 10:58:11 | 2 |
| 10:58:12 | 3 |
| 10:58:14 | 4 |
| 10:58:16 | 5 |
| 10:58:17 | 6 |
| 10:58:32 | 7 |
| 10:58:34 | 8 |
| 10:58:42 | 9 |
| 10:58:58 | 10 |
| 10:59:04 | 11 |
| 10:59:04 | 12 |
| 10:59:09 | 13 |
| 10:59:15 | 14 |
| 10:59:18 | 15 |
| 10:59:22 | 16 |
| 10:59:28 | 17 |
| 10:59:38 | 18 |
| 10:59:46 | 19 |
| 10:59:49 | 20 |
| 10:59:56 | 21 |
| 00:06 | 22 |
| 00:08 | 23 |
| 00:13 | 24 |

1          MR. BELT:  We'll keep the line open for

2    you.

3          MR. JAMISON:  Thanks very much.  I'll

4    dial back in.

5          MR. BELT:  Sure.

6          MR. JAMISON:  Thank you.  Bye-bye.

7     Q.   Most of the contents of the press release

8    you did not edit in Exhibit 6, correct?

9          MR. BELT:  Objection.

10    A.   I edited several places where I noticed a

11   discrepancy.

12    Q.   How many discrepancies did you notice when

13   you reviewed Exhibit 6?

14    A.   It looks like three.

15    Q.   So you noticed three discrepancies in a

16   six-page press release, correct?

17    A.   Yes.

18    Q.   And the date of the fax is February 1995.

19   Is that consistent with your recollection of

20   approximately when you edited this press release?

21    A.   Approximately, yes.

22    Q.   Do you recall when the actual press release

23   was issued?

24    A.   No.

45

| 11:10:33 | 1 | display. |

11:10:33 1 display.

11:10:40 2     Q.   Okay.  Do you consider the operational

11:10:53 3 system that Boston Coach was using -- the

11:11:00 4 operational Flightview system that Boston Coach was

11:11:02 5 using to be a public display of such information in

11:11:06 6 an interactive format?

11:11:13 7     A.   I can't answer that.

11:11:14 8     Q.   Why not?

11:11:15 9     A.   Because Boston Coach did the front end.

11:11:22 10     Q.   Explain.

11:11:26 11     A.   Boston Coach built the user's front end,

11:11:30 12 and I don't know what they demonstrated it to.

11:11:36 13     Q.   They weren't using the Flightview front

11:11:38 14 end?

11:11:39 15     A.   No.

11:11:39 16     Q.   They weren't using any of the Flightview

11:11:43 17 user interfaces?

11:11:44 18     A.   They just received the data.

11:11:47 19     Q.   So they weren't using any of the Flightview

11:11:49 20 user interfaces, right?

11:11:51 21     A.   Right.

12:14 22     Q.   Have you done any investigation to

12:19 23 determine when Mr. Jones, the inventor of the '936

12:25 24 patent, actually conceived of the inventions that

50

1   actually no code?

2        A.   I don't know.

3             (Marked, Exhibit 16, memorandum of

4   understanding - FlyNow Service, 3-5-96.)

5        Q.   The court reporter has handed you Exhibit

6   16.  Do you recognize Exhibit 16?

7        A.   Yes.

8        Q.   What is it?

9        A.   It's a memorandum of understanding between

10  U.S. West and RLM Software.

11       Q.   Do you recall receiving this from Mr. Toffa

12  at U.S. West?

13       A.   Yes.

14       Q.   Exhibit 16 does not bear your signature.

15  Did you sign the exhibit at some point?

16       A.   Yes.

17       Q.   Do you recall when you signed it?

18       A.   On or about March 5, 1996.

19       Q.   The numbered paragraph 1 -- or actually,

20  I'm sorry; the first paragraph of the letter says,

21  "This memorandum of understanding (MOU) describes

22  the current discussions between U.S. West

23  Interactive Services, Inc., and RLM Software

24  concerning participant" -- I'm sorry; I'm going to

FARMER ARSENAULT BROCK LLC

52

1     Q.    That's what the discussions about

2    collaboration and participation consisted of at that

3    time?

4     A.    I'm sorry; what's your question?

5     Q.    That's what the current discussions, or the

6    discussions at that time --

7     A.    That's what these discussions allude to,

8    yes, refer to.

9     Q.    Numbered Paragraph 1 says, "Participant and

10   developer," which refers to U.S. -- or RLM Software

11   and U.S. West, "have entered into preliminary

12   discussions about conducting two trials of the

13   FlyNow service which would incorporate participant's

14   Flightview data for developer's Internet

15   applications and provide flight arrival times in

16   North America for the FlyNow project."

17          Tell me what you recall about the

18   preliminary discussions between RLM and U.S. West

19   pertaining to conducting those trials.

20    A.    That we would help them with our Flightview

21   product for them to provide flight information on

22   their website.

23    Q.    Is it actually that you were discussing

24   providing Flightview to them, or just data that

1   could be used in Flightview?

2   A.   We discussed both.

3   Q.   The trials that were contemplated at that

4   point in time, the first one is referenced as being

5   an incorporation of Flightview data for developer's

6   Internet applications.  Was there anything more to

7   the trial than incorporating RLM data into the

8   developer's Internet applications?

9   A.   Can you repeat the question?  I had to read

10   this.

11   Q.   Was there anything more to the preliminary

12   discussions about the first trial which would

13   incorporate RLM data for U.S. West's Internet

14   applications than what's described in this first

15   paragraph?

16   A.   I guess I'm not understanding your

17   question.  Was there anything more described?

18   Q.   About what would be tried in the first

19   trial.

20   A.   That it was a technical trial, right?

21   Can you --

22   Q.   Explain what you mean by -- let's back up.

23   I'm going to get to the technical trial in a second.

24   I see that reference in the paragraph as well.

54

1        The first trial, just tell me in your

2   own words, what was the first trial that's

3   referenced in Paragraph 1; what was your

4   understanding as of March 5, 1996, as to what that

5   first trial would consist of?

6        A.   That we would work with them to develop a

7   system that they would use Flightview information on

8   their website.

9        Q.   And as of March 5, 1996, what details do

10   you recall about the logistics of that trial?

11        A.   We were providing them data; I know that.

12        Q.   FAA ASD data?

13        A.   Flightview data.

14        Q.   Is there a difference between Flightview

15   data and FAA ASD data?

16        A.   Yes.

17        Q.   Okay.  So you were providing them data in

18   the Flightview data table format?

19        A.   Yes.

20        Q.   And where was that data to be sent in the

21   first trial?

22        A.   To U.S. West.

23        Q.   And what was your understanding of how U.S.

24   West intended to use that data in the first trial?

55

1      A.   They were going to build the front end for

2   the user.

3      Q.   Other than the details that you've now

4   provided me about what your understanding was as to

5   what this first trial would consist of, are there

6   any other details that you were aware of as of March

7   5, 1996 regarding how this first trial would be

8   conducted?

9      A.   Not that I can recall.

10      Q.   I didn't ask you when we started, and it's

11   my normal course to do it early in the deposition,

12   but for some reason this morning, I just forgot.

13           Are you under the influence right now of

14   any prescription drugs or other impediments that

15   could affect your ability to recall events that have

16   happened in the past?

17      A.   No.

18      Q.   Is there any reason why you can't give your

19   best, most truthful testimony today?

20      A.   No.

21      Q.   And you're aware that the oath that you

22   took when we started this morning is the same oath

23   that you would take if you were testifying live in

24   this matter in front of the judge and jury?

58

1    enforceable contract between RLM and U.S. West?

2            MR. BELT:   Objection.

3        A.    No.   We just followed what this agreement

4    was.

5        Q.    Okay.   The second trial is referred to as a

6    commercial proof-of-concept marketing trial.   Can

7    you explain in greater detail than that what your

8    understanding of what the second trial would consist

9    of was, as of March 5, 1996?

10       A.    I believe what we meant at that time was

11   that we would allow them to put that on the

12   Internet.

13       Q.    For what purpose?

14       A.    To allow the ability to receive realtime

15   flight information off of their website.

16       Q.    What does the phrase "marketing trial"

17   mean, as you understood it on March 5, 1996?

18       A.    It essentially meant that we would allow

19   them to use our data.

20       Q.    For what purpose?

21       A.    To allow realtime flight tracking on their

22   website.

23       Q.    Is that the only purpose that you're aware

24   of, or that you understood to be in existence as of

FARMER ARSENAULT BROCK LLC

67

1      Q.   And is it between RLM and U.S. West

2  Interactive Services?

3      A.   Yes.

4      Q.   Does this refresh your recollection as to

5  whether or not there was a trial agreement between

6  RLM and U.S. West?

7      A.   Yes.  Well --

8      Q.   Were there drafts of Exhibit 17 exchanged

9  between RLM and U.S. West?

10     A.   I'm sorry; could you say your question?

11     Q.   Were there drafts of Exhibit 17, the

12  agreement, the trial agreement, exchanged prior to

13  June 12, 1996?

14     A.   I don't know.

15     Q.   You're not aware of any as you sit here?

16     A.   No.

17     Q.   The last page of Exhibit 17 is entitled

18  Confidentiality Agreement?

19     A.   Yes.

20     Q.   And it's dated February 7, 1996, and

21  February 5, 1996, at the bottom.  Do you see that?

22     A.   Yes.

23     Q.   Why did RLM Software enter into a

24  confidentiality agreement with U.S. West Interactive

68

1    Services?

2        A.    Because we were discussing the flight

3    tracking -- discussing providing the flight tracking

4    system on their website.

5        Q.    Did RLM ask U.S. West Interactive to

6    maintain the confidentiality of all information

7    reasonably related to Flightview?

8        A.    We asked them to keep confidential any of

9    our trade secrets or any of the information that we

10   were -- about offering this new product.

11       Q.    Did U.S. West Interactive Services protect

12   the confidentiality of RLM Software's information?

13              MR. BELT:   Objection.

14       A.    I don't know of any instance when they

15   did -- didn't.

16              Wait a minute; ask the question again.

17       Q.    Are you aware of any instance where U.S.

18   West did not respect the confidentiality of RLM

19   Software information?

20       A.    No.

21       Q.    And the page immediately preceding that,

22   that is titled Exhibit A, is that an accurate

23   description of the Flightview system that was being

24   discussed with U.S. West Interactive?

69

| | | |
|---|---|---|
| 12:08:03 | 1 | A.   Could you say the question again? |
| 12:08:05 | 2 | Q.   Is this an accurate description, does this |
| 12:08:08 | 3 | Exhibit A contain an accurate description of the |
| 12:08:11 | 4 | Flightview system that was being discussed by U.S. |
| 12:08:17 | 5 | West Interactive Services and RLM Software on or |
| 12:08:23 | 6 | about June 1996? |
| 12:08:25 | 7 | A.   It's an accurate description of the flight |
| 12:08:29 | 8 | data, Flightview data that we would provide to them. |
| 12:08:33 | 9 | Q.   Was there more to the trial agreement |
| 12:08:44 | 10 | between U.S. West Interactive Services and RLM than |
| 12:08:47 | 11 | providing Flightview flight data? |
| 12:08:57 | 12 | A.   Yes. |
| 12:08:58 | 13 | Q.   And what is it in addition to the |
| 12:09:04 | 14 | Flightview data that is not listed on Exhibit A? |
| 12:09:12 | 15 | A.   I'm sorry; I was looking at Exhibit A. |
| 12:09:15 | 16 | Could you say the question again? |
| 12:09:16 | 17 | Q.   What else, other than the Flightview data, |
| 12:09:21 | 18 | was supposed to be a part of the trial agreement |
| 12:09:23 | 19 | that's not shown in Exhibit A? |
| 12:09:25 | 20 | A.   I don't recall anything else. |
| 12:09:36 | 21 | Q.   Exhibit A repeatedly refers to The Trip |
| 12:09:40 | 22 | project.  Do you know what that is? |
| 12:09:43 | 23 | A.   Yes.  That's their website. |
| 12:09:54 | 24 | Q.   There are also references in Exhibit A to |

FARMER ARSENAULT BROCK LLC

70

1    The Trip site.  Is that the same thing?

2        A.   Yes.

3        Q.   Does Exhibit A constitute an accurate

4    description of the scope of work associated with the

5    trial agreement?

6        A.   Yes.

7             MR. HILL:  Let's mark this the next

8    number.

9             (Marked, Exhibit 18, photocopy of

10   document with handwritten notes.)

11       Q.   Do you recognize Exhibit 18?

12       A.   Yes.

13       Q.   What is Exhibit 18?

14       A.   It looks like notes from Mary Flynn -- Mary

15   Flynn's notes.

16       Q.   How do you know the notes are Mary Flynn's?

17       A.   She gave them to me.

18       Q.   Do you recognize your sister's handwriting?

19       A.   Yes.

20       Q.   Does this appear to be Mary Flynn's

21   handwriting?

22       A.   Yes.

23       Q.   Do you know what year Ms. Flynn took these

24   notes?

77

12:29:16    1        Q.    Three lines down from the top.    "TN beta
12:29:21    2   next week."
12:29:39    3        A.    I don't know what the "TN" is.
12:29:41    4        Q.    In the 1996-1997 time frame, did you ever
12:29:45    5   hear the phrase "trip network"?
12:29:51    6        A.    I don't recall that right now.
12:29:56    7        Q.    Do you recall a beta testing schedule being
12:30:01    8   developed for The Trip project?
12:30:20    9        A.    I believe that they were beta -- I think, I
12:30:22   10   believe there was a beta.
12:30:23   11        Q.    Do you recall when the beta test for The
12:30:29   12   Trip project occurred?
12:30:32   13        A.    No.
12:30:35   14        Q.    Do you recall whether it was between
12:30:37   15   January 1, 1996, and January 1, 1997?
12:30:43   16        A.    Yes.
12:30:44   17        Q.    It was during that year?
12:30:47   18        A.    Yes.
12:30:49   19        Q.    You just don't recall when in 1996 it
12:30:53   20   occurred?
12:31:00   21        A.    No, I don't.
12:31:01   22        Q.    Do you recall whether it was before or
12:31:03   23   after you signed your name to the memorandum of
12:31:06   24   understanding in March of '96?

78

1    A.   It was after.

2    Q.   And for those potential jurors who may not

3  be experts in the field of software development,

4  would you just explain on the record what beta

5  testing refers to?

6    A.   Beta testing is when you allow a group of

7  people to test your system, that it's ready to go

8  live.

9    Q.   Why is beta testing common in software

10  development?

11          First of all, is beta testing common in

12  software development?

13    A.   Yes.

14    Q.   Why is that?

15    A.   It allows you to find little bugs that

16  might be in the system, things that aren't working

17  correctly.

18    Q.   Why is that important?

19    A.   It's essentially like letting you get

20  spelling mistakes out.

21    Q.   What happens if you deploy software in a

22  production environment, and there are bugs in the

23  software?  What kinds of things can happen?

24          MR. BELT:  Objection.

1    A.   Well, like I said, you could have a
2  spelling mistake on the screen.
3    Q.   Is that it, in your experience?  Is that
4  the only thing that can happen when there's --
5    A.   It's not the only thing that can happen.
6    Q.   In your experience, what other things can
7  happen when there are software bugs in software
8  that's being used in a production environment?
9    A.   I'm sorry; say your question again.
10   Q.   In your experience, what other things can
11 happen when there are bugs in software that is being
12 used in a production environment?
13   A.   In a production environment?
14   Q.   Yes.
15   A.   An example would be that a file could be
16 corrupted on transmission, and a software module
17 might not handle the error correctly.
18   Q.   Anything else come to mind?
19   A.   No.
20        MR. HILL:  Why don't we take an hour
21 lunch break and meet back here at 1:30.
22        THE VIDEOGRAPHER:  The time is 12:35.
23 We're off the record.
24        (Luncheon recess taken)

1   a viable product for commercial use."  And what's

2   your question in regard to that?

3        Q.   Well, did you do the Phase 2 trial?

4        A.   We did test the trial and -- I mean, we did

5   test the system and put it on line.

6        Q.   Did you do a Phase 2 trial as a commercial

7   proof-of-concept marketing trial?

8        A.   What I know is that The Trip did present

9   the system during '96 to a marketing group, and then

10  put it on live sometime in September or October;

11  between September and October.

12       Q.   Take a look at Exhibit 17, if you would.

13  Turn to the first page of the trial agreement, which

14  is Bates-numbered RLM 392.

15       A.   Yes.

16       Q.   That agreement is effective April 30, 1996,

17  correct?

18       A.   Yes.

19       Q.   Look at Section No. 2, Trial Periods.

20       A.   Yes.

21       Q.   It says, "Phase 1 is tentatively scheduled

22  from June 3, 1996 through September 30, 1996."  Does

23  that refresh your recollection as to the dates for

24  the Phase 1 trial?

82

1    A.   Yes.

2    Q.   Okay.

3    A.   It refreshes my memory on it.

4    Q.   And what is your memory, now that it has

5    been refreshed, regarding the approximate dates of

6    the Phase 1 trial?

7    A.   Basically it tells me that around September

8    is when we went live.

9    Q.   Around September of 1996?

10   A.   When we went actually available to the

11   public on the Internet.

12   Q.   Okay.  I appreciate you saying that.  My

13   question to you was, what is your recollection

14   regarding the date, the approximate dates, of the

15   Phase 1 trial?

16   A.   My recollection is that -- what I don't

17   recollect is when, that June 3 date, because my

18   recollection is that we had actually been -- I don't

19   remember the exact date we started what they called

20   the soft launch.

21   Q.   What's the term "soft launch"?  Is that

22   another way of saying, is that what you called Phase

23   1?

24   A.   That's what they called the first trial.

FARMER ARSENAULT BROCK LLC

1   just went right to, you know, an agreement with

2   them.  So I don't know if technically there was an

3   end of the Phase 2.  Phase 1, I mean, it went on

4   line, and that was it.

5       Q.   Okay.  Take a look at Section 4 of Exhibit

6   16 on the second page, if you would.  16, second

7   page, No. 4, the top.  It says, "Each party

8   acknowledges that this MOU and the data and

9   information which will be exchanged during the

10  interim period will contain confidential information

11  of both parties."  Was that your understanding at

12  the time that you signed the memorandum of

13  understanding?

14      A.   Is what my understanding?

15      Q.   That the memorandum of understanding and

16  the data and information which will be exchanged

17  during the interim period will contain confidential

18  information of both parties.

19      A.   This says to me that any trade secrets that

20  we exchange will remain confidential, is our

21  understanding.

22      Q.   I appreciate that.  I'm simply asking you

23  whether or not -- I mean, when you read Section 4,

24  as you recall your intent at the time that you

1   signed the memorandum of understanding, was it your

2   intention that the memorandum of understanding was

3   confidential?

4       A.   Yes.

5       Q.   Was it your understanding that there was

6   going to be data and information exchanged between

7   RLM Software and U.S. West Interactive Services

8   during an interim period?

9       A.   Yes.

10      Q.   And what was that interim period?

11           Let me see if I can help you out.   Look

12  at Section 2 of Exhibit 16, the previous page.   Does

13  Section 2 refresh your recollection as to what was

14  meant by "the interim period"?

15      A.   It doesn't really say here where the

16  interim --

17      Q.   You don't think "the interim period" refers

18  to the time between the date of the memorandum of

19  understanding and the date of execution of a formal

20  trial agreement?

21           MR. BELT:   Objection.

22      Q.   Take a look at Section 2 of Exhibit 16.

23  Third line down, do you see where it says, "The

24  parties agree during the interim period needed to

1    finalize the trial agreements ('Interim period')"?

2        A.   Right.

3        Q.   What does that mean to you?

4        A.   To me it means from the time, from the time

5    when we're not under agreement, which would be, I

6    guess, the time of the trial agreement.

7        Q.   Until the time that you are in the trial

8    agreement?

9        A.   Yes.

10       Q.   Do you agree that data and information --

11   do you agree that as of March 5, 1996, you believed

12   data and information would be exchanged between RLM

13   and U.S. West Interactive Services during the

14   interim period?

15       A.   I believed that confidential data and

16   information would be exchanged.

17       Q.   And was it your intention in signing

18   Exhibit 16 that U.S. West Interactive Services would

19   protect the confidentiality of that data and

20   information?

21       A.   Yes.

22       Q.   Are you aware of any instance when U.S.

23   West Interactive Services did not protect that

24   confidentiality?

99

1     A.    No.

2     Q.    Is there any time when RLM Software did not

3   protect the confidentiality of U.S. West Interactive

4   Services' information?

5     A.    Not that I'm aware of.

6               MR. HILL:   Let's mark this as the next

7   number.

8               (Marked, Exhibit 19, memorandum, Toffa

9   to Mary Flynn, 12-2-96.)

10    Q.    Do you recognize Exhibit 19?

11    A.    Yes.

12    Q.    State for the record what Exhibit 19 is,

13  please.

14    A.    It's a memorandum from Mary Flynn of RLM

15  Software to Antoine Toffa at The Trip.

16    Q.    Are you sure it's not the other way around?

17    A.    I'm sorry; I did it backwards.  It's a

18  memorandum from Antoine Toffa at The Trip to Mary

19  Flynn at RLM Software.

20    Q.    Is this document maintained in RLM's

21  business files?

22    A.    Yes.

23    Q.    You've seen a copy of it before today?

24    A.    I don't recall.



# EXHIBIT / ATTACHMENT

## EX.14

**(To be scanned in place of tab)**

# EXHIBIT 14



# RLM Software

# FAX

**Date**        December 8, 1995

*Number of pages including cover sheet*

**TO:**        *Mr. Leo Hollis*
              *America West Airlines*
              *4000 E.Sky Harbor Blvd.*
              *Phoenix, AZ 5034*

**FROM:**        *Mary Flynn*
               *RLM Software*
               *214 Lincoln St. Ste. 112*
               *Boston, MA 02134-1346*

**Phone**        (602) 693-3978
**Fax Phone**    (602) 693-4733

**Phone**        (617) 787-4200
**Fax Phone**    (617) 787-2570

**REMARKS:**     ☐ *Urgent*      ☐ *For your review*      ☐ *Reply ASAP*      ☐ *Please Comment*

Leo,

Here is the pricing proposal for our FlightView product in response to your RFP dated November 7, 1995.  The licensing agreements were overnighted, but we just checked with FEDEX, and delivery is scheduled for tomorrow moring.

DEPOSITION
EXHIBIT
14
FLYNN 8-29-03



**RLM**
**SOFTWARE**

December 7, 1995


Mr. Leo D. Hollis, Director, Flight Control
America West Airlines
4000 E. Sky Harbor Boulevard
Phoenix, AZ 85034


Dear Mr. Hollis,

*RLM Software is pleased to present this proposal in response to your request for an Aircraft Situation Display System.* We fully understand the importance of timely and accurate flight data for your business and believe this proposal addresses all the critical elements of such a system.

*FlightView,* our state-of-the-art Air Traffic Tracking system, is a robust, fully integrated system that provides easy-to-use, real-time flight data.

As a company with a solid knowledge of advanced computer systems, we have been dedicated to research and development of flight tracking systems since 1989. We have directed our resources toward identifying flight operation problems and developing state-of-the-art solutions, that are specifically tailored for use in the aviation industry. I believe that our product offering, as well as our extensive computer systems expertise, can be useful to America West Airlines.

Sincerely,

Mary Flynn
Vice President



MEF/mh
Enclosure



**R L M**
**SOFTWARE**

# PROPOSAL
# FOR
# AMERICA WEST'S
# AIRCRAFT SITUATION DISPLAY

## DECEMBER 7, 1995

214 Lincoln Street, Suite 112, Boston, MA 02134-1346   Phone: (617) 787-4200, Fax: (617) 787-2570

# PROPOSAL FOR
# AMERICA WEST'S
# AIRCRAFT SITUATION DISPLAY

## DECEMBER 7, 1995

1. INTRODUCTION .................................................................................4
  1.1. Company Background ......................................................................4
2. *FLIGHTVIEW* ..................................................................................4
  2.1. Product Description .........................................................................4
    2.1.1. Flight File Server .......................................................................4
    2.1.2. Flight Database ..........................................................................5
    2.1.3. Remote Monitoring Capability .................................................5
    2.1.4. *FlightView* Display ..................................................................5
    2.1.5. *FlightView* Weather Option ....................................................6
    2.1.6. America West's Functional Requirements .................................6
  2.2. System Configuration .....................................................................6
    2.2.1. Hardware Requirements.............................................................7
  2.3. Additional Communication Requirements .......................................7
  2.4. Costing Information .........................................................................7
3. PRODUCT TRAINING AND DOCUMENTATION .......................................9
  3.1. Product Training .............................................................................9
  3.2. Documentation ...............................................................................9
4. SUPPLIER INFORMATION ....................................................................9
  4.1. Background.....................................................................................9
  4.2. RLM Facilities ..............................................................................10
  4.3. Personnel Information....................................................................11
  4.4. Corporate Organization.................................................................12
5. INSTALLATION INFORMATION............................................................12
6. SYSTEM SERVICE AND SUPPORT ........................................................13
  6.1. Maintenance..................................................................................13
  6.2. Maintenance Log ..........................................................................14
  6.3. Maintenance Procedure.................................................................14
  6.4. Updates ........................................................................................14
7. RESERVATION INTERFACES.................................................................14
8. PROJECT MANAGEMENT PLAN ...........................................................15

# EXECUTIVE SUMMARY

Under a cover letter from Leo D. Hollis, Directory - Flight Control, dated November 7, 1995, America West Airlines provided RLM Software, Inc. (RLM) a Request for Proposal for a Flight Operating System. We appreciate the opportunity we have been afforded to submit a proposal to work with America West in replacing its current flight operations system.

Mr. Hollis' letter states that America West is interested in replacing its current Flight Operations System to provide comparable functionality at a competitive cost. This includes ASD, Weather, Automated Flight Information, Flight Planning/Dispatch, and Operations Control.

RLM is submitting a proposal to provide America West our *FlightView*® product which meets the objectives of the Aircraft Situation Display portion of the RFP. RLM realizes the significant impact the real-time ASD data can have on the productivity and efficiency of an airline's flight operations. *FlightView* is the basis for an integrated flight operations system. It is a fully modular system running on networked PCs. Processes execute independently, sharing data as required. All user front-end processes execute independently and all have full access to the flight data necessary to display updated flight positions. *FlightView* provides full display capabilities of the ASD data, it integrates weather products from selected vendors. It also makes the real-time flight information available to other components of an airline's flight operations, improving the efficiency of such systems as flight planning and flight following.

RLM is a subscriber to the Limited Aircraft Situation Display data through the Cooperative Research and Development Agreement between the FAA and the ATA. RLM processes the raw ATA data at its facility in Boston, MA, maintains a flight database at its facilities, and provides this processed data to its customers. RLM was the first non-airline company that was approved to receive the ATA data and our system has been operational for our customers since November, 1994.

The FAA ASD is a component of the Enhanced Traffic Management System (ETMS). Since 1985, RLM has provided on-going systems expertise to the Volpe National Transportation System Center, Cambridge, MA in support of the ETMS. This support has been in the following technical areas: wide area networking, local area networking, communications support including NADIN and ARINC, graphics support, and open systems conversion. Under our current contract with the Volpe Center, we maintain a complete TMU testbed, including all software and communication components of the ETMS. We provide testing and evaluation of modifications and enhancements to the ETMS system. Additional responsibilities include specifications of communication interfaces for new data sources to the ETMS.

2

RLM has over ten years experience with the ASD data. This experience has enabled RLM to develop a product for the airline industry that delivers reliable and flight information at a reasonable cost. *FlightView* is a full-function ASD product providing America West with its ASD functional requirements. The base *FlightView* system provides the following: multi-level user interface, configuration files for tailoring display, accurate display of current air traffic, display of aircraft heading, user-selectable background maps, user-defined center and scale of the world display, advanced flight filtering, textual display of flight information, batch processing of user commands. Our *FlightView* Weather Display allows an airline to integrate radar weather from its selected vendor with the real-time display of the flight data.

In summary, *FlightView* meets the current requirements of the ASD component of the flight operations system. *FlightView*'s modular design ensures that it can meet the future needs of American West. Additional servers may be added to the network to support additional dispatcher workstations. Additional functions ( as future requirements dictate) may be easily integrated into the system by adding appropriate processes to the network to perform the functions. RLM's expertise with the ASD data ensures that it can provide America West the ASD portion of its Flight Operations System in a timely and cost-effective manner.

3

# 1.   INTRODUCTION

## 1.1.   Company Background

RLM was founded in 1981 to provide high-quality, profession software to companies in need of systems development. Specializing in real-time applications, RLM has provided our clients with a wide range of services including needs analysis, system development, installation, and training. Our clients have included small business, Fortune 500 companies, and the Federal Government. Over the past fourteen years we have worked under various contracts for the Volpe National Transportation System Center in support of the Federal Aviation Administration. Our FlightView product provides real-time flight information to airlines, cargo companies, and ground transportation companies.

# 2.   *FLIGHTVIEW*

RLM proposes its *FlightView* product as a low-cost solution which meets America West's requirements for the ASD portion of its Flight Operating System. The following sections detail the product description of *FlightView* and how it meets the requirements of America West.

## 2.1.   Product Description

*FlightView* is RLM's advanced flight information system which provides graphic display of all IFR traffic contained in the Limited ASD data stream. *FlightView* maintains a current database of flight information and allows a flight dispatcher to select how this data is displayed. Additional information crucial to a dispatcher's workstation such as composite radar weather can also be integrated into the display. *FlightView* can also be customized to meet the exact requirements of an airline's flight dispatch center, RLM can customize FlightView to provide an interface which allows a dispatcher to overlay flight plans from its flight planning system. The following are the system components of the *FlightView* system.

### 2.1.1.   Flight File Server

This file server maintains the flight database on the dispatch network. The Flight File Server receives its flight information via a dedicated 56.0 Kb Baud telephone line from RLM's facilities in Boston. The file server makes this real-time flight information available to the dispatch workstations. If an airline also leases the Weather Interface, the Flight File Server also interfaces the *FlightView* system to the weather server provided by

4

the airline's weather vendor. Supported weather products are retrieved from the weather vendor's file server and reformatted for display by the *FlightView* system.

## 2.1.2.  Flight Database

RLM maintains a real-time flight database at its facilities in Boston, MA. Processed flight information is then transmitted to each customer site. The flight database performs the following functions:

- ingests raw ATA ASD data,
- monitors the integrity of the incoming data,
- maintains all flight information filed with the FAA, including departure airport, arrival airport, filed altitude, reported altitude, speed, filed flight plan,
- maintains the waypoints for the filed flight plan,
- projects the current positions of all flights based on reported, speed, altitude, and filed flight plan, and
- projects the estimated time of arrival for each flight, based on its position, speed, and filed flight plan.

The *FlightView* database runs in a dual-processor, backup mode. Separate Hewlett-Packard workstations, running on UPS, process the raw ATA data and maintain separate flight databases. Either of these systems may provide the flight information to the customer site.

This feature of *FlightView* eliminates the need for a flight dispatch center to run a backup file server for the flight data. In the event of a failure of the flight file server, the Flight database can restore complete flight information on the Flight File Server within three minutes.

## 2.1.3.  Remote Monitoring Capability

This process allows the support staff of RLM to log into America West's system for diagnostic support and troubleshooting. It allows the RLM staff to monitor the status of all *FlightView* processes running on the Flight File Server.

## 2.1.4.  *FlightView* Display

The *FlightView* display provides the dispatcher with a robust graphic display of the ASD data. Section 2.3 details how the *FlightView* display already meets the functional requirements of the America West's Flight Operating System.

2.1.5.  *FlightView* Weather Option

The *FlightView* Weather Option allows the dispatcher to display radar weather provided by America West's weather vendor.  This option currently supports radar weather from either Kavouras or WSI.  *FlightView* menus allow convenient user control of the display of the graphic weather.

2.1.6.  America West's Functional Requirements

*FlightView* meets the functional requirements of America West's Flight Operations System.  Table 2.1  details the requirements which are available from *FlightView*.

| FUNCTIONALITY | AVAILABLE |
|---|---|
| FLIGHT TRACKING | |
| User interface in SVGA | YES |
| Configuration files for tailoring display at startup | YES |
| Accurate display of current air traffic, for all ASD flights | YES |
| Flight heading designated by aircraft icon | YES |
| User tailorable display of background maps | YES |
| User may center display anywhere in world | YES |
| Advanced flight filtering and highlighting capabilities | YES |
| Datablock display of complete flight information | YES |
| Textual display of flight information | YES |
| Monitor integrity of ASD data | YES |
| Batch processing of customized user screens | YES |
| | |
| WEATHER | |
| Graphic overlay of ASD flight data | YES |
| | |
| SYSTEM INTEGRATION | |
| On-line storage and retrieval of flight-related data | YES |

**TABLE 2.1 - FlightView Display Capabilities**

## 2.2.   System Configuration

RLM supports multiple platform configurations for its *FlightView* product, both UNIX and PC-based systems are available.  The PC-based *FlightView* system provides America West with all required ASD functionality and is compatible with its token-ring IBM LAN

6

and its workstation configuration running either Windows NT or Windows 95. This system configuration can support up to 10 dispatch workstation on the LAN. The dispatcher workstation does not require a dedicated workstation for the ASD functionality.

## 2.2.1. Hardware Requirements

RLM proposes the following hardware:

| EQUIPMENT Configuration | Number Required Additional Comments |
|---|---|
| Display Workstation | 1 per dispatch workstation |
| Pentium 90 Mhz | does not have to be a dedicated workstati |
| 16 MB memory | up to 10 displays may be supported |
| 1 GB drive | |
| 17 inch or larger SVGA monitor | |
| Flight File Server | |
| Pentium 120 Mhz | |
| 32 MB memory | |
| 1 GB drive | |
| | |
| | |
| Communications Equipment | |
| Micom Marathon 1 K SU-5696 DSU | |

## 2.3.    Additional Communication Requirements

America West is responsible for the installation and maintenance of a 56 Kb leased line from their facilities in Phoenix to RLM's facilities in Boston. This leased line provides 2 19.2 lines for transmission of *FlightView* data. The third line provides a communication channel which allows RLM support personnel to remotely log in to America West's system for troubleshooting and problem evaluation.

## 2.4.    Costing Information

The following table details the costs for providing America West with the functionality detailed in Section 2.1.

| Product | One Time License Fee | Maintenance Monthly Fee |
|---|---|---|
| •*FlightView* Software Multi User System | | |
| Weather Option | | |
| •*FlightView* Data Feed (Excluding Line Costs) | | |
| •Maintenance Charge *FlightView* | REDACTED | |
| Weather | | |
| TOTAL | | |
| | | |
| OPTIONAL CHARGES | | |
| Training 2 day on-site session ( excluding travel expenses) | | |
| 2-day Installation ( excluding travel expenses) | | |

8

## 3.    PRODUCT TRAINING AND DOCUMENTATION

### 3.1.   Product Training

RLM will provide training on-site at America West's facilities for up to five America West users. This training provides the users with thorough knowledge of the system capabilities, an understanding of the day-to-day use of the system, and will allow the user to configure the dispatch workstation based on his assigned responsibilities. Additionally, this training provides advanced training for a designated system administrator. This two-day training session includes the following:

- overview of the *FlightView* system and its components,
- overview of system capabilities,
- review of fundamental system features,
- hands-on session followed by question and answer period,
- review of remaining system features, and
- additional training for designated system administrator.

The cost for this training session is $2000. plus travel expenses.

### 3.2.   Documentation

RLM provides the following documentation for a *FlightView* installation:

- System Administrator's Guide which details the *FlightView* system components, hardware configuration, software, and system troubleshooting information.
- *FlightView* Display Workstation User's Guide which provides detailed explanations of all the features available to the user of the *FlightView* display. Up to 10 copies of this guide will be provided.

## 4.    SUPPLIER INFORMATION

### 4.1.   Background

RLM has a broad background in computer development and can support multiple hardware and software platforms based on its clients current and future system configurations. We can currently support the following product lines that were mentioned in Section 4 of the RFP.

9

Operating Systems: DOS, Windows for Workgroups 3.1, Windows NT, Windows 95, Unix.

Networks: Ethernet and H/P Apollo Token Ring

Network Operating Systems:  Novell, Lantastic, H/P Apollo Domain

The following tables lists past and current projects of RLM and indicates system support provided in these areas.

## OPERATING SYSTEMS

|  | DOS | Windows 3.1 | Windows NT | Unix | Linux |
|---|---|---|---|---|---|
| ETMS, Volpe Center, MA |  |  |  | X | X |
| Center for Navigation, Volpe Center | X | X | X | X |  |
| National Field Office for Loran Volpe Center | X | X | X |  |  |

## NETWORKS

|  | NOVELL | LANTASTIC | H/P Domain Token Ring | FTP PC-TCPIP | IBM Lan Server |
|---|---|---|---|---|---|
| ETMS, Volpe Center, MA | X | X |  | X |  |
| Center for Navigation, Volpe Center | X |  |  | X |  |
| National Field Office for Loran Volpe Center | X | X | X |  |  |

## 4.2.   RLM Facilities

RLM has over ten years experience developing providing support and turn-key systems based on the FAA's ASD data.  We have supported the ETMS project at the Volpe Center in Cambridge, MA since its beginning in 1986.  We have run an operational system at our Boston facility since November 1994.  Computer configurations at RLM facilities in

Boston currently support the following system components:

**Operational Flight Database.** This is a dual-process system, independent H/P workstations process separate ATA datafeeds and maintain complete flight database information. It also consists of communication software for data dissemination to *FlightView* customers and network monitoring software that ensures the integrity of the network.

**Software Development Network.** This network consists of HP Apollo workstations as well as the following PC machines, 486/33, 486/100, and Pentium 120. This provides our software developers with the tools required for developing solutions for Unix environments using XWindows/Motif as well as PC-based solutions using C, C++, and Microsoft Foundation Class.

**Customer Support Network.** This network provides our customer support engineers access to both Unix workstations and PCs. This network allows the support engineers to configure any environment required to troubleshoot customer problems. This network currently can support the following:
- Operating Systems: Dos, Unix, Linux, Windows for Workgroups 3.1, Windows 95, Windows NT, and H/P Apollo Domain,
- Networks: H/P Apollo Token Ring, Ethernet.

### 4.3.   Personnel Information

RLM personnel represents a strong team with expertise, background and experience in the disciplines needed to achieve the America West specified objectives. The following table details the RLM staff assigned and available for the *FlightView* product.

| CATEGORY | # of Employees |
|---|---|
| Technical Support Staff | 4 |
| Sales Personnel | 2 |
| Managerial Personnel | 2 |

**Technical Support Staff** includes:

- Network Support staff who provide network installation, configuration, and troubleshooting,

- System Engineers who provide functional specifications, system design.

- Programmers who provide software development in a variety of languages including C, C++, Pascal, and standard front-end interfaces such as Motif, XWindow, and Microsoft Foundation Class.

11

**Sales personnel** provide customers with product description, product demonstration, pricing, and technical information required from our technical support staff.

**Managerial personnel** provide project management, and ensure that project stay on schedule and on budget.

### 4.4.    Corporate Organization

The President of RLM Software is Lorraine Flynn. She is responsible for the direction and coordination of the business and operational activities of our FlightView product.

Mary Flynn is the project manager for this project. Reporting to the president, she is responsible for the direction and success of the project and is able to bind the Corporation contractually. She is the main point of contact for America West. The program manager is responsible for all project phases, from bid proposal, through negotiations, to contract award, to installation and acceptance, to follow on maintenance.

The Vice President of Development is James Steinberg. He manages all phases of product development. All technical staff reports to the Vice President of Development.

## 5.    INSTALLATION INFORMATION

RLM currently supports the following installations:

**BOSTON COACH**
Boston, MA
Contact: Lisa Censullo, Director MIS
(617) 394-3744
Boston Coach is a ground transportation company headquartered in Boston, MA. A wholly-owned subsidiary of Fidelity Investments, Boston Coach is a rapidly-growing company with annual revenues of over $30 million dollars. Boston Coach provides over 10,000 pickups monthly for arrivals at Logan Airport alone, as well as providing service to DUL, EWR, IAD, JFK, LGA, PHL, and soon ORD. Boston Coach has integrated the *FlightView* arrival times into its fleet dispatch software, and relies solely on these times for fleet dispatch. This system has been operational since November 1994.

**Baltimore Washington International Airport**
Baltimore, MD
Contact: Jerry Groth (410) 859-7018

RLM customized the its UNIX-based system to provide the Maryland Department of

Transportation with a *FlightView* system for the new terminal observation lounge at BWI. RLM replaced the user-interface with a simplified touch-screen interface geared towards a novice user. This system provides all the *FlightView* functionality, zoom, locate a flight, identify a flight, show arrivals/departures, display flight plans, etc. This system has been operational since June. RLM provided hardware specifications, user-interface designed, and oversaw system installation.

Additionally, the following two installations, similar to what America West is requesting will be installed by January 31, 1996.

**Grand Aire, Inc.**
Eric Alexius
(313) 457-1730 x 12100

RLM is supplying Grand Air with its *FlightView* flight operations system. This will provide real-time flight information to Grand Air's dispatchers. This system will be installed at Grand Air's flight dispatch center December 8, 1995.

**SkyPlan Services**
Patrick Luft
Director of Research and Development
(40?) 275-2520

RLM is supplying SkyPlan Services with its *FlightView* flight operations system. This system will be available at the SkyPlan Service Centers in Toronto and Calgary. This installation is scheduled for January 15, 1996.

## 6.    SYSTEM SERVICE AND SUPPORT

### 6.1.   Maintenance

RLM's customer support provides the maintenance support for the FlightView product. This service provides a telephone help desk, which provides phone conversations to determine problem and  hardware and software status, evaluation of problem and solution, and a phone conversations to inform Customer of solution.  RLM provides 24 hour phone coverage.

### 6.2.    Maintenance Log

All service calls to RLM are logged and tracked through resolution by the RLM maintenance system. For each call logged the system tracks, customer, customer contact, problem description, effected components, priority rating, corrective actions taken, time to repair, and impact on customer. Initial problem evaluation prioritizes each problem into one of the following categories:

> Priority 1 - problem effects operational use of system and/or system availability,
> Priority 2 - system is operational, but major component of system is effected,
> Priority 3 - all components are operational, but software does not meet software specifications
> No Trouble found - problem is customer software/network related.

### 6.3.    Maintenance Procedure

Customer support personnel perform the following steps in handling a maintenance problem.

1.  Log problem call, collecting all information required by RLM,
2.  Review that customer's hardware is configured and operational,
3.  Review that customer has followed troubleshooting guide,
4.  Perform initial problem analysis, assigning priority,
5.  Notify project manager of any priority 1 and priority 2 problems,
6.  Notify customer of problem evaluation, estimated time to repair, and corrective actions to be taken.

The customer is notified of the problem evaluation within two hours of the initial call. Priority 1 and Priority 2 problems are assigned RLM staff until problem resolution is reached. To date RLM has not received any priority 1 or priority 2 calls.

RLM bills for "no trouble found" calls at its published support rate of $105 per hour.

### 6.4.    Updates

RLM provides FlightView updates for no charge other than postage as part of its maintenance program.

## 7.    RESERVATION INTERFACES

FlightView currently does not interface to any reservation system. If this becomes a requirement for America West, RLM can provide this functionality on a time and material basis. RLM has extensive experience with standard communication protocols such as 3270, SNA, and TCP-IP. Additionally, RLM has provided the FAA with WAN development and support, as well as NADIN and ARINC support.

## 8.   PROJECT MANAGEMENT PLAN

RLM's management plan for this project is an effective approach based on incorporating the management system which is currently in place at RLM and which has been utilized to manage other projects of this scope. RLM currently manages a development team of nine engineers in support of the ETMS project. RLM has provided long-term support to the ETMS project and has consistently completed all contracts on time and within budget. RLM proposes to meet all of the schedule and deliverable requirements specified in the RFP.

Because America West's functionality requirements are met by the standard FlightView system, no customization and no specialized hardware are required for the system installation. RLM can provide a system installation within 45 days of project award.

The following employees have made these needs determination and will be responsible for timely delivery of the project.

Program Manager  The Program manager is responsible for all project phases as described in Section 4. Additionally the program manager reviews performance for progress and schedule.

Vice President of Development.  Reviewed FlightView capabilities with requirements of America West. Performed hardware analysis for recommending system configuration. The Vice President has managed the ETMS project since 1989.

15



# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**

 **America West Airlines**

Phoenix Sky Harbor International Airport
4000 E. Sky Harbor Boulevard
Phoenix, Arizona 85034
Telephone: (602) 693-0800

April 24, 1996

Attn: Mary Flynn
RLM Software
214 Lincoln Street, Suite 112
Boston, MA 02134-1346

Dear Mary:

We have signed both copies of the enclosed contracts. Please return a signed copy to my attention at Department 52-ISD.

If you should have any questions, please call me at (602) 693-7647.

We are looking forward to working with RLM on our EAGLE project.

Sincerely,

Paul Hubbell
Project Manager

DEPOSITION
EXHIBIT
15
FLYNN    8-28-63

# SOFTWARE LICENSE
## and
# MAINTENANCE AGREEMENT

# BETWEEN

# RLM SOFTWARE, INC.

## and

# AMERICA WEST AIRLINES, INC.

# TABLE OF CONTENTS

1. DEFINITIONS ........................................................................................................1

2. LICENSE OF SOFTWARE: TERM, SUPPORT AND WARRANTY............................2
    2.1. License .........................................................................................................2
    2.2. Infringement Indemnity ...............................................................................3
    2.3. Transfer of License ......................................................................................3
    2.4. Acceptance ..................................................................................................4
    2.5. Documentation.............................................................................................4
    2.6. Training........................................................................................................4
    2.7. Support Services .........................................................................................4
    2.8. Warranty ......................................................................................................4
    2.9. Payment/Delays..........................................................................................5
    2.10. Taxes .........................................................................................................5


3. PRODUCT MAINTENANCE..................................................................................5
    3.1. Term ............................................................................................................5
    3.2. Maintenance and Support Services.............................................................5
        3.2.1. Maintenance Support.........................................................................5
        3.2.2. Non-Critical Support Services ...........................................................6
        3.2.3. Critical Support Services ...................................................................6
    3.3. Updates .......................................................................................................6
    3.4. Fees.............................................................................................................6
    3.5. Upgrades .....................................................................................................7
    3.6. Consultation Services ..................................................................................7
    3.7. Eligibility for Service....................................................................................7
    3.8. Responsibilities of Customer ......................................................................7
    3.9. Travel Expense ...........................................................................................8


4. PROTECTION OF RLM INTELLECTUAL PROPERTY............................................8
    4.1. Confidentiality .............................................................................................8
    4.2. Trade Secret Protection ..............................................................................8


5. TERM AND TERMINATION ..................................................................................8
    5.1. Term of License ...........................................................................................8
    5.2. Termination by RLM.....................................................................................9

i

5.3. Termination by Customer........................................................................10

6. GENERAL .................................................................................................10
    6.1. Waivers.............................................................................................10
    6.2. Limitation of Liability ........................................................................10
    6.3. Non-Hiring of Employees ..................................................................11
    6.4. Notices.............................................................................................11
    6.5. Severability .....................................................................................11
    6.6. Force Majeure..................................................................................11
    6.7. Section Headings..............................................................................12
    6.8. Governing Law.................................................................................12
    6.9. Press Releases .................................................................................12
    6.10. Joint and Several Liability ...............................................................12
    6.11. Assignment of Proceeds ..................................................................12
    6.12. Non-RLM Software .........................................................................12
    6.13. Entire Agreement ...........................................................................13

7. APPENDIX A ............................................................................................14

# SOFTWARE LICENSE AGREEMENT

THIS AGREEMENT, made this _ day _____ of 1996, by and between RLM Software, INC. ("RLM"), a Massachusetts corporation, with principal offices at 214 Lincoln Street, Allston, Massachusetts 02134, and America West Airlines, Inc. ("Customer"), a Delaware Corporation, with offices located at 4000 E.Sky Harbor Blvd., Phoenix, AZ 85034, is for the license of the Software described herein and more specifically listed in Appendix A hereto.  Customer wishes to license the Software from RLM and RLM wishes to license the Software to Customer.  RLM and Customer hereby agree as follows:

## 1.    DEFINITIONS

**"Business Day"** is defined as 9:00 a.m. through 5:00 p.m., Eastern Time, Monday through Friday, excepting RLM holidays, a listing of which will be provided to Customer annually.

**"Consultation Services** are services of qualified RLM representatives to provide custom solutions for the Customer at the Customer's request.

**"Documentation"** refers to RLM's manuals identified on Appendix A.

**"LAN"** refers to a local area network consisting of a server and one or more workstations.

**"Products"** refers to Software, Documentation and Services furnished under this Agreement.

**"Server"** is the computer hardware and operating system used as the hub of the Customer's local area network ("LAN") located at the Site.

**"Site"** is Customer's facility located at 4000 E.Sky Harbor Blvd., Sky Harbor Airport, Phoenix, AZ 85034

**"Software"** is the software described on Appendix A hereto that will use a live data feed supplied by RLM under a separate agreement and use that data to display the location of aircraft in real time (subject to FAA and other governmental requirements) on a Windows-based computer.

**"Support Services"** are Software operations support by telephone to determine hardware and software status, evaluation of problem and solution, and phone conversations to inform Customer of solution.

**"Non-Critical Support Services"** are Support Services for those problems that do not affect system availability nor the availability of a major component of the Software.

1

"**Critical Support Services**" are Support Services for those problems that affect system availability or the availability of a major component of the Software.

"**Upgrade**" is a modification to the Software that RLM announces as involving one or more significant functional product enhancements.

"**Update**" is a modification to the Software not designated by RLM as an Upgrade.

"**Workstation**" means any device that is linked to the Server that includes a monitor capable of displaying the output of the Software, other than the monitor connected directly to the Server for use by the LAN administrator.

## 2.    LICENSE OF SOFTWARE: TERM, SUPPORT AND WARRANTY

### 2.1.    License

RLM hereby licenses the Software to Customer (including any Updates provided for under the warranty provisions contained herein), pursuant to this Agreement at the license fees set forth in Appendix A for company-internal strategic planning purposes, but not for air safety, air traffic control, or compliance with FAA regulations.  Any use of the Software for such safety or compliance purposes will constitute product misuse and be grounds for termination of this license.

The licensed Software provided hereunder (including Documentation thereof), and any subsequent Upgrades or Updates, or any parts thereof, may be used only on the Server on which the Software is first installed and as many as twelve Workstations, and may only be copied, in whole or in part, for use on such Server and Workstations.  In the event that an equipment malfunction occurs in the above single Server, the Software (or copies thereof) may be used on one backup Server and as many as twelve Workstations on the LAN it supports on a temporary basis during such malfunction.  Customer shall not provide, or otherwise make available, the Software or any part or copies thereof in any form to any person (except Customer's employees or agents directly concerned with Customer's licensed use of the Software), except as consented to in writing by RLM.  Customer agrees to exercise diligence in preventing dissemination of the Software to unauthorized personnel.

RLM Shall have the right to terminate the Software license granted hereunder if Customer fails to comply with these license terms and conditions.

Termination shall occur in accordance with the provisions of Article 5 herein.  Customer agrees, upon notice of such termination, to immediately return the Software and Documentation provided under such terminated licenses and all portions and copies thereof.  Notwithstanding the foregoing, after ten (10) days written notice to Customer, RLM may withhold any Services for failure of Customer to pay any license or maintenance fees properly due.  Except in the event of termination by RLM under the

terms specified in this Agreement the Software license granted under this Agreement shall last forever.

The obligations of Customer under this section are continuing and shall survive the termination, discontinuance or abandonment of this Agreement for any reason whatsoever.

## 2.2.   Infringement Indemnity

RLM hereby warrants that at the time of delivery it has the right to grant the Software license(s) contained herein. If notified promptly in writing of any actions (and all prior claims relating to such action) brought against the Customer, based on a claim that the Customer's use of the Software infringes a United States patent or copyright or misappropriates a trade secret or any other proprietary right of any kind (hereinafter collectively referred to as "Infringement"), RLM will defend such action at its expense and will pay the costs and damages finally awarded in any such action, provided that RLM shall have sole control of the defense of any such action and all negotiations for its settlement or compromise. RLM shall not have any liability if the alleged infringement is based upon the use of the Software by Customer in combination with other products (including software) not furnished by RLM.

Customer covenants to fully cooperate with RLM, by providing such information and other resources as would be reasonably required by RLM in the course of, or arising out of its defense or settlement of any Infringement claim.

RLM shall, in the event that the Software is finally determined to infringe the rights of a third party, replace such Software with non-infringing Software or, if it is unable to do so, refund to Customer a portion of the license fee previously paid, such portion to be computed by multiplying the license fee times a fraction, the numerator of which is the number of months remaining in the original 24-month term of the maintenance provisions of Article 3, and the denominator which is 24. The foregoing states the entire liability of RLM and is the sole and exclusive remedy of Customer with respect to Infringement of any intellectual property rights.

## 2.3.   Transfer of License

RLM agrees to transfer the Software to a different Server purchased or leased by Customer, provided that Customer shall first obtain the consent of RLM. The LAN served by such Server shall thereupon become the only LAN licensed to use the Software, and Customer shall certify that all copies of the Software on the original LAN have been destroyed.

3

### 2.4.   Acceptance

Customer's acceptance of the Software shall occur ninety days after installation of the Software on the Server unless Customer notifies RLM of a failure of the Software to perform in accordance with its specifications during such thirty day period. If Customer does provide notice of such a failure, and RLM does not correct such failure within seven (7) days of receipt of such notice, then Customer may terminate the term of this Agreement, in which case Customer shall have no further payment obligations hereunder and any portion of the license fee previously paid to RLM shall promptly be returned without interest.

### 2.5.   Documentation

RLM shall provide Customer with Documentation as described in Appendix A, including Updates for one (1) year from the date of installation. Customer may duplicate such Documentation only as provided for by the Software license granted herein with the inclusion of RLM copyright notice.

### 2.6.   Training

RLM agrees to provide Customer with the Services of qualified personnel to train Customer's staff in the operation of the Software according to the terms outlined in Appendix A. In addition to paying the training charge described therein, Customer will provide coach airfare when needed, and Customer will reimburse RLM for reasonable travel expenses incurred in providing such training. Such expenses may include but are not limited to: meals, private hotel or motel room, taxi or carfare, and tips.

### 2.7.   Support Services

RLM agrees to provide, for a period of ninety (90) days following installation of the Software, a reasonable amount of Support Services, in addition to the training described elsewhere in this Agreement for no additional charge. Such support is not to be used in lieu of adequate staffing of the operation and training of the staff. After such ninety (90) day period, all such assistance will be provided in accordance with and on the terms set forth in Article 3.

### 2.8.   Warranty

RLM warrants that the Software will perform substantially in accordance with the printed materials accompanying the Software for a period of ninety (90) days from the date of installation. **EXCEPT FOR THE EXPRESS WARRANTIES STATED HEREIN, RLM DISCLAIMS ANY AND ALL WARRANTIES ON PRODUCTS FURNISHED HEREUNDER, INCLUDING ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

4

## 2.9.   Payment/Delays

The license fees, maintenance fees, and other Support Fees of the Products set forth in Appendix A shall be paid in accordance with the payment terms outlined in Appendix A hereto.

If payment is not made within thirty (30) days of Customer's receipt of invoice, or date payable, whichever is later, an interest charge of eighteen percent (18%) per annum will accrue for each additional day the invoice remains unpaid.  RLM must be notified by Customer within ten (10) days of receipt of an invoice if that invoice is being contested.

## 2.10.  Taxes

License fees are exclusive of all sales, use and like taxes.  If applicable, Customer shall certify, and provide appropriate documentation thereof, that it is exempt from all known federal, state or local sales, use or like taxes.  Any tax RLM may be required to collect or pay upon the sale, use or delivery of the Products shall be paid by the Customer and such sums shall be due and payable to RLM upon receipt of an invoice therefor.  Any personal property taxes levied after delivery shall be paid by Customer.  It shall be solely the Customer's obligation, after payment to RLM to challenge the applicability of any tax by negotiation with, or action against, the taxing authority.  RLM agrees to refund any tax collected which is subsequently determined not to be proper and for which a refund has been paid to RLM by the taxing authority.

In the event that RLM fails to pay or delays in paying to any taxing authorities sums paid by Customer to RLM, RLM shall be liable to Customer for any additional sums, such as the assessment of additional interest, which may accrue by virtue of such failure or delay.

## 3.   PRODUCT MAINTENANCE

### 3.1.   Term

RLM shall provide maintenance and Support Services under this Article when the warranty provisions of Article 2 expire, and shall continue such service until the date two (2) years after expiration of the foregoing Warranty Period.  The parties may by mutual agreement extend the maintenance and Support Services to be provided for additional terms of one year.

### 3.2.   Maintenance and Support Services

#### 3.2.1.  Maintenance Support

RLM shall provide Maintenance Support to remedy the following:

a) Any nonconformance of the Software with its Documentation as soon as is reasonably possible after receipt of notice of such nonconformance.  RLM agrees to provide this services between 9:00 A.M. and 5:00 P.M. Eastern Standard Time.

5

b) Failure of the live data feed supplied by RLM if such failure is due to a failure of any hardware or software used to deliver the data feed to the Customer and which is located at RLM's facilities.  RLM agrees to provide this service on a twenty-four hour basis, seven days a week.

Any claim which upon investigation RLM in good faith determines is not due to either of the above shall be considered Support Services.  The fees for Maintenance Support are as specified in Section 3.4.

### 3.2.2.   Non-Critical Support Services

RLM shall make available to Customer Non-Critical Support Services of qualified RLM representatives to assist and advise Customer in operation of the Software.  RLM agrees to provide these services between 9:00 A.M. and 5:00 P.M. Eastern Standard Time, Monday through Friday, excepting RLM holidays.  The fees for Non-Critical Support Services are specified in Section 3.4.

### 3.2.3.   Critical Support Services

RLM shall make available to Customer Critical Support Services of qualified RLM representatives to assist and advise Customer in operation of the Software for those problems that affect the availability of the system or the availability of any major component of system.  RLM  agrees to provide these on a twenty-four hour basis seven days a week.  The fees for Critical Support Services are in Section 3.4

### 3.3.   Updates

If, during the term of this Agreement, RLM makes Updates to the Software generally available to its customers and such Updates are appropriate to the Customer's Site, RLM shall provide such Updates, including appropriate documentation, to Customer at no charge other than RLM's out-of-pocket expenses for delivering the Update to Customer. All such Updates shall be subject to all provisions of this License Agreement.

### 3.4.   Fees

The Basic Maintenance Support under this Agreement includes the following: Maintenance Support, Updates, and up to four hours a month of any combination of Non-Critical Support Services or Critical Support Services.  The Fee for Basic Maintenance Support is listed in Appendix A, payable in equal monthly installments commencing thirty (30) days from the expiration of the applicable warranty period. Services may be requested by the Customer and RLM shall bill for these services in accordance with the hourly rates specified in Appendix A.  The Customer shall also reimburse RLM for its reasonable out-of pocket expenses for travel, meals and lodging, and all reasonable computer dial-in phone charges incurred in connection with any work requested and performed which is not directly related to Software maintenance.  RLM shall provide Customer monthly invoices itemizing services performed, the name of the

6

staff member or members performing such services, the amount of time expended, and expenses. RLM will provide Customer, upon written request, a detailed accounting of time spent on the Customer's behalf.

### 3.5.  Upgrades

RLM may publish Upgrades to the Software from time to time. RLM shall make Upgrades available to Customer on terms at least as favorable to Customer as to any other of its commercial customers. RLM shall be the sole judge as to whether a modification to the Software is an Update or an Upgrade.

### 3.6.  Consultation Services

RLM shall make available to Customer the Consulting Services of qualified RLM representatives if the Customer requests a change in the functionality of the Software. RLM agrees to provide these services between 9:00 A.M. and 5:00 P.M. Eastern Standard Time, Monday through Friday, excepting Massachusetts or Federal holidays. Such consultation and support services shall be billed in accordance with the hourly rates shown in Appendix A of this Agreement. The Customer shall also reimburse RLM for its reasonable out-of-pocket expenses for travel, meals and lodging, and all reasonable dial-in phone charges incurred in connection with any work requested and performed. RLM shall provide Customer monthly invoices itemizing services performed, the name of the staff member or members performing such services, the amount of time expended, and expenses. RLM will provide Customer, upon written request, a detailed accounting of time spent on the Customer's behalf.

### 3.7.  Eligibility for Service

Maintenance eligibility is contingent upon proper use of the Software by Customer. If services are requested and performed to remedy a malfunction which is due to the following conditions, such services shall be deemed to be Support Services:

1) Software has been modified by Customer; or
2) Customer deviates from the Software operating procedures established by RLM in the Documentation.

### 3.8.  Responsibilities of Customer

Customer shall provide RLM with access to Customer personnel and equipment during normal business hours for the purpose of performing services under this Agreement. This access shall include the ability to dial-in to the LAN at the highest privilege level. Such dial-in shall be at least 14,400 baud. Customer shall maintain a current backup copy of all Software and data.

### 3.9.   Travel Expense

Customer shall reimburse RLM for reasonable travel expense for those services for which such reimbursement is provided herein.  Such expenses may include but are not limited to:  meals, private hotel or motel room, taxi or carfare, and tips.  RLM will invoice Customer for such expenses as occurred, and Customer agrees to pay such invoices within thirty (30) days of receipt thereof.  The Customer will provide coach airfare if it is required.

## 4.    PROTECTION OF RLM INTELLECTUAL PROPERTY

### 4.1.   Confidentiality

All materials, documents and other information provided by RLM to Customer pursuant to this Agreement shall remain strictly confidential, shall be used only by Customer's agents or employees, and shall not be disclosed to any third party whomsoever without the written consent of RLM.

The obligations of Customer and RLM under this section shall survive the termination, discontinuance or abandonment of this Agreement for any reason whatsoever.

### 4.2.   Trade Secret Protection

Customer acknowledges that the Software contains valuable trade secrets and proprietary forms of expression.  Customer covenants to respect the confidential and trade secret nature of that Software by restricting use and access as described herein.  Customer covenants not to reverse engineer or otherwise recreate the form of expression or underlying ideas, (collectively, "Recreate") contained in any portion of the Software.  Customer covenants not to suffer or permit others to Recreate the Software.  No title to or ownership of the Software or any parts thereof shall be transferred to the Customer.

## 5.    TERM AND TERMINATION

### 5.1.   Term of License

The term of the Software License portion of this Agreement shall commence upon the signing hereof, and shall continue in perpetuity unless either party exercises its rights of termination set forth herein.

## 5.2.    Termination by RLM

RLM shall have the right to terminate this Agreement if Customer:

A.  Fails to pay any License, Maintenance or other Service Fees due hereunder and such failure continues for thirty days after written notice of default provided by RLM to Customer;

B.  Uses the Software for air safety, air traffic control, or FAA compliance purposes;

C.  Assigns this Agreement or any of its rights hereunder (except in connection with a sale of substantially all of the assets of the Customer or a transfer to an affiliated corporation);

D.  Neglects or fails to perform or observe any of its existing or future obligations to RLM under this Agreement;

E.  Makes an assignment for the benefit of creditors, or a receiver, trustee in bankruptcy or similar officer is appointed to take charge of all or part of its property; and/or

F.   Is adjudged as bankrupt;

and any of the above condition(s) is not remedied within thirty (30) days after written notice thereof has been given to Customer.

In the event of cancellation and/or termination as set in this Section 5.2, Customer shall pay RLM for the Services rendered by RLM's employees as of the effective date of cancellation and/or termination based on the then prevailing hourly billing rates for such RLM employees.  Customer shall also reimburse RLM for its out-of-pocket expenses, such as supplies and travel.  All material, including, but not limited to Software, delivered to Customer (and all copies thereof) shall be returned forthwith to RLM.  Any Software licenses granted shall terminate, and the rights, obligations and liabilities of each party shall cease.  Customer agrees, upon notice of such termination, to immediately return all copies of the Software, and Documentation provided hereunder to RLM.  If Customer refuses to so return the same, RLM shall have the right to pursue all legal and equitable remedies available, including but not limited to repossession of the software electronically.  Customer's intentional interference with RLM's ability to exercise its rights hereunder shall subject Customer to such costs as may be incurred in RLM's enforcement of such rights, including but not limited to, reasonable attorneys, fees and court costs.

### 5.3.   Termination by Customer

Customer shall have the right to terminate this Agreement:

A.  in accordance with Section 2.4 hereof, in which case Customer shall have no further payment obligations hereunder and any portion of the license fee previously paid to RLM shall promptly be returned without interest; and

B.  if during the original twenty four (24) month term of the maintenance provisions of Article 3 of this Agreement RLM loses its right to provide the data feed for which the Software was designed, Customer may terminate this Agreement and RLM shall refund to Customer a portion of the original license fee for the Software, such portion to be calculated by multiplying the license fee times a fraction, the numerator of which is the number of months remaining in the original twenty four (24) month term of the maintenance provisions of Article 3, and the denominator of which is twenty four (24).

C.  Customer may terminate this Agreement at any time upon thirty (30) days prior written notice to RLM, and provided that Customer is not otherwise in default and all license fees have been paid, Customer shall be entitled to retain the Software and any copies thereof, subject to the terms and conditions of the license granted herein.

## 6.   GENERAL

### 6.1.   Waivers

No waiver of right, obligation, or default shall be implied, but must be in writing, signed by the party against whom the waiver is sought to be enforced. one or more waivers of any right, obligation, or default shall not be construed as a waiver of any subsequent right, obligation or default.

### 6.2.   Limitation of Liability

IN CONSIDERATION OF CUSTOMER'S ACCESS TO RLM'S SOFTWARE LICENSED HEREUNDER, CUSTOMER'S RIGHT TO RECOVER DAMAGES CAUSED BY RLM'S FAULT OR NEGLIGENCE SHALL BE LIMITED TO THE AMOUNT PAID BY CUSTOMER FOR THE PRODUCTS LICENSED OR PURCHASED PURSUANT TO THIS AGREEMENT. RLM WILL NOT BE LIABLE IN ANY EVENT FOR ANY DAMAGES RESULTING FROM MISUSE OF THE SOFTWARE, LOSS OF DATA, LOSS OF PROFITS, LOSS OF USE OF PRODUCTS OR FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGE UNLESS CAUSED BY RLM'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT. THIS LIMITATION OF RLM'S LIABILITY WILL APPLY REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT OR TORT, INCLUDING

NEGLIGENCE.   Any action against RLM must be brought within twenty-four (24) months after the cause of action arises.

### 6.3.   Non-Hiring of Employees

If Customer solicits for employment or hires any RLM employee engaged in fulfilling the terms of this Agreement without the prior written consent of RLM, both parties agree that damages would be difficult to ascertain.  Customer therefore agrees that the sum of                           shall be considered the liquidated damages for each violation.  This provision shall remain in effect for the term of this Agreement and for twenty-four (24) months thereafter.  Such prohibition shall not apply, however, in the event that RLM ceases to do business.

### 6.4.   Notices

Any notices required or permitted under this Agreement shall be in writing and delivered in person, by facsimile, overnight express, or by registered or certified mail, return receipt requested, with proper postage prepaid, and properly addressed as set forth below or as shall be hereafter changed by written notice.  Notice shall be effective upon delivery.  Facsimile notices shall also be delivered by U.S. mail postage prepaid, or another  means listed above, but shall still be effective upon facsimile transmission.

The parties hereto affirm that the persons below listed are duly authorized to receive and accept such notice:

FOR RLM:            Mary Flynn
                    RLM Software Inc.
                    214 Lincoln Street, Suite 112
                    Boston, MA  02134-1326
                    FAX:  (617) 782-7810

FOR CUSTOMER:  America West Airlines
                    400 E. Sky Harbor Blvd.
                    Phoenix, AX 85034
                    Attn: Leo Hollis
                    FAX: (602) 693-3978 4733

### 6.5.   Severability

if any provision of this Agreement is determined to be unenforceable or invalid, the remaining provisions of this Agreement shall not be affected thereby and shall remain in full force and effect.

### 6.6.   Force Majeure

RLM shall not be liable for any damages resulting from any delay in delivery or failure to give notice of delay which directly or indirectly results from the elements, acts of God,

11

delays in transportation, delays in delivery by RLM's vendors, or any other cause beyond reasonable control of RLM.

### 6.7.  Section Headings

Section headings used in this Agreement are for the purpose of categorizing the contents of the sections, are for reference only, and are not to be considered part of this Agreement.

### 6.8.  Governing Law

This Agreement shall be governed by the laws of The Commonwealth of Massachusetts both as to interpretation and performance.

### 6.9.  Press Releases

RLM shall have the right to include Customer's name in its published list of customers, without prior approval of Customer.

RLM reserves the right, without prior consent of Customer, to issue any comments or corrections to any press release not issued by RLM in which RLM is mentioned in conjunction with this Agreement or any Services performed pursuant hereto.

### 6.10.  Joint and Several Liability

In the event that Customer is composed of more than one legal entity, then in that event, such legal entities shall be jointly and severally liable to RLM for any and all obligations of the Customer under this Agreement whatsoever, the nature of such obligations to include, by example only and without limitation: payments, confidentiality, restrictive use, restrictive access operation and maintenance of the system provided by RLM.

### 6.11.  Assignment of Proceeds

RLM may  assign its rights hereunder, and may delegate its duties hereunder to any purchaser of substantially all of RLM's interest in the Software.

### 6.12.  Non-RLM Software

Customer shall have the right to install on the Server and the Workstations additional software which has not been licensed, sublicensed or distributed by RLM to Customer. RLM reserves the right however, to terminate its maintenance and support obligations for the Software if it reasonably believes that such software not acquired through RLM would adversely affect the operation of the Software.  In any event, RLM shall have no responsibility for maintenance or support of non-RLM software and shall not be responsible for any adverse effects on the Software caused by the use of non-RLM

software.  Such software shall be disabled prior to any acceptance testing of the Software by Customer.

### 6.13.  Entire Agreement

This Agreement is the result of negotiation of the parties and has been agreed to by both parties after careful and prolonged negotiation and discussion.  The provisions of this Agreement and its appendices, including such documents as may be incorporated by reference, supersede all prior agreements, oral or written, between the parties.  No change, termination or attempted waiver of any of the provisions hereof shall be binding unless in writing and signed by a duly authorized representative of the parties hereto.  In the event of a conflict between the terms of this Agreement, and the terms of any Purchase Order issued by Customer, the provisions of this Agreement shall control.

IN WITNESS WHEREOF, the undersigned parties have executed this Agreement, in duplicate copies, each of which shall constitute an original, as of the day and year first above written.

RLM SOFTWARE, INC.

Dated:                           By: _____

Mary E. Flynn

Vice President

America West Airlines, Inc.

Dated:                           By: _____

Title: _Vice President I.S._

13

# Appendix A

## A.1 Software

The Software provided under this agreement is RLM's FlightView Workstation. This product provides the following functionality:

- communication interface to the *FlightView®* datafeed,
- weather module which provides an interface with WSI Corporation, the weather vendor selected by Customer, and display software to integrate the display of composite radar images with flight information,
- server software which maintains current flight information,
- user-configurable display software which allows the user to set the following: flight information displayed, display width, display of background maps including: airway route structures, FAA air traffic control center boundaries, special use airspace, lat/lon grid, and airport locations.

## A.2 Pricing

All terms are net 30 days. The fees for the FlightView datafeed supplied by RLM are given in a separate agreement.

## License Fees

The license fee for the FlightView Software, for the Server and up to twelve Workstations is as follows:

     FlightView Software         REDACTED

     Weather Module

These fees are net 30 days, from date of installation of the Software.

The customer may increase the number of Workstations by eight, for a total of twenty for the following license fee per each additional Workstation:

     one-time

## Fees for Basic Maintenance Support    REDACTED

The monthly fee for system support is      due and payable the first of every month.

## Fees for Non Critical Support Services

Non Critical System Support Services when requested by the Customer are available for an hourly rate of     billable monthly.

REDACTED     14



# EXHIBIT / ATTACHMENT

## EX. 16

**(To be scanned in place of tab)**

U S WEST Interactive Services, Inc.
9000 East Nichols Avenue, Suite 100
Englewood, Colorado 80112



*MEDIA GROUP*

March 5, 1996


Ms Lorraine Flynn
President
RLM Software
214 Lincoln Street
Boston, MA  02134-1327

**Re:  Memorandum of Understanding:  FlyNow Service**

Dear Ms Flynn:

   This Memorandum of Understanding ("MOU") describes the current discussions between USWEST Interactive Services, Inc. ("Developer") and RLM Software ("Participant") concerning Participant's collaboration with and participation in Developer's proposed Interactive FlyNow Web Site ("Service"). The Service will enable consumers to obtain travel information, purchase travel related products and services, and conduct other travel related transactions using Developer's Web Site Server and Participant's data centers.

   1.    Participant and Developer  ( the "Parties") have entered into preliminary discussions about conducting two trials ("Trials") of the FlyNow Service which would incorporate Participant's FlightView data  for Developer's internet applications and provide flight arrival times in North America for the FlyNow project.  The first trial would be a "technical trial" ("Phase 1") and the second trial a commercial proof of concept "marketing trial" ("Phase 2").   Phase 1 is tentatively scheduled from April 30, 1996 through June 30, 1996 and Phase 2 is tentatively scheduled from June 30, 1996 through December 31, 1996.

   2.    It is the current intention of the Parties to enter into a formal Trial Agreement by the beginning of Phase 1.  However, in order to help ensure that the Trials can proceed as scheduled and to show the spirit of cooperation between the Parties, the Parties agree during the interim period needed to finalize the Trial Agreements ("Interim Period"), to immediately begin allocating the necessary resources to further design and implement the architecture which provides the functionality required by the FlyNow Service.  Participant will use all reasonable efforts to provide up-to-the minute flight status information based on FAA radar data; expertise regarding application and display format of FlightView data;  and ground transportation company information by the beginning of Phase 1.  Developer will use all reasonable efforts during this Interim Period to provide connectivity from its FlyNow Web Site to Participant's FlightView and North American flight status data.

   3.    The Parties currently contemplate that their Trial Agreement will provide that after six months of Phase 2, the Parties will evaluate the Service and determine if the Service is a viable product for commercial use. If FlyNow is mutually determined to be a viable service offering, the Parties will commence negotiations on the form and amount of compensation that each Party will receive and any other applicable terms necessary for the ongoing support of the Service.

**DEPOSITION EXHIBIT**

16

FLYNN 8-29-03

Ms Lorraine Flynn
Page Two
March 5, 1996

4.    Each Party acknowledges that this MOU and the data and information which will be exchanged during the Interim Period will contain Confidential Information of both Parties (as described in the Confidentiality Agreement by and between USWEST Interactive Services, Inc. and RLM Software dated February 7, 1996). Each Party acknowledges and agrees that Confidential Information disclosed to it pursuant to the terms of this MOU will be subject to the terms and conditions of the Confidentiality Agreement.

5.    Except as provided in Paragraph 4, (i) the Parties do not intend this MOU to be a binding and enforceable contract or an offer to enter into a binding and enforceable contract, nor do they intend it to be binding on any other person, nor to create any legal or equitable obligation or right; (ii) this MOU merely summarizes our present discussions to facilitate negotiations and, if final agreement is reached, to aggressively prepare and negotiate a definitive Trial Agreement, and (iii) we intend legal rights and obligations to arise only if appropriate written documentation is executed in the future.

If this MOU fairly and accurately reflects our understanding, please sign each of the duplicate originals below and return one fully executed copy of this MOU to me.

Sincerely,

USWEST Interactive Services, Inc.
9000 E Nichols, Suite 100
Englewood, Colorado  80112

By: _____
     Antoine Toffa
     Director

                              Accepted and agreed to as of this ____ day of March,
                              1996

                              RLM Software

                              By: _____
                                   Lorraine Flynn
                                   President



# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**

Fax Transmittal Memo

To        MARY FLYNN
Company
Location
Fax        (617) 787-2570
Telephone

## MEMORANDUM

To:        Mary Flynn @ RLM Software
From:      Antoine Totta @ TheTrip.com
cc:        Maya Iyengar, Terry Niner, Brian Thomson @ TheTrip.com
Date:      December 2, 1996
Re:        Requirements for Graphical Version of Flight Status

Mary, following are the high-level requirements we agreed upon in our phone
conversation last Friday:

(1) Graphical view of a <u>selected plane</u>



■  Selected plane can be any commercial aviation aircraft
■  Selected plane can be called only through a flight number query (airline
   code + flight number)
■  Plane must be "clickable"
■  After clicking on the plane, all information already available in the current general
   public version should be displayed on the screen (airline, aircraft type, speed,
   altitude, location, etc.)

(2) Graphical view of a <u>random plane</u>

■  Random plane can be any commercial aviation aircraft
■  Plane must be "clickable"
■  After clicking on the plane, all information already available in the current general
   public version should be displayed on the screen (airline, aircraft type, speed,
   altitude, location, etc.)

(3) Graphical view of <u>all planes leaving or arriving in a given airport</u>

■  Airport can be any major airport in the U.S. (top 120)
■  Time window must be short (10 minutes?) and/or number of planes
   simultaneously displayed must be limited (10 planes?)
■  Planes must be "clickable"
■  After clicking on any given plane, only limited information about the plane can be
   displayed (airline code and aircraft type only) to avoid cannibalization of the
   professional product.

Please don't hesitate to leave me voicemail at 303-790-9197. I will be talking to
you at 5pm your time. Thanks.



DEPOSITION
EXHIBIT
19
FLYNN  8-29-03





# EXHIBIT / ATTACHMENT

# EX. 20

**(To be scanned in place of tab)**



# *FlightView®*
# *Workstation*



# User's Guide

Version 1.05
©1997. All rights reserved



DEPOSITION
EXHIBIT
20

FLYNN  8-29-03

RLM 00059



**RLM**
SOFTWARE

# *FlightView®*
# *Workstation*



# User's Guide

Version 1.05
©1997. All rights reserved

RLM 00060

*Copyright:* © 1997 RLM Software. All rights reserved.
RLM Software Inc., 214 Lincoln St. Ste. 213,
Boston, MA 02134-1346

*Trademark: FlightView®* is a registered trademark of RLM Software. The RLM Software logo is a trademark of RLM Software. Other brands or products mentioned in this publication are the trademarks or registered trademarks of their respective holders and should be treated as such.

*Copy and use restriction: FlightView* is protected by the copyright laws that pertain to computer software. It is illegal to make copies of the *FlightView* software and data except for backups. It is illegal to make available for copying or to give copies to another person, corporation, or enterprise, or to duplicate the *FlightView* software and data by any other means, including electronic transmission. The *FlightView* software contains trade secrets and in order to protect them you may not decompile, reverse engineer, disassemble, or otherwise reduce the software to human-perceivable form. You may not modify, adapt, translate, rent, lease, loan, resell, distribute, network or create derivative works based upon the *FlightView* software or any part thereof.



RLM 00061

**Section 1: Introduction** ................................................................ 1
   Overview ...................................................................................... 1
   Background .................................................................................. 1

***Section 2: Getting Started*** ...................................................... 3
   *FlightView Workstation* Interface .................................................. 3
   Monitoring Aircraft with *FlightView*: A Quickstart ........................... 4
   Starting *FlightView* ........................................................................ 4
   Zooming to Your Selected Airport .................................................. 4
   Viewing Selected Flights with Flight Information ............................. 5
   Clearing Aircraft Information from the *FlightView* Screen: .............. 7
   Viewing a List of Incoming Flights ................................................. 8

**Section 3: Working with *FlightView* Menus** ........................... 10
   File Menu .................................................................................... 10
   View Menu ................................................................................... 10
   Flights Menu ............................................................................... 11
   Zoom Menu ................................................................................. 14
   Airports Menu .............................................................................. 14
   Overlays Menu ............................................................................ 15
   Weather Menu ............................................................................. 15
   Command Menu ........................................................................... 16

**Section 4: *FlightView* Commands** .......................................... 17
   Command Menu ........................................................................... 17
   Command Input Line .................................................................... 17
   Editing the Command Line ............................................................ 17
   Command Format ........................................................................ 18
   Command Format Keywords ......................................................... 18
   Commands ................................................................................... 21
      AIRPORT ................................................................................ 21
      ARTCC .................................................................................... 22
      BACKGROUND COLOR (BGCOLOR) ..................................... 23
      BATCH (BAT) .......................................................................... 24
      FILTER CREATE (FIL CRE) .................................................... 25
      FILTER DELETE (FIL DEL) ..................................................... 28
      FIND ........................................................................................ 29
      FLIGHTS .................................................................................. 30
      GRID ....................................................................................... 31
      ROUTE .................................................................................... 32
      RADAR (RAD) ......................................................................... 33
      RANGERINGS (RR) ................................................................ 34
      STATUS ................................................................................... 35
      SUAS ....................................................................................... 36



WORLD ................................................................................37
ZOOM ................................................................................38
**Appendix A:  Air Traffic Control Center Identifiers ..........................39**
**Appendix B:  *FlightView* Display Colors ...................................40**
**INDEX .................................................................................41**

RLM SOFTWARE

RLM 00064

## Section 1: Introduction

### Overview

*FlightView®* is an advanced flight following system that provides accurate, minute by minute flight information.  Its interactive display allows you to track aircraft position, speed, and estimated arrival times. This guide describes the features of the *FlightView Workstation®* and explains how to use its menus and commands.   For information on installing and configuring the *FlightView* server and displays, see the *FlightView Workstation* Administrator's Guide.

*FlightView Workstation* runs on a personal computer with Microsoft Windows 95® or Windows NT® operating system.  Operating under Windows 95, you will see a slightly different interface than with Windows NT.  For simplicity this manual shows the Windows NT interface.



### Background

*FlightView*, developed by RLM Software, uses a commercial version of the Federal Aviation Administration (FAA) air traffic data to generate a database of accurate, up to the minute flight information of U.S. air traffic. This includes all commercial and general aviation instrument flight rule (IFR) air traffic, but does not include military.  A *FlightView* data feed of information extracted from this database is transmitted from



our *FlightView* facility over a dedicated high-speed or dial-up telephone line, or satellite link to the *FlightView* server at the customer site. The *FlightView* server receives the information and sends the data to each *FlightView Workstation* running on the network. With this information *FlightView Workstation* displays the latest air traffic data as you request it.

Using *FlightView*'s  interface you are able to:

♦ view air traffic for flights approaching and within the continental United States;

♦ zoom to any location at any scale;

♦ activate background display maps including airway route structures, FAA air traffic control center boundaries, special use airspace, latitude/longitude grid, and airport locations;

♦ highlight selected flights based on airline code, aircraft identifier, origin or destination airport.

♦ tag particular flights with data blocks showing their aircraft type, origin, destination, speed, altitude and estimated time of arrival.

RLM 00066





## *Section 2: Getting Started*

### *FlightView Workstation* **Interface**

At startup, *FlightView* displays the map of the United States. Within a minute or two it connects to the *FlightView* server and displays the current United States air traffic, with each flight represented as a dot.

*FlightView* commands are input via the main menu or the command input dialog. The left mouse button is used to make selections from the *FlightView* menu. Clicking the left mouse button on a field in the main menu, for example **View**, causes its drop-down menu to appear. A selection can be made from that menu by clicking the left mouse button on the appropriate field. In this manual 'select a field' implies that you click the left mouse button on that field.

The left mouse button can also be used to individually select flights on the map for highlighting. With the cursor over a flight indicated by a dot, click the left mouse button. *FlightView* displays information about that flight including their flight path.

*FlightView* commands may be entered three different ways, (1) menus, (2) command lines, and (3) batch files - files that contain multiple commands. Each method allows you to access *FlightView*'s features in an easy and direct way. The menus are described in Section 3: Working with *FlightView* Menus. The format of each command,


**R L M**
SOFTWARE

3

including the batch command, is provided in Section 4: *FlightView Commands*. The rest of this section provides a Quickstart guide to *FlightView* with instructions:

- to zoom to a selected airport,
- to view selected information about selected aircraft,
- to view sorted lists of incoming flights.

## Monitoring Aircraft with *FlightView*: A Quickstart

Assume for this example that you are interested in monitoring flights at Boston's Logan International Airport.

### Starting *FlightView*

If *FlightView Workstation* is not already running, bring it up by double clicking the *FlightView Workstation* icon or by running it from your Windows Program Manager. Its path name is normally:

### f:\FV\Ops\Exe\FV.exe

where f is the disk where *FlightView* has been installed. See your system administrator or the *FlightView Workstation* Administrator's Guide for more information on *FlightView* installations.

You will see an image of the continental United States and within minutes flight data will be available and shown on the screen as dots identifying flight locations.

### Zooming to Your Selected Airport

Once you are setup, you may want to focus on the flight activity approaching your city, in our example Boston. To do so:

- From the main menu, click on **Zoom**.

- Click on the **Location** choice on the drop-down menu. A "Zoom to Location" Dialog Box appears.

- In the "Center Location" field, type in the abbreviated FAA identifier for the airport, in this case, BOS. Now move to the next field,

RLM 00068

4



"Display width in miles" by pressing the <tab> key or clicking the left mouse button in the field.



- In the " Display Width in Miles" field, type in the selected number of nautical miles for zooming. The resulting image will show Boston centered in the viewing area for the number of miles selected. For instance, a zoom level of 400 miles will center Boston in an area extending 200 miles to New York to the south, to Albany to the west and to central Maine to the north.

- Press the <enter> key or click the "OK" button to zoom.

## Viewing Selected Flights with Flight Information

After zooming to Boston, click on the **Flights** menu.  Using this menu you can show information on all flights approaching and departing Boston (or your city).

1. From the **Flights** drop-down menu click on **Create a Filter**.  A "Create a Filter" dialog box appears.



**R L M**
SOFTWARE

5

2. At the "Departure Airport" field you can type in an airport (or click on the arrow to select from an airport list) to identify aircraft having departed from a specific airport and which are flying directly to Boston. In our sample, no entry is necessary since we don't want to restrict flights to any particular departure airport.

3. At the "Arrival Airport" field, type in BOS - the airport abbreviation.

4. At the "Airline" field, type in the specific airline of the aircraft you wish to identify with information. In our example we will leave this



field blank in order to see flights for all airlines.

5. At the "Color" field, select "Red".

6. At the "Data Block" field, select "Short" from the four choices:
   - "Long" provides all of the above information on all flights plus flight speed and altitude.
   - "Medium" - shows airline, flight number, departure and arrival airports and minutes to arrival,
   - "Short" - shows airline and flight number,
   - "None" - no information shown,

7. At the "Route" field, select "Off" for no flight path.

8. Click the "Create" button - this creates the filter for all Boston arrivals.

RLM 00070


**RLM**
SOFTWARE

9. Now create a filter for Boston departures by changing the "Departure Airport" to BOS.

10. Clear the "Arrival Airport" by clicking the field - this highlights the previous BOS entry - and pressing the <delete> key.

11. Change "Color" to green.

12. Click the "Create" button - this creates the filter for all Boston departures.

13. Click "Close" to enable the filters and return to the *FlightView* screen.



## Clearing Aircraft Information from the *FlightView* Screen:

Clearing information about selected aircraft is done by deleting the "filter" that was initiated to show the information in the first place. From the **Flights** drop-down menu, click on **Delete a Filter**. This displays a list of all filters that have been created. From there, select the filter that you want to delete by clicking on it, then click on "Delete".

For our Boston example, if you select **Flights**, then **Delete a Filter**, a dialog box with the following filters will appear:

from=bos,kbos db=short color=green



**R·L·M**
SOFTWARE

7

to=bos, kbos db=short color=red

To delete aircraft information, select each line by clicking on it, then click on "Delete", click the "Close" button to return from the screen.

## Viewing a List of Incoming Flights

To see a list of all flights that will be arriving in Boston, select **Flights** and then **List**. A list box is displayed showing all active flights. For each flight the following information is displayed:

- *flight number* - The FAA three letter airline code followed by the flight number. When the list first appears, it is sorted by flight number, and therefore it is also sorted by airline since the first three characters refer to the airline.

- *departure airport* - The departure airport for the leg of the flight to



the arrival airport, not necessarily the airport where the flight originated.

- *arrival airport* - Note that the "K" prefix to airport indicates reference to an international flight.

- *departure time,* before take-off, this is the filed flight plan departure time, after take-off this is actual departure time.

- *arrival time* as estimated by *FlightView,*

- *status* (proposed, active, landed)

RLM 00072

8



When the list first appears, it contains only active flights.  To see proposed or landed flights, click on the side **STATUS** button and click on or off any of the choices: Proposed, Active, or Landed.   If you select all three the list response may be slow since there can be up to 8,000 flights in the list.

You can narrow the list of flights by limiting it to selected arrival airports or airlines.  For our example, we will limit it to Boston arrivals.  Click the side button "Arrival Apt".  It pops up a scrolling list selection box where you can click on one or several airports.  Select only BOS. The list now contains only Boston arrivals.  Click the "Close" button to return from the list screen.

If, after you have set up detailed information on flights (either on-screen or on a listing described below), you want to start fresh, the quickest way is to reset *FlightView*, deleting all entries such as zooming or flight highlighting.  Simply click on **View** menu and **Reset**. This re-establishes a screen image of the continental U.S. with dots representing all flights airborne - the startup screen.

RLM
SOFTWARE

RLM 00073

## Section 3:  Working with *FlightView* Menus

The last chapter introduced *FlightView* and its menus, providing a "Quick Start" tutorial.  This chapter is a reference and a comprehensive guide to the *FlightView* menus.

### File Menu

The first menu, **File**, contains only one selection - **Exit**.  Use this option for the obvious - when you wish to quit *FlightView Workstation*.

### View Menu

The **View** menu contains three options - **Reset, Status,** and **Status Bar**.

**Reset** returns the *FlightView* screen to the startup screen showing the map of the U.S. and current air traffic.

**Status** displays a message box showing how current the flight data is.  The message box contains five fields of information,

- Current Time,
- Number of Flights - the number of flights currently airborne. Typically, there are 4,000 to 6,000 flights during the daytime.
- "Last Flight Update Time" - the time the flight positions were calculated and the file was made.
- "Last Flight Update Received Time" - the time your computer received the most recent file from the *FlightView* server.
- "Last Radar Time" - the time stamp taken from the last radar file received from the weather server.

RLM 00074





**Status Bar** is selected to toggle the display of the bottom status bar to on or off.  This bar shows the prompt for the current menu selection,  the time of the latest flight file and time of the latest weather file.

## Flights Menu

The **Flights** menu allows you to customize the display of flights relevant to your operations.  When you select **Flights**, the drop-down menu shows four options: **All**, **Create a Filter**, **Delete a Filter**,  and **List**.

**All** is a toggle switch. If the airborne flights *are shown*, either on the U.S. map or on the zoom area that you have chosen, clicking on **All** removes them from the screen. If they are not shown, clicking on **All** will show them on the screen. When you are zoomed to an area less than 400 miles in width, each flight is displayed as an icon of an aircraft. Beyond 400 miles each flight is displayed as a dot. This view of the flights is separate from and not affected by any aircraft you may request be shown using the **Filter** menu.

**Create a Filter** shows a dialog box where you enter criteria for specially displaying flights and their information on the screen.  At each field you type in your entry or select from the field's scrolling



list.  Click on the down arrow to see the drop-down scrolling list. For an airport or airline, enter the FAA identifier or leave the field blank for no restrictions

Enter the "Departure Airport" when you want to limit the aircraft shown to those from a specific airport.  Note that the "Departure Airport" will be the origin of the flight *on the leg of the flight to the arrival airport*.  For example, Flight 1 originating at Los Angeles (LAX) with a stopover at Newark (EWR) before flying to your arrival airport of Boston (BOS) is tracked from Newark to Boston for a Boston arrivals filter.    To track the entire flight, create a filter by flight number.

Enter the "Flight Number" which is the three letter FAA code for the. airline, followed by the flight number, for example AWE821 for America West Airlines Flight 821.

Enter an "Airline" to restrict the selection to only that particular airline.

If you don't enter a "Color", *FlightView* picks a color for you, cycling through a list of colors as each filter is created.

Select a "Datablock" type to specify the amount of information you wish to have shown for each flight, as follows:

> *None* results in the selected aircraft being shown on the screen in a unique color, but with no flight information.

> *Short* results in the selected aircraft being identified by airline abbreviation and flight number.

> *Medium* ( the default selection) results in the selected aircraft being identified by "*Short*" information plus departure and arrival airports and minutes to arrival.

> *Long* results in the selected aircraft being identified by "*Medium*" information plus flight speed (in knots) and altitude in hundreds of feet, e.g. 370 means 37 thousand feet.

**Delete a Filter** allows you to delete filters individually.  When you click on **Delete a Filter** from the **Flights** menu, a list of all filters

RLM 00076

12



appears. Each line lists a filter. Select the one you want to delete by clicking on it. When you select a line, it is highlighted. If you click it again, it becomes de-selected and is no longer highlighted. Select all the filters that you want to delete and then click on delete. Click "done" when you have finished deleting filters.

**List** allows you to view all flights filtered and sorted to your requirements. When you select **List** from the **Flights** menu, a list of all the active flights occur. To sort the list, click on the button at the top of the column to sort according to that column. To narrow this list to specific flights use the filter buttons on the right.

### Sort Buttons
- *Flight Number* - Since the flight number is the airline three character identifier plus the flight number, it sorts according to airlines, then flight number.

- *Departure Airport*

- *Departure Time*

- *Arrival Airport:* Flights are grouped by arrival airport and within this grouping alphabetically by airline.

- *Arrival Time*

- *Flight Status* - Flights are grouped by Active, Landed, and proposed. Within each grouping they are grouped and listed alphabetically by airline.

### Select Filter Buttons
The right side of the list box contains three buttons for "Select Filter". These buttons allow you to narrow your list by airport, airline or status. When you click one of these buttons, the scrolling list for that category appears.

- *Arrival Apt* - select one or more airports to limit the list to only these selected airports.

- *Status* - When the flight list is initially shown, it contains only Active (airborne) flights, The status list allows you can add Proposed (airline has filed a flight plan with the FAA) or Landed (recently landed within the last 30


**R L M**
SOFTWARE

13

minutes or as set by your administrator).  Select any combination of these categories.  If you select all three categories and do not narrow the list by other airport or airlines, the list is typically over 8,000 flights and could slow the response time for updating and changing the list.

- *Airline* - select only those airlines whose flights you want listed.

If you limit the list to certain airlines, airports, or status, *FlightView* "remembers" those limits.  The list stays limited to them each time you select **List**.  To turn off the filtering, de-select each line that is highlighted in the Arrival Airport, Airline, or Status scrolling list.

## Zoom Menu

The **Zoom** menu allows two options - **Location** to zoom to a designated airport, and **USA** to return to the continental U.S. map.

- **Location** option to zoom to a designated airport.  When selected, it pops up a "Zoom to Location" dialog box.  Type in both the "Center Location" field with the FAA location identifier for the airport.  In the "Display Width in Miles" field, type in the selected number of nautical miles for the zoom area.  The maximum zoom level is 35,000 miles and the minimum zoom is 10 nautical miles.  Note that a zoom of 400 or less converts the dots to aircraft icons.

- **USA** option reverts from zoom to show the total continental United States.

To zoom to a Latitude/Longitude instead of an airport, see the **Zoom** command in the Section 4: *FlightView* Commands.

## Airports Menu

The **Airports** menu allows you to tag airport locations.
**All** - displays all airports in the U.S. with minimum paved runway of 6,000 feet.  Although this display is too crowded at the U.S. map level, it is a convenient way to quickly put up airport names at a zoomed in level.



**Selected Airports** - brings up the "Select Airports" dialog box. You can individually enter airport identifiers to turn display on or off. You may enter more than one airport at a time, separating them by a space.

## Overlays Menu

From the **Overlays** menu you can select one of the following commands.

**Boundary**          toggles the geographical map of the world on and off.

**Grid**              toggles the latitude/longitude grid lines on and off. Grid lines are set at 10 degrees of latitude or longitude for scale of 1,000 nautical miles(nm) or more. For less than 1,000 nm grid lines are every 5 degrees, and for less than 500 nm, every 1 degree.

**ARTCCs**            toggles the Air Route Traffic Control Centers on and off.

**SUAs**              toggles on and off all Special Use Airspace that are restricted flying areas.

**Jet Routes**        toggles all jet routes on and off.

**Selected Jet Routes**      allows you to set individual jet routes on and off.

**Victor Routes**     toggles victor routes on and off.

**Selected Victor Routes**    allows you to set individual victor routes on and off.

**Range Rings**       pops up a dialog box for you to enter an airport, number of rings, and distance between rings in nautical miles.

## Weather Menu

If you have added the Weather Package to your *FlightView* Server, then the **Weather** menu can be selected on your *FlightView* Workstation . The **Weather** menu has one selection, Radar. Selecting Radar toggles on and off the display of radar weather over the map.



15

## Command Menu

The **Command** menu brings up the command dialog box. This allows you to type in a *FlightView* command line. The use of the command line provides the user with the most complete control of the information to be displayed by *FlightView*. Commands are explained in detail in Section 4.



RLM 00080

16



## Section 4: *FlightView* Commands

### Command Menu

To enter a command, select **Command** from the main menu then the submenu **Enter**. This brings up the command input dialog box.

### Command Input Line

In the input line area underneath the "Enter Command" prompt, type the command you wish to be executed. For example, you could type a command to highlight all flights arriving at Boston Logan Airport:

**filter create to=bos**

When you are finished typing a command, press the keyboard <enter> key or click the dialog box "enter" button. First enter each command you want to execute. Then click the close button to execute all the commands you have entered. You may enter multiple commands separated by a semicolon.

### Editing the Command Line

The command input dialog box keeps a history of the commands that have been entered in the lower section of the dialog box. Any of these command lines may be copied into input area to be executed again. By clicking a previous command line, it is re-entered into the command window. You can then edit the command and enter the command.

RLM 00081


**R L M**
SOFTWARE

17

## Command Format

To introduce you to *FlightView* commands, some typical commands will
be shown.  To highlight all flights arriving at Phoenix Sky Harbor
International Airport (PHX), type in the following command:

**filter create to=phx color=red db=none**

zoom to within an 800 mile radius:

**zoom phx 800**

set up 3 range rings 25 miles apart,

**rr phx 3 35**

show airport names

**airport * on**



## Command Format Keywords

Each command is made up of the command name followed by the
parameters for the command .  Some commands require one or more
parameters which are indicated by keywords.  While this section lists the
keywords, the next section describes each *FlightView* command using
the keywords.  Refer to these keywords when looking at a particular
command format.

RLM 00082



| Keyword | Description |
| --- | --- |
| * | wildcard - denotes all of the possible items, e.g. all airports |
| . | dot - denotes the current cursor location |
| **action** | display actions are as follows:<br>**on** activate displaying the item<br>**off** deactivate displaying the item<br>**toggle** if item displayed, turn it off, else turn it on |
| **ac-type** | aircraft type - This is the FAA aircraft type identifier, e.g. B737 (Boeing 737) |
| **airline-id** | three letter FAA airline code, e.g. GAE (Grand Aire Express) |
| **ac-id** | aircraft identification for a flight, consisting of the airline-id and a one to four digit flight number, e.g. AWE517 (America West Airlines Flight 517) |
| **airport-name** | three or four letter FAA identifier for airports, e.g. BWI (Baltimore/Washington International Airport). Airport names should include the three letter US code and the four letter international code (prefix = K) to pick up flights that have filed international flight plans |
| **artcc-name** | three letter FAA identifier for Air Route Traffic Control Centers, e.g. ZBW (Boston ARTCC). These are listed in Appendix A |
| **color** | name of a color, e.g. YELLOW. Appendix B lists the colors recognized by *FlightView* |
| **db-type** | type of data block to be displayed with highlighted flights. *FlightView* recognizes the following data block types:<br>**NONE** no data block<br>**SHORT** display aircraft identifier<br>**MEDIUM** SHORT plus display departure and destination airports<br>**LONG** MEDIUM plus display current ground speed, altitude, and departure and arrival time |
| **dist** | the distance between range rings, in nautical miles |
| **file-name** | the name of a batch command file in the *FlightView* batch file directory. The file name is case-insensitive, i.e. TOBOS is the same as tobos and Tobos |
| **location** | the three, four or five letter FAA identifier for locations, including airports and navigational aids, e.g. ASHES |
| **num-rings** | the number of range rings |

RLM 00083



| | |
|---|---|
| **route-name** | the name of an airway, e.g. J575 for jet route 575, or V45 for victor route 45 |
| **route-type** | the type of an airway, *FlightView* recognizes the following airway types: |

| | |
|---|---|
| **HIGHCONUS** | jet routes |
| **LOWCONUS** | victor routes |
| **HAWAII** | Hawaiian routes |
| **PUERTORICO** | Puerto Rican routes |
| **ALASKAHIGH** | Alaskan jet routes |
| **ALASKALOW** | Alaskan victor routes |
| **OCEANIC** | Oceanic routes |
| **BAHAMA** | Bahaman routes |

| | |
|---|---|
| **scale** | the width of the display, in nautical miles |
| **sua-type** | the type of a special use airspace area, *FlightView* recognizes the following types of special use airspace: ALERT, MOA, PROHIBITED, RESTRICTED, WARNING |

RLM 00084

**R L M**
SOFTWARE

## Commands

## AIRPORT

This command allows the user to control the labeling of selected or all airports.

Format:      airport 'airport-name' 'action'

Example

airport bos on              Draw a label at Boston Logan (BOS)

airport dtw toggle          Toggle Detroit Metro (DTW) on or off.

airport * off               Turn off all airport labels

RLM 00085

**R L M**
SOFTWARE

## ARTCC

This command allows the user to control the drawing of selected, or all, FAA Air Route Traffic Control Center boundaries

<u>Format</u>          **artcc 'artcc-name' 'action'**

<u>Example</u>

**artcc  zma  on**          Draw the boundaries for the Miami Air Route Traffic Control Center

**artcc  *  on**          Draw the boundaries for all air traffic control centers

RLM 00086

**R L M**
SOFTWARE

## BACKGROUND COLOR (BGCOLOR)

This command allows the user to change the color of the background of
the display.   Appendix B lists the colors recognized by *FlightView*.

<u>Format</u>        **bgcolor 'color'**

<u>Example</u>

**bgcolor  black**        Draw the background as black

RLM 00087



## BATCH (BAT)

The BATCH command invokes a batch file that contains a list of commands to be executed. This allows you to customize the *FlightView* interface with a single command. A batch file is simply a text file listing one command per line. You can also use the BATCH command within a batch file to call another batch file.

To create a batch file, use any text editor or a word processor saving the file in text format. The file must be added to the *FlightView* batch command directory. See your systems administrator or the *FlightView* Administrator's Guide for instructions.

Any command entered in the command input dialog box that is not recognized by *FlightView* is assumed to be the name of a batch command file. *FlightView* attempts to execute a batch command file by that name.

<u>Format</u>       **batch 'file-name'**
               **'file-name'**

<u>Example</u>

**batch todtw**       Execute the file of *FlightView* commands named
                   TODTW that has the following commands:
                   **reset**
                   **fil cre to=dtw,kdtw color=green db=none**
                   **airport dtw on**
                   **rr dtw 3 25**

RLM 00088



## FILTER CREATE (FIL CRE)

This command allows the user to specify flights to be highlighted, and to specify how to highlight the selected flights.

Format

**filter create 'filter-def' 'display-spec'**

<u>filter-def</u> – the filter definition specifies the criteria for *FlightView* to use in order to select a flight for highlighting. Multiple criteria may be specified in a single filter and each criterion may allow multiple values. If you specify more than one criterion, the flight must satisfy all criterion to be selected. For example, if you specified:

**filter create from=lax to=bos**

This selects only flights departing Los Angeles *and* arriving in Boston.

However, the values for each of the criteria are "or'd". For example, if you specified:

**filter create from=lax, sfo to=bos**

This highlights all flights departing Los Angeles or San Francisco and arriving in Boston, that is, LAX to BOS and SFO to BOS flights.

RLM 00089

 **R L M**
SOFTWARE

The following is a list of the available criteria for a filter command.

airline code:
> **al='airline-id','airline-id',...**

aircraft identification:
> **acid='aircraft-id','aircraft-id',...**

departure airport:
> **from='airport-name','airport-name',...**
> **departure='airport-name', ...**

destination airport:
> **to='airport-name','airport-name',...**
> **destination='airport-name',...**
> **arrival='airport-name',...**

aircraft type
> **type='aircraft-type','aircraft-type',...**

## display-spec - display specification format

The user may specify how any flight matching a filter's criteria is displayed. This includes the color and the extent of the data block. The definition of the display specification is:

> **COLOR='color'**
> **DB='db-type'**

## Example

To highlight all Northwest flights, letting *Flight\View* choose the color, and defaulting to display of a long data block:

**filter create al=nwa**

To highlight all domestic NorthWest flights arriving at Toledo OR Detroit OR Cleveland:

**filter create al=nwa to=tol,dtw,cle**

RLM 00090



To highlight all international and domestic flights arriving at Toledo OR Detroit OR Cleveland, and have them displayed in yellow with only the flight identifier in the data block:

**filter create to=tol,dtw,kdtw,cle  color=yellow db=short**

To highlight all Boeing 737's arriving at Kennedy OR Newark AND departing from O'Hare OR Denver, displaying these flights in green and with a complete data block:

**filter create type=b737 to=jfk,ewr from=ord,den
        color=green db=long**

RLM 00091



## FILTER DELETE (FIL DEL)

This command deletes a filter previously created.  Any flights which have been highlighted based on the criteria of this filter are no longer highlighted.

<u>Format</u>        **delete 'filter-def'**

where filter-def *exactly matches* the filter definition used in filter create. The previous section - **FILTER CREATE** specifies the filter definitions.

<u>Example</u>

To stop highlighting all Northwest flights:
       **filter delete al=nwa**

RLM 00092



## FIND

This command allows the user to find a specified flight, using the flight identifier, and have that flight highlighted with a LONG data block.

<u>Format</u>       **find 'aircraft-id'**

<u>Example</u>
To highlight SouthWest Air flight number 305, and display a long data block with the flight:

**find swa305**



## FLIGHTS

This command allows the user to turn on or off the display of all flights being tracked by *FlightView*. This does not effect any flights which are being displayed because they satisfied user criteria for highlighting. Turning background flights off is useful if the display is too cluttered while viewing highlighted flights.

Each flight is displayed as a dot at its current location. At appropriate zoomed-in levels the flights are displayed as 'aircraft icons' whose shape and orientation correspond to the heading of the flight.

<u>Format</u>        **flights 'action'**

<u>Example</u>

**flights off**        Do not draw all the flights.

**R L M**
SOFTWARE

## GRID

This command allows the user to turn on or off the display of a latitude/longitude grid. At zoomed-out levels the grid lines are drawn at every ten degrees of lat/long; while at zoomed-in levels the grid lines are drawn at every five degrees of latitude and longitude.

Format
    **grid 'action'**

Example
    **grid ON**

RLM 00095

 **R L M**
SOFTWARE

## ROUTE

This command allows the user to specify airway route structures to be displayed. *FlightView* has data for high and low altitude CONUS; Bahaman; Hawaiian; Alaskan; Puerto Rican and Oceanic routes. The user specifies which type of route, and the route name to be displayed. At zoomed-out levels, *FlightView* displays routes as connected lines, however at zoomed-in levels *FlightView* annotates the routes with their associated fixes.

Format

    **route 'route-type' 'route-name' 'action'**

Example

**route highconus j14 on**    Turns on jet route J14

**route oceanic * off**    Turns off all Oceanic routes

RLM 00096



## RADAR (RAD)

This command allows the user to specify the minimum radar value to display.

<u>Format</u>

**radar 'action' 'level'**

<u>Example</u>

**rad on 3**          Turn on level 3 radar.

**rad off 15**        Turn off level 15 radar.

RLM 00097



**R L M**
**SOFTWARE**

33

## RANGERINGS (RR)

This command allows the user to specify that range rings be drawn around a specified location. The number and spacing of the range-rings is controlled by the user.

Format

**rangerings 'location' num-rings' 'dist' 'action'**

Example

| | |
|---|---|
| **rr bos 3 25 on** | Turn on three rings around Boston Logan Intl. Airport with each ring 25 nautical miles apart |
| **rangerings * off** | Turn off all range rings. |

RLM 00098

**R L M**
SOFTWARE

## STATUS

This command pops up a box containing the current status of the *FlightView* system. **Status** displays a message box showing how current the flight data is.  The message box contains five fields of information,

- Current Time.

- Number of Flights - the number of flights currently airborne. Typically. there are 4000 to 6000 flights during the daytime.

- Last Flight Update Time is the time when the flight positions were calculated and the file was made.

- Last Flight Update Received Time - the time when your computer received the file from the *FlightView* server.

- Last Radar Time - the time stamp taken from the last radar file received from the weather server.


<u>Format</u>        **status**

RLM 00099



## SUAS

This command allows the user to specify Special Use Airspace boundaries to be displayed. The user may specify that all Special Use Airspace be shown or turned off or that all Special Use Airspace of a particular type be shown or turned off.

<u>Format</u>          **sua 'sua-type' *'action'**

<u>Example</u>

**sua \***          Turns off all Special Use Airspace boundaries.

**sua alert \* on**     Turns on alert Special Use Airspace

RLM 00100



## WORLD

This command allows the user to turn the background display of the world and state boundaries on or off.

<u>Format</u>        **world 'action'**

<u>Example</u>

**world on**        Turn the background world map on.

RLM 00101



## ZOOM

This command allows the user complete flexibility to center the display anywhere in the world, and at any scale. All information currently displayed by *FlightView*, including flights, background maps and airways are redrawn to reflect any changes in scaling or centering. Each flight is displayed as a dot at its current location. At appropriate zoomed-in levels the flights are displayed as 'aircraft icons' whose shape and orientation correspond to the heading of the flight.

Format      **zoom 'location' 'scale'**

Example

**zoom atl 750**      Zoom to Atlanta-Hatsfield Intl. Airport with a display scale of 750 nautical miles

RLM 00102

**R L M**
SOFTWARE

## Appendix A:  Air Traffic Control Center Identifiers

| | | |
|---|---|---|
| A | ZAB | Albuquerque, New Mexico |
| B | ZBW | Boston, Massachusetts |
| C | ZOB | Oberlin, Ohio (Cleveland) |
| D | ZDV | Denver, Colorado |
| E | ZAN | Anchorage, Alaska |
| F | ZFW | Dallas/Fort Worth, Texas |
| G | ZAU | Aurora, Illinois (Chicago) |
| H | ZHU | Houston, Texas |
| I | ZID | Indianapolis, Indiana |
| J | ZJX | Jacksonville, Florida |
| K | ZKC | Kansas City, Missouri |
| L | ZLA | Los Angeles, California |
| M | ZME | Memphis, Tennessee |
| N | ZNY | New York, New York |
| O | ZOA | Oakland, California |
| P | ZMP | Minneapolis, Minnesota |
| Q | ZHN | Honolulu, Hawaii |
| R | ZMA | Miami, Florida |
| S | ZSE | Seattle, Washington |
| T | ZTL | Atlanta, Georgia |
| U | ZLC | Salt Lake City, Utah |
| V | ZLB | American Samoa |
| W | ZDC | Washington, District of Columbia |
| X | TSC | Cambridge, Massachusetts |
| Y | ZSU | San Juan, Puerto Rico |

RLM 00103

# Appendix B: *FlightView* Display Colors

AQUAMARINE
BLACK
BLUE
BLUEVIOLET
BROWN
CADETBLUE
CORAL
CORNFLOWERBLUE
CYAN
DARKGREEN
DARKOLIVEGREEN
DARKORCHID
DARKSLATEBLUE
DARKSLATEGRAY
DARKTURQUOISE
DIMGRAY
FIREBRICK
FORESTGREEN
GOLD
GOLDENROD
GRAY
GREEN
GREENYELLOW
INDIANRED
KHAKI
LIGHTBLUE
LIGHTGRAY
LIGHTSTEELBLUE
LIMEGREEN
MAGENTA
MAROON
MEDIUMAQUAMARINE
MEDIUMBLUE
MEDIUMFORESTGREEN

MEDIUMGOLDENROD
MEDIUMORCHID
MEDIUMSLATEBLUE
MEDIUMSEAGREEEN
MEDIUMSPRINGGREEN
MEDIUMTURQUOISE
MEDIUMVIOLETRED
MIDNIGHTBLUE
NAVYBLUE
ORANGE
ORANGERED
ORCHID
PALEGREEN
PINK
PLUM
RED
SALMON
SANDYBROWN
SEAGREEN
SIENNA
SKYBLUE
SLATEBLUE
SPRINGGREEN
STEELBLUE
TAN
THISTLE
TURQUOISE
VIOLET
VIOLETRED
WHEAT
WHITE
YELLOW
YELLOWGREEN

RLM 00104



## INDEX

action............................................19
aircraft identification ....................19
aircraft type .................................19
airline code..................................19
airport .....................................19, 21
Airports Menu ..............................14
airway..........................................20
Alaskan jet routes........................20
Alaskan victor routes....................20
All
    Airports Menu ..........................14
    Flights Menu ............................11
artcc.......................................19, 22
ARTCCs
    Overlays Menu ..........................15
Bahaman routes ...........................20
batch......................................19, 24
BATCH command..........................24
Boundary
    Overlays Menu..........................15
color ..........................................19
    BACKGROUND ........................23
    FlightView Display Colors .........40
Command Menu ...........................16
Create a Filter
    Flights Menu ............................11
data block....................................19
Datablock
    "Create a Filter" ......................12
Delete a Filter
    Flights Menu ............................12
File Menu ....................................10
FILTER
    CREATE .................................25
    DELETE..................................28
FIND............................................29
fixes............................................32
FLIGHTS .....................................30
Flights Menu................................11
FlightView data feed......................1
FlightView workstation...................2

Grid...............................................31
    Overlays Menu ......................... 15
Hawaiian routes ........................... 20
highlight ....................................... 19
Jet Routes.................................... 20
    Overlays Menu ......................... 15
List
    Flights Menu............................. 13
Location
    Zoom Menu .............................. 14
navigational aids........................... 19
Oceanic routes............................. 20
Overlays Menu.............................. 15
Puerto Rican routes ..................... 20
RADAR (RAD) ............................. 33
Range Rings ................................ 19
    Overlays Menu ......................... 15
RANGERINGS (RR) ..................... 34
Reset
    View Menu................................ 10
ROUTE ........................................ 32
route-name .................................. 20
scale ........................................... 20
Selected Airports
    Airport Menu ............................ 15
Selected Jet Routes
    Overlays Menu ......................... 15
Selected Victor Routes
    Overlays Menu ......................... 15
special use airspace area............. 20
Status........................................... 35
    View Menu................................ 10
Status Bar
    View Menu................................ 11
SUAs............................................ 36
    Overlays Menu ......................... 15
sua-type ...................................... 20
USA
    Zoom Menu .............................. 14
Victor Routes ............................... 20
    Overlays Menu ......................... 15

View Menu ..................................... 10
Weather Menu ............................. 15
WORLD ....................................... 37

ZOOM .......................................... 38
Zoom Menu ................................. 14

RLM 00106





# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**

## DECLARATION OF MARTIN KELLY JONES

I, Martin Kelly Jones, declare under penalty of perjury as follows:

1.    My name is Martin Kelly Jones. I am the President of Arrival Star, Inc. I have an engineering background and have worked extensively (over seventeen years) on the development of vehicle notification technologies. I am also the inventor of the fourteen Arrival Star patents (as well as eleven additional patents pending), which deal with a broad array of technologies in the general fields of travel, package and vehicle status messaging. These patents include the '936 patent which is the subject matter of this declaration. I am over the age of twenty one and competent to testify in this matter.

2.    I have reviewed the contents of the Declaration of Lorraine Flynn and agree with her opinion that the priority date of claims 1 and 27 of the '936 patent is at least as early as March 7, 1997, per the contents of provisional patent application no. 60/039,925.

3.    I, like others of ordinary skill in this field of technology, am and have been generally aware of computer hardware and, from reading the '936 patent, would be aware how to create a system using known hardware with

software the routines of which are described in the '936 patent so that the system performs the functions in the manner described by the claims of the '936 patent.

4. I am the inventor of the '936 patent, and I conceived of the inventions of claims 1 and 27 of the '936 patent no later than the first quarter of 1994. From that point in time until March 7, 1997 (when the provisional patent application was filed), I was actively working on creating and testing the inventions.

5. My understanding from my reading of the summary judgment materials filed on behalf of Sabre, Inc. and American Express, including the Declaration of James Steinberg and attachments, as well as my reading of Mr. Steinberg's deposition transcript (pp. 34-93), is that on April 26, 1993, Mr. Steinberg spoke for 30-45 minutes (including time allotted for audience questions) at the RAA Spring meeting, and that he showed about twenty slides describing the benefit and certain aspects of the operation of the Flightview system, as well as color slides of the screens a user would see when using the system to track a flight. The slides were shown to the attendees of the meeting (roughly twenty airline executives).

6.    The presentation did not consist of a description of each and every claim limitation of claims 1 and 27 of the '936 patent, as shown by the claim chart I prepared and attach as Exhibit A hereto, showing the deficiencies in the presentation relating to claims 1 and 27 of the '936 patent.

7.    At the 1993 RAA meeting, Mr. Steinberg showed representative screens illustrating how Flightview was designed to work at that point in time.    The screens show an initial, "Main Menu" that permits a user to select a "Background Map."    Specific airline data is shown as being textual data presented in a text-block format.    However, neither the slides nor the screen he showed would have enabled one of ordinary skill in the art to practice claims 1 or 27 of the '936 patent. This is because of three interrelated factors: (1) Mr. Steinberg admits he did not provide any details as to the hardware configuration of Flightview; (2) Mr. Steinberg admits he did not provide any flow diagrams or architectural diagrams showing the process implemented by Flightview software; and (3) the slides themselves combined with Mr. Steinberg's recollection and in some cases supposition about what he "would have" told the audience is simply not detailed enough to teach the limitations of claim 1 or claim 27.

8.    In Flightview as it was used prior to 1997, the software command to draw a map resided on the computer being used by the airline dispatcher and was not a

3

command sent from RLM's computers in Massachusetts.  Mr .Steinberg testified

to this at pp. 84-85 of his deposition, and it is confirmed by a reading of Steinberg

Dep., Ex. 7 (pp. 3-4) ("bwi1 runs the Flightview touch screen programs").

9.  According to the materials I have reviewed, including the summary judgment

materials and the depositions of Lorraine Flynn and James Steinberg. the RLM

proposal to America West dated 1995 was a proposal for essentially the same

system that Mr. Steinberg described in 1993.  As such, it did not include a system

comprising a storage mechanism, a data manager, communications devices, a

mapping system, where all components are configured to work in the manner set

forth in claims 1 or 27 of the '936 patent.  This is detailed in the chart I prepared

that is attached hereto as Exhibit A, describing deficiencies in the various prior art

references relied upon by Sabre and American Express.

10.  Specifically, the functionality of Flightview described at page 6 of Exhibit 14 to

the Flynn Deposition (the America West proposal) contains only the following

capabilities relating to maps and mapping data: "configuration files for tailoring

display at startup" and "user tailorable display of *background* maps."  Separately,

the functionality of Flightview regarding the retrieval and display of flight

information is only described as follows:  "advanced flight filtering and

highlighting capabilities" (referring to searching for a flight), "*datablock* display

4

of complete flight information," and *textual* display of flight information." Thus, the message about flight status is textual not graphical. It includes no mapping data defining a geographical map. No map is displayed as a travel message to a user. And the particular map is a function of user selection of background on the screen, divorced from the contents of the message (the "datablock" text) about the flight status.

11. The description of Flightview functionality contained at page 6 of Flynn Deposition Exhibit 14 illustrates that certain elements of claims 1 and 27 of the '936 patent art missing. For example, regarding claim 1 of the '936 patent, Exhibit 14 shows that Flightview as it existed prior to 1997 lacked "a mapping system configured to receive said travel data retrieved by said data manager and to generate mapping data based on said travel data retrieved by said data manager, said mapping data defining a geographical map, said geographical map indicating said proximity of said one vehicle from said particular location, wherein said mapping data is included in said message."

12. Exhibit 14, page 6 also describes that the operation of Flightview prior to 1997 did not perform the steps of claim 27: "generating mapping data based on said travel data retrieved in said retrieving step, said mapping data defining a geographical map that indicates said proximity of said one vehicle from said

particular location; and <u>including said mapping data in said message</u>."

13. Exhibit 14's description of Flightview lacks an enabling description of hardware and software configuration. The details of the proposal regarding functions and features of Flightview are too sparse to facilitate software design and development. No one of ordinary skill in the art reading the 1995 RLM proposal to America West would read the proposal and then be able to construct a system comprising all elements of claims 1 and/or 27 of the '936 patent.

14. From my review of the literature and testimony regarding Flightview as it existed prior to 1997, it is clear that the messages on flight status were sent by Flightview prior to March 7, 1996 in a *datablock* format, which format did not include any mapping data. Thus, no mapping data was actually sent as part of the message to the user about a particular flight.

15. The user in Flightview (as it existed prior to 1997) would establish the background map on the screen before the request for information on a particular flight would be sent. Once the system received a request to provide information on a particular flight, the information was sent in "datablock" form, where it was displayed on whatever the last map was that the user had selected. Prior to 1997,

the selection of a background map was independent of the flight status information on a particular aircraft. Mr. Steinberg so testified in his deposition, pp. 133-136, 142-146, 148. Accordingly, there was no generation of "mapping data based on said travel data retrieved by said data manager" (claim 1), and no "generating mapping data based on said travel data retrieved in said retrieving step."

16. From my review of the technical literature produced by RLM Software for Flightview as it existed in 1997 and before, and from my review of the deposition testimony of RLM Software representatives Ms. Flynn and Mr. Steinberg, and as a person of ordinary skill in this field of technology, it is clear to me that FVTK Mapping as it existed prior to 1997 merely permitted the user to establish a background map, which would not change depending upon the flight status information, and which was selected prior to any request to display information on a particular flight. Among other things, Mr. Steinberg testified to this during his deposition, pp. 133-136, 142-146, and 148. The request for flight information then resulted in the transmission of a "datablock" consisting of non-mapping, textual data regarding a flight. The datablock would then be transposed on top of the user's previously-selected background map. This is described in the user's

guide (Exhibit 20 to Flynn Dep.) and depicted on the screen shots Mr. Steinberg showed at the 1993 RAA meeting. The map would not change based upon the particular flight status information being reported. Again, Mr. Steinberg testified to this at pp.133-136, 142-146, and 148 of his deposition.

17. A detailed review of Exhibit 20, the Flightview User Guide dated 1997, reveals that Flightview as it existed in 1997 and all times before lacked the ability to generate mapping data based on travel data retrieved by Flightview from the Flightview database. Moreover, the guide does not show said mapping data defining a geographical map. Moreover, the user guide does not show said mapping data included in any flight status message.

18. A detailed review of Exhibit 20, the Flightview User Guide dated 1997, reveals that Flightview as it existed in 1997 and all times before did not perform the step of generating mapping data based on travel data retrieved by Flightview from its database, where the mapping data defines a geographical map of any kind. Moreover, the guide confirms that no mapping data is included in any flight status message sent by Flightview.

19. Exhibit 9 is the only diagram of Flightview as it existed prior to 1997 that

was not created after-the-fact in this litigation. I reviewed it very carefully. The only reference to any mapping capabilities in Exhibit 9 is to the "*Background* Maps Module." This reference actually supports the notion that the mapping capabilities of Flightview between 1989 and 1997 consisted exclusively in the provision of user-configurable background maps. Separately, as already described, a user request for flight information would result in a message in textual, datablock format would be overlaid on top of the pre-existing *background* map.

20. I have attached hereto as Exhibit B a simple flow chart showing one of the basic differences between the claims 1 and 27 as described in the '936 patent, and the background mapping capabilities of Flightview.

21. All things considered, it is my opinion that Flightview as it existed prior to 1997 does not anticipate claim 1 or claim 27 of the '936 patent.


Martin Kelly Jones


Dated this _22_ day of September. 2003.



# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**

*Exhibit A to Declaration of Martin Kelly Jones*

| Claim Language | Deficiencies in AITCA Demonstration (Sept. 1990) | Deficiencies in Flightview® Brochure (Aug. 1990) | Deficiencies in Flightview® Data Sheet (Sept. 1990) | Deficiencies in RAA Presentation (1993) | Deficiencies In BWI Airport Storyboards (12/1/93 and 1994) | Deficiencies In AWA Proposal (Dec. 7, 1995) | Deficiencies in Trip.com MOU (March 5, 1996) |
|---|---|---|---|---|---|---|---|
| 1. *A system for monitoring travel of vehicles relative to particular location, comprising:* | RLM used canned data. See Flynn Declaration (Ex. K), ¶ 29.¹ There was not any actual monitoring of any aircraft.<br><br>In addition, the demonstration did not permit any actual use of the system by the public. This did not happen until after February of 1995. See Exhibit 17 (February 1995 fax draft press release edited by RLM) to Flynn Dec., p. 3 ("The [BWI Airport] exhibit is unique because *it is the first time this type of information will be on public display in an interactive format*").<br><br>RLM did not "run an operational system at | | There is no attempt to match up the data provided in the data sheet to Claim 1 on an element-by-element basis. The data is far too general and sketchy to be useful in that regard. | The RAA Presentation is Exhibit 2-3 to the Steinberg Dec. | This is the single page numbered "4c" on Exhibit 12 and the storyboards located at Exhibit 14 to the Flynn Dec. The BWI Airport was not "operational until June [of 1995]." Flynn Dec., Ex. 19, p.13. | This is Exhibit 19 to the Flynn Dec. | Exhibit 22 to the Flynn Agreement shows an experimental arrangement ("preliminary discussions about conducting two trials") whereby US West Interactive Services, Inc. (as "Developer") and RLM Software (as "Participant") are going to collaborate on Developer's "proposed Interactive Flynow Web Site ("Service"). The Service will enable |

¹ All Exhibit and Tab references are to the Summary Judgment Appendices filed by Sabre in Support of its two motions for summary judgment.

*Exhibit A to Dec. of Martin Kelly Jones*

| | | | | | | |
|---|---|---|---|---|---|---|
| consumers to obtain travel information, purchase travel related products, and conduct other travel related transactions using Developer's Web Site Server and Participant's data centers." | | | | | | our Boston facility [until] November 1994." Ex. 19 to Flynn Dec., p. 10. |
| The first anticipated trial "would be a technical trial" and the second trial a "commercial proof of concept marketing trial." The trials were tentatively schedule "from April 30, 1996" through "December 31, 1996." | | | | | | |

2

*Exhibit A to Dec. of Martin Kelly Jones*

| (A) a storage mechanism configured to store travel data transmitted from a communications device associated with a vehicle being monitored by said system, said vehicle located at a first remote location; | Ms. Lynn admits that at the time of the demonstration there was not a storage device configured to store travel data transmitted from an airplane transponder associated with aircraft actually at a first remote location and being monitored by the system. Rather, she admits RLM used canned data. See Flynn Declaration (Tab K), ¶ 29.<br><br>There is no mention in the document of storing travel data transmitted from an airplane transponder associated with aircraft actually at a first remote location. | Ms. Lynn admits that at the time of the demonstration in 1990 there was not a storage device configured to store travel data transmitted from an airplane transponder associated with aircraft actually at a first remote location and being monitored by the system. Rather, she admits RLM used canned data. See Flynn Declaration (Tab K), ¶ 29. | The "Archive/Replay" module "provides on-line storage and retrieval of all flight-related data," but does not mention storing travel data transmitted from an airplane transponder associated with aircraft actually at a first remote location. | At Exhibit 2 to the Steinberg Dec., there is a slide of the presentation entitled "ASD *DATA Potential* Uses" (as opposed to actual uses), suggests that as of 1993, there was no live data feed from the FAA to Volpe Center that was being passed on to FlightView.<br><br>There is another slide entitled "FLIGHTVIEW" that states "integrated access to required data."<br><br>There is another slide entitled "FLIGHTVIEW MODULES Archive/Replay" that states "provide on-line storage and retrieval of data."<br><br>This is similar to the quote form earlier documents that this module | The Flight Database is described in detail on page 5 of Ex. 19.<br><br>There is no teaching or suggestion that the database is configured to store travel data "transmitted from a communications device associated with a vehicle." | There is no mention of any storage mechanism on the storyboards. | Exhibit 22 merely refers to RLM's "data centers."<br><br>There is no teaching or suggestion that the database is configured to store travel data "transmitted from a communications device associated with a vehicle." |

3

*Exhibit A to Dec. of Martin Kelly Jones*

| (B) a data manager configured to receive a request from a user and to retrieve travel data associated with said vehicle from said storage mechanism in response to said request; | The only alleged corroborative evidence is the product brochure that is Ex. 8 to the Lynn Dec. (Ex. K). See Flynn Dec., ¶¶ 31 and 32.<br><br>In the claim chart on page 18 of the Lynn Dec., she quotes from page 2 of the brochure (Ex. 8). The quotes appear in a section marked "System Integration." The quotes are not consecutively listed or otherwise suggested to be complimentary. | In the claim chart on page 18 of the Lynn Dec., she quotes from page 2 of the brochure (Ex. 8). The quotes appear in a section marked "System Integration." The second is to suggest the request of data. However, they are not ordered in such a way as to suggest the configuration of the | There is no mention of request and retrieval functions being performed with a data manager that, as we see below, ultimately retrieves data resulting in a map-message being sent.<br><br>The only reference to a user request is not in the central flight tracking module. Instead, it is in the "Flight Talk" module, which "provides public telephone | "provides on-line storage and retrieval of all flight-related data."<br><br>There is no mention of storing travel data transmitted from an airplane transponder associated with aircraft actually at a first remote location. | There is no slide that describes a data manager.<br><br>There is no slide that describes the configuration of Flightview software to retrieve flight data from a storage mechanism in response to a user request.<br><br>Rather, the slide entitled "FLIGHTVIEW TOOLKIT MODULES" describes | There is a request-retrieve functionality described in the touch-screen capability, but nothing to indicate that the travel data is coming from any storage mechanism. As shown above, no storage mechanism is described. | There is no mention of a data manager.<br><br>There is no mention of request and retrieval functions being performed with a data manager that, as we see below, ultimately retrieves data resulting in a map-message being sent. | There is no mention of a data manager.<br><br>There is no mention of request and retrieval functions being performed with a data manager that, as we see below, ultimately retrieves data resulting in a map-message being sent. |

4

*Exhibit A to Dec. of Martin Kelly Jones*

| | | |
|---|---|---|
| One quote is to suggest retrieval of data. The second is to suggest the request of data. However, they are not ordered in such a way as to suggest the configuration of the data manager as suggested by the claim. For "retrieval", Ms. Flynn relies upon the quote that there is "retrieval of *all* flight-related data received by the *FlightView* system." This does not teach a data manager configured to receive a request for a flight and to retrieve the information regarding that flight. Rather, this suggests that *all* flight data is being retrieved, without mention of a user request. Exhibit 10 moves even farther away from the claim language because it shows that this marketing language is actually associated | data manager as suggested by the claim. For "retrieval", Ms. Flynn relies upon the quote that there is "retrieval of *all* flight-related data received by the *FlightView* system." This does not teach a data manager configured to receive a request for a flight and to retrieve the information regarding that flight. Rather, this suggests that *all* flight data is being retrieved, without mention of a user request. Exhibit 10 moves even farther away from the claim language because it shows that this marketing language is actually associated with the "Archive/Replay" module of Flightview, which is utterly unrelated to a system for actually monitoring and reporting on aircraft. | access to arrival information." Obviously, the map-message cannot be delivered through a telephone call.<br><br>"Archive/Replay" module "provides on-line storage and retrieval of all flight-related data." This does not teach a data manager configured to receive a request for a flight and to retrieve the information regarding that flight. Rather, this suggests that *all* flight data is being retrieved, without mention of a user request. | "highlighting of flights of interest." This is far too general and vague to teach the claim limitation. |

*Exhibit A to Dec. of Martin Kelly Jones*

| | |
|---|---|
| with the "Archive/Replay" module of Flightview, which is utterly unrelated to a system for actually monitoring and reporting on aircraft.

Likewise, there is no teaching of the configuration of data manager to "receive a request from a user *and to retrieve travel data...in response to said request.*" To the contrary, her quote reads "*Permitting airline applications to request flight data.*" This only suggests that third party airlines can develop (configure) software for requesting flight data, and refutes the notion that the support for requests in part and parcel of *Flightview*. | Likewise, there is no teaching of the configuration of data manager to "receive a request from a user *and to retrieve travel data...in response to said request.*" To the contrary, her quote reads "*Permitting airline applications to request flight data.*" This only suggests that third party airlines can develop (configure) software for requesting flight data, and refutes the notion that the support for requests in part and parcel of *Flightview*. |

*Exhibit A to Dec. of Martin Kelly Jones*

| (C) a first communications device configured to transmit a message to a second communications device located at a second remote location, said message based on said travel data retrieved by said data manager and indicative of a proximity of said vehicle from a particular location; and | | | | | | | |
|---|---|---|---|---|---|---|---|
| The only alleged corroborative evidence is the product brochure that is Ex. 8 to the Flynn Dec. (Ex. K). See Flynn Dec., ¶¶ 31 and 32.<br><br>The reference to "Electronic mail" does not necessitate or even suggest a second remote location, and it does not necessitate or suggest a "message based on said travel data retrieved by said data manager and indicative of a proximity of said vehicle from a particular location."<br><br>Likewise, the reference to "transmitting FAA data to your computer" does not necessitate or even suggest a second remote location, and it does not necessitate or suggest a "message based on said travel | The reference to "Electronic mail" does not necessitate or even suggest a second remote location, and it does not necessitate or suggest a "message based on said travel data retrieved by said data manager and indicative of a proximity of said vehicle from a particular location."<br><br>Likewise, the reference to "transmitting FAA data to your computer" does not necessitate or even suggest a second remote location, and it does not necessitate or suggest a "message based on said travel data retrieved by said data manager and indicative of a proximity of said vehicle from a particular location."<br><br>Finally, the separate reference to | Exhibit 10 to the Flynn Dec. does not discuss a first communication device or a second communication device the context of configuring the first device to transmit messages to the second communication device, at a remote location. Moreover, the notion of the transmission of a message based on data retrieved by a data manager is not at all discussed in the exhibit. Lastly, there is no mention of a message indicating the proximity of a vehicle from a particular location. | Exhibit 3 to the Steinberg Dec. does not discuss a first communication device or a second communication device the context of configuring the first device to transmit messages to the second communication device, at a remote location. Moreover, the notion of the transmission of a message based on data retrieved by a data manager is not at all discussed in the exhibit. Lastly, there is no mention of a message indicating the proximity of a vehicle from a particular location. | The storyboards do not discuss any message indicative of a proximity of said vehicle from a particular location that is either (a) passed from a first communication device to a second communication device; or (b) based on travel data retrieved by a data manager. | The proposal does not discuss any message indicative of a proximity of said vehicle from a particular location that is either (a) passed from a first communication device to a second communication device; or (b) based on travel data retrieved by a data manager. | The MOU does not discuss any message indicative of a proximity of said vehicle from a particular location that is either (a) passed from a first communicatio n device to a second communicatio n device; or (b) based on travel data retrieved by a data manager. |

*Exhibit A to Dec. of Martin Kelly Jones*

| | |
|---|---|
| data retrieved by said data manager and indicative of a proximity of said vehicle from a particular location."

Finally, the separate reference to "electronically inform flight scheduling and customer service of any changes in *flight plans*" does not necessitate or even suggest a second remote location, and it does not necessitate or suggest a "message based on said travel data retrieved by said data manager and indicative of a proximity of said vehicle from a particular location." There is nothing from which a reader of ordinary skill in the art would be able to determine that the data representing the change in "flight plans" is based on travel data retrieved in response to a specific | "electronically inform flight scheduling and customer service of any changes in *flight plans*" does not necessitate or even suggest a second remote location, and it does not necessitate or suggest a "message based on said travel data retrieved by said data manager and indicative of a proximity of said vehicle from a particular location." There is nothing from which a reader of ordinary skill in the art would be able to determine that the data representing the change in "flight plans" is based on travel data retrieved in response to a specific user request, as opposed to an automated alert. For example, Exhibit 8 to the Flynn Dec. describing "Flight Planning" describes "reporting alert conditions *based on* |

*Exhibit A to Dec. of Martin Kelly Jones*

| | |
|---|---|
| user request, as opposed to an automated alert. For example, Exhibit 8 to the Flynn Dec. describing "Flight Planning" describes "reporting alert conditions *based on weather and airport congestion*," not based upon user requests and responsive data retrieval. | *weather and airport congestion*," not based upon user requests and responsive data retrieval. |

*Exhibit A to Dec. of Martin Kelly Jones*

| | | | | | | |
|---|---|---|---|---|---|---|
| **(D) a mapping system configured to receive said travel data retrieved by said data manager and to generate mapping data based on said travel data retrieved by said data manager, said mapping data defining a geographical map, said geographical map indicating said proximity of said one vehicle from said particular location, wherein said mapping data is included in said message.** | The only alleged corroborative evidence is the product brochure that is Ex. 8 to the Lynn Dec. (Ex. K). See Flynn Dec., ¶ 31 and 32.<br><br>"Graphic display of maps, airway route structures... and flight routes" does not suggest much less necessitate a mapping system that does any of the following: (1) receives data *retrieved* by the data manager in response to the user request as illustrated above; (2) generates mapping data *based on the data retrieved* by the data manager in response to the user request as illustrated above; (3) provides mapping data as the whole or part of the message described above that passes between first and second communication | "Graphic display of maps, airway route structures... and flight routes" does not suggest much less necessitate a mapping system that does any of the following: (1) receives data *retrieved* by the data manager in response to the user request as illustrated above; (2) generates mapping data *based on the data retrieved* by the data manager in response to the user request as illustrated above; (3) provides mapping data as the whole or part of the message described above that passes between first and second communication devices.<br><br>Exhibit 10 to the Flynn Declaration | The slide entitled "FLIGHTVIEW TOOLKIT MODULES" describes the mere "display of maps, airways, runways flight plans." This does not suggest much less necessitate a mapping system that does any of the following: (1) receives data *retrieved* by the data manager in response to the user request as illustrated above; (2) generates mapping data *based on the data* *retrieved* by the data manager in response to the user request as illustrated above; (3) provides mapping data as the whole or part of the message described above that passes between first and second | According to the storyboard at Exhibit 12 (p. 4c), the map is background, such that it pre-exists the output of the system in response to the user's touch-screen command. The "Attract screen is the live image of the U.S." Visitors can "zoom into the BWI region to touch one of the planes to get more specific flight information," but the information is shown on the pre-existent map background. There is no mapping system that is based upon the travel data received. In fact, only after the BWI area map is set does a "visitor touch[] a plane, [causing] the monitor to display important information..."<br><br>The foregoing is confirmed by the storyboards at Exhibit | According to Ex. 19 to the Flynn Dec., p. 6, the functionality offered includes "*datablock display* of flight information" and "*textual display* of flight information."<br><br>There is no mapping system that is based upon the travel data received.<br><br>The messages about flight status delivered in "datablock" and "textual" display, rather than including a graphical map as part or all of the message, confirm that the messages are delivered onto the map background, which is separately and independently selected in advance. This is not what the mapping system of Claim 1 contemplates. Claim 1 contemplates the delivery of mapping data as part of the message on | The MOU does not suggest much less necessitate a mapping system that does any of the following: (1) receives data *retrieved* by the data manager in response to the user request as illustrated above; (2) generates mapping data *based on the data retrieved* by the data manager in response to the user request as illustrated above; (3) provides mapping data as the whole or part of the message described |

10

*Exhibit A to Dec. of Martin Kelly Jones*

| | | | | | above that passes between first and second communication devices. |
|---|---|---|---|---|---|
| devices. Rather, from my reading of Exhibit 8 to the Flynn Dec., it appears that mapping data is pre-existent on the user display of Flightview to any user request, and is not retrieved and included as part of a message to a user in response to a user request. This is illustrated by the picture on page 1 of Exhibit 8 showing a map and numerous flights, but not showing a user interface screen for requesting on a particular flight, not showing the retrieval of the travel data in response to the request, and not showing the generation of a map as part of a responsive message to the end user. | as part of a message to a user in response to a user request. This is illustrated by the picture on page 1 of Exhibit 8 showing a map and numerous flights, but not showing a user interface screen for requesting on a particular flight, not showing the retrieval of the travel data in response to the request, and not showing the generation of a map as part of a responsive message to the end user. | states that Advanced Flight Tracking Module "zooms to desired locations." Thus, it appears that there is a pre-existent map display with "zoom" capabilities, rather than a map-message that is retrieved by a data manager in response to a user request and then sent to the user at a remote location from the data manager. | communication devices.<br><br>Furthermore, the maps that are attached as Exhibit 3 to the Steinberg Dec. are described as "Background Maps" and selected accordingly. They are not illustrated as being content-driven based upon travel data retrieved in response to a user request, nor are they show as being included in a message sent to the user that is based upon the user request for travel data. | 14, showing the map background pre-existent to any messaging that is based on any flight data retrieved in response to any user request. In fact, one of the storyboards confirms that the Arriving and Departing Flights button only becomes active after the state map background has been selected. The remaining storyboards showing messages about flight status confirm that the messages are delivered onto the map background. This is not what the mapping system of Claim 1 contemplates. Claim 1 contemplates the delivery of mapping data as part of the message on flight status.<br><br>This does not suggest much less necessitate a mapping system that does any of the | flight status.<br><br>The proposal to AWA does not suggest much less necessitate a mapping system that does any of the following: (1) receives data *retrieved* by the data manager in response to the user request as illustrated above; (2) generates mapping data *based on the data retrieved* by the data manager in response to the user request as illustrated above; (3) provides mapping data as the whole or part of the message described above that passes between first and second communication devices. |

11

*Exhibit A to Dec. of Martin Kelly Jones*

following: (1) receives data *retrieved* by the data manager in response to the user request as illustrated above; (2) generates mapping data *based on the data retrieved* by the data manager in response to the user request as illustrated above; (3) provides mapping data as the whole or part of the message described above that passes between first and second communication devices.

12

*Exhibit A to Dec. of Martin Kelly Jones*

| | | | | | |
|---|---|---|---|---|---|
| 27. A method for monitoring travel of vehicles and for reporting a status of vehicles relative to particular locations, comprising the steps of: | | | | | |
| **receiving travel data transmitted from vehicle at a first remote location;** | See 1(A) above. | See 1(A) above. | See 1(A) above. | | See 1(A) above. | See 1(A) above. |
| **storing said travel data;** | | | | See 1(A) above. | | |
| **receiving a request from a user located at a second remote location;** | See 1(C) above. | See 1(C) above. | See 1(C) above. | | See 1(C) above. | See 1(C) above. |
| **retrieving travel data** | See 1(B) and (C) above. | See 1(B) and 1(C) above. | See 1(B) and 1(C) above. | | See 1(B) and 1(C) above. | See 1(B) and 1(C) above. |

13

*Exhibit A to Dec. of Martin Kelly Jones*

| | | | | | |
|---|---|---|---|---|---|
| associated with said vehicle in response to said request; | | | | | |
| **forming a message corresponding with said travel data retrieved in said retrieving step and indicating, via said message, a proximity of said vehicle from a particular location;** | See 1(B) and 1(C) above. | See 1(B) and 1(C) above. | See 1(B) and 1(C) above. | See 1(B) and 1(C) above. | See 1(B) and 1(C) above. |
| **transmitting said message to a communications device associated with said user;** | See 1(B) and 1(C) above. | See 1(B) and 1(C) above. | See 1(B) and 1(C) above. | See 1(C) above. | See 1(B) and 1(C) above. |
| **generating mapping data based on said travel data retrieved in said** | See 1(D) above. | See 1(D) above. | See 1(D) above. | See 1(D) above. | See 1(D) above. |

14

*Exhibit A to Dec. of Martin Kelly Jones*

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| retrieving step, said mapping data defining a geographical map that indicates said proximity of said one vehicle from said particular location; and | See 1(D) above. | See 1(D) above. | See 1(D) above. | See 1(D) above. | See 1(D) above. | See 1(D) above. | See 1(D) above. | See 1(D) above. |
| including said mapping data in said message. | See 1(D) above. | See 1(D) above. | See 1(D) above. | See 1(D) above. | See 1(D) above. | See 1(D) above. | See 1(D) above. | See 1(D) above. |

15



# EXHIBIT / ATTACHMENT

## EX.B

**(To be scanned in place of tab)**

1~

# RLM AT TIME OF INVENTION



RLM OPERATING PROPRIETARY SOFTWARE WITH MAPS & WAITING FOR VEHICLE STATUS UPDATES

VEHICLE LOCATION UPDATED

NOT UPDATED BY MESSAGE

2~

# CLAIMED WITHIN THE INVENTION



PC WITH INTERNET ACCESS.

STATUS MESSAGE WITH MAP TO COMMUNICATION DEVICE

US PATENT 6,278,936



# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**

## DECLARATION OF DAVID HICKS

I, David Hicks, declare under penalty of perjury as follows:

1.  My name is David Hicks.  I have an engineering background and have special expertise in the development of vehicle notification technologies by virtue of my work in this field.   Among other things, I am the co-inventor of U.S. Patent No. 6,363,254, which is entitled "System and method for enciphering and communicating vehicle tracking information."  I am over the age of twenty one and competent to testify in this matter.

2.  I have reviewed the contents of the Declaration of Lorraine Flynn, and all of the exhibits attached thereto, the Declaration of James Steinberg, and all of the exhibits attached thereto and I have also reviewed U.S. Patent No. 6,278,936 (the '936 patent).

3.  I, like others of ordinary skill in this field of technology, am and have been generally aware of computer hardware and, from reading the '936 patent, would be aware how to create a system using known hardware with software the routines of which are described in the '936 patent so that the system performs the functions in the manner described by the claims of the '936 patent.

4.    The claims of the '936 patent at issue (1 and 27) relate to the method and system where a user (from a user device at a remote location) requests information about the status of a particular vehicle to a home computer. In response, the home computer gathers travel data relating to the vehicle. Based on the travel data, a message is prepared by the home computer to be sent to the user communication device at the user's remote location. In this case, as shown in more detail below, the home computer must include a mapping system to generate a geographic map based upon the travel data retrieved about a vehicle, where the map is included as part of the message that the home computer sends to the remote user communication device.

5.    Claim 1 of the '936 patent, requires "a mapping system configured to receive said travel data retrieved by said data manager and to generate mapping data based on said travel data retrieved by said data manager, said mapping data defining a geographical map, said geographical map indicating said proximity of said one vehicle from said particular location, wherein said mapping data is included in said message."

6.    The <u>mapping system</u> of claim 1 thus must have at least (1) software that

receives travel data associated with a vehicle; (2) software to create data that forms a geographic map based on said travel data; and (3) the ability to provide the map back to the messaging software component so that the map is included as part of the message that the home computer sends to the remote user communication device.

7.   Claim 27 requires the performance of the following steps: "generating mapping data based on said travel data retrieved in said retrieving step, said mapping data defining a geographical map that indicates said proximity of said one vehicle from said particular location; and including said mapping data in said message."

8.   The steps of claim 27 thus must include at least (1) creating data that forms a geographic map based on travel data retrieved in response; and (2) including the map as part of the message that the home computer sends to the remote user communication device.

9.   I have reviewed the summary judgment materials relied upon by Sabre and American Express in support of their motions for summary judgment that claims 1 and 27 of the '936 patent are invalid because they are anticipated by Flightview as it existed prior to 1997. Based on my review of these materials, I disagree with

Sabre and American Express and am of the opinion that Flightview pre-1997 did not work in the manner described in claims 1 and 27. Here is why:

10. I conclude that Flightview pre-1997 did not include software to create data that forms a geographic map <u>based on said travel data</u>. This opinion is based upon the screen shots showing the manner in which the software operated pre-1997.   The screen shots were attached to the Declaration of James Steinberg, and show a user-defined background map which is selected from a dialogue box entitled "Main menu."  Only with the background map displayed does the user encounter a screen that allows him or her to request information about a particular flight.   A user who requests information receives a textual block of data about a particular flight that is displayed on top of the user-defined, pre-existing, pre-selected background map.   I reviewed the storyboards for Flightview's implementation at BWI airport, and they confirm that my understanding of Flightview's method of operation is correct.  I also reviewed the description of Flightview in the Flightview 1990 brochures and the 1995 proposal RLM Software made to America West and I am satisfied that Flightview pre-1997 operated exactly as

I have described, which means it did not create data that forms a geographic map based on the data that is retrieved by Flightview in response to a user request (the contents of said data being produced in the form of a block textual message about a particular flight, as is shown in the screen shots and the BWI storyboards).

11. I have reviewed the 1990 product brochures for Flightview that were attached to the Declaration of Lorraine Flynn. I do not believe anyone of ordinary skill in the field of vehicle monitoring and notification technology reading the brochures in question would understand them in such a way as to be able to build a system or method that would have a one-to-one correlation to the claim elements of claims 1 or 27 of the '936 patent. Part of this, as I explain above, has to do with the fact that Flightview does not have a mapping system that operates consistently with claims 1 and 27 of the '936 patent. Another part of this conclusion is derived from the fact that I do not believe these brochures contain enough technical content to allow a reader who is skilled in this technology to understand the author's conception. As a result, had I read these materials in 1990 with the skill and knowledge that I have right now, I do not believe I could create the system and method of claims 1

and 27 of the '936 patent without a great deal of guesswork and speculation (or doing the inventing for myself) about the hardware and software architecture and components, a process that would undoubtedly involve a great deal of experimentation. By contrast, the '936 patent would not require such speculation and guesswork on my part because the hardware components and software algorithms are described plainly and in considerably more detail than the brochures I reviewed.


David Hicks

This 17th day of September, 2003.



# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**

## DECLARATION OF MARK STUBBINS

I, Mark Stubbins, declare under penalty of perjury as follows:

1. My name is Mark Stubbins. I am over the age of twenty-one and am competent to testify in this matter. My professional background is in the field of interactive voice response.

2. In 1994, I was working to assist Kelly Jones with the implementation and testing of certain systems that he designed relating to the field of vehicle status notification.

3. I recall during the first quarter of 1994 Mr. Jones sharing with me his conception of a system for monitoring vehicles and notifying persons in response to their requests for status regarding a vehicle where the message regarding vehicle status would be displayed as a map on the screen of a user's communication device.

4. I have reviewed claims 1 and 27 of U.S. Patent No. 6,278,936 (the '936 patent), and those claims appear to match the conception Mr. Jones shared with me during early 1994.


Mark W. Stubbins

Dated this 17 day of September, 2003.